UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Charles R. Breyer, Judge

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, ) No. 3:23-MD-03084-CRB

WHB 823 v. Uber Techs, Inc., et al.
No. 3:24-cv-04900

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

WHB 823,

Plaintiff,

vs.

UBER TECHNOLOGIES, INC., et al.,

Defendants.

No. 3:25-cv-00737-CB

VOLUME I

Pages 1 - 253

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE CHARLES R. BREYER
UNITED STATES SENIOR DISTRICT COURT JUDGE
WEDNESDAY, APRIL 15, 2026 AT 9:15 A.M.

JILLIAN M. TURNER, RMR, CRR, CRC
Official U.S. District Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:

For Plaintiffs:

SARAH R. LONDON, ESQ.
ANDREW KAUFMAN, ESQ.
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, California 94108

JOHN T. BOUNDAS, ESQ.
SEJAL BRAHMBHATT, ESQ.
Williams Hart & Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017

WILLIAM L. SMITH, ESQ.
ALEXANDRA M. WALSH, ESQ.
Anapol Weiss
6060 Center Drive, 10th Floor
Los Angeles, California 900045

THIEN AN V. TRUONG, ESQ.
Simmons Hanly Conroy
112 Madison Avenue
New York, New York 10016

For Defendants:

ALLISON M. BROWN, ESQ.
LAURA VARTAIN HORN, ESQ.
CAROLINE POWER, ESQ.
GEOFFREY M. WYATT, ESQ.
Kirkland & Ellis LLP
2005 Market Street, Suite 1000
Philadelphia, Pennsylvania 19103

MICHAEL A. BROWN, ESQ.
Nelson Mullins
100 S. Charles Street, Suite 1600
Baltimore, Maryland 21201

# I N D E X


| | PAGE |
|---|---|
| OPENING STATEMENT BY PLAINTIFF | 26 |
| OPENING STATEMENT BY DEFENDANT | 37 |

PLAINTIFF'S WITNESSES

| | PAGE |
|---|---|
| BRIANNA MENSING | |
| Direct Examination by Mr. Boundas | 53 |
| Cross-Examination by Ms. Brown | 125 |
| Redirect Examination by Mr. Boundas | 195 |
| DAVID YANKOWSKI | |
| Direct Examination by Ms. Brahmbhatt | 202 |
| Cross-Examination by Mr. Brown | 212 |
| Redirect Examination by Ms. Brahmbhatt | 221 |
| Recross-Examination by Mr. Brown | 221 |
| MELISSA MENSING (Via Video Deposition) | 224 |

PLAINTIFF'S EXHIBITS

| NO. | RECEIVED |
|---|---|
| P-0498.00001 | 93 |
| P-04659 | 85 |
| P-4691 | 211 |
| P-04695 | 73 |
| P-04929 | 86 |
| P-04941 | 68 |
| P-04944 | 65 |
| P-04946 | 63 |
| P-04951 | 62 |
| P-04962.00005 | 90 |
| P-04962 | 91 |

PLAINTIFF'S EXHIBITS (Cont.)

| NO. | DESCRIPTION | ENTERED |
|---|---|---|
| P-04966 | | 64 |
| P-04969 | | 85 |
| P-04973 | | 68 |
| P-04977 | | 76 |
| P-04978 | | 108 |
| P-04979 | | 110 |

DEFENDANTS' EXHIBITS

| NO. | RECEIVED |
|---|---|
| D-4018 | 126 |
| D-4038 | 134 |
| D-4046 | 138 |
| D-4046 | 141 |
| D-4091 | 172 |
| D-4153 | 155 |
| D-4186 | 177 |

(Court called to order on Wednesday, April 15, 2026, commencing at 9:15 a.m.)

P R O C E E D I N G S

THE COURT: Good morning, everybody. Let the record reflect that the jury is not present but the parties are.

So I received last night briefs in connection with the driver's record dealing with a prior misdemeanor conviction, as well as an objection for it to calling a number of Uber witnesses dealing with the issue of -- well, practices and so forth.

Anyway, I think I need some discussion about that, as well as perhaps some misdemeanor conviction, but I would just advise the parties not to reference it in their opening statements this morning because they may very well be excluded, at least the conviction.

As to the Uber witnesses, I'm a little -- we can have a little bit of discussion now about it.

Given that, the issues that the jury has to decide, one is did the assault occur, and if so, were there damages, and if so, what were the damages. Those three issues I think are the ones that the jury has to concern itself.

As a matter of law, if an assault occurred, then Uber is liable for any damage that occurs as a result of what the driver -- if the jury finds that the driver did

something.

So I'm not sure what these witnesses are going to testify to in terms of Uber's practices and so forth. I have to be further educated on that. Though I can -- I can listen to argument about that after, if it's not going to be included, not necessary to include it in the opening, then I can deal with it during a recess.

Yes.

MS. TRUONG: Your Honor, good morning.

THE COURT: Good morning.

MS. TRUONG: An Truong for Plaintiffs.

I think for the most part it will not be included in the opening, with the exception of one portion, and that's the testimony of Roger Kaiser. The testimony that Uber's objecting to there is Mr. Kaiser's agreement in reviewing some Uber documents that traumatic incident, such as the one experienced by Plaintiff in this case, would have a profound impact on the victim.

And we think that that's directly relevant given that in this case Uber's argument is the nature of the sexual assault here could not have any impact on Ms. Mensing. So I think that testimony we think is directly relevant to rebut Uber's defense in this case.

MS. POWER: Your Honor, the question was --

THE COURT: You have to speak into the microphone.

MS. POWER: Thank you. Caroline Power for Defendants.

Your Honor, Plaintiff's designations of Uber company witnesses are simply an effort to inject Uber and to suggest that Uber's conduct and the way it conducted its business was somehow unsafe. The testimony that was referenced is preceded by designations about Mr. Kaiser's job and his job duties and that he is the head of safety.

So to suggest that the head of safety is going to be opining that sexual assault in general is profoundly damaging in this case. It simply doesn't fit.

THE COURT: Why doesn't it fit? Why isn't an admission by -- well, why isn't it an admission by the party that the scope of damages could be profound? They're not -- isn't that a classic admission, is what I'm saying?

It's the defendant. I mean, they couldn't bring in anybody else. I mean, they could if it's an expert and so forth saying those things. But absent that, it seems to me that that's certainly a classic admission.

MS. POWER: Well, I -- sorry.

THE COURT: I just have to wonder whether we need that in the opening statement.

MS. LONDON: Your Honor.

THE COURT: Go ahead.

MS. LONDON: May I respond to that?

Given that Uber's central argument here is that there can be no impact, we think it's incredibly relevant and important to --

THE COURT: Okay. I'm going to allow it.

MS. LONDON: Your Honor, if I can just respond to that.

THE COURT: Pardon?

MS. LONDON: It is not Uber's central argument that there can be no impact from the alleged incident.

THE COURT: No. Your central argument, as I understand it, is that the assault didn't occur. That's a central argument, but it's also an argument. But if it occurred, it was a minimal impact. And the fact that Uber -- this is -- I haven't seen the testimony, so I don't know.

But if the testimony is that Uber says, Oh, by the way, it can have a profound impact, I think that's an admission. It's a classic admission. The liability -- the damages, not liability, but damages can be extensive.

MS. POWER: Your Honor, I think there are two points to make here.

THE COURT: Yes.

MS. POWER: First, Mr. Kaiser was never confronted with Ms. Mensing's allegations. So there are descriptions of different kinds of sexual assault, sexual assault in general, the conversation in the transcript. And, Your Honor, we've

provided you the excerpts that have been designated. If Your Honor would like to see the full context of the questioning and answering --

THE COURT: I think I would like to see it, but on the other hand, I think basically it comes in as an admission.

And here is the risk that the plaintiffs take, is that if I ultimately don't allow it in into evidence, I don't allow it into evidence. But I can't go through the opening and say, Well, that comes in -- I know that will come in, that won't come, within certain parameters you can't. For example, the conviction won't come in, in my view.

But I think that it is a crucial thing in terms of the evidence in the case. And Uber's recognition, if that's what it was, that damages can -- can be substantial.

I mean, one of the questions is -- well, no. I don't have to apply none. Anyway, I'm going to allow it in. And I'm going to advise the jury that these are opening statements and they're not evidence.

MS. POWER: Your Honor, could I ask that just that clip be excluded from opening so that we could have a chance to argue about this further?

THE COURT: I think that's the only one they want in.

MS. POWER: Your Honor, they also have slides that

show images of other Uber witnesses, who I understand they intend to play and who they designated from, and we've moved to exclude them in their entirety. So we'd ask that those slides be excluded as well.

THE COURT: Well, during the opening. My understanding is this is the only thing that you're going to reference.

MS. LONDON: Your Honor, I apologize. Let me just make the record clear. Two issues. One is Mr. Kaiser's testimony, which -- and just to respond, earlier I think counsel said she did not testify with respect to --

THE COURT: We're not going to get into that argument. Go ahead.

MS. LONDON: It is in the designation.

The other testimony we wanted to get in is from Mr. Cardenas, who is head of global security. And we do want to show testimony there that he acknowledges that a safe ride on Uber is one that is without sexual assault and sexual misconduct.

MS. POWER: May I be heard on that, Your Honor?

THE COURT: That a safe ride is one without a sexual assault. Well, is that contested?

MS. POWER: Yes.

MS. BROWN: But, Your Honor, it's not an issue. And I can show the Court a slide. And that the Court in

allowing two jurors on this case yesterday who believe that Uber is unsafe, the Court said that's not an issue in this case, and the Court is right, it is not an issue. The question is do you agree a safe ride --

THE COURT: Okay. I'm going to exclude that from the opening.

MS. BROWN: Thank you.

THE COURT: And I'm going to make a judgment later on.

My problem is I haven't seen these excerpts.

MS. BROWN: Yes, Your Honor.

THE COURT: So I'm operating somewhat in a vacuum. And I'm just trying to call from the opening statements that I would consider highly unlikely that they would be received into evidence.

So I'll exclude that.

MS. POWER: And one additional point on Mr. Kaiser. The language "profound damages," Plaintiff here has chosen to limit their case to a 24-period following the alleged incident. I think there is a real risk of jury confusion that if words like "profound damages" are at the very beginning of the case, it's going to confuse the jury's ability to really limit it to what is at issue here.

THE COURT: I don't think the jury is going to be confused, okay, on that.

MS. LONDON: Your Honor, one final point. Additional issue raised in this brief is that we should not be able to reference Uber employees' position, their role. It's necessary to provide context. We will be referencing Mr. Kaiser's role in the opening.

THE COURT: I said I would allow Mr. Kaiser.

THE COURTROOM DEPUTY CLERK: Hold on.

THE COURT: We're having technical issues.

MS. LONDON: We'll cut this slide. We can cut this slide. We just won't put the slide up of the executives.

THE COURT: Is it working? No.

(Pause in proceedings.)

THE COURTROOM DEPUTY CLERK: One moment, Judge. They need to fix this.

THE COURT: Is it fixed? Is it fixed?

THE LAW CLERK: No, sir.

MS. BROWN: Your Honor, when the time is appropriate, I think we just have a handful of slides that we're objecting to that we wanted to raise. But I don't know if you wanted to do while we wait for the technical issues or pause.

THE COURT: Sure. I can take a look at them.

MR. BOUNDAS: Your Honor, can I approach and give you the slides?

THE COURT: Yes, why don't you give it to the

courtroom deputy.

MS. POWER: Your Honor, if I may be heard. I just have two points for clarification.

THE COURT: Yes, go right ahead.

MS. POWER: Mr. Kaiser's testimony included a similar designation about rides being unsafe. Do I understand your ruling to also exclude that from opening?

THE COURT: That rides being unsafe?

MS. POWER: That a ride involving sexual assault is an unsafe ride.

MS. BROWN: They pulled that.

MS. POWER: That is Cardenas. Kaiser also has a similar. Is that in your clip?

THE COURT: I mean, this just seems obvious to me.

I don't know why we're -- I mean, I'm going to allow them to make their opening statement the way they want to make their opening statement in those terms. I'm not going to go through and shed how they're expressing each issue that they want to. I hate to tell you, but I think the openings will be forgotten soon in light of the testimony, so I don't want to spend too much more time on this.

Do I really have to go through the slides?

MS. BROWN: I mean, do you want to just do it?

MR. BOUNDAS: Your Honor, there are some slides that we think are just extremely prejudicial and --

THE COURT: Well, which ones are they?

MR. BOUNDAS: Okay. If you look at -- just to give you -- flip quickly to page 17.

THE COURT: Page 17.

MR. BOUNDAS: Yeah. I mean, I'm just --

THE COURT: Well, okay.

MR. BOUNDAS: They're in the bottom right corner.

So the issue with this one is this is an exchange between their expert and our client.

MS. BROWN: 17. Can you tell me what the title is. My 17 is different.

MR. BOUNDAS: Oh. Do you have different -- it says "Plaintiff admits her drug use has affected her memory."

THE COURT: That's not my.

MR. BOUNDAS: Oh. Someone -- no. Mine says 17 also.

MS. BROWN: What item?

I don't know.

MR. BOUNDAS: You know, Your Honor, I might have an easier way to do this. I probably should have just gone in order.

THE COURT: Remember, the opening statement is not supposed to be argument; it's just --

MS. BROWN: Yep.

THE COURT: But go ahead.

MR. BOUNDAS: Okay. So the point on this slide is that the actual line of questioning, if you look, like, the second slide where she says, "I don't really remember a lot of those things," the question she was asked literally was: "How many times have you been sexually assaulted?"

And the slide above was also specifically a line of questioning about her being asked her memory of sexual assaults, which is definitely -- well, according to your current rulings is not coming into evidence. And so her being asked how many times she's been sexually assaulted, I just don't see how that --

MS. BROWN: And, Your Honor, we're certainly not intending to go into that at all. This is an admission of the plaintiff during an IME with our expert in which she told our expert I don't remember a lot of things and our expert said, why do you think that is? And she said I think it's because of my drug use.

Those are the only two points that we're playing. They're admissions of a party opponent. And it's just that clip. And certainly we have no intention, consistent with the Court's ruling, of getting into prior sexual assaults.

THE COURT: Okay. I think that's fair.

MS. BROWN: Thank you.

MR. BOUNDAS: But -- I mean, Your Honor, the point is we have no way to respond to that.

MS. BROWN: It's an admission.

MR. BOUNDAS: Well, it's an admission that she doesn't remember sexual assaults.

MS. BROWN: But that's not the --

MR. BOUNDAS: And that is not relevant.

THE COURT: I have to look at the entirety to see whether, in the context, it's misleading. And the problem is I don't have the entirety in front of me.

MR. BOUNDAS: I can hand it --

THE COURT: We're about to make opening statements.

MR. BOUNDAS: I have it, Your Honor. But I don't want to -- if you don't want me handing things up, I'm -- I don't want to waste your time.

THE COURT: Well, it's not a question of wasting my time. It's a question of whether I need to rule on this right now. You know, I think if you're -- I have to leave it up to the parties' good faith if they're not taking the statement out of context.

MS. BROWN: That's right, Your Honor.

THE COURT: So, so I just think I'm going to allow the parties to make basically the opening statements they have. It's not evidence, and we'll see exactly what the evidence shows.

MS. BROWN: Thank you, Your Honor.

THE COURT: I mean, whether I allow that clip to be

played is an example, or allow the witness to testify is another question, but I have to -- I have to have a context. I have no context.

MR. BOUNDAS: Okay. Understood.

Your Honor, we have a couple others. But, again, I want to do this quickly. I know you want to get to opening statement.

The second -- the third page of the slide deck, just so you don't have -- we have different page references, shows Mr. Richardson, the driver, in the hospital, which I don't have a problem with a picture of him in the hospital, but this is a video clip where he is talking about his own character, he's a man of character, he's a man of integrity, you can ask his wife. You know, it's classic you can't have a witness bolster their own credibility.

THE COURT: Yeah.

MS. BROWN: You can certainly, though, have a witness who has been accused of sexual assault deny it, Your Honor. This is not extrinsic character evidence in an effort to bolster. What it is is the way in his own words he explained what the effect has had on him of being accused of something he swears he did not do.

And it's two paragraphs. He talks about having a 19-year-old daughter in college. And you, as a lawyer, don't know how much it hurts when someone puts something negative

against him --

THE COURT: I don't know that he can testify to all of that. I mean, I don't know if he can testify as to the impact of being, quote, falsely accused of something. I don't know that that's -- that that's admissible. You know, you'd have to show me that it is admissibility.

MS. BROWN: Why don't, in the interest of time, Your Honor, why don't I show the picture, as I understand there's no objection to it, and we can further discuss with Your Honor if the clip comes in. I don't need to play it in opening.

THE COURT: Right. That's what I have to do. The problem is doing it in opening. It's not -- it's -- it's out of context.

MR. BOUNDAS: Okay. Your Honor, just -- understood. That's -- you're going to show the picture and not play the clip.

If you go two slides forward, we have an objection to there are slides about discovery responses.

THE COURT: Oh, yeah. Please let's leave the discovery.

MS. BROWN: Your Honor, this is a critical issue for us, and the only one I'm going to argue, if I may.

This is the plaintiff's fact sheet where she was asked to describe the incident. The incident for which they

have brought this lawsuit is the touch of a leg and a statement that Mr. Richardson allegedly made to the plaintiff. She described the statement in two sworn fact sheets as entirely different than the statement that they told the jury and is in the fourth fact sheet. It is a --

THE COURT: So the statements would probably come in.

MS. BROWN: Yes.

THE COURT: I understand that.

MS. BROWN: Thank you, Your Honor.

THE COURT: Okay. Even though they were produced in discovery.

MS. BROWN: Yes, Your Honor. It's an admission. Thank you.

THE COURT: If they're inconsistent statements, they would come in.

MS. BROWN: Thank you.

MS. LONDON: Your Honor, if I could just be heard on that briefly.

THE COURT: Yes.

MS. LONDON: So, Your Honor, this is exactly what came up in the Dean case. This was a subject to motion *in limine* on changing fact sheets, and it talked about -- making amendments to the fact sheet over the course of the litigation to comply with discovery orders, to deal with

back-and-forths with Judge Cisneros, to be dealing in negotiations with other side.

There were -- we filed a motion on this. That motion was granted. Your Honor said we're not going to get into the changing of fact sheets. And then the parties stipulated that those rulings were going to apply in this case. So it was a surprise to us to see this on -- in these slides. It's not something that we've had a chance to come back to and talk about. And I will --

THE COURT: So exclude the facts sheets in the opening.

MS. BROWN: Your Honor, can I really be heard on this? This is so critical.

THE COURT: Actually not. Exclude the facts because now in light of what counsel is saying --

MS. BROWN: But --

THE COURT: -- it may be that these fact sheets are not the traditional --

MS. BROWN: I understand. But she left out one part. The motion *in limine* was to nonmaterial amendments to the fact sheet. This is the heart of their case.

THE COURT: Look, I'm not telling you -- I'm not telling you that it won't come in. I don't know whether it will come in or not.

MS. BROWN: Can I open at my --

THE COURT: No. This is an opening statement. Period. It's not supposed to be an argument. It is supposed to be an opening statement. If I say to you that there seems to be a controversy as to whether or not these particular statements can be used for impeachment purposes, which is what you're suggesting, and they may be, I don't know. I haven't ruled on it and I haven't seen it. But I'm awaiting the jury to make an opening statement and start the case. And, you know, I think we'll get to this pretty quickly in terms of -- in terms of the witness.

MS. BROWN: I -- it's just the heart of our case, Your Honor. The statement that she brought the lawsuit over is inconsistent. She first said the driver told me he wanted to lick my legs, and then she made a completely different statement that they opened to the jury in the mini openings yesterday. It's a classic admission of a party opponent. It's the heart of our inconsistent defense. And I would be prejudiced if I couldn't at least open on, think about this as the evidence is comes in. The heart of the case is inconsistent.

THE COURT: As the evidence comes in, you'll be allowed to do that, which you can rebut in terms of appropriate evidence.

What they're saying is that these factual -- these fact sheets cannot form the basis of an impeachment.

I don't know whether they can or not. I know that we have to have some determination of that, but I can't -- I can't just sit up here and figure out whether or not they were used just for discovery purposes or other purposes, or whether they actually have to reflect what the -- what the witness -- a statement of the witness. Maybe it comes in; I don't know.

Classically, they would come in. I don't know whether it does in this case. But I think it's a good idea not to put it in your openings since it is that -- it is something that I have to make a determination.

MS. BROWN: Can I describe it without showing the fact sheet?

MS. LONDON: Your Honor, the whole point --

THE COURT: No.

MS. LONDON: -- is the fact sheet.

THE COURT: You can say she's made inconsistent statements. This is contrary to what she said on an earlier occasion.

MS. BROWN: Okay. Just don't show it. I understand. Thank you.

I just need one minute, then, Your Honor, to take that out of the slide.

THE COURT: Yes.

MR. BOUNDAS: And I have one more thing, Your

Honor, but I don't want Ms. Brown --

THE COURT: Go ahead. Go ahead.

MR. BOUNDAS: Okay. So there's a slide -- I'll basically -- it says, "Plaintiff had best friend and son drive to crack dealer's house."

THE COURT: Pardon me?

MR. BOUNDAS: It says, "Plaintiff had best friend and son drive to crack dealer's house." And it's testimony from Plaintiff's -- a former friend saying that she was pregnant when she had her son. Brianna asked her to drive to her house. It was her crack dealer's house. I opened my cigarette box and there was a crack rock in my car."

Now, I know drugs and alcohol are in, but this is sort of beyond that.

THE COURT: This suggests that is -- I think she's using obtain to people to obtain drugs or something of that nature.

MS. BROWN: This woman was identified as a witness. She was identified as somebody who was the plaintiff's best friend at the time and identified as someone to whom she reported this incident. And when we deposed her, she said that's not true. And, in fact, I haven't spoken to her because of the serious nature of the drugs and alcohol. And that's what it's for, Your Honor.

THE COURT: That can come in, but it can't come in

that she instructed her -- it said something about that she should pick up drugs. If that's what I'm hearing correctly.

MR. BOUNDAS: Yes. It's driving to her crack dealer's house.

MS. BROWN: I will take out the slide, Your Honor. We can argue it in the context of the designation.

MR. BOUNDAS: Your Honor, I'm going to stop here and just note we have objections to some of these slides coming into evidence, and we'll deal with it when they try to get into evidence. I'm just not waiving that.

THE COURT: You're not waiving it. All right. No one's waiving anything.

All right. So are we ready to bring in the jury?

MS. BROWN: Can I just have one second to delete the slides?

THE COURT: Sure.

MS. BROWN: Thank you.

(The jury entered the courtroom.)

THE COURT: Okay. Please be seated. Let the record reflect the jury is present.

Now, ladies and gentlemen of the jury, on your screen, which I don't see, you're supposed to be able to see me, but I'm not all that important in this process. But if you wish to see me, I guess you're going to have to turn around. Do we know why the screens are not illuminated?

We'll figure that out.

This is a new courtroom for me and for my staff here, so we're not quite used to all of the technology that exists. But we're not going to be defeated by technology here.

So let's start the proceedings.

Let me just tell you that you are about to hear opening statements.

Now, opening statements are just that. They are statements by the attorney for each party telling you what they expect the testimony in the case to be. It is not -- it is not evidence itself and can't be considered as evidence itself.

So you may hear an attorney say something that we expect X or Y or Z to be proven, and it may turn out that for various reasons there isn't evidence of it. And if there isn't, then that's -- then that's something -- oh, here we go. The looks like you almost -- oh, wow. You get to see me. Well, that's not such a grade reward, but now you can.

And if, in fact, the testimony is different from the way that the attorneys have characterized it, or in their expectations, it's your memory of what is being said.

The questionnaire instruction here is that there is no evidence yet to be produced, and so you should not consider what the parties are about to say in their opening

statement as evidence. On the other hand, it's quite useful because it gives you sort of a roadmap as to what the parties expect the evidence to be, and I think it's helpful in that regard.

So with that, we will start with plaintiff, Plaintiff's counsel.

You may proceed.

MS. BRAHMBHATT: Thank you, Your Honor. May it please the Court, members of the jury, my colleague William Smith here introduced John Boundas and I yesterday. But let me introduce my again for you.

My name is Sejal Brahmbhatt, and my colleagues and I represent Ms. Brianna Mensing in her lawsuit against Uber.

Thank you for your time and attention as we explain to you why you are here and your importance of your role. This is a straightforward case but an important one.

You recall what the judge said at the very beginning about what is not in dispute: What the law says. The rule in this case is that if Uber's driver assaults a passenger, Uber is responsible. Period. That's it.

MR. BOUNDAS: Your Honor, I'm so sorry to interrupt. In order for the video to show, that needs to be turned off. Thank you.

THE COURTROOM DEPUTY CLERK: I just think it takes a moment. There is a time limit.

MR. BOUNDAS: Thank you for turning it on.

THE COURTROOM DEPUTY CLERK: Sorry.

THE COURT: There we go. All sorts of things are happening.

THE COURTROOM DEPUTY CLERK: I just need it on my screen, but that's not.

MR. BOUNDAS: We see it at counsel table.

THE COURT: So the audience for now cannot see it, but the jurors have it.

MS. BRAHMBHATT: Thank you very much, Ms. Scott.

May I continue, Your Honor?

THE COURT: Yes.

MS. BRAHMBHATT: All right.

The rule in this case is that is Uber driver assaults a passenger, Uber is responsible. Period. That's it. And Uber knows it.

So after both sides put on their evidence, if you find that their driver inappropriately sexually touched our client, Uber is responsible. And we are here in this majestic courtroom called the Virginian Revival Courtroom because Uber refuses to accept liability.

Let me introduce you to our client. This is Brianna Mensing.

MS. MENSING: Hello.

MS. BRAHMBHATT: Ms. Mensing was sexually assaulted

by her Uber driver on March 26, 2019, and she's here to hold Uber accountable for what happened to her on that day.

But let's take this back to the beginning. Ms. Mensing was born in Raleigh, North Carolina, on June 22nd, 1995. She's the baby out of three kids. But let me tell you a little bit more about her. Growing up Brianna was a tomboy through and through, from riding bikes in the neighborhood, to climbing trees, Bree was in the thick of it.

She loved playing football with the neighborhood kids. And there was a short period of time where she was on a basketball team. She actually likes to mow the grass. She likes to be out in nature. As a young kid you would find her running the woods with no shoes on with her siblings in the water, spending time with her grandma, and listening to music. In fact, she's got a very wide range of music taste. From Slip Knot to Spice Girls to The Cure to James Brown to The Beatles.

And if you were in her life, there is nothing that she wouldn't do for you. If she loves you, she loves you hard. And that includes her family, her friends, her and nine-year-old son Travis.

She describes herself as a helper and always wanting to make things easier for people around her. If her mother mentions needing something in the house, Bree will go and get it. If her dad is working on a car and needs some

help, she'll figure out a way to help him.

She has a dry sense of humor and a quick wit, but only to those that she's close to. And that's a woman Brianna is. An old soul with a huge heart.

So what brings us here today? In 2019, the year that the Uber assault happened, she was living with her boyfriend, Neal Young, not the musician, in Franklinton, North Carolina. When she first met Neal, it was as friends. He knew David Yankowski, a family friend that you will hear from later on today.

Neal's family had a camper at Lake Royale, close to David's camper, which was on Brianna's parents' property. Neal likes to do the same things as Brianna on the lake: Go boating, barbecuing, hanging out with the family, cookouts. And eventually they started dating and they moved in together in early 2019.

It was when Brianna and Neal were living together that she reconnected with an old friend, Trevor Woodham. On March 25th, 2019, Trevor invited her to the new place that he and his girlfriend had moved into.

Now, Franklinton is a small town. She didn't have a car and there's no public transport. So she had recently downloaded the Uber app after seeing some adds. She didn't have a ride, so she thought it would be a good alternative to get from Point A to Point B if someone couldn't take her.

Her very first ride ever was March 25th, 2019. The assault occurred on her second ride, the one when she was returning back to Neal's house.

Back to Trevor. They hung out, caught up, chatted about the art that Trevor was sketching, and they watched television. And she had a beer. It was getting late so she decided to call the Uber to go home. Her second ride ever.

Let's talk about this ride.

There's no dispute that this ride occurred on March 26, 2019. There's no dispute that she used the Uber app to obtain the ride. There's was no dispute that she was picked up from her friend's house at 1:25 a.m. or that the ride ended at 1:53 a.m.

There is also no despite that the driver was Jeffrey Richardson.

It never occurred to Brianna that she could be unsafe or sexually assaulted by the driver.

We expect that you will hear some evidence from Uber executives who are speaking on behalf of the company and from its highest levels. So on March 26, 2019, at 1:23 a.m. when Richardson asked her to sit in the front seat when he picked her up, she thought this was normal. It was her second ride. And she complied with his request.

Remember, there's no muscle memory here or familiarity with the protocol of using Uber. She's 23 years

old. Her second ride.

There was small talk between the two, but nothing sexual. Upon arriving at her boyfriend's house at 1:53 in the morning, Richardson intentionally and sexually reached over and grabbed her upper inner thigh without her permission and said he wanted to keep it with him. She was alone in the car with a strange man late at night. She was shocked by this overt sexual unsolicited bold act, said no, and jumped out of the car.

She fearfully ran around the side of the house to let herself in and tried to wake Neal up to tell him what happened, but he was fast asleep.

She was in the house trying to calm herself down. She then tried to pull up the security camera to see if Richardson was still there. He knew where she lived. By this time, because she had taken the time to calm down, the security footage was on a live feed and the car was gone.

And this is where Richardson pulled up to the front of the house that she ran across when she escaped out of the car inside the house so that she could let herself in.

She shared what happened to her with multiple people, including her mother and friends, and you'll hear through them from video and live testimony.

Her mother, Melissa Mensing, shared that Brianna told her what happened. She also said that Brianna told her

about what happened soon after the incident, possibly the same day or days after.

Neal Young, her boyfriend at the time and who she was living with, stated that he recalled -- he recalled her telling him about an incident with a driver when she was dropped off at the house the very next morning.

And her boyfriend at the time of the deposition that you'll hear later on, Taylor Lowery, said Brianna had told him that a sexual assault had occurred in an Uber.

She also told another family friend, David Yankowski, who you'll hear from this afternoon.

Dr. Veronique Valliere, a clinical psychologist who has spent her career treating sexual offenders and assault victims, well, we asked her to come here and answer some important questions that can help us understand the evidence. She will explain how offenders operate, how they target vulnerable people, women who seem like they won't be believed, how the Uber environment is optimal because it's isolated, because the driver is in the position of a trust, and because often there are no witnesses or cameras. She will explain how victims respond, that there's no one or right way to respond. And how an assault trauma can impact memory and how we remember things and react.

Also why sexual assaults are so underreported. What are the barriers to women like Brianna for coming

forward, the fear and anticipation of not being believed, being shamed and blamed, and that they're not deserving and worthy of justice.

And that is really important because I expect you'll hear from Uber about how Brianna did not tell the police or Uber.

So now I want to address what I expect Uber to say since I won't get a chance to come back up here after their opening.

The first one is this: That my client, Brianna Mensing, is a liar. She is making this up. She must be a liar because she didn't tell the police or she didn't tell Uber. I expect Uber will ignore all the people that she did tell and focus on the people that she didn't, like the police or a friend.

I also expect that they'll spend a lot of time discussing the fact that she has struggled with drugs and alcohol. And we heard a little bit about this yesterday and we spoke about this yesterday too.

Almost all of us know someone who has been touched by the disease of addiction. Brianna is one of those people, and she's not going to deny that.

The evidence will be that this really has nothing to do with an assault that happened to her that night at Uber. They will point out that the Uber driver said it

didn't even happen. But listen closely to his testimony, please. He doesn't remember the ride. Uber's attorneys called and texted him numerous times, but the evidence will show that he doesn't remember much.

The evidence will also show that Uber got him a lawyer for this case. He does not remember the lawyer's name, where this lawyer's office is located, how his own lawyer got his contact information. He doesn't even know who is paying for his own lawyer because it's not him.

Not once did they step back for a second and think, you know, maybe Brianna is telling the truth. She told all these people around the time that it happened and she's been consistent with her recollection of the incident. There's not one person who's going to say it didn't happen other than the driver, and well, duh.

We're going to show you Mr. Richardson's testimony, and we'll leave it to you to decide if you think he's credible.

And, finally, I expect that Uber will attempt to downplay what happened to Brianna. That this was just a two-second leg touch. That's not what the evidence will show.

A stranger grabbing your upper inner thigh in an aggressive manner is a sexual assault without your permission. Period. It's a violation. And Uber's own head

of safety operations, Roger Kaiser, agrees.

(Clip played to the Court and jury.)

MS. BRAHMBHATT: Ms. Mensing felt violated and was in shock that this happened. She trusted Uber's driver to get her home safely. That trust was broken, and in the process, she was traumatized, violated, shamed, and assaulted. This driver was a complete stranger. She's a few months shy of turning 24. It's late at night. It's her second Uber ride.

On that day that grabbing of Ms. Mensing's upper inner thigh and the words that he used caused her to be shocked, fearful, dirty, and violated. And you'll hear from Brianna. She will share with you what happened that night. She's here to be a voice for those who never spoke up, who do not speak up no matter how serious the assault.

And this is what Brianna said in her deposition on July 10th of 2025. "More than anything, I would just want this to never happen to anybody, like ever. I want justice more than anything."

Two final things before I sit down. This is a civil case. We're going to talk about the burden of proof. We have a burden of proof. And we take that seriously. And we believe at the end of this case you will find that Ms. Mensing has met that burden.

It means that both parties start at 50 percent, and

you must decide based on the evidence which side the proverbial scales tip ever so slightly. So it could be as subtle as a feather on a scale. It could be a blink of an eye. It could be a drop of water ever so slightly. That is how much more than 50 percent Ms. Mensing must prove.

The other point. Something I learned in law school which I'm going to share with you. Here's Lady Liberty, or Lady Justice, I should say. She's blindfolded, and I want to point to you why she's blindfolded. I looked this up.

The Lady Justice blindfold symbolizes impartiality, objectivity, and fairness, representing that justice is administered without fear, favor, bias, or regard to a person's wealth, power, race, or gender. It signifies that legal decisions should be based solely on facts and evidence, not on appearance or the status of the parties involved. Lady Justice does not discriminate. Everyone is entitled to their day in court. Lady Justice is focused on the evidence or the rules, if you will. And here the rule is if Uber's driver assaults a passenger, Uber is responsible.

And at the end of the case, after we have met our burden, we will ask you to reach a verdict for Ms. Mensing, speak the truth, and deliver justice.

Thank you.

THE COURT: Thank you. Now let's turn to the defense.

MS. BROWN: Thank you, Your Honor.

Your Honor, would it be okay.

THE COURT: I think it's better that you do it there.

MS. BROWN: Okay.

May I proceed, Your Honor?

THE COURT: Please.

MS. BROWN: All right. Good morning, everyone. We met yesterday briefly.

THE COURT: I think you're going to have to use the microphone.

MS. BROWN: I'm going to have to stand right here.

THE COURT: And I apologize, but I have a hearing issue.

MS. BROWN: Understood. Understood, Your Honor.

Good morning, everyone. We met yesterday, but again, my name is Alli Brown, and I am here with my colleague and my good friend Mike Brown on behalf of the folks at Uber.

Now, Plaintiff has brought a lawsuit here claiming that seven years ago, during the height of her drug addiction, she was touched on the leg for one to two seconds in an Uber before immediately exiting the vehicle. And this right here is her testimony under oath that it was a one- to two-second touch and she immediately exited.

Now, we asked her, and Plaintiff told us, she

doesn't recall the 24 hours after getting out of the vehicle. But in this lawsuit her claim to you all for money is for this 24-period and this 24-hour period alone. That's the claim for damages in this lawsuit, 24 hours after exiting the vehicle. But she told us she doesn't recall what happened during that time period.

Now, all of this is absolutely Ms. Mensing's right, and this is one of the great things about our justice system. It gives people the right to bring a lawsuit like this. And when Ms. Mensing does that she's entitled to a judge like Judge Breyer to preside over this case. She is entitled to a jury, a fair and impartial jury like you all, to listen to the evidence.

But now that she's done that, now that she has brought these claims, made these allegations, and filed this lawsuit, the law puts the burden on Plaintiff, and Plaintiff alone, to prove to you all that the allegations she's made in this lawsuit are the truth and are supported by the evidence and the facts.

And at the start of this case, I thought I heard counsel say we're already at 50 percent on the scale. That's not right. There's no evidence that you've heard in this case at all yet. Plaintiff has the burden of putting enough evidence on that scale to prove to you all it is more likely than not that this happened. And the evidence and the facts

and the truth are not going to support these lawsuit allegations.

You're going to get to hear from Mr. Richardson, the driver of this Uber back in 2019. And I really wish Mr. Richardson could come in here and speak to you all live, but he's in the hospital, unfortunately, dealing with some very, very serious health issues.

And fortunately Mr. Brown was to take his sworn deposition testimony under oath this past weekend so we can play the video to you all.

And all this business about lawyers texting Mr. Richardson, what the evidence is going to show is that we had to coordinate how to video him from the hospital. And there were logistics that needed to be set up. And fortunately they were so we can bring you his testimony, because what you are going to hear is that he emphatically denies the allegations in this lawsuit.

Mr. Richardson was a truck driver by trade, you're going to hear. Married with two daughters who drove with Uber for a period of time. And he strenuously denies that this touch ever occurred.

In fact, you're going to hear one of the allegations in the case is that Mr. Richardson invited Ms. Mensing to sit in the front seat. You're going to hear from Mr. Richardson that was not his practice, to invite

people to sit in the front seat of the car he was driving.

You all are here, and we are very grateful for your jury service. You all are here as the finders of fact. You are here to look at the facts and determine if plaintiffs have met their burden of proof in this case. And the facts are not going to support the lawsuit claims.

You're going to hear that the allegations of what happened have been inconsistent over the course of this lawsuit. You're going to hear that the witnesses who have provided sworn testimony prior to getting this case to you all, they do not corroborate or support the claims that Ms. Mensing is making.

And, finally, you are going to hear that unfortunately due to a very serious drug addiction, Ms. Mensing's memory is not clear, particularly during this time period, which was a very difficult time for her personally.

The evidence will show the allegations are not consistent. And here I believe Ms. Mensing is going to testify today, and I want you all to listen real carefully to what the allegations are now. The allegations are now that Mr. Richardson touched Ms. Mensing for one to two seconds and said, Can I keep this with me.

But what we're going to hear is that Ms. Mensing had a different story about what Mr. Richardson said, that

you're going to hear evidence that she used to say something else, and that she used to say Mr. Richardson turned around to touch her before she asserted that actually she was sitting in the front seat. These details have not been consistent even through the course of this lawsuit.

You're going to hear that Ms. Mensing continued to take Uber, even after alleging that this incident occurred in 2019. And what she said was that, Well, I only take it when it's absolutely necessary. But what the evidence is going to show, in fact, is that after suing us, she opened eight different Uber accounts with different emails and different phone numbers.

So if you look at this timeline, the alleged incident happened on March 26, 2019. And Ms. Mensing didn't alert the police. Ms. Mensing didn't report it to Uber through the app, on a website, through a phone call.

Three years later you're going to hear what she did was file a lawsuit for money. And right after filing that lawsuit for money, she opened multiple different Uber accounts. If you look at the spring of 2022, April 2nd, June 19th, July 4th, August 4nth, multiple different Uber accounts. You'll hear both for Uber rides and to use Uber Eats.

She even opened her most recent account not that long ago, May 10th, 2025.

And you'll have to sift through the evidence and decide if this happened as alleged, if Ms. Mensing was sexually assaulted in an Uber, will she continue to open Uber accounts? Will she continue to take 37 Uber trips? Would she continue to order Uber Eats where delivery people came to her home and delivered food and alcohol?

And we asked Ms. Mensing, well, in addition to using Uber, do you use any other rideshares? And in July of 2025, under oath -- and you are all going to hear a lot about people giving testimony under oath before a trial. It's called a deposition. You swear to tell the truth, and we have a transcript of what you said, which is what you see on the screen here.

So we said are you using any other rideshare, and she told us point-blank no. But then we got her Lyft records that shows she's been riding Lyft since April of 2022. And you'll learn and you'll hear about some of the places she's been going using Lyft.

What the evidence is going to show is that Plaintiff's allegations in this case are not corroborated, supported by other witnesses who have given sworn testimony.

You're going to hear that Ms. Mensing herself will admit that on the night the incident allegedly happened, she did not tell anyone. She took an Uber with Mr. Richardson back to her boyfriend's house. She left her friend's house

at about 1:30 a.m., arrived back at her boyfriend's house at about 1:53 a.m.

She did not tell her boyfriend who was asleep at the house. We heard a bit about her relationship with her family, her mom and her dad this morning. She did not call her mom. She did not call her dad. She did not call her siblings. She did not call any friends. She certainly did not call the police or Uber. Didn't text anybody or reach out to anybody either.

You'll hear it was never reported to the police, never reported to Uber, but Ms. Mensing told us that on or about March 26, 2019, she told her very, very best friend, Ariel Watkins, and her boyfriend, Neal Young, when he woke up the next morning.

What's more, her mom testified, and we'll talk about that in a second, that the plaintiff told her right about the time that it happened.

Now, we had the opportunity to talk to those folks under oath and ask them under penalty of perjury, is this true? Did this happen?

Here's her best friend, Ms. Ariel Watkins. We asked her under oath, Did Ms. Mensing tell you in March of 2019 about an incident she had in an Uber? And the answer was no, she didn't.

We asked the boyfriend at the time, Mr. Neal Young,

did she tell you about what happened? He said he couldn't remember.

Well, sitting here today, do you know what happened? Do you have an understanding of it? He says he doesn't know.

And oddly, while Ms. Mensing's mom testified that she was pretty sure she was told right after it happened, Ms. Mensing herself swore that wasn't true.

If you look at the bottom, these are sworn responses from Ms. Mensing herself that said she didn't tell her mom until one or two years after the alleged incident. And so you'll have to sort through why the mom, who will not testify in this trial live to you all, has a different story than the plaintiff herself.

You're going to hear that the plaintiff, Ms. Mensing, alleges that she told some therapists about this incident, and the therapist she had from 2023 to 2024 was a doctor, a psychiatrist named Dr. Jenny Smith. We had the opportunity to talk to Dr. Smith under oath. We asked, Did Ms. Mensing never discussed with you a rideshare incident, did she? The answer was no.

And while Ms. Mensing testifies that she's told multiple therapists, we had the opportunity in this lawsuit to look at all of her medical records. It's part of the way lawsuits work. You'll hear about it during this trial. Uber

gives some documents so the plaintiffs can look at it, and they give us some documents so we can look at it.

We looked through more than 1,000 pages of medical records that spanned the entire time period at issue here. And not one of them with any one of the therapists listed there references the Uber incident that's the subject of this lawsuit.

And then you'll have to sort through something like this and why something like this happened. What we know is that before these witnesses gave sworn testimony, Ms. Mensing wasn't talking to them anymore. She had a falling-out with her best friend, Ariel Watkins, and she was no longer dating Neal Young. So he hadn't been in contact with them for a while.

And before we asked for their sworn testimony under oath, out of the blue she texted them and said, Hey, sorry the lawyers are calling you, but could you give me a call? Could we talk before the lawyers ask you questions?

And what the evidence is going to show is that none of these witnesses ever texted back. That instead, Ms. Watkins testified under oath that Ms. Mensing never told her about this. And Mr. Young testified under oath that he's got no memory of what this is all about.

In fact, what you'll hear from Ms. Watkins is when she ultimately found out that Ms. Mensing had brought this

lawsuit, she said she wanted nothing to do with this.

You are going to hear today from the only live fact witness who's going to testify to you on behalf of the plaintiff that he learned about this at the time it happened. And what the evidence is going to show is that Mr. Yankowski, he never gave sworn testimony before the trial. He was not a witness who was deposed. We didn't know what his testimony was going to be.

And so what he did, and it was actually, I believe my colleague Ms. Powers sitting right here. We called him and we said, Mr. Yankowski, we represent Uber. I understand you're going to be a witness. Wanted to know what information you have for the trial.

And what the evidence is going to show is he told us he wouldn't tell us unless we paid him. And then he sent a text to these lawyers saying Uber reached out to me to find out what I know, and I told them I wouldn't tell them unless you guys pay me.

So you'll have to evaluate Mr. Yankowski's credibility when he comes in here to talk to you today. The only live witness who wouldn't talk to us unless we gave him money.

What the evidence is going to show is that due to a very serious and tragic addiction to drugs, Ms. Mensing's memory is not clear. And one of the things we, Mike Brown

and I, are going to have to do in this case, is we're going to have to talk about very sensitive and personal issues about substance abuse.

And I want to be real clear from the start, we mean no disrespect to Ms. Mensing doing this. We do not mean to embarrass or shame Ms. Mensing. These are the facts of the case that we need to bring you so you can evaluate the evidence, but we're going to try to do it as sensitively as we possibly can.

But what the evidence is going to show, and Ms. Mensing is going to admit it herself, is that there are a lot of things that she just doesn't remember.

And here's a little clip you're going to hear. We're going to bring you an expert psychiatrist who met with Ms. Mensing and went through their medical history, and here is a little bit of their interview where Ms. Mensing admits there's a lot of stuff that she can't remember.

(Clip played to the Court and jury.)

MS. BROWN: And one of the things Dr. Reminick followed up on is, well, why do you think that is? Why do you think you don't remember a lot of things? And you'll hear Ms. Mensing say because it was because of her drug abuse.

(Clip played to the Court and jury.)

MS. BROWN: And what you're going to hear in the

trial is that unfortunately because of these issues, these serious and terrible issues, Ms. Mensing has a hard time recalling some basic facts, particularly during this relevant period of time, including, for example, where she was living at the time.

(Clip played to the Court and jury.)

MS. BROWN: And one of the reasons that you're going to hear that that is, is because of this. And this is some evidence in Ms. Mensing's medical records and deposition testimony that you'll hear about and see. Unfortunately, Ms. Mensing started using alcohol and marijuana at age 11. You'll see in the records opioid use at age 16.

And unfortunately during the time period at issue in this case, you'll learn that Ms. Mensing was addicted to crack cocaine, using heroin and fentanyl, and alcohol as well. This was a particularly difficult time for Ms. Mensing as it relates to her substance abuse.

And one of the things that is going to happen here is that the plaintiffs are going to bring in an expert, and I think you saw a slide on that, it's Dr. Valliere, to talk about sexual assault generally. And one of the things she's going to tell you all, I expect the evidence will show, is that, well, people who are victims of sexual assault oftentimes don't remember all the details. They oftentimes don't have a perfect recollection of what happened. I think

that's going to be the gist of her testimony. And a lot of folks don't report.

But one of the things that is going to be remarkable is that they didn't tell Dr. Valliere a thing about Ms. Mensing. She never met Ms. Mensing. She doesn't know anything about Ms. Mensing's history of drug addiction and substance abuse as reasons why she might not remember things.

And that's going to tell you something about the strength in the case coming to you here. The only expert they're going to bring you knows nothing about Ms. Mensing at all. You'll have to figure out why that is. Why is their only expert kept in the dark about their plaintiff.

Here are some of the records that you'll see with our expert who did meet with Ms. Mensing and did interview Ms. Mensing. Alcohol and drug use since age 11.

And then this is sort of important because this is just about less than a year before the Uber ride at issue in this lawsuit, and you'll see this is part of a record of an involuntary hospitalization that Ms. Mensing unfortunately had at the time. A severe addiction to opioids, cocaine and cannabis. And you can see down at the bottom, unfortunately for how long these troubles have persisted.

You'll see this was something that Ms. Mensing at the time period that's at issue -- that is at issue in this

lawsuit was unfortunately doing every day.

And you'll see records like this one where Ms. Mensing was often denying, as is understandable when you're struggling with an addiction, sort of denying use of these drugs. But the records and the screens show that they were positive here for marijuana, cocaine, and opiates.

And right before the ride at issue in this case, her treating physicians actually terminated her care because they felt that her addiction was so serious that she needed a higher level of care that they could provide. This was the middle of January 2019 when services were terminated so that she could get a higher level of care. And unfortunately what you'll hear from our expert is that she never was able to get that care. And so things became very difficult for her in the ensuing months as it related to her addiction. And that would have been right about the time of the Uber ride.

And unfortunately you'll hear that these problems persist today, that is this the most recent information that we have. We asked in her most recent deposition, Are you sort of still doing any sort of recreational drugs other than meth, and she said no. But the medical records, you know, show otherwise from that time period positive for meth, but also cocaine. And so unfortunately, and not to be unexpected with a serious medical problem, this is something that persists as recently as the records we have.

You'll have to sort through in the face of that testimony and those records whether Ms. Mensing's testimony that on the night in question she only had one beer and wasn't using any drugs is credible. You're the finders of credibility. You're the finders of facts. And she'll testify to you that when she was at Mr. Woodham's house, a friend that she hadn't seen in years, from 9:00 p.m. to almost 2:00 a.m., if it's credible that she only drank one beer, particularly in light of her own testimony that that year she was using heroin every day. And her best friend's testimony that during that time period she was using recreational drugs every day.

This will be for you as the finders of fact to sort through about what is the truth, what is supported by the evidence, what makes more sense, what's more likely than not.

At the end of this case I think what the evidence is going to show is that this is a lawsuit about a one- to two-second touch of a leg that was filed three years after it happened. And there is not going to be proof to support the claims that are being made in this lawsuit.

Thank you very much for listening today. And we look forward to bringing you the evidence in this case.

Thank you, Your Honor.

THE COURT: Thank you.

So let's take a recess. We'll take a 15-minute

recess.

And the admonition, ladies and gentlemen of the jury, is don't discuss the case, allow anyone to discuss it with you, form or express any opinion. I'll see you in 15 minutes.

(The jury exited the courtroom.)

THE COURT: Okay. We'll resume in 15 minutes.

MR. BROWN: Thank you, Judge.

(The proceedings were recessed at 10:32 a.m. and reconvened at 10:45 a.m.)

THE COURT: Okay. Bring in the jury, please.

MS. BROWN: Your Honor, there is one issue.

THE COURT: Oh, yes. Please be seated.

MS. BROWN: Before --

THE COURT: Go ahead, Counsel.

MS. BROWN: Thank you, Your Honor.

As the Court knows, *in limine* the Court excluded any issues regarding Ms. Mensing's son.

THE COURT: Yes.

MS. BROWN: Plaintiff claims she has lost custody due to her substance abuse. Plaintiff has disclosed a number of pictures of the son that they want to use in the direct examination, and we would argue, Your Honor, that would open the door to the current state of custody.

THE COURT: It does not.

MR. BOUNDAS: Your Honor.

THE COURT: You can use them.

MR. BOUNDAS: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Okay. Please be seated. Let the record reflect all the jurors are present, the parties are present.

You may call your first witness.

MR. BOUNDAS: Your Honor, Plaintiff calls Brianna Mensing.

BRIANNA MENSING, PLAINTIFF WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BOUNDAS:

THE COURTROOM DEPUTY CLERK: Please state your full name for the record, and spell your last name.

THE WITNESS: My name is Brianna Mensing, M-E-N-S-I-N-G.

THE COURTROOM DEPUTY CLERK: Thank you.

MR. BOUNDAS: Good morning, Your Honor. May it please the Court. Can I proceed?

THE COURT: Of course.

MR. BOUNDAS: Okay.

BY MR. BOUNDAS:

Q. I just want to say good morning to our jurors and introduce myself. My name is John Boundas, along with

Mr. Smith who you heard from yesterday, and Ms. Brahmbhatt, I represent Brianna Mensing, who is here to testify here today.

Brianna, can you start just by -- introduce yourself to the jurors. Give them your name, where you're from.

A. My name is Brianna Mensing. I'm originally from Raleigh, North Carolina. I was born at REX Hospital. What was the rest of the question?

Q. Where are you from?

A. I just said. Okay. That's where I was.

Q. That's the question.

A. Yep.

Q. And by the way, that's Judge Breyer up there.

THE WITNESS: Hi, Judge.

BY MR. BOUNDAS:

Q. Say hello to the judge.

So where do you live now, Brianna?

A. I currently live with my parents in Franklinton, North Carolina.

Q. Okay. For people who aren't familiar with Franklinton, give us a sense, how far from Raleigh is Franklinton?

A. It's about a half-hour drive.

Q. And tell our jurors, have you always lived in North Carolina?

A. Yes, I have.

Q. So we're in this federal courtroom. We got jurors. We

got people in the gallery. It's a grand courtroom. Are you nervous?
A. Super nervous.
Q. Okay. And you and I talked about this some before you were going to testify this week.
A. Um-hum.
Q. And I want to talk to you about some of the fears that you had when you were coming in here. Okay. Do you remember telling me about that?
A. Yes, sir.
Q. Okay.
What are some of the fears, Brianna, that you have about what's going to happen here today in your testimony and about this trial?
A. My main fears are that no one will believe me because of my substance abuse history. And it's scary. It's scary. And I just want to be heard. I don't -- I don't know. Scary, regardless. It's scary.
Q. You have fears of people won't believe you, right?
A. Um-hum.
Q. Okay. Are you here to tell the truth, Brianna?
A. Yes, I am.
Q. Better or worse?
A. Better or worse.
Q. Ask you about your drug use?

A. What you want to hear about it?
Q. Okay. Brianna, Uber's lawyer spent some time this morning telling the jury about your drug and alcohol abuse and that history.
Can you tell the jury, have you had real struggles with drug and alcohol abuse throughout your life?
A. Yes.
Q. Is that a fact?
A. That is a fact.
Q. Okay. Tell the jury, are you going to deny any of that?
A. I don't deny any part of it.
Q. Okay. In your -- in your view, what is this case about?
A. This is about me being assaulted by one of Uber's drivers.
Q. And --
A. And I want justice for it. I want accountability. I don't want anyone else to go through that.
Q. And, Brianna, despite the fact that you've had this history of drug and alcohol abuse, which they said started when you were 11 years old; is that fair?
A. Eleven was the first time I used marijuana.
Q. So you said this case is about what happened to you in the Uber, right?
A. Yes.
Q. Okay. Now, I want you to look at our jurors and tell

them because they're entitled to know the truth. Are you here to tell them the truth about what happened to you on March 16, 2019?

A. Yes, I am.

Q. All right. So before we get to the Uber incident, Brianna, I want to just spend a little bit of time talking about you, who you are so the jury can get a sense of Brianna Mensing before we go right into what happened to you. Is that all right?

A. Okay.

Q. So you said you were born in Raleigh?

A. Yes, sir.

Q. Okay. When were you born?

A. June 2nd, 1995.

Q. Okay. So I know it's probably not appropriate to ask your age, but can you tell us --

A. I'm 30 years old. I'll be 31 in June.

Q. If it makes you feel any better, I'm 56. So we've shared that.

So the assault by the Uber driver, I think we've heard from everybody, there's no doubt about it, it occurred in March 2019, right?

A. Yes, sir.

Q. Okay. That's a day you remember, right?

A. March 26.

Q. Yeah.
How old would you have been when that happened.
A. I was 23, I want to say.
Q. Twenty-three?
A. About.
Q. So you were born in Raleigh. Where did you grow up?
A. In Raleigh. I grew up Raleigh by Fox Road. I went to Fox Road Elementary School.
Q. Do you have any brothers or sisters?
A. I do. I have a brother and a sister.
Q. Okay. Give me their -- well, I know their names.
A. Maxwell and Danica.
Q. Just give me the sort of pecking order. Who's the oldest?
A. Danica is the oldest. She's four years ahead of me. And then Max is a year older than me. And then I'm the baby.
Q. Okay. So you're the baby of the family. By the way, does Max live near where we are in Charlotte?
A. Yeah, he does.
Q. Got any plans to see him at least while you're here?
A. I do. I'm going to see him tonight.
Q. All right. That's good.
So growing up, Brianna, just tell us what did your dad do for a living?
A. He mostly worked at Rooms To Go as a salesman. And

prior to that he was a salesman. He's just been a salesman.
Q. Mostly Rooms To Go, like that furniture store?
A. Yeah.
Q. Okay. And what about mom, what did she do?
A. She was a stay-at-home mom up until we all decided to stop being homeschooled. And she went and got a job. And now she owns a business, dog-grooming business.
Q. Right.
A. Yeah.
Q. You told me she's like mobile dog groomers, pulls right up to your door. Very convenient.
A. She's very good at it too.
Q. So are your parents still married?
A. Yes, they are.
Q. And you said you're living with them at least for now?
A. Yes, I am.
Q. When you were growing up with Max, Danica, did you all live together with your mom and dad?
A. Yes.
Q. What about, was there any particular family members like a grandparent that you were close to when you were young?
A. Yes. My grandma, I call her Grammy. It was my dad's mother. She was my best friend. She's my confidante. And I talked to her about everything.
Q. You shared things with her?

A. Um-hum. Everything.
Q. Just so the jury understands, she's passed away, right?
A. Yes.
Q. And she was not alive at the time of this incident for you to tell her, right?
A. Nuh-uh.
Q. Okay. Just wanted everyone to understand that.
So we've been -- you and I have been talking, getting to know each other as this case has gone on.
You told me that you were a tomboy as a kid, right?
A. Still kind of am.
Q. Why don't you start as a kid and then tell me why you think you still are?
A. Well, as a kid, like I was climbing trees. I was playing sports. I played basketball. I ran around with no shoes on in the neighborhood, doing tricks on my bike, rollerblading, skateboarding, all that.
Q. Okay. So you --
A. I was all over the place.
Q. Like --
A. Sporty.
Q. So back when -- I have two sons. They don't play outside anymore. But this is back when kids played outside.
A. Yeah.
Q. Okay. Was rollerskating a thing when you were kid?

A. Yeah.
Q. They had a roller rink?
A. Yeah. I'd go to the roller rink every Friday, 7:00 to 11. It was called Jelly Beans.
Q. All right. You've also told me about -- you spent a lot of time in your life around lakes, the water.
A. Um-hum.
Q. Tell us about that.
A. Well, growing up my dad had two Jet Skis. And we had eventually got a place at Lake Royale. And we had a camper on a lot. And we'd keep our Jet Skis there. And we frequented the lake quite often.
Q. Okay. And where is Lake Royale?
A. It's technically Louisburg, but it's pretty much Bunn. I don't know if anyone's even heard of Bunn, but --
Q. Okay.
A. -- it's about a half hour from Raleigh.
Q. So your dad had a camper there, and you guys would Jet Ski, play in the water?
A. Um-hum. Go camping.
Q. You know, Brianna, I just brought a couple of pictures I wanted to show the jury.
MR. BOUNDAS: Ms. Brown, do you have those?
MS. BROWN: If I could have a copy, that would be great.

MR. BOUNDAS: Yeah.

MS. BROWN: Thank you.

MR. BOUNDAS: Ms. Brown, do you want to look at these?

MS. BROWN: I'm good.

MR. BOUNDAS: You're good?

MS. BROWN: Thank you.

BY MR. BOUNDAS:

Q. Brianna, I know we're going to get to the Uber incident, and this is what the jury wants to hear about. I just want to cover a little bit more about who you are so that they can learn a little bit more about you. Okay? I wish we could spend more time letting them to get to know you, but that's not what we're here.

So let's look at just a couple. You said you looked spending time in the water.

MR. BOUNDAS: With Your Honor's permission, can we display a photo?

THE COURT: Yes. Go ahead.

MR. BOUNDAS: Thank you.

THE COURT: Give me a number.

MR. BOUNDAS: This is P-04951.

THE COURT: Okay. Admitted.

(Plaintiff's Exhibit Number P-04951 was received into evidence and published.)

MR. BOUNDAS: Thank you, Mr. Smith. I couldn't tell if it was zoomed in.

BY MR. BOUNDAS:

Q. Tell me what's going on here. Who is this and where are you?

A. Well, on the last was my brother Max, and then the middle Danica, and then I am the blonde girl with the straight bangs on the right. And we were at the lake. My dad would take us out on the inner tube and we'd fly all over. It was a good childhood.

MR. BOUNDAS: I have another one. This is P-04946. May I just?

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04946 was received into evidence and published.)

BY MR. BOUNDAS:

Q. Who's in this picture?

A. The one on the left is my brother Max, and the right is me.

Q. You're going to go see Max tonight?

A. Um-hum.

Q. Maybe you should bring him a copy of this. You can show him.

You mentioned also -- you said you like climbing trees?

A. Oh, yeah. I was a big tree climber.

MR. BOUNDAS: All right. P-04966, if I can display that.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04966 was received into evidence and published.)

BY MR. BOUNDAS:

Q. So there's you and who?

A. Max and Danica.

Q. Okay. In a tree?

A. Yep.

Q. You mentioned about tree climbing. What was your first email address?

A. It was breezymonkey62@hotmail.com. I was a little monkey.

Q. Monkey being?

A. In the trees.

Q. So at some point did your family move away from Raleigh?

A. We did.

Q. Okay.

A. When I was about 16 we moved out to Franklinton, and it was cultural shock for me. I went from the city to the middle of nowhere. It was -- it was -- traffic was being held up on the one road by a riding lawn mower. Why it was in the middle of the road, I don't know why. It's like --

Q. It's a small --

A. Small town.
Q. Okay.
A. The very small town.
Q. And so how old were you when your family -- your family all moved, right, together?
A. Um-hum.
Q. How old were you?
A. I was 16.
Q. Okay. Because I think you told us it was a small town. Anything else about Franklinton you wanted to share with us.
I just want some jurors --
A. There's nothing really to do there.
Q. Some jurors --
A. People often find stuff to do. I mean, I rode four-wheelers and such. We also had four-wheelers. Nothing to do there. It's very boring. Most people are drugging and drinking. And that's pretty much all that there is to do there.
Q. Got it.
MR. BOUNDAS: So I want to just show you one last picture sort of later. This is P-04944.
THE COURT: Admitted.
(Plaintiff's Exhibit Number P-04944 was received into evidence and published.)
THE COURTROOM DEPUTY CLERK: The number again?

MR. BOUNDAS: There's a lot of numbers on these. P04944.

THE COURTROOM DEPUTY CLERK: Thank you.

MR. BOUNDAS: You're welcome.

BY MR. BOUNDAS:

Q. Okay. So this is when you were a little bit older. What was -- tell us about this picture.

A. That was in Pembroke when my brother -- he's a music major. He went to UNC Pembroke. And we were going to one of his recitals. And that's my grandfather, my mom, her mom, and my dad's in the back. And then there's me, of course.

Q. So Max was a music guy?

A. Yep. He still is.

Q. What's he do?

A. He teaches virtually kids. Like, he has some in California. He has some all throughout the United States. And he's even, like, played for the Hornets and the Panthers.

Q. What's he play?

A. He plays the tuba.

Q. Ms. Brahmbhatt mentioned you were a big music fan. She told the jury about that in opening. Why don't you tell us from your own words?

A. About my music?

Q. Yeah, your love for music. What you like?

A. I mostly like oldies. Like, I would dance around with

my grandma when she was still alive, listening to like Mungo Jerry and Frankie Valli. Everybody loves Frankie Valli.

Q. All right.

A. I don't know where I'd be without music. When I was in music school, I was a year behind Max. I was actually in percussion for a while, and I had a drum set and all that and so. I love music.

Q. So you're in Franklinton. You mentioned you're living with your parents. What are you doing for work these days?

A. Now?

Q. Now.

A. I'm currently working at U-Haul in Wake Forest.

Q. Okay.

A. I've been there a year and a half. A little bit more than that.

Q. All right. What do you do at U-Haul?

A. I'm a facility housekeeper.

Q. And how many days a week do you work?

A. Five days.

Q. One other thing about your life. Do you have any children?

A. Yes, sir. I have one son. He's nine. His name is Travis.

Q. All right. I just wanted to share just a couple of photos of Travis. Did you bring some to court to show?

A. You got them, don't you?
Q. I've got them. But you gave them to me, right?
A. Yeah.
MR. BOUNDAS: So P-04941?
THE COURT: Admitted.
(Plaintiff's Exhibit Number P-04941 was received into evidence and published.)
BY MR. BOUNDAS:
Q. Well, that's you and Travis, right?
A. Yeah. It was a while ago.
Q. Like, how old was he in that picture?
A. He would have been like two and a half maybe.
MR. BOUNDAS: All right. And I've just got one more. P-04973.
THE COURT: Admitted.
(Plaintiff's Exhibit Number P-04941 was received into evidence and published.)
BY MR. BOUNDAS:
Q. And this looks like to be one of those -- why don't you tell us. Is this like a recent photo?
A. That was last year's.
Q. Got to be a school picture?
A. Um-hum.
Q. Looking good and.
A. Yes.

Q. So let's get right to why we're here, right? 2019, March. That's when this incident happened, right?
A. Yes, sir.
Q. Okay. So were you living with a boyfriend at that time?
A. Yes, I was. It was Neal Young.
Q. Neal Young. And Ms. Brahmbhatt mentioned Mr. Young. How did you meet him?
A. I met him in passing because like, Dave Yankowski, he was -- he had a camper on our lot Lake Royale. And then whenever my dad sold off the lake house, David moved on the next street up, and that's where -- Neal was his neighbor. So whenever we would go up to the lake, it would be the -- see Dave. And I met Neal because he was next door.
Q. At some point did you and Neal Young start dating?
A. Yeah.
Q. Okay. Ballpark, when was that?
A. 2018.
Q. All right. And you eventually you said you moved in with him?
A. Um-hum.
Q. All right. When was that?
A. Shortly thereafter we started dating.
Q. So you were living with him when this Uber incident happened?
A. Yes.

Q. All right. His house?
A. Not at Lake Royale. We actually moved to Raleigh on Fayetteville Road, to an actual house, not a camper.
Q. So you lived with him in a camper --
A. Um-hum.
Q. -- and then you guys moved to a house.
A. Yes.
Q. So what did Neal do for a living?
A. He is a partial owner of a roofing company.
Q. And the house was in Raleigh, correct?
A. Um-hum. Yes, sir.
Q. Just tell us a little bit about your and Mr. Young's relationship. What kind of things did you like to do together?
A. Just about everything. We always were going out. Like, he was real big into NASCAR, so we went to lots of races. There was a racetrack right up the street. He always would take me to the movies and everything. We went to -- he's took me on, like, to Myrtle Beach. It was -- he was a really good guy. He was really sweet.
Q. A lot of normal couple stuff, going to the movies and stuff like that.
A. Yeah. Um-hum.
Q. Did he have -- did you go to the lake with him? Did he have a place?

A. Yeah. Next to -- he still kept his place at the lake. His parents were two or three campers up, and then there was David was his neighbor. Yep.
Q. And you and Mr. Young go to the lake?
A. Um-hum. Almost every weekend that we didn't have something else planned.
Q. Okay. Just as a -- you dated him for a while. You lived with him.
A. Um-hum.
Q. Just tell us, what were your impressions of him? Was he good a guy? How did he treat you? Tell the jurors something about Mr. Young.
A. He was spontaneous. Every day he would stop and get me something at like -- I came home after being with my parents for a week, and he had the whole freezer full of Reese's Sticks because he kept bringing them back every time he went to the store. It was like little things like that. That's was that -- I don't know. He was a lot. He was really sweet. I was like, how am I going to eat all of these?
He would buy me flowers. He would endure the two-hour ride in traffic so he could take me to see my son. And then the two hours back. It was a lot of things.
Q. And you mentioned a trip to Myrtle Beach. The only reason I want to ask about it is, was that around the time of the Uber incident?

A. I think it was earlier on in the month. It was the same month.
Q. It was the same month. And you guys -- was it just a like a beach vacation? Do anything specific?
A. It was spur of the moment. I had -- he's just like pack up your bathing suit and let's go. And he got an Airbnb condo. And we had a good time at the beach.
Q. Okay. So I want to turn to the night of March 25, 2019. Okay?
A. Okay.
Q. All right. So that's when this all happened with the Uber driver, right?
A. Yes, sir.
Q. Okay. So you were living with Mr. Young at the time, right?
A. Yes.
Q. Do you remember his address?
A. It's 9705 Fayetteville Road.
Q. Okay. And the night of March 25, 2019, do you recall if that was the first time you used -- you ordered an Uber?
A. Leaving there it was, yes.
Q. When you left Mr. Young's house?
A. Yes.
Q. And we'll talk about where you went. But just tell us right now, where were you going?

A. I was going to an old friend, Trevor Woodham's, house.
Q. Okay. I just want to show you --
MR. BOUNDAS: Ms. Brown, do you have copies of our exhibits?
MS. BROWN: I believe I have them. If you'll just call out.
MR. BOUNDAS: I'll call -- if you don't have them I'm happy to.
This is P-04695.
THE COURT: Admitted.
(Plaintiff's Exhibit Number P-04695 was received into evidence and published.)
MR. BOUNDAS: I'm turning that way and I should be.
BY MR. BOUNDAS:
Q. So I want to -- I know the exact time -- did you leave in the evening?
A. Yes.
Q. So what I want to show you is this exhibit. If I may display it. And these are records Uber produced to us. Would it refresh your memory to know exactly what time you left?
A. I mean, I remember it was 9:00.
Q. Yeah. Okay. So we've got -- this is 3/25/19. And you left at 9:30, got there around 9:49. Does that sound about right?

A. Yes, sir.
Q. Okay. And so you said this was the first time that you actually ordered an Uber and took one, correct?
A. Yes.
Q. Did you have a ride that night?
A. No. That's why I utilized Uber.
Q. Just generally, how did you become aware of Uber?
A. I'm pretty -- I'm not 100 percent on how, but I thought it was from an ad on television.
Q. A lot of people have heard about Uber, and you were one of them, right?
A. (The witness nodded their head.)
Q. Okay. Do you remember that night before you left at 9:00, like generally what were you doing that day?
A. Lounging. Being lazy, sitting around the house watching TV. Nothing special.
Q. Okay. Where were you?
A. At Neal's house.
Q. Mr. Young's house. Okay.
So you decided to call an Uber. You said you were going to visit this Trevor. Who's Trevor?
A. He's is a very old friend. I met him when I was like 11, almost 12. So I've known him for a long time.
Q. So you were going to catch up with an old friend?
A. Um-hum.

Q. Just on the Uber trip going from Mr. Young, Neal Young's house, to Trevor's, was anything unusual, eventful happen on that ride that you recall?
A. No.
Q. Okay. I want to talk just for a minute about Trevor and why you were going to his house. Okay?
You said you had known him for a long time, right?
A. Yes.
Q. What did you call him Trevor or?
A. Trey.
Q. Trey?
A. I knew him as Trey.
Q. So before March of 2019, how often were you and Trey in contact?
A. It was very rare for years. At one point he had moved here to Charlotte, and then I don't know, we just fell off. I don't know. Stopped contacting each other for a while. And then he would just come up out of nowhere and be like, Hey, how are you doing? Yeah, it's very rare.
Q. Seeing him in person, had you seen --
A. I hadn't seen him in years.
Q. Years. Okay.
So you'd text on social media sometimes. How did you wind up going over there that night?
A. I was invited.

Q. Okay.
A. He invited me over.
Q. All right. And you told me that -- I'm going to find this. You told me that Trevor was an artist?
A. Yes.
Q. Okay.

MR. BOUNDAS: I just want to show the jury, if we can, P-04977.

MS. BROWN: Your Honor.

THE COURT: Admitted.

MS. BROWN: I object, Your Honor, on relevance.

THE COURT: I'll allow it.

(Plaintiff's Exhibit Number P-04977 was received into evidence and published.)

BY MR. BOUNDAS:

Q. Who is the guy in the corner?
A. That would be Trey, Trevor.
Q. And so he was an artist-type person?
A. Yep.
Q. Did you ever go to one of his art shows?
A. I have.
Q. Okay.
A. And those -- the two black-and-white pictures are the ones that -- he actually drew those like at my house back in, I don't know, like 2009 maybe.

Q. Okay. So those are pictures he drew?
A. They're very old.
Q. Got it.
A. Yes.
Q. So you're going to catch up with your old friend. What -- when you got there, I think we just showed it was around 9:30ish what did you do at his house. What did you guys do?
A. Well, I got there, and we just sat on the couch, opposite. Like he had an L-shaped couch. And he offered me one beer. I drank one beer. I remember that I was broke. He was broke. So the -- he had a six-pack and there was only three, so I was like okay.
But I made fun of him because he had all those -- he's like a nerd obviously by his drawings and such. So he had a bunch of the Funko Pop toys all over like the house. I was like, nerd.
Q. I don't know what those are. Are they the bobble head kind of things?
A. I guess. And you keep them in the box. I don't understand that. But, yeah, it's just a bunch of little toys. And he's like a grown baby, child like.
Q. So you and Trey were catching up?
A. Um-hum.
Q. Looking at his collection. Anything else you remember

doing with him?
A. No.
Q. All right. Now, we've heard -- our jury has heard quite a bit about your drug and alcohol use. And that's something that you don't deny, right?
A. I don't.
Q. Okay. But someone on the jury might be asking themselves, like how is it that you only had one beer that night.
A. Because that was all I had. There was -- you can't -- I can't like magically make things appear. I didn't have money for it.
Q. And -- well, were you going -- were you going to Trevor's house to drink --
A. No.
Q. -- or to do drugs at all?
A. No, I was going to catch up with him.
Q. So was Trey at that point -- you hadn't seen him in years. Was he someone that you were doing -- using drugs or getting drunk with?
A. No.
Q. Okay. He wasn't one of the people you would do that with?
A. No.
Q. And just so the jury knows, the purpose of this trip to

his house was not for any drug use?
A. No.
Q. Now, you were living at the time, and I think you said, with Neal. We know that.
A. Um-hum.
Q. And at that time he was the owner of what kind of a company?
A. It was a roofing company.
Q. Okay. Did Neal Young, the man you were living with at that time, was he a drinker?
A. On occasion. Like on weekends he would drink. I would drink with him on weekends.
Q. Okay. Was he --
A. I was --
Q. I'm sorry. I cut you off.
A. You go ahead.
Q. So you said he drank on weekends. Was he like a heavy drinker?
A. No.
Q. Social drinker?
A. Social.
Q. If he drank on weekends at Neal's house, would you have a drink with him?
A. Yeah.
Q. Or more?

A. I would. He would monitor me, though. He would like -- he knew that I had a drinking problem, so he would buy like the airplane bottles, like the pack of airplane bottles and he would divvy them out so I wouldn't get too drunk or anything.
Q. Did Neal -- tell the jury, did Neal -- was he a drug user?
A. No.
Q. Was he somebody that you used drugs with?
A. No.
Q. Were there certain people in your life that you would use drugs with?
A. Yes.
Q. Okay. I'm not asking you for their names, but there was -- that sort of what you would use when you were with those certain people?
A. Yes.
Q. Okay. And Neal was not one of them?
A. No.
Q. Okay. Now, I want the jury to understand. You did at times engage in -- times you would just I'm just going to say like spiral out and drink really heavily or use drugs consistently?
A. Yes.
Q. Okay. You're not denying that, right?

A. Not denying that.
Q. Now, was that all the time?
A. No. It was usually -- it was just around certain people. It's like peer pressure. If something happens like -- I don't know. I lost my best friend, that's who I named my child after, when I was like 15. So every year around the date that he died I would like spiral.
Q. And I'm just asking -- and it wasn't just during that time. You had other times where you would --
A. I know.
Q. -- kind of go off the rails with drugs and alcohol, right?
A. Yes.
Q. Okay. And I know -- there's a lot of people in this room. I understand. But we've got to talk about this, right?
A. Um-hum.
Q. And are you willing to be open about it?
A. Yeah.
Q. So I do want to talk about something that Uber's lawyer, Ms. Brown, showed in opening. It was a piece of testimony from you that said in 2018 or 2019 you recall you may have been using heroin. Do you remember that?
A. Yes.
Q. Okay. And were you using heroin like for those two

years or periods of years every single day?
A. No, sir.
Q. Okay. So you didn't go a year for 365 days and use heroin every day?
A. No.
Q. Even close to that?
A. No.
Q. The next question you were asked is when you were using, okay, did you use it every day?
A. When I was using, did I use it every day?
Q. So --
A. No.
Q. I'm trying to give the jury a sense. Is this something -- were you like on binges at certain times on certain drugs?
A. Yes.
Q. So you weren't on heroin all the time, but you'd binge and use it a lot of times, right? Is that fair?
A. I would use it around certain people. I never had like a heroin dealer, so I wasn't like -- I could just go get it whenever I wanted. I didn't want -- yeah, I didn't -- I was with people who would do it and then I would do it with them.
Q. At that point you were living with Mr. Young?
A. Um-hum.
Q. Did you do drugs in his house with him?

A. No.
Q. Okay. Now, look. I just -- we know you've used drugs and alcohol, right. It's out there. We've talked about it. But I want to talk about this case.
A. Yes.
Q. Okay. You weren't using drugs and alcohol every single day, were you?
A. No.
Q. Okay. And on this night, March 26 -- well, 25 to 26, because we go in the early morning, were you -- other than the beer that you had with Trey, were you using drugs and alcohol that day?
A. No, I wasn't.
Q. Okay. And was it your purpose that night in any way to go seek out drugs or become intoxicated?
A. I probably wouldn't have gone to his house if I was. No, I was not seeking out any drugs or alcohol.
Q. All right. Now, I want to be clear with this jury. Okay? Can you tell them, you know, were you drunk or intoxicated that night?
A. No, I wasn't.
Q. Okay. So let's talk about you went to Mr. Williams's house. You looked at some of his figurine things. You watched TV. You had a beer.
A. Um-hum.

Q. After you left, how did you leave?
A. I ordered another Uber.
Q. Okay. And where were you going to go?
A. Back home to Neal's house.
Q. Neal's house. All right.
So this would have been the second time you ever ordered an Uber?
A. Yes, sir.
Q. All right. So you used the Uber app, I assume on your phone, right?
A. Yes.
Q. Just around what time -- I can go back to the exhibit. Around what time do you recall leaving Trey's house?
A. Around 1:00 or 2:00.
Q. Would it help you if I showed you our exhibit again? Because I want the jury to understand the times here, okay?
A. Um-hum. Yes, sir.
Q. So we're going to look back at P-04659. And these are records Uber produced to us. So we already talked about this one to Trey's house.
MR. BOUNDAS: I think we already admitted this.
THE COURT: We didn't admit this.
MR. BOUNDAS: I'm sorry, Your Honor. Can we please admit P-04659?
THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04659 was received into evidence and published.)

MR. BOUNDAS: Thank you, Your Honor.

BY MR. BOUNDAS:

Q. Okay. So begin trip is 1:25 in the morning. Does it sound about right?

A. Yes, sir.

Q. Okay. And then did you get dropped off, it looks like 1:53ish?

A. Yes, sir.

Q. I mean, I know you weren't like checking your phone for exact times. But does that sound about right, late at night?

A. Yes, sir.

Q. All right. So have you seen the ride receipt that Uber -- that you got from Uber? You take a ride, you get a receipt, right?

A. Yes.

Q. Okay. I want to show -- this is P-04969.

MR. BOUNDAS: And I offer the document.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04969 was received into evidence and published.)

BY MR. BOUNDAS:

Q. So have you seen this before, Brianna?

A. Yes, sir. It's from my email.

Q. That was actually pulled off of your email?
A. Yes, sir.
Q. Okay. So it shows that you took an Uber ride, paid for it. I want to go back to the -- talk about the driver in a minute, but.

So the Uber ride receipt shows you going from 1010 East Martin, Trey's house?
A. Yes.
Q. Dropped off just where you told the jury you were dropped off?
A. 9705.
Q. Mr. Young's?
A. Yes, sir.
Q. I want to ask you something, and I want to show you a picture.

MR. BOUNDAS: It's P-04929.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04969 was received into evidence and published.)

BY MR. BOUNDAS:
Q. Who is this?
A. That would be the assailant. His name was Jeffery, from the receipt.
Q. If we look back at the receipt, I think we can --

MS. BROWN: I'm sorry, Counsel. What number is

this?

MR. BOUNDAS: P-04929.

MS. BROWN: Thank you.

MR. BOUNDAS: You got it?

MS. BROWN: Yes. Thank you.

MR. BOUNDAS: You're welcome.

BY MR. BOUNDAS:

Q. So the ride receipt shows that you rode with this man, Jeffery, right?

A. Yes, sir.

Q. And this picture, is this the man who assaulted you that night?

A. Yes, sir.

Q. Okay.

A. Without a doubt.

Q. Without a doubt.

Do you remember his face?

A. I definitely remember his face.

Q. Do you remember what he did to you?

A. Yes, I remember what he did to me.

Q. So we're going to have to go through this. I know this isn't a night you really -- is this a night you really want to talk about?

A. I've been talking about it for a while now, going over it with -- back and forth.

Q. You're ready to tell our jury the truth about what happened that night?
A. Yes.
Q. Okay. So we had the ride receipt. We looked at -- Jeffery definitely was the guy who picked you up, right?
A. Yes.
Q. Uber's records show that. Your memory shows that, right?
A. Yes.
Q. Okay. So he pulls up to Trevor's house at some point, right?
A. Um-hum.
Q. Okay. How did you want -- well, let me ask you first where did you sit in the car?
A. Well, whenever he arrived, he had his window down and he asked me to sit in the front seat. And I was like, What? Do you not want to chauffeur me or something? I thought nothing of it so I just got in the front seat. I had no idea it was going to be a -- what it -- I didn't foresee that happening what happened to me.
Q. This was only your second Uber ride, correct?
A. Yes. I thought it was supposed to be a safe platform to get a ride.
Q. But you didn't think much of the driver asking you to sit in front --

A. No.
Q. -- at that time?
A. Like I said, I said to him, you don't want to chauffeur me or something. I thought it was a joke. I mean, I was joking. Anyways.
Q. So you were in the front seat. By the way, when you take Ubers -- and you -- the jury heard, and we'll talk about that. When you take Ubers or Lyfts, where do you sit now?
A. In the back. Definitely, every time.
Q. Now, during the ride were you and this driver like talking at all?
A. Yeah. I typically have a conversation with anybody I'm in the car with because otherwise it's awkward.
Q. Was it -- tell us about it.
A. It was just chitchat. It was nothing significant. It was nothing weird or like perverted or anything -- any indication of a green light for anything.
Q. Just casual conversation?
A. Yeah.
Q. Okay. Now, at that time in the ride did you have anything to be like worried about --
A. No.
Q. -- or alarmed about?
A. No.
Q. I want to show you just sort of a map.

MR. BOUNDAS: This is P-04962.00005.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04962.00005 was received into evidence and published.)

BY MR. BOUNDAS:

Q. And if I may show the jury.

So is this -- tell us what this is.

A. That's a map.

Q. From where?

A. From Trey's house to Neal's house.

Q. Okay. So that's where you were going?

A. Um-hum.

Q. Did you pay any particular attention to what route the driver was taking?

A. I did not.

Q. Was there any significance to you at that time of the route?

A. I didn't think I needed to -- I mean, I know I was going in the right direction.

Q. Right.

A. But I wasn't really watching the road because I wasn't driving.

Q. As you're driving along with this Mr. Richardson having conversation, did you have any reason at that point to think you were in any particular danger?

A. No.
Q. Were you trusting Mr. Richardson, Uber's driver, to get you to Neal's house safely?
A. Yes.
Q. Was that what you expected?
A. That's exactly what I expected.
Q. And on the ride home, do you remember making any stops?
A. I don't remember it, no.
Q. Again, you weren't paying a whole lot of attention to the route at that time until you got to Neal's house, right?
A. Yes.
Q. So at the end of the ride I think we looked at the ride receipt. I'm not going to put it back up.
But at 1:53 a.m. March 16, is that when you got to Neal's house?
A. Yes.
Q. Okay. I want to show the jury so they can get a sense of what, like, the property looked like.
MR. BOUNDAS: And for that reason I'd like to offer and show P-04962.
(Plaintiff's Exhibit Number P-04962 was received into evidence and published.)
THE COURT: Which number -- you've already admitted that 0005.
MR. BOUNDAS: Oh, I'm sorry, Your Honor. It's

00001.

THE COURT: Okay. Admitted.

MR. BOUNDAS: Thank you, Your Honor.

(Plaintiff's Exhibit Number 00001 was received into evidence and published.)

BY MR. BOUNDAS:

Q. Tell us -- let's go with the zoomed out. So is this -- tell us what we're looking at.

A. So if you can see the roof and everything right here, that's the house. And then we have --

Q. The house is where I'm sort of --

A. Yes. Yes, right there. Yes.

And then where we turned in is right here at the left driveway.

Q. This one?

A. No, the one left.

Q. Is it kind of a dirtish road?

A. Yes.

Q. So this is the house, but what's this whole compound back here?

A. Well, we had a dog. He still has him but. There's a gate, a fence, and then like at the back all that building structure and stuff back there is part of his business. There's even like -- if there was a bigger picture. The property is part of his business. He's even got like a giant

sign right there in the front yard.
Q. All right. Was this like a residential area?
A. No.
Q. There was --
A. That's a car lot right there.
Q. This is a car lot?
A. It's like a used car lot, yeah.
Q. So it wasn't like some neighborhood where there were a bunch of people around?
A. No. Nuh-uh.
Q. I want to show one more picture of the house, and then we're going to talk about what happened. But I want -- because the one I just showed you was in the day. And I want to ask --

MR. BOUNDAS: This is, Your Honor, P-0498.00001.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-0498.00001 was received into evidence and published.)

BY MR. BOUNDAS:
Q. So when you pulled up -- well, is this the house?
A. Yes.
Q. Okay. And these pictures were taken at night, right?
A. It looks that way.
Q. Well, then it was dark, right?
A. Yeah.

Q. So the jury knows, these weren't taken that night, right?
A. Yeah, no.
Q. Is that what it looked like that night, more or less?
A. Yes.
Q. Okay. So where does Mr. Richardson pull the Uber up?
A. Pretty much that first picture right there. It was right there on the side. Yes.
Q. Where I circled here?
A. Yes.
Q. And a full view would be kind of in the circle here?
A. Yes.
Q. So you're not -- you're in front of Neal's house, right?
A. Yes, sir.
Q. It's not a residential area with people around, right?
A. No.
Q. Dark?
A. It was very dark.
Q. Late at night?
A. Very late.
Q. Any people around?
A. No.
Q. You and the driver alone in the car?
A. Yes, sir.
Q. You in the front seat?

A. Yes, sir.

Q. Sitting right next to him?

A. Yes, sir.

Q. Tell the jury when he stopped the car, before you got out, what Mr. Richardson did.

A. As soon as we rolled up, I said thank you, as I do every other driver. And I put my hand on the hand knob -- not hand knob -- the door handle to go by. And he like slapped and grabbed like a giant handful of my thigh and asked if he could keep it with him, take it with him, keep it. It was really disgusting to say the least.

So as soon as he did that, I went into like flight or fight mode. And I just ran. And I had the opposite side of the house because that's where the door was unlocked.

Q. Right. Before we get to your running, I want to ask you some questions about in the car.

So Mr. Richardson was sitting next to you. Was he a big person?

A. He's a ginormous man. He was like 3, 400 pounds maybe. I don't know. He was huge.

Q. When he grabbed your thigh, can you explain, was this a touch?

A. No. It was not a touch like I keep hearing. No. It was handful, like violently. It was gross. I felt violated and disgusting, and it was inter- -- I didn't foresee it

happening. It was such a shock for me.

Like, I don't understand how it went from having like a casual conversation with somebody, and then it's just all of a sudden it was gross. I don't know why anyone would do that.

Q. And just so the jury knows, and kind of maybe I'll ask you to do this. But can you show us actually where -- was it near your pelvis? Where exactly it was?

THE WITNESS: Can I stand up? It was right here.

THE COURT: You have to stand.

MR. BOUNDAS: If you wouldn't mind showing our jurors.

THE WITNESS: He reached over and grabbed it, and asked if he could keep it for him.

THE COURT: Indicating the left.

MR. BOUNDAS: Well, let's be clear. That's a good point.

BY MR. BOUNDAS:

Q. Indicating the left, right?

A. Yes. He was in the driver's seat.

Q. That would have been the leg closest to the driver's seat?

A. Yes.

Q. So then you said you quickly got out of the car.

A. My hand was already on the door knob -- or handle. So

I'm glad that I was fast as I was.
Q. Whole thing happened pretty fast.
A. Yes.
Q. So at that moment was there any concern in your mind that if you don't get out of the car something else might happen?
A. Well, yes. All of these "what ifs" were going through my head. Time was moving so slow but it was so fast that it happened. What if he hit the lock button before I opened it? What could have happened? I don't even want to think about it really.
Q. So you said -- I want to go back to show our exhibit. You mentioned that you ran after you got out of the car, right?
A. Yes.
Q. What was going through your mind at that point?
A. Get out of here. Fight or flight. Flight. I ran.
Q. Is that about where you were in the Uber?
A. Yes. And I went all the way across the building. The light bluish gray over here, where your thumb is right now. Yeah. I went straight that way, yes. To the garage.
Q. You had to run all the way around to the garage?
A. Yes.
Q. Were you in fear?
A. Yes. I was terrified. I was horrified. I couldn't --

anxious -- I was grossed out. I felt disgusting. I don't -- it's hard to explain. I mean, it's not, but I was freaking out. I'm trembling. I'm trembling right now. It was just disgusting. I felt disgusted to get away from him. I ran inside. I locked the door.
Q. What did you do after you locked the door?
A. After I locked the door, tried to get the dog to go outside. And I tried to get monitor on the computer. So we did have cameras.
Q. Was Mr. Young home?
A. Yeah, he was home. I could hear him, from the living room. He's like a bear when he's snoring. He's really loud.
Q. He was asleep?
A. Yes.
Q. Did you go into his room?
A. I did.
Q. Okay. What did you do?
A. I went in there. I tried to wake up. He didn't easily wake up. I'm assuming -- I don't know. It was -- he didn't wake up. I don't know. I tried. It wasn't working. I tried to calm down.
Q. When you say you tried down, how were you feeling physically at that time?
A. I was shaking. I was -- my heart beating out of my chest. I was anxious. I was violated.

Q. And so at some point after you checked on Mr. Young, you said that you went and looked at -- I think -- did you say you went and looked at the cameras?
A. Yeah. It takes a minute for them to turn on. It's an old monitor. So whenever I came in, I went to the computer and it wasn't immediately just was on. So whenever I went in there. Tried to wake him up. Calm down. Go look again at the monitors. So it was -- I don't know how to work it if it was -- I don't know. But it was always on a live stream. And I was seeing if he was still out there. He wasn't at this point.
Q. At that point. And at that point you had gone to check on Mr. Young. I think you said you tried to calm yourself down. And then you went and looked outside, right?
A. Yes.
Q. By the way, there was some mention in opening statement that you don't remember what happened after this ride; is that true?
A. What happened after --
Q. Yeah. You weren't in here, but they suggested that you said that you don't remember what happened 24 hours after the ride.

Let me just ask you differently. Have you given testimony to Uber's lawyers under oath about this incident?
A. Yes.

Q. Okay. Did they question you under oath for hours?
A. Yes.
Q. Did you tell them what you did, being grabbed, running inside, checking the cameras?
A. Yes.
Q. Were you interviewed by a psychiatrist that Uber hired to evaluate you?
A. Yes.
Q. Okay. Did you tell her what the sequence of events basically that you just told us?
A. Yes.
Q. So you looked outside. And then what did you do next when you were inside? Did you go immediately to bed or do you recall anything else?
A. I felt disgusting. I wanted to wash that man's hands off me. Hand. And I went and took a shower, a very hot shower.
Q. Even when you were back in the house, you said you felt violated, fear, and disgusted. Is that how you were feeling that night?
A. Yes. I still feel like that.
Q. And, Brianna, the next morning, like let's say when it was light outside, okay, what did you do? So --
A. When --
Q. Like --

A. When Neal was awake? When Neal finally woke up?
Q. Yes.
A. Yeah, I told him about it.
Q. Okay.
A. And he seemed like -- he was wondering why I was looking at the cameras. He walked in because I was in the living room whenever he got up.
Q. Did you go back and look at cameras?
A. I was trying to figure it out. And then I only found out that it was only live stream at point.
Q. At that point were you planning on filing a lawsuit against Uber? Was that even part of entering your mind?
A. I mean, that didn't occur to me at the time, no.
Q. Do you know that morning if Mr. Neal was in the room or actually saw you checking those cameras?
A. Do I know that?
Q. Yeah. I mean, you were there.
A. I mean, I turned around and he seen me. Or I seen him when he walked into the room. So, yeah.
Q. By the way, do you recall if the Uber's driver had a camera in his car?
A. Not that I recall.
Q. When he touched you and grabbed you in the car, that all happened inside the car, right?
A. Yes.

Q. Just him and you alone, right?
A. Yes.
Q. So after you checked the cameras, now we're in the morning. I just want to wrap up talking about this incident. Can you tell the jury at that time, you know, how were you -- how were you feeling? What was your reaction by the morning?
A. I was just hypervigilant, really. I was constantly like -- what's the word? -- paranoid. I was paranoid that like he knew where I lived. I didn't want -- I was scared. I kept the doors locked. I was very glad when he never came back.
Q. Okay. So is that kind of your memory of the assault and the, say, 12 or hours afterwards?
A. Yes.
Q. Okay. Brianna, the whole issue in this case, or one of the biggest issues, is that the jurors are going to be asked is did this happened. Did this happen to you?
A. It happened, yes. It definitely happened. Definitely happened.
Q. Okay. And you've taken -- you know, they've said you've taken drugs and alcohol and things like that.
A. Not that day.
Q. But even if you did --
A. Even if I did --
Q. Leave that aside, would it be acceptable for

Mr. Richardson to grab a woman who was intoxicated?
A. No.
Q. Okay. Now, regardless, I want the jury to understand because you said you were -- you had fears about whether or not they would believe you.
A. Yes.
Q. Because you might be judged because of your past and your alcohol abuse.
A. Yes.
Q. But I want to tell them, they're entitled to know the truth of that night. Did Mr. Richardson assault you on March 26th?
A. He did. He did. And he knows he did. I know he knows he did. They know he did it.
Q. So after the assault happened, this was actually your second -- we already talked about this. This was the second Uber ride. The first one was just earlier that night, right?
A. Yes.
Q. Okay. Did you report the incident to Uber?
A. No. I didn't know even know -- I'm not tech savvy. I don't even hardly know how to -- I'm not good with any of that.
Q. Okay. But did it cross your mind that this is -- who report it to Uber? I just want to know. At that time, is that something you were thinking of doing?

A. I wasn't, because I had no proof. And since I was scared of saying anything because I've gone for help before and come up with none.
Q. So there was also mention that you didn't go to the police.
A. Yeah.
Q. Was it the same reason? You didn't think you'd be believed?
A. That is what I'm talking about.
Q. Okay.
A. That is exactly who I'm talking about.
Q. Because they'd show up and not have any physical evidence?
A. Yes.
Q. But did you tell people that you trusted?
A. I did.
Q. Friends?
A. My mother, close friends at the time. I told Dave David.
Q. David?
A. Yankowski.
Q. And David is David Yankowski?
A. Yes, sir.
Q. Okay. And David Yankowski will actually be here this afternoon to talk to the jury. I don't know if you knew that

or not, but they will get to hear from him.

Why did you tell your mother or David or Neal?

A. Because I wanted to tell somebody, somebody that I could, like -- that wouldn't judge me and think that I'm lying and actually listen.

Q. When you were telling these people, were you, like, planning on a lawsuit with Uber and trying to create evidence of it or something?

A. No.

No. That's ridiculous. I don't even -- I can care less about any of that. I'm not --

Q. Tell us --

A. I am not after anybody's money. Period. I am not. I'm here because this is ridiculous that it keeps happening to women. This is crazy that they won't take accountability. I'd be okay with a "Sorry. We messed up." I'd be okay with that. I'm not after their money.

Q. You know they're calling you a liar?

A. I don't -- they're liars.

Q. Do you know whether -- after you filed this lawsuit, you know, they took your testimony, Uber's owner did it twice right. They questioned you under oath, right?

A. Yes, sir.

Q. We mentioned this, they had a psychiatrist talk to you, right?

A. Yes.
Q. It was recorded, right?
A. Yes.
Q. And we have that recording, right?
A. I would imagine, yeah.
Q. And do you know after you filed this lawsuit, they questioned you. They asked you about your drug and alcohol use?
A. They dug into my whole life since I was -- since I can remember. They wanted my dental records. They wanted everything.
Q. They questioned people that you knew, right?
A. Yeah.
Q. Okay. And we did too, right?
A. Um-hum.
Q. And do you know if -- so right when you filed the lawsuit, Uber was denying that this happened, right?
A. Yeah. They're calling me a liar. They'd been calling me a liar.
Q. Do you know that the first time they talked to the driver was just six weeks ago?
A. What?
Q. You didn't know that.
A. No, I didn't know that. How would I know that?
Q. So they were taking his side of the story before they

ever talked to him?
A. That's insane.
Q. Do you know -- and you may not know -- whether they went through all of his records?
A. I highly doubt it. I hope they do, but.
Q. Well, if you don't know, you don't know, and that's fine. We have the -- you haven't seen the driver's deposition, right?
A. No.
Q. Do you want to watch it?
A. Sure.
Q. Okay. Well, we're going to show it to the jury. They're going to get to evaluate that.
So after -- I want to talk to you about a totally separate issue now.
A. Okay.
Q. It was brought up that after this Uber ride, you took Ubers after March of 2019, right?
A. Some years later.
Q. So what I want to show you is -- would it help if I showed you a summary of your Uber rides that you took after 2019?
A. Yes. Sure. You said it was some years later.
MR. BOUNDAS: Your Honor, I have P-04978.
THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04978 was received into evidence and published.)

BY MR. BOUNDAS:

Q. And, Ms. Mensing, what I want to show you -- so I just want you to know that Uber produced to us in discovery your ride history?
A. Um-hum.
Q. So what this is, is a summary of Uber's records of your ride history. So we got March. But March 2019 Mr. Richardson assaults you, right?
A. Yes.
Q. Do you take another Uber in 2019?
A. No.
Q. 2020?
A. No.
Q. 2021?
A. No.
Q. So now we look, and I counted so you don't have to here, looks like 30. There may be more, but 30ish rides. Are you denying that you took Uber --
A. No. I'm not denying any of it.
Q. Right.
A. I took all those rides, yes, I did.
Q. Sure.
A. It was absolutely necessary. I had a job and I had to

get there and had to get home.

Q. I mean, is there is some -- like, the fact that you took Uber after the assault, does that mean the assault didn't happen?

A. No.

Q. Is there something wrong -- do you feel like women who had been assaulted should never take Ubers again?

A. I definitely didn't trust them. I don't think that -- I think that everyone should pay more attention to who they're hiring and who their drivers are.

Q. Okay. It was also brought up that you took Lyft. By the way, do you use Uber anymore?

A. No.

Q. Okay. It was also brought up that you took Lyft. Have you used Lyft?

A. Yeah. All the time. But not all the time, but when it's necessary.

Q. Okay. And when you use Lyft, do you sit in the back seat too?

A. Of course.

Q. So I want to show -- we have a summary -- well, first of all, did Uber ask you to go to your Lyft account and produce all the rides that you had?

A. Did they ask me? I haven't talked to them at all.

Q. Well, they didn't ask you. They asked --

A. So okay, then yes. I don't know.
Q. And you went to your account.
And did you download or pull up everything that you had available?
A. Everything it showed me a record of.
Q. You didn't have access to Lyft's internal records, right?
A. No.
Q. So from what you're able to pull up on your phone, I want to show P-04979.
THE COURT: Admitted.
(Plaintiff's Exhibit Number P-04979 was received into evidence and published.)
BY MR. BOUNDAS:
Q. Is this a summary of the Lyft rides that we can flip through taken really mostly in 2025.
A. Yes.
Q. Looking through, where are most of the rides -- when you're using Lyft, where are you going most of the time?
A. Work or home.
Q. U-Haul, parents' house, some other places, but mostly where?
A. Work or home.
Q. I just have a couple more topics.
What I want to talk about now is you mentioned that you

told certain people, certain friends, family about this incident after it happened. Okay?

A. Yes.

Q. So you told your mother, right?

A. (The witness nodded their head.)

Q. Now, the jury is actually going to see your mother's deposition in this case. Did you know that?

A. I didn't.

Q. Okay. Have you read or seen her deposition?

A. I think not.

Q. Do you have a really specific memory of when you told your mother?

A. No, not really. I don't know. I don't know when exactly I told her.

Q. You did tell her at some point?

A. Yes.

Q. And do you know what your mother testified under oath as to when she was told by you?

A. I have no idea.

Q. Whenever you told your mother, did you tell her the same thing you told our jurors, that he grabbed your inner thigh, and said he wanted to keep it with me?

A. Yes.

Q. Have you ever personally told anyone that this did not happen?

A. No.
Q. When you told your mom, were you planning on filing a lawsuit against Uber? Is that why you told her?
A. No.
Q. I want to talk about Neal Young. So you said earlier that Mr. Young was in the room when you were checking the cameras the next morning, right?
A. Yes.
Q. He saw you do that, right?
A. Yes.
Q. Do you remember telling him what happened?
A. Yes.
Q. That would have been when, the morning --
A. Right then when he seen me looking at the cameras. He's like, What are you doing?
Q. Do you know that he gave a deposition in this case? I guess it was six years after you told him.
A. Okay.
Q. Have you read or seen his deposition?
A. No.
Q. By the way, Mr. Young, are you still dating or seeing him?
A. No.
Q. There's no ill will?
A. No, there's no ill will. We're good. I don't hate

anyone ever or dislike people typically. I usually keep friends with everybody. We're just not together anymore.
Q. Got it. And who is Taylor Lowery?
A. He is my most recent ex-boyfriend.
Q. Tell us when you started dating him, like ballpark.
A. Like four years ago, something like that.
Q. Do you still see him every now and then?
A. Every now and then, yes.
Q. At some point did you tell him about the assault by the Uber driver?
A. Yes.
Q. Do you remember when that was? Was that like a couple years later?
A. It was near -- sometime in the beginning of our relationship because certain things that --
Q. I mean, just tell us when. And if you don't remember exactly --
A. I don't know exactly. '22.
Q. Have you seen or read Mr. Lowery's deposition in this case?
A. No.
Q. All right.
The jury is also going to see the deposition of a woman. I think back when you knew her she was Ariel Watkins.
A. Um-hum.

Q. I think she goes by Ariel Watkins Lankford now. Do you know that?
A. I don't know what her name is anymore. I know she was supposed to get married.
Q. Was she your friend in 2019?
A. She was. I thought she was anyway.
Q. Was she your best friend?
A. She was.
Q. Did you see her often?
A. All the time.
Q. Talk to her a lot?
A. Yep.
Q. Back in 2019, do you remember telling her what happened?
A. Yes.
Q. And do you know whether she gave a deposition in this case in 2025, six years later?
A. I know that she did. I don't know what happened or what she said.
Q. You haven't read or seen the testimony of these witnesses, have you?
A. No.
Q. By the way, have you ever suggested to anyone what they should say or how they should testify or coach them what to say before their deposition?
A. No.

Q. So between 2019 when you were best friends with -- her name's Ariel, right?
A. Yes.
Q. Between being best friends with Ariel in 2019 and then 2025 when she gave her deposition, did you have a falling out with her?
A. Sort of. I was never mad at her. I don't know what -- well, I do know. But yeah, we just fell off.
Q. And when was that?
A. The end of 2019ish.
Q. So she was your best friend, but let's say from 2020ish, I'm not going to pin you to an exact time, but until now are you best friends?
A. No.
Q. How often have you seen her in the last five years?
A. I seen her one time.
Q. Is she a good friend now?
A. No.
Q. Do you know that she had some not very nice things to say about you in your deposition? Do you know that or have you not read it?
A. I haven't read it.
Q. Now, Mr. Yankowski, we mentioned you told him, too, right?
A. Yes.

Q. He's going to come in here and tell the jurors what he saw, what you told him. I just want to know just from your perspective who is he, how do you know him?
A. He used to work with my dad at Rooms To Go. And when we had the lake house, or camper, he moved the camper on to our lot. And my dad had him paying the lot rent so he could stay there. And then whenever we sold that lot, he went up the street and moved next to Neal. And he's just been a family friend ever since I met him. I met him when I was like 15, I want to say.
Q. So is he like your dad's age?
A. I think he's a little bit older than my dad. Yeah. He's looked out for me a lot.
Q. Is he -- is he -- why is he someone -- well, you trust him?
A. Yeah. He's like an uncle.
Q. Why is he someone you felt like opening up and telling what happened?
A. Well, he was my neighbor when I was living with Neal out there. He was my dad's like best friend. He was like my uncle. I don't know. I just -- I talk a lot. I don't know. I talk to people a lot. And like I'm an open book. I don't really keep much from other people. I like -- I talk a lot. I tell everybody everything all the time.
Q. And --

A. So --
Q. -- speaking of telling Mr. Yankowski. Did you tell him what Mr. Richardson did to you?
A. Yes.
Q. Was it -- I'm not going to put words in your mouth. How long after was it?
A. It was only a few days, I think.
Q. Shortly?
A. Yes.
Q. Okay. Certainly you weren't planting that evidence to sue Uber years later?
A. No.
Q. Okay. I only have a few more questions for you, Ms. Mensing.
Let's talk just a little bit about you. There's more to you than a person who uses drugs and alcohol, right?
A. Yeah.
Q. A lot more?
A. A lot.
Q. And you've struggled with that, right?
A. Yes.
Q. And do you feel like because you've used drugs and alcohol in your life that the jury shouldn't believe you?
A. I don't think that they shouldn't believe me because I'm not a bad person. I'm not a liar. I don't make up stories.

I don't -- I didn't even want to like go through with all this because it's just -- I about quit how many times. Like, I didn't want nobody else to go through all of that. I don't want to see another person get hurt. I don't know.
Q. Has been going through this, has it been a hard process?
A. It's been hell. It's been so much hell.
Q. And why are you doing it?
A. To stick up for myself and for everybody else, all these other women, men, everybody. It's ridiculous that they're getting away with any of it. Like, take accountability. That's all. Just take accountability.

Like I said, I'm okay with a Sorry, we messed up. I'm fine with that. I'm really fine with that. I just want -- when you do something wrong or -- just say sorry at least. Make it right. Don't deflect. I want to have like -- I want other people to stop hiding and neglecting their own feelings. I want people to be inspired to speak up. I want everyone to like -- nobody's better than anybody else.

We're all here together. And if you don't take accountability for what you do, like, who are you. Like, I don't know. Like, somebody needs to stick up for the people that won't stick up for themselves.
Q. Has this been hard for you?
A. It's been very, very, very hard.
Q. Okay.

A. Very hard.
Q. Last question: Did Mr. Richardson assault you in that car?
A. Yes.
Q. Thank you.
A. Yes, he did.

MR. BOUNDAS: That's all the questions I have.

THE COURT: Ladies and gentlemen, we're going to take our recess now. We'll be in recess until 1:00. Remember the admonition given to you. Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

(The jury exited the courtroom.)

(The proceedings were recessed at 12:13 p.m. and reconvened at 1:01 p.m.)

THE COURT: Be seated.

In terms of cross, I am going to allow you -- and I haven't heard the argument of the other side. The question is whether there was some amended fact -- amended sheets.

MS. BROWN: Correct, Your Honor.

THE COURT: Okay. So I would allow you to cross her on those.

MS. BROWN: Thank you.

THE COURT: Because those are statements that would come from the plaintiff in describing the incident.

Now, I would also allow the defense -- I mean, pardon me, the plaintiff obviously to talk about the circumstances surrounding those statements, which by the way, I have no idea how they were achieved. But, you know, did she have a discussion with them? Did you write it out and give it to the lawyers? I don't know.

MR. BOUNDAS: Understood.

THE COURT: But I think in other words, in fairness, you can use the statements if you want to, and they can come back and explain the circumstances surrounding the statements. And all that would be presented to the jury.

MS. BROWN: Thank you, Your Honor.

THE COURT: Okay?

MS. BROWN: Yep.

THE COURT: Is there any sort of unaddressed -- this is going to be cross.

MS. BROWN: Thank you.

THE COURT: I want to be careful not to interrupt it --

MS. BROWN: Thank you.

THE COURT: -- if I can.

MR. BOUNDAS: Your Honor?

THE COURT: Yes. Go ahead.

MR. BOUNDAS: I'm so sorry to interrupt.

THE COURT: You're supposed to. I mean, you're not

supposed to interrupt, but this is the time to talk.

MR. BOUNDAS: Yes, it is. And you said you would hear argument from me on it.

THE COURT: Yes. Go ahead.

MR. BOUNDAS: And I'm going to make it.

So here's the thing. There was a motion *in limine* in the Dean trial that was granted on fact sheets, okay?

And part of what was granted was updating the location and timing of the assault, detailing additional descriptive facts. That motion *in limine* was then stipulated by us and Uber this trial.

Now, we get last night, I think it was through the PowerPoints slides, that they're intending on using these fact sheets.

If Uber was intent -- there's clearly something within the scope, or at least potentially in the scope of this motion *in limine*. If they intended to raise an issue that was covered by a previous motion that you granted and they agreed to, they should have brought it up and not waited until --

THE COURT: Well, here's what I understand the context to be.

In the Dean case there was sort of a lot of details and so forth. This may have been off and that may have been off.

This goes, in my view, to the core of what occurred. That is she says X, or she said X in a pertinent time, and it's the defendant's view that that's inconsistent. I'm not characterizing it whether or not it's inconsistent, but that it's inconsistent with a version of events with her testimony today.

MR. BOUNDAS: Okay.

THE COURT: And that's a factor that at least from a prima facie point of view if it meets certain tests it would be admissible. Then up to the jury to make the determination.

So I don't think it's contrary to what happened in Dean. That is to say yes, there were things that were inconsistent or on the margins, but it didn't in Dean go to her basic story as I recall Dean. And Ms. London is here to here to refresh my recollection. So I know that it's inconsistent with that. I'm not so worry about timing.

However, Counsel, if you want to, before turning her over to cross-examination, if you want to ask her questions about that statement, you should be permitted to do so before cross-examination. I'll give you that option, because I'm now ruling after the -- in fairness I don't want it -- I don't want to look like one side or the other is hiding anything. I think that's very important in terms of credibility.

So if you -- you can talk to your team there or whatever you want to do, or come to your own opinion, but I'll allow it, and I'll allow them to proceed with a few more questions.

Welcome.

MR. WYATT: Nice to see you, Your Honor.

THE COURT: Nice to see you.

Do you want to add anything to this?

MR. WYATT: No thanks, Your Honor.

THE COURT: They always bring counsel. You should identify yourself for the record.

MR. WYATT: Geoff Wyatt for the defendants, Your Honor.

THE COURT: They always bring him to my cases. He's got a tremendous track record of success.

MS. BROWN: He's the smart one, Judge. We bring the smart people for the hard arguments.

THE COURT: Okay. All right. So I think we're ready for the jury; is that right?

MR. BOUNDAS: Yes. And, Your Honor, on the issue of whether I want to finish the direct on that issue, I do not think it would be a particularly good idea.

THE COURT: Okay. So you're not going to. Okay. Thank you.

Bring in the jury.

MS. BROWN: And, Your Honor, for the Court and the staff, we have a binder of cross exhibits. Should I hand that up now?

THE COURT: Yes, please.

Counsel, let me just caution you. In terms of cross-examination on prior testimony --

MS. BROWN: Yes.

THE COURT: -- it really has to be virtually inconsistent. I don't like crossing on things that are marginally inconsistent or not inconsistent at all.

MS. BROWN: Yes. I appreciate it, Your Honor. Thank you.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Let the record reflect the jury is present, all parties are present.

Ms. Mensing, will you come up please and have a seat.

Thank you very much.

And counsel may proceed with cross.

MS. BROWN: Thank you very much, Your Honor.

Welcome back from lunch, jurors.

CROSS-EXAMINATION

BY MS. BROWN:

Q. Good afternoon, Ms. Mensing. My name is Alli Brown. It's nice to meet you.
A. Nice to meet you.
Q. I'm here with my colleague Mike Brown on behalf of the folks at Uber, and we have some questions for you today. Okay?
A. Yes, ma'am.
Q. Your claim in this lawsuit, Ms. Mensing, has to do with the description you gave our jurors about Mr. Richardson, I think you used the word grabbed your leg, correct?
A. Yes.
Q. And one of the things you told us in your deposition is that it was about one to two seconds between Mr. Richardson's hand on your -- putting his hand on your leg and your ability to exit the car, correct?
A. Yes.
Q. And I think you described it as immediate, correct?
A. (The witness nodded their head.)
Q. And in addition to claiming that Mr. Richardson put his hand on your leg, you have a claim in this lawsuit that he said something to you as well, correct?
A. Yes.
Q. And remind me what it is that you told our jurors he said to you.
A. He said, Can I keep this with me?

Q. All right. And throughout the course of this lawsuit, you have alleged that he said something different to you, right?
A. Not -- not that I know of.
Q. Let's take a look, if we could.

MS. BROWN: Your Honor, permission to admit D-4018, and that's Tab 1 in the binder we provided to the Court.

THE COURT: Tab 1. Is this in her prior testimony?

MS. BROWN: No, sir. In the larger binder with the exhibits.

THE COURT: Okay. Let me take a look at it.

MS. BROWN: Yes.

THE COURT: Tab 1, and it's 4018.

MS. BROWN: Correct, Your Honor. And I would direct the Court to page ending in .0009.

THE COURT: Okay. You may read that.

MS. BROWN: Thank you, Your Honor.

THE COURT: And that's admitted.

(Defendants' Exhibit Number D-4018 was received into evidence and published.)

MS. BROWN: Thank you, Your Honor.

THE COURT: So it's D-4018.0009. Go ahead.

MS. BROWN: Thank you.

May I approach the witness to give a copy?

THE COURT: Sure.

MS. BROWN: Okay.

Ms. Mensing, here is a copy for you.

Do you need a copy?

MR. BOUNDAS: I don't.

BY MS. BROWN:

Q. Ms. Mensing, I'm handing you a document, and --

MS. BROWN: Your Honor, do we have permission to bring it up on the screen now that it's evidence?

THE COURT: Yes, it's admitted. You don't need my permission.

MS. BROWN: Thank you very much.

And can we first go to the cover first, Mr. Delaney.

BY MS. BROWN:

Q. This is entitled "Amended Plaintiff Fact Sheet." Do you see that there, Ms. Mensing?

A. Yes.

Q. All right. And if we go to the very, very last page of this document, we see something called a verification. Do you see that there?

A. Yes, ma'am.

Q. All right. And this verification states that the person signing it has reviewed the fact sheet and the statements set forth therein are true and correct. Do you see that?

A. Yes, ma'am.

Q. And it's dated -- this one we're looking at is dated October 2nd, 2024, correct?
A. Yes, ma'am.
Q. And that is your electronic signature, I believe. Do you see that?
A. Yes, ma'am.
Q. And you, as part of this litigation process, provided us with some information about your claim, correct?
A. Yes.
Q. And you swore back in October of 2024 that it was true and accurate to the best of your ability, correct?
A. Yes.
Q. All right. And so I want to direct you, if we could, to page 9 where you were asked on this form to give a description in our own words of the incident. Do you see that? It's on the screen to you.
A. Yeah, I see it.
Q. I know it's a little small. You see that there, right?
A. Yes, I see it.
Q. All right. And one of the things you told us here in October of 2024 was that you got into the Uber, and your Uber driver and you were having a casual conversation. And that's correct, right?
A. Yes.
Q. All right. Do you recall any of the things you spoke to

Mr. Richardson about?
A. Nothing bad. I don't -- casual conversation. It was nothing provocative. There was nothing that indicated, Hey, you should totally touch me. It was not -- it was just a casual conversation.
Q. All right. And you said, in fact, at first the Uber driver was very friendly, correct?
A. Yeah. Yes, ma'am.
Q. And what you said here is, When we made it to my destination, the Uber driver turned around and grabbed my thigh. Do you see that?
A. Yeah, I see that, but that's not -- I don't know how this came about.
Q. Okay.
A. I've been wondering about this.
Q. Let's keep going. Where it says here the Uber driver turned around and grabbed my thigh, is that not true?
A. He didn't turn around.
Q. All right. The next sentence says, The Uber driver told me he wanted to lick them. You see that?
A. I see that, but that is not what occurred.
Q. All right. And this is the description of the incident that you provided and swore was true and accurate to the best of your ability back in October of 2024, right?
A. Apparently, yes, but I don't agree with it. I was told

to sign something and I just signed it. That's gotten me into a lot of trouble before. Obviously, yes.
Q. Do you recall signing this document in October of 2024?
A. No, not really. No.
Q. When you signed it, did you look at it to make --
A. No.
Q. -- sure it was true and accurate?
A. No.
Q. Okay. So when we looked at your verification saying everything in here is true and accurate, that wasn't exactly right, fair?
A. Yes.
Q. Because you hadn't actually looked at any of this?
A. I didn't see that part.
Q. Okay. Do you have any idea how a description of the incident where the drive turns around and makes a statement that he wants to lick something would have gotten into your plaintiff fact sheet?
A. I have no idea.
Q. All right. In December of 2024, Ms. Mensing, you had the opportunity to look at the information in your plaintiff fact sheet one more time and certify that it was true and accurate. Do you recall that?
A. No.
Q. Let's take a look.

MS. BROWN: Your Honor, permission to display P-4109, which is Tab 18 in the Court's binder.

THE COURT: One moment, please.

MS. BROWN: Yes.

And for the Court, it would again be at Number 9.

THE COURT: Okay. 4019.

MS. BROWN: Permission to approach.

THE COURT: Page what?

MS. BROWN: Nine, Your Honor.

THE COURT: Page 9.

MS. BROWN: Permission to approach the witness and display.

THE COURT: Sure.

MS. BROWN: Thank you.

BY MS. BROWN:

Q. Now, Ms. Mensing, what I'm showing you that has been marked and admitted as D-4019, Mr. Delaney, if we can bring that up and look again at the first page, is the same document. Do you see that?

A. Yes.

Q. All right. And if we flip to the very last page of this document, you see this is verification that you electronically signed on December 16th of 2024. Do you see that?

A. I see that it says December 17th right there underneath

it, but -- and it says 16th, so I'm confused by that. But yes, I see it.

Q. All right. And do you recall having the opportunity to review and give your electronic signature to this document that the information in it was true and correct?

A. No, because that is not a day that I would be -- I wouldn't even be looking at it on that day. That is a significant day to me, and I know that I would not have been doing that on that date.

Q. Which one of those days is significant, the 17th?

A. The 16th of December.

Q. The 16th of December. And we don't need to know why if it's personal. But it's a significant date to you, right?

A. Um-hum.

Q. And so this document that we received in this lawsuit has your electronic signature and swearing that everything in it is true and correct, you believe that to be false?

A. I don't believe that it was true. I don't recall it. I don't -- I don't -- I would not be signing things on that day. Like, it's a bad day for me, and I would not be doing it.

Q. If you look right under your signature, and maybe Mr. Delaney can help us to pull it up. It looks like the electronic signature is dated December 17th, 2024. Was that a significant day for you?

A. No, not as significant as the 16th.
Q. All right. Do you have reason to believe that you are not the person who electronically signed this document with your name on December 17th, 2024?
A. I can't say I did or didn't because I don't recall that at all.
Q. Well, let's look at the description of the incident on this version of the document now a few months after the one we just looked at. This is again page 9. You see a similar Number 20 question asking you to describe the incident in your own words. Do you see that?
A. It's the same thing. What number is it? Yes, I see this.
Q. Okay. And, once again, the description that somebody swore was true and accurate says that the driver turned around, right?
A. That's what it says.
Q. And the description that somebody used your electronic signature to verify says that the Uber driver told me he wanted to --
MR. BOUNDAS: Your Honor, I'm going to object. Someone used her electronic signature. There's no evidence of that. It didn't happen.
THE COURT: Sustained.

BY MS. BROWN:

Q. This document that is certified with your electronic signature, ma'am, once again says the driver told you that he wanted to lick them, correct?

A. That's what it says.

Q. Okay. And once again we're looking at a document with your electronic signature certifying truthful and accurate statements, and you believe these statements to be false?

A. Yes.

Q. Okay. At some point you changed a number of things in the description of the incident, correct?

A. I never changed anything that I said. What that says is not ever what I said.

Q. Okay. Well, do you have any idea how it would have gotten into a document with your electronic signature?

A. I would imagine it was through a computer. I don't know.

Q. All right. Let's look at a version that contains different information, if we could.

MS. BROWN: Your Honor, permission to admit what is at Tab 19 in the Court's binder, D-4038.

THE COURT: And the page?

MS. BROWN: Your Honor, this would be at page 10.

THE COURT: Page 10. Admitted.

(Defendants' Exhibit Number D-4038 was received

into evidence and published.)

MS. BROWN: Thank you, Your Honor. Permission to approach the witness?

THE COURT: Yeah. Go ahead.

MS. BROWN: Thank you.

And now, Mr. Delaney, if we could take a look at the first page of what's been admitted as D-4038.

BY MS. BROWN:

Q. You see the same document, correct, Ms. Mensing?

A. Yes.

Q. If we look to the very, very last page, the verification here, this is your signature, not an electronic one, right?

A. Yes.

Q. And this is from July 9th, 2025. Do you see that?

A. Yes.

Q. All right. And if we flip to page 10, we have a description of the incident again. Do you see that?

A. Yeah.

Q. All right. And this time there's some additional and different information in the description. Do you see that?

A. Yes.

Q. Okay. Here it says, I got in the Uber vehicle and my Uber driver asked me to sit in the front seat. Do you see that?

A. Yes.

Q. And we didn't see that in any of the prior versions, correct?
A. Yes.
Q. All right. You talk here about the casual conversation and the Uber driver being friendly, correct?
A. Yes.
Q. Okay. And here it says, When we made it to my destination, the Uber driver turned around -- still there right?
A. What is?
Q. Uber driver turned around, right?
A. That's what it says, yes.
Q. Okay.
A. Yeah.
Q. That's what you swore to be true and accurate, right?
A. Apparently. I did not read it word for word. He did turn and grabbed my leg, yes, he did. My upper thigh, inner thigh.
Q. Well --
A. He didn't turn around. I didn't write this. It's not my handwriting obviously. It's (indicating). He -- I didn't write that. But that's more accurate than the last one.
Q. All right. Well, they all say that you certified they were true and accurate, so I'm just trying to understand how there might be some different versions.

THE COURT: Well, I think you should finish reading the statement.

MS. BROWN: Sure. Sure. Thank you, Your Honor.

BY MS. BROWN:

Q. So when we made it to my destination, the Uber driver turned around and grabbed my inner thigh and said, Can I keep this with me? Do you see that?

A. Yes.

Q. Okay. And that's different than Can I lick them, right?

A. Yeah. It is very different because I did not say the first statement. I said that.

Q. All right. All right. And in terms of whether it was the upper thigh or the inner thigh, which one is right?

A. I mean, there's only -- both, upper inner, inner thigh. I mean, he has big hands. It was almost my whole thigh. What -- it was gross. I don't know. It was like what do you -- I don't understand what you're even asking me, really.

Q. In terms of the statement that the Uber driver turned around in this incident description; is that right?

A. That's what it says.

Q. Yes, ma'am.

A. If you're sitting in the driver's seat, you have to turn to grab somebody's leg, correct? I might have said turned, not turn around like I'm in the back seat because I wasn't in the back seat. That was all. That's all I got to say about

that.
Q. And the reason I ask, Ms. Mensing, is because in another version of this fact sheet you deleted that part. You crossed it out. Do you remember doing that?
A. Which part? Where he turned around?
Q. Yes, ma'am.
A. I just told you that it wasn't true. I just said that I didn't say "turned around." Correct?
Q. So this part is wrong, correct?
A. It is all correct until "turned around." The "around," not accurate.
Q. All right.
A. I was not behind him.
Q. Let's take a look at the final two. There's one final cross out and a verification.
MS. BROWN: Your Honor, may we look at and admit D-4046, which is Tab 11 in the Court's binder at page 10?
THE COURT: Let's see. It's Tab 6.
MS. BROWN: Tab 11, Your Honor.
THE COURT: Oh, Tab 11. Page 10?
MS. BROWN: Yes, sir.
THE COURT: Okay.
MS. BROWN: And the exhibit number is D-4046.
THE COURT: And that's admitted.
(Defendants' Exhibit Number D-4046 was received

into evidence and published.)

THE COURT: What is the date of that?

MS. BROWN: Your Honor, this has the same dated certification. And I believe it took place at the deposition, which was the next day. And then there's another version with a 2026 certification.

THE COURT: Okay. So this -- you believe that this occurred on what day?

MS. BROWN: July 10th.

THE COURT: Of?

MS. BROWN: 2025.

THE COURT: July 10th of 2025.

MS. BROWN: Okay. Thank you.

THE COURT: Admitted. Admitted. Admitted.

BY MS. BROWN:

Q. Ms. Mensing, do you recall prior to having your deposition taken in this case you had the opportunity to look at this with your lawyer sitting next to you?

A. On the 10th of July, is that what you're saying?

Q. Yes, ma'am.

A. I'm not sure.

Q. All right.

A. I mean, it's -- I don't -- I see it's got a date of the 9th on it. I just signed it. I assumed it would have been correct.

Q. All right.

MS. BROWN: Let's take a look at page 10, if we could, Mr. Delaney.

BY MS. BROWN:

Q. Do you recall at your deposition, or just prior to your deposition, making further changes to the description of the incident?

A. As in what?

Q. It's up on the screen, ma'am. It's also on page 10, if it's helpful.

A. That's exactly what I just said.

Q. And do you recall crossing out what had been in three prior versions that the Uber driver turned around?

A. I just told you that he didn't turn around.

Q. All right.

A. That's why it says that. That's why I scratched it out. Whoever was typing got it wrong. I didn't type that out. So -- there's lack of communication.

Q. Finally, ma'am if we can look at the last certified version we have?

MS. BROWN: Your Honor, it's Tab 20. Permission to admit and display 4045 at page 10.

THE COURT: Okay. And that is dated what day?

MS. BROWN: February 24th, 2026.

THE COURT: Admitted.

MS. BROWN: Thank you, Your Honor.

(Defendants' Exhibit Number D-4046 was received into evidence and published.)

BY MS. BROWN:

Q. Now, Ms. Mensing, we've looked at a number of different versions of this fact sheet here, and this is the very last one I want to show you.

MS. BROWN: If we look, Mr. Delaney, at the last page of D-4045.

BY MS. BROWN:

Q. We see a version that you certified not that long ago on February 24th of 2026. Do you see that?

A. Yes.

Q. And, once again, this time we have your electronic signature, correct?

A. Yes.

Q. Similar to the electronic signature we saw on some of the forms you felt were inaccurate, correct?

A. That's actually my signature.

Q. All right.

A. The other ones were not.

Q. Okay.

A. Those were obviously -- these ones right here, yeah -- not that one.

THE COURT: So this is your signature. Excuse me.

This is your signature, Ms. Mensing?

THE WITNESS: The really ugly one, yes, that is my signature.

THE COURT: And you are identifying 4045 at 10, the one that was dated February 24, 2026?

THE WITNESS: Yes.

THE COURT: Okay. Thank you.

BY MS. BROWN:

Q. And if we go to page 10 now on the most recent one, you'll see a description of the incident that now includes all the updates we've looked at. Do you see that?

A. Yes.

Q. Now, we have your addition that the driver asked you to sit in the front seat, correct?

A. Yes.

Q. That he grabbed your inner thigh, correct?

A. Yes.

Q. And that he said, Can I keep this with me, correct?

A. Correct.

Q. And in terms of the earlier versions that we saw with different information that were certified under your signature, you believe those not to be accurate, correct?

A. Correct.

Q. And you don't know how it is that that information got in those documents under your signature?

A. Correct, but -- okay. So the ones that are wrong, that is a font. That is not my signature. It is just my name. Just my name.
Q. Do you --
A. This is my actual signature.
Q. Do you understand that that electronic signature was provided to us as yours? Did anyone tell you that?
A. I -- no. I don't know. I don't know. How did I get this many of these? When did this even -- like, this is insanity. I wouldn't have signed the same thing so many times.
Q. All right, ma'am.
A. Especially the first two that were not correct.
Q. Let's move on, Ms. Mensing.
A. Okay.
Q. I want to put up a picture that came up into evidence.
MS. BROWN: Actually, Mr. Delaney, could you bring up what is in evidence under the direct examination of P-04929.
BY MS. BROWN:
Q. This is a picture, Ms. Mensing, of Mr. Richardson that your counsel put up during your examination. Do you recall looking at this picture?
A. Yes.
Q. When -- did you -- who got this picture? Where did this

picture come from?
A. Why would -- I don't -- it's not my picture. Why would I have a picture?
Q. When is the first time you saw this picture?
A. Today.
Q. When counsel showed it to you?
A. Yeah.
Q. Have you seen it before you started testifying?
A. No.
Q. Do you know what year this picture was from?
A. Why would I? I've never seen it before.
Q. And in terms of the car Mr. Richardson is in front of, is that the car you drove in on the evening that we're here talking about?
A. At 1:00 in the morning in the dark, I don't know what kind of car it was. That was like a minor detail. I don't know. It could have been. I don't know.
Q. All right.
MS. BROWN: We can take that down.
BY MS. BROWN:
Q. Ms. Mensing, I heard you say a couple of times under your testimony that you're actually not interested in seeking any money damages in this lawsuit; is that right?
A. That is what I said.
Q. I thought I heard you say something like what was really

important to you is making sure something like this didn't happen to anybody else, correct?
A. Yes, that's what I said.
Q. And one of the things, though, that you have done here is you've brought a lawsuit for money, right?
A. How did I bring a lawsuit for money? I said I want your money? Where does it say that?
Q. Do you understand that that's what this lawsuit is?
A. I wasn't asking for money. I told you I was asking for an apology. I want accountability. What else -- I'm not a lawyer. I don't -- this is all brand-new to me.
Q. Yes, ma'am.
One of the things, Ms. Mensing, that you did not do is reach out to Uber at any point to report this incident, correct?
A. Correct.
Q. Okay. Did you ever think about doing that?
A. Nope.
Q. Did you ever think about one way that you could alert somebody that Mr. Richardson was out there in your mind in an unsafe way would be to call the company?
A. Did I think about it?
Q. Yes, ma'am.
A. No, I didn't.
Q. Well, one of the things you didn't do, Ms. Mensing, is

call the police to alert them to a sexual assault that you've described, correct?

A. According to you guys, it was never a sexual assault. It was a touch of my leg. So why would -- if that's how you feel what happened to me actually went, like, why would -- like, I -- it just doesn't make sense. Like, no one's going to believe you guys are saying that I said and saying that actually happened, but you weren't there. How -- I don't know -- I don't want --

Q. And I just want to understand, Ms. Mensing, what you were thinking. Okay? That's what's important, and that's why I'm asking you these questions. Okay?

A. Yeah.

Q. And I understand from your testimony to our jury that it was important to you, and it remains important to you, to make sure that nothing like this happens again, correct?

A. Correct.

Q. And I understand from you and your lawyer's opening that this, in your view, was a sexual assault, yes?

A. Yes.

Q. And my question to you is did you ever think about calling the police and reporting that?

A. Of course I thought about it. Of course I thought about it.

Q. When did you think about calling the police?

A. When it happened.
Q. All right.
A. I didn't do it because every time -- I have called the police many times on abusive things, and it has never ended well for me. No one ever believes me. That is why I did not go tell the police. That's exactly what I was afraid of this whole fucking time.
Q. I understand, ma'am.
Did you ever make an effort to reach out to the police or that's just not something you did?
A. I would not have because of prior run-ins with said police. Every time I have called them for help, they have not helped me.
Q. When you -- I want to talk a little bit about who you told that night. Okay, Ms. Mensing?
A. Which night?
Q. The night -- the night that the ride happened. Okay?
A. It was in the morning that I finally told somebody, which was Neal.
Q. Yep. I just want to talk --
A. It was not the nighttime.
Q. -- a little bit about that. Okay?
At the night of March 26, 2019, I understand you came home to Mr. Young's house and he was asleep, correct?
A. Yes.

Q. So you didn't talk to him about what had just happened to you, correct?
A. He was asleep.
Q. Yes, ma'am.
A. So, no, not until he woke up.
Q. And you didn't reach out to any of your family members, correct?
A. Not immediately. It was 1:00 in the morning.
Q. Yes, ma'am. And you didn't reach out to any of your friends that night either, correct?
A. I did not.
Q. And I heard -- I thought I heard you say that when you came into the house, you ran around the house to a garage?
A. Yes. That was the way to get into the house.
Q. Okay. And when we had asked you to describe what happened when you got to the house, you had never mentioned before going into a garage. Why did you do that?
A. So what did I say then?
Q. That you entered the house and locked the door.
A. Okay. I didn't say the garage? Is that even like -- that was the only way to get into the house.
Q. Okay. Did you not have a key to the front door?
A. No. The front door never opened.
Q. The front door to this house did not open?
A. Okay. So there's a front door by the kitchen. He

always kept it locked. I didn't have a key to it, no. We never had the back door locked. So that was the way we always went into the house.

Q. Okay.

A. Through the back door.

Q. All right.

A. The other door -- in the picture there's two doors. That had a recliner in front -- there was a recliner in front of that door, so no one used that door either. It's always locked. The only way we would get in is through the back door.

Q. Okay.

A. You had to go through the garage to get to the back door.

Q. And let me just show you what we looked at and make sure I understand what you're talking about. Okay?

A. Yeah.

Q. P-04962 was I think an aerial view.

MS. BROWN: Actually, Mr. Delaney, if you could bring it up. Perfect.

BY MS. BROWN:

Q. That you looked at in your testimony. And if I understand you correctly -- actually, can I go to the ELMO?

THE COURTROOM DEPUTY CLERK: Please stand in front of the microphone.

MS. BROWN: Sure.

BY MS. BROWN:

Q. If I understand your testimony, Ms. Mensing, where I started right here is where you got dropped off; is that right?

A. No. It's up on the side.

Q. Over here?

A. Right up here (indicating), yes.

Q. Like somewhere --

A. Right at the side, at the corner of the house.

Q. Like over here?

A. If that's as far as your picture goes. There you go.

Q. I think that's as far as my picture goes.

MR. BOUNDAS: Zoom out. Picture that goes -- has more, so you know. It's in the same document.

MS. BROWN: I don't think so.

BY MS. BROWN:

Q. All right. So I just want to understand, you got dropped off here, or as far out as the picture would go, correct?

MR. BOUNDAS: I'm sorry. I shouldn't -- if you slide out, there is a --

THE WITNESS: There you go. Right here.

BY MS. BROWN:

Q. And where you entered was over here?

A. Yes. Entered.
Q. And the driver came here, correct?
A. What do you mean?
Q. Came into the driveway.
THE COURTROOM DEPUTY CLERK: You need to speak into the microphone so we all can hear you.
MS. BROWN: Thank you very much. I appreciate that.
BY MS. BROWN:
Q. The driver came over here; is that correct?
A. No.
Q. Which way did he come?
A. This way.
Q. And he came over here?
A. That.
Q. And circled around over here?
A. That's exactly what I'm saying.
Q. And you got dropped off in this corner, correct?
A. Right there, yes.
Q. Okay. And as I understand it, the doors were locked in the front of the house, correct?
A. Yes.
Q. And so you went around to the garage, correct?
A. The only way we ever get in, yes.
Q. All right.

And you told us that you checked some security tapes when you got into the garage, correct -- when you got into the house?

A. Yes, eventually. I was freaking out. I didn't immediately do it. I was horrified. I was almost paralyzed. I felt like time was standing still. I don't know how much time went by before I went to the camera.

I ran. I tried to catch my breath when I got in there after I locked the door. I called for Penny, the dog, opened up her dog door, hoping that she would -- if he was still there, bark so I would know.

And then I went into the bedroom on the other side of the house, tried to wake up Neal. Didn't wake up. Then I go back into the living room on the other side of the house, and tried to get on the computer that had the live stream of the surveillance.

Q. Understood.

A. Yeah.

Q. And that night were you able to get on the computer and look at the live stream security?

A. Yes.

Q. Okay. And you were able to see that Mr. Richardson had pulled out of the driveway, correct?

A. Correct.

Q. All right. And Mr. Young, your testimony is that you

told him about this in the morning, correct?
A. Yes.
Q. All right. And you understood that that video feed was a live stream, correct?
A. Yes.
Q. So why would you have been looking at the video feed in the morning if it was a live stream?
A. I didn't know if it was only a live stream. He told me after the fact. That's why I don't have a film of said incident.
Q. Okay. You were looking -- you looked at it at night. You confirmed Mr. Richardson had left, correct?
A. His car wasn't there.
Q. All right. And then why did you go back to the film in the morning?
A. Because I thought it could have been rewound like a normal camera.
Q. And what did you want to get from that?
A. Evidence.
Q. Did you know --
A. It was right there.
Q. Did you know that you had Mr. Richardson's license plate on your Uber app?
A. What does that have to do with -- I wanted to see if I could see it happen. That's what I was trying to see.

Q. Um-hum.

A. So then I would have evidence for all of -- everyone that wanted to know about it. But I didn't. Henceforth, I did not go to the police because I had no evidence.

Q. I understand.

And I understand at some point unfortunately you no longer spoke to Mr. Young, your boyfriend at the time, correct?

A. I stopped dating him.

Q. Yes, ma'am.

And you understood, though, that because you had identified him in this lawsuit that we would ask for his deposition or ask him to give testimony, correct?

A. I told him about it so he would not be surprised.

Q. Okay. And you sent him a text, correct?

A. Maybe.

Q. All right.

MS. BROWN: Your Honor, permission to admit just the first two pages of D-4153, which is Tab 58.

THE COURT: Tab 58?

MS. BROWN: Yes.

THE COURT: All right. One moment, please.

MR. BOUNDAS: Ms. Brown, can I get a copy of this one?

MS. BROWN: Sure.

MR. BOUNDAS: I appreciate it.

THE COURT: So you're asking to introduce 4153; is that correct?

MS. BROWN: Yes, Your Honor. Just the first two pages, as counsel and I have discussed. The two text messages.

THE COURT: Okay. Admitted.

MS. BROWN: Thank you.

(Defendants' Exhibit Number D-4153 was received into evidence and published.)

MS. BROWN: And, Mr. Delaney, if we could please pull up the second page of D-4153.

BY MS. BROWN:

Q. This, Ms. Mensing, that I'm showing you that's been entered into evidence is the text message that you sent Mr. Young on June 20th of -- I believe it was 2025.

Do you see that?

A. Yeah. It's still on my phone.

Q. And it says, Hey, didn't mean for them to try and drag you into this lawsuit, but apparently they really want to talk to you. Call me if you would. Do you see that?

A. I do.

Q. And you sent that to Mr. Young because you knew that he would be asked about questions in this lawsuit in a deposition, correct?

A. I did.
Q. And you wanted to talk to him before that, correct?
A. I wanted him to know that he's going to be, like, spoken to.
Q. And Mr. Young --
A. Same thing with Ariel, yeah.
Q. And Mr. Young did not text you back, correct?
A. I don't think so.
Q. And you are not aware of the testimony that Mr. Young gave when he did sit for a deposition, correct?
A. I have no idea what any of the depositions besides my own were.
Q. All right. And another person that you identified as somebody you told about the ride was your best friend at the time, Ms. Ariel Watkins, correct?
A. Yes, ma'am.
Q. And you told us that you told Ms. Watkins that very next day, March 26, 2019, correct?
A. Yes, ma'am.
Q. Okay. And similarly like Mr. Young, you reached out to Ms. Watkins prior to her sitting for a deposition and being asked questions about that, correct?
A. Correct.
Q. And if you go to the just flip side of that document that I gave you, and Mr. Delaney it's that first page of the

exhibit, this is the text that you sent to Ms. Watkins, correct?

A. Yes.

Q. Similar, Didn't mean for the lawyers to drag you into this, but give me a call, correct?

A. Yes.

Q. And you also wanted to speak to Ms. Watkins prior to her giving testimony in this case, correct?

A. Correct.

Q. All right. And she -- do you have any idea what she testified to as to whether or not you spoke to her on March 26th, 2009?

A. I know nobody's deposition but mine.

Q. Yes, ma'am.

And you haven't -- you haven't spoken to Ms. Watkins in a while; is that correct?

A. That is correct.

Q. All right. Another person that you indicated that you told about this were your -- some of your therapists, correct?

A. I thought I did. I don't -- I don't know.

Q. You told us in your deposition that therapists are some of the people you spoke to about this. Do you think now maybe that's not right?

A. I have spoken --

MR. BOUNDAS: I'm going to object to this. This is something I think we need to discuss.

THE COURT: We'll return to this subject.

MS. BROWN: Yep.

BY MS. BROWN:

Q. One of the things we saw in opening was this slide. If I could have the ELMO, it says, Brianna reported the incident immediately to, and we see these three folks. Do you see that?

A. Yes.

Q. And it says Draft for Exchange because we get a copy before the opening, and so that's why that's marked on there.

THE COURT: I think it should be clear when you say Brianna reported the incident immediately to her, that's -- those words weren't given by this witness.

MS. BROWN: Sure.

THE COURT: They are your argument that this is what happened.

MS. BROWN: Yes, Your Honor. I'll clarify that. Thank you.

THE COURT: Okay. So.

BY MS. BROWN:

Q. This is the argument your lawyers made to the jury this morning. I think you were at counsel table for that. Do you remember that?

A. Do I remember them saying that it was immediately that I spoke to Dave or my mom?
Q. Yep.
A. I don't know. I don't know. I don't know.
Q. Well, the truth is, is that it wasn't immediately that you spoke to your mom at all, correct?
A. I don't --
THE COURT: That's not inconsistent with her testimony. She said -- she testified she wasn't certain when she actually had a conversation.
MS. BROWN: Understood, Your Honor.
BY MS. BROWN:
Q. You've told us, Ms. Mensing, that you didn't tell your mom about the incident until one to two years later, correct?
A. Correct.
Q. All right. And you -- did you tell Mr. Yankowski immediately?
A. Within the week.
Q. Okay. Tell us about that. Where were you when you told Mr. Yankowski?
A. I don't know. It was over the phone.
Q. Okay. And in terms of not telling your mom until one to two years later, why was that?
A. Why was it that I think or what -- what -- ask me again. Sorry.

Q. Yep. Bad question. My fault.

Why did you wait one to two years to tell your mom about this incident?

A. Because my relationship with my mom has not been the best. She's not like the most nurturing. She tells me to go talk to a flower or look at -- hug a tree instead of, you know, giving any type of advice for anything ever. So yeah.

Q. Let's talk a little bit, if we could, Ms. Mensing, about your decision to file this lawsuit. Okay?

A. What about it?

Q. You don't remember when you decided to bring the lawsuit, correct?

A. I started talking to my attorneys team in 2022, I think.

Q. All right. And that would have been about three years after the ride, correct?

A. Correct.

Q. Okay. And the only thing you remember about the decision to bring the lawsuit was sort of filling out a questionnaire, correct?

MR. BOUNDAS: Your Honor, there's a motion *in limine* on this topic.

THE COURT: Okay. Let's return to this.

MS. BROWN: Yes, Your Honor.

BY MS. BROWN:

Q. Ms. Mensing, I want to shift gears and a talk a little

bit about the night of March 25th, 2019. Okay?
A. Okay.
Q. All right. You don't remember what you were doing on March 25th, 2019, correct?
A. I can't tell you if I was watching TV. I'm sure I wasn't doing much. I didn't have a job. I can't tell you what the weather was because that was some years ago. I don't think anyone remembers exactly what they were doing.
Q. All right. Sure. And I understand this was a long time ago, and that's fine.
A. Long time ago.
Q. The question was just you don't remember what you were doing that day, right?
A. Yeah.
Q. Okay. You did at some point, and you've explained it to us on your questioning, decide to visit an old friend of yours, Mr. Trevor Woodham, correct?
A. Yes, ma'am.
Q. And he's somebody that you hadn't spoken to in quite some time at that point, correct?
A. Yes, ma'am.
Q. And you told us in your deposition you couldn't remember why you went to see him that day; is that true?
A. There's no, like -- it wasn't for anything besides going to see my friend. I don't --

Q. Sure. And at this time in March 25th of 2019 you were dating Mr. Young, correct?
A. Yes, I was.
Q. And I understand Mr. Woodham, he had a girlfriend as well, correct?
A. Yes.
Q. And you went over to his house about 9:00, 9:30 p.m., correct?
A. Yeah.
Q. And you hung out with him until about 1:30 a.m., correct?
A. Yes.
Q. And there was nobody else at his house, correct?
A. No. Just his little figurine things.
Q. Sure. It wasn't like he was having a party that night, correct?
A. No. I would have drank more than a beer if there was.
Q. Now, one of the things you showed us during your examination was the ride receipt for your Uber going home later that night. Do you recall that?
A. Yes.
MS. BROWN: All right. And if we can look, Mr. Delaney, at P-04969, please.
BY MS. BROWN:
Q. And if we go to the second page -- the third page,

please, there we go -- it shows where you were picked up and where you were dropped off. Do you see that?
A. Yes.
Q. And it shows a pickup at 1010 East Martin Street in Raleigh, North Carolina, correct?
A. Yes.
Q. And a drop off at 9705 Fayetteville Road. Do you see that?
A. Yes.
Q. And 1010 East Market [sic] Street, that's actually not Mr. Woodham's house. Do you know that?
A. I don't remember what his address was.
Q. All right.
A. All you have to do is hit your location. If I walked up the street, that's where it picked me up. I don't --
Q. All right.
A. It's not a big deal.
Q. Do you recall walking around to pick up the Uber outside that night?
A. I wasn't, like, in the house waiting for them.
Q. Where were you waiting for the Uber?
A. Evidently at 1010 East Martin street.
Q. And do you recall walking to a different house to get the Uber home that night?
A. I don't remember that part of the night because it was a

really long time ago. There was nothing significant about me getting picked up right there. There was about getting picked up, but not walking, like -- I walked away from the house. Is that like -- is that even -- who cares -- what does it matter?

Q. No, ma'am. If you don't remember, it's not worries at all. I'm just trying to understand if you have a memory of why this pickup address is actually not Mr. Woodham's address?

A. I don't know what his address even is.

Q. All right. Do you have any memory of how long it took for the Uber to arrive the evening of March 26th, I guess early in the morning hours of March 26th?

A. I would imagine it took a minute, because it usually always does.

Q. Do you have any memory of what you were doing from the time you requested the Uber and the time you got picked up at this address, 1010 East Martin?

A. I'm sorry. Ask me again.

Q. Sure. Do you have any memory of what you were doing while you waited for the Uber to arrive?

A. Walking.

Q. Walking outside?

A. Probably.

Q. Okay.

A. Definitely smoking a cigarette maybe.
Q. All right.
A. I don't know.
Q. One of the questions counsel asked you on his questioning was whether you recall any stops during the Uber ride. Do you remember that?
A. Yes.
Q. Okay. And your answer was that no, you don't recall making any stops, correct?
A. Correct.
Q. And have you since come to learn whether or not there was a stop?
A. Yes.
Q. Okay. All right. When did you learn about that?
A. When I gave my deposition.
Q. Okay. And one of the things you learned during your deposition is that -- one of the things you know is that there is a Sheetz or a convenient store very, very close to Mr. Young's house, correct?
A. Yes.
Q. And you've actually been there before, correct?
A. A bunch of times.
Q. It is sort of a close place for you to run in and grab something when you need it, correct?
A. Yes.

Q. It has food, drinks, cigarettes, things like that?
A. Yes.
Q. And you frequented it often because it was close to where you were living, correct?
A. Yes.
Q. Is that where you would get your cigarettes at the time?
A. Yes. Sometimes.
Q. All right, sir. And you came to learn, even though you don't remember, that right before you got dropped off at Mr. Young's house you stopped at that Sheets, right?

MR. BOUNDAS: Your Honor, I'm going to object. Unless they have a witness -- if they have a witness with GPS expertise they're going to call, I don't have a problem with that, but otherwise there is no foundation for this.

MS. BROWN: I'm just asking about what she knows, Your Honor, based on what she was shown in her deposition.

THE COURT: I don't know that she's testifying from memory or from what you told her. I think you have to lay a foundation --

MS. BROWN: Yes.

THE COURT: -- if she remembers stopping or you have a witness who is testifying that it occurred.

MS. BROWN: Sure.

THE COURT: So objection sustained.

MS. BROWN: Okay.

BY MS. BROWN:

Q. Let's do it this way: Ms. Mensing, you personally do not have a memory of stopping at a Sheetz near Mr. Young's house for any snack or cigarettes or anything like that, correct?

A. Correct, I don't.

Q. All right. One of the things that counsel asked you about was your memory of what happened in the 24 hours following this ride. Do you recall that?

A. Yes.

Q. Okay. And one of the things that you've sworn under oath and told us was the truth is that you don't have a memory of what happened in the 24 hours following this ride, correct?

A. I have a memory of me telling Neal and looking at the camera and everything I said. Past what I've told you, it was how many years ago? I remember what happened, how I felt, what he did, where I was, what I saw it right then and there as we have gone over.

I have used drugs and alcohol for a bit of my life, not significant things like sitting on a couch or what -- like I don't -- I don't remember.

Q. Yes, ma'am.

MS. BROWN: Your Honor, permission to display and admit D4062, which is at Tab 6. And I'm interested in the

response to Tab -- the question at Tab 13, and the response at Tab -- I'm sorry -- page 13 and the response at page 15.

THE COURT: Give me a moment to look at it, please. And what tab is it?

MS. BROWN: This is Tab 6, Your Honor. And it's Interrogatory Number 9 at page 13 is the question. And then the response would be the last full paragraph from page 15.

THE COURT: So the question appears on page 6?

MS. BROWN: No, Your Honor. The question appears on page 13, Interrogatory 9.

And, Your Honor, it's the last full sentence of the -- or the second-to-last sentence of the last full paragraph on page 15.

THE COURT: Page 15?

MS. BROWN: Yes. Last full paragraph, second-to-last sentence.

THE COURT: And what lines?

MS. BROWN: In that paragraph, it would be the sentence that begins with "Plaintiff" and ends with "incident."

THE COURT: I'm sorry.

MS. BROWN: Sorry. Line 26 and 27. Page 15.

THE COURT: You may start reading -- read the question.

MS. BROWN: Yes, Your Honor.

THE COURT: Read the question, and then the response. Start with line 24.

MS. BROWN: Thank you, Your Honor.

THE COURT: And go through line 27.

MS. BROWN: Yes, Your Honor. Permission to approach for the copy for the witness.

THE COURT: Well, just read. You can read it.

MS. BROWN: Okay. Thank you.

BY MS. BROWN:

Q. And, Ms. Mensing, one of the things that we've done in this lawsuit is ask you questions under oath. And we've similarly asked you to verify that your answers to those questions are true and accurate to the best of your ability.

And the question and the answer I'm to read was verified by you as true and accurate on September 22nd, 2025. And it has your signature that, with the Court's permission, we'll show once I read it.

So the question that you were asked was to describe each activity you took part in within the 24 hours before and after the alleged incident.

And the answer that you gave was, Within 24 hours of the incident, Plaintiff recalls watching television at home and then leaving her house to go hang out at a friend's house. She hung out with Trevor Woodham at his house and then got into a Uber back home. At the time Plaintiff lived with Neal

Young. Plaintiff does not recall what she was doing 24 hours after the incident. See also the fact sheet and different interrogatory response.

And that was your sworn statement that you did not recall what you were doing in the 24 hours after the incident as verified on December 22nd, 2025, correct?

MR. BOUNDAS: Your Honor, I'm going to object. The answer actually said what were you doing 24 hours after the incident. That's specifically what it says.

MS. BROWN: Yes.

MR. BOUNDAS: And that was the question.

MS. BROWN: That's what we're talking about.

THE COURT: No. 24 hours after the incident would be a day after the incident. In other words, it wouldn't be.

MS. BROWN: The 24 hours after the incident, the period of time. Your Honor, that's redirect.

MR. BOUNDAS: But that's not what it says, Your Honor.

MS. BROWN: Yes, it is.

THE COURT: Well, I'm not going to get into an argument. Move on to another subject.

MS. BROWN: Yes, Your Honor. Thank you.

THE COURT: It has very little -- go ahead.

MS. BROWN: Yes, Your Honor. Yes, Your Honor.

BY MS. BROWN:

Q. One of the things, Ms. Mensing, that you spoke about in your questioning with Mr. Boundas was an interview that you did with the plaintiff's expert psychiatrist. Do you recall that?

A. Theirs or you all's?

Q. Well, you did one with both, correct?

You did at their request an interview with their psychiatrist, correct?

A. Correct.

Q. And then you did one with ours as well, correct?

A. Yes.

Q. All right. Let's talk a little bit about your continued use of Uber. Okay?

A. Okay.

Q. You continued to use Uber after this incident, correct?

A. Yes. Years later.

Q. That's right. And one of the things that we asked is for you to provide us with the email accounts or the phone numbers that you used to set up Uber accounts, correct?

A. Yes.

Q. And you recall, ma'am, that you have set up -- after filing this lawsuit, you have set up multiple different Uber accounts, correct?

A. Okay. Yes, I did.

Q. Correct.
A. So?

MS. BROWN: So, for example, Your Honor, permission to admit D-4091, Tab 54.

THE COURT: D-4091?

MS. BROWN: Yes, Your Honor.

THE COURT: I'm sorry. What tab is it?

MS. BROWN: I'm sorry, Your Honor?

THE COURT: The tab number?

MS. BROWN: Yes, Your Honor. That would be Tab Number 54.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4091 was received into evidence and published.)

MS. BROWN: Thank you, Your Honor.

And so, Mr. Delaney, if we could bring up D-4051.

BY MS. BROWN:
Q. This is an Uber profile that you created in April of 2022. Do you see that in that sort of middle box there where it says rider?
A. Yes.
Q. And this was -- you created under the name Bree Gilbert, correct?
A. I sure did.
Q. That's the name of your son's dad, correct?

A. That's the last name of my son as well.
Q. Correct. And this account that you created under that name was about one month after you filed this lawsuit against Uber, correct?
A. Point being? What is -- yes. I'm not denying it at all.
Q. And you went on to create multiple --
A. Yeah.
Q. -- different accounts with different names, correct?
A. Yes, I did. I did. I definitely did. I'm not saying I didn't.
MR. SMITH: Your Honor, permission to admit D-4092, Tab 63.
THE COURT: What's the relevance of this?
MS. BROWN: The number of accounts, Your Honor --
THE COURT: Why is that relevant?
MS. BROWN: It goes to credibility as to whether the event happened if we continue to open of accounts.
THE COURT: If it does, then I'll hear argument later. However, the jury at this point is instructed to disregard it.
MS. BROWN: And, Your Honor, can we have argument outside the presence of the jury on this?
THE COURT: Yes, we will. Of course.
BY MS. BROWN:

Q. Suffice it to say, ma'am, you continued to use Uber, correct?

THE COURT: That's been asked and answered.

THE WITNESS: Okay. So.

THE COURT: Ms. Mensing, you don't have to answer. It's been answered.

THE WITNESS: Okay.

BY MS. BROWN:

Q. And in terms of your use of Uber, Ms. Mensing, you used it both to order food and alcohol and to take rides, correct?

MR. BOUNDAS: Your Honor, I'm going to object. Is there some evidence of what she's ordering?

THE COURT: I think we're getting far afield.

MS. BROWN: Sure.

BY MS. BROWN:

Q. You used both Uber Eats and Uber rides, correct?

A. Okay.

MR. BOUNDAS: I think that she uses Uber Eats --

THE COURT: Wait a minute. I'm speaking. Everybody else has to be quiet. That's the rule of the game.

That she uses Uber Eats is irrelevant.

MS. BROWN: Yes, Your Honor.

THE COURT: Absent some showing that.

MS. BROWN: Yes, Your Honor.

THE COURT: Okay.

BY MS. BROWN:

Q. And we spoke a little bit as well about your use of Lyft, correct?

A. Yes.

Q. And that's something that you've also -- another rideshare you've also used for some time, correct?

A. Yes.

Q. And one of the -- one of the things you said is that you use it only to get to work; is that right?

A. I use it to get where I need to go.

Q. And I thought I heard you say only when necessary or something like that; is that right?

A. When absolutely necessary, yes. I have a bike. I ride my bike usually. If it's raining, I'm going to get a Lyft. I don't want to spend the extra money on a ride. I don't. I have a bike.

Q. Sure. And counsel moved into evidence a summary of the some of the places you've taken Lyfts. I just want to ask you one question about that.

If we could bring up P-04979. And this was a chart sort of summarizing some of your Lyft rides.

Do you recall taking a look at this?

A. Yes.

Q. All right.

A. I remember all of them.

Q. Sure. And one of the things that appears on here quite a lot, and, for example, on this first page, a ride at 4:16 a.m. to 4:25 a.m. is the Wood Spring Suites Hotel in Raleigh?
A. Yeah.
MR. BOUNDAS: I'm going to object. What's the relevance of her going to a hotel?
THE WITNESS: That part.
THE COURT: Sustain the objection.
MS. BROWN: All right.
THE COURT: And the jury is instructed to disregard that question.
BY MS. BROWN:
Q. And one of the things you produced to us was your Lyft records from your phone, correct?
A. Correct.
MS. BROWN: And, Your Honor, we would move into evidence 4186, which is at Tab 52.
THE COURT: 4186? Is that the number?
MS. BROWN: Yes, sir. Tab 52.
THE COURT: Tab 52. One moment.
And these are the rides in September of 2025 going -- September through 2026, March 31st of 2026. And these are with Lyft?
MS. BROWN: Yes, Your Honor.

THE COURT: Is that it?

MS. BROWN: Yes, Your Honor.

THE COURT: Okay. Any objection?

MR. BOUNDAS: No objection.

THE COURT: Okay. Admitted.

(Defendants' Exhibit Number D-4186 was received into evidence and published.)

BY MS. BROWN:

Q. And the document that we've just moved in, you were able to take those off of your phone, correct?

A. Correct.

Q. Okay. And it shows -- if we go to the second-to-last page here that you've been riding since April of 2022. Do you see that?

A. I do.

Q. All right.

And when you asked you in your deposition in 2025 if you were using any rideshare other than Uber, you said no.

A. I made a profile. I did not make a ride.

Q. Okay.

A. I wanted to see what the price was on Lyft versus Uber because I don't want to use Uber, but it's cheaper than Lyft.

Q. So you signed up for Lyft --

A. I signed up for it, found out it was really expensive and didn't use it.

Q. And now you use it fairly regularly, correct?
A. Yes.
Q. I want to talk a little bit about some of the substance abuse. And I want to do it as quickly as possible, okay, Ms. Mensing.
Just some basic facts I want to get on the record, and I don't want to spend a lot of time on this. Okay?
A. Go ahead.
Q. Thank you.
You told us in your deposition that you first began drinking alcohol around age 13, correct?
A. Correct. That was the first taste of alcohol, yes.
Q. And you know that some of your medical records show that maybe you started a little bit earlier than that?
A. What my medical records say, what people wrote down, I can't tell you.
Q. Sure. And --
A. I didn't write them.
Q. Sure. I understand.
You looked at some of those in your deposition, right?
A. What? My medical records?
Q. Yes, ma'am.
A. Only specifically what they pointed at. I didn't like excessively look through stuff.
Q. I understand. Sure.

A couple of the times, at least twice, you have had to be put into a facility or a hospital to help with some of your substance abuse, correct?
A. You said I had to be put in into a place because of my -- no. I didn't have to go anywhere. I don't know what you're referring to.
Q. Sure. What I meant by is there were a couple of times that involuntary, meaning you didn't volunteer to do that. Do you recall that?
A. When I was 15? That wasn't about substance abuse.
Q. Do you recall a time in Holly Hill in 2018, ma'am?
A. What did that have to do with substance abuse?
Q. Do you recall having to go there because of substance abuse?
A. That's not what I was there for.
Q. All right. Do you recall in 2018 having some difficulties with drugs and alcohol?
A. Yes.
Q. Okay.
A. But I didn't go there because of that.
Q. Okay. 2018 was a particularly difficult time for you in terms of drugs and alcohol, correct?
A. A lot of my life was particularly bad about -- with drugs and alcohol. What are you -- sure. I'm not denying that.

Q. Yeah. And I don't want -- I really want to do this as quick as possible. I understand it's been difficult. And I don't want to stay here too long.

But one of the things you told us about that has been difficult for you is an addiction to crack cocaine, correct?

A. That was -- okay. And?

Q. Correct?

A. I was smoking crack at one point in my life. Yes, I was.

Q. Okay. And you told us also that you started using marijuana when you were 11, correct?

A. That is 100 percent true.

Q. And you used it habitually from the ages of 12 until about 21, correct?

A. Correct.

Q. And you started using opioids in the year 2012, correct?

A. Yes.

Q. And the kinds of -- you told us that you snorted them up your nose, correct?

A. I sure did.

Q. And you used Percocet, Hydrocodone, and Oxycodone, correct?

A. Yes, I did.

Q. And at least two pills a day for two to three years, correct?

MR. BOUNDAS: Your Honor, I think we've -- she's not denying drug use.
THE WITNESS: What is -- yeah.
MR. BOUNDAS: Details of how many pills.
THE COURT: I think we've covered it. Go ahead.
MS. BROWN: Thank you, Your Honor.
BY MS. BROWN:
Q. And does that sound about right. You told us in your deposition about two to three years there, correct?
A. Correct.
Q. And it was 2018 -- I'm just really doing this as quickly as possible to get the timeline. Okay, Ms. Mensing?
A. Yeah.
Q. In 2018 your son's dad introduced you to crack cocaine, correct?
A. Correct.
Q. And you told us he was actually somebody who kind of triggered drug use for you, correct?
A. Correct.
Q. Okay. And you told us that you were -- this sort of started in 2018, and you were still using crack cocaine in 2020, correct?
A. Not like the entire time. Not two years straight smoking crack. I'd probably have no teeth and have a lot more bruises and burns.

Q. You started in 2018, correct?
A. Correct.
Q. And by 2020, you were using crack cocaine, correct?
A. Sometimes.
Q. Okay. You told us that starting in about 2018 or 2009 as well you started using heroin, correct?
A. You said 2018 or '19?
Q. Yes. That was your testimony, correct?
A. Yeah.
Q. Okay. And you told us when you were using heroin, you were taking it -- you were using it every day several times a day, correct?
A. When I was using it, I was -- yes. I mean, I was addicted to it at one point. I went like -- I don't understand what we're getting at.
Q. I don't mean to linger on this. I understand that, and I just wanted to get the timeline.
When you were using it 2018, 2019 --
A. It was not every single day from 2018 to 2019, if that's what you're saying.
Q. When you were using it --
A. I was with Andrew Lorcher.
Q. I'm sorry, ma'am?
A. I was always with Andy, Andrew Lorcher. Casey, son's father, introduced it, he said, to come off the crack and

give me some heroin. And I snapped on him about it. And then I did it with him. And I didn't agree with it, but at that point that was one of them times when I went spirling. So got rid of Casey, started with Neal, the incident happens, then I go to Andy. Then heroin a lot.
Q. Okay. And just to be clear, you told us when you were using heroin, it was every day several times a day, correct?
A. Yes. And I just said after I left Neal and was with Andy, because that's what happened, I left Neal to go be with Andy.
Q. Yes, ma'am.
A. That is when I like heavily was using heroin.
Q. Yes. And there was unfortunately a time period in 2021 where you overdosed, correct?
A. Yes, I did.
Q. And it continues as recently as September 2025 to be something that you're unfortunately struggling with, right?
A. What? 2025?
Q. Yes, ma'am. In August and September of 2025 --
MR. BOUNDAS: Your Honor, I think we're how many years beyond the incident. I think it's just gotten cumulative.
THE COURT: Well, I'm not quite sure what it means. A person who is addicted to drugs may spend a lifetime struggling with addiction.

MS. BROWN: Sure, Your Honor.

THE COURT: That doesn't mean that they're under influence in some sense. Or in one sense they may be, another sense they may not. But I don't know that that's for the jury to consider.

I'll listen to an offer of proof outside the presence as to the testimony you're seeking to elicit. Otherwise, why don't you move to another subject.

MS. BROWN: Yes, Your Honor.

BY MS. BROWN:

Q. And just to wrap this up, Ms. Mensing, and thank you nor your patience as I went throughout it.

One of the things you told Dr. Reminick is that you think your substance abuse has had an impact on your ability to remember things.

A. I've even said that today.

Q. Yes. Okay.

MS. BROWN: Your Honor, I think I'm just about done. If I could just have a few minutes to double-check. I don't know if this is a good time for a break.

THE COURT: Well, why don't you -- maybe it is a good time for break.

MS. BROWN: That's would be terrific.

THE COURT: We'll take about the other subjects.

Ladies and gentlemen, we'll take a 15-minute

recess, 15 to 20 minutes. Remember the admonitions given to you. Don't discuss the case, allow anyone to discuss it with you, form or express any opinion. See you back here.

(The jury exited the courtroom.)

THE COURT: Okay. Let the record reflect all the jurors have left.

So please be seated.

If there are subjects -- I cut you off on a number of subjects, so if you want to raise any of those, we can have a discussion.

MS. BROWN: Yes, sir.

THE COURT: If it's your intention. You don't have to justify what you've done. Okay?

MS. BROWN: Thank you.

THE COURT: The question is whether or not you want to return to these subjects. And if so, we can have some discussion about it.

MS. BROWN: Okay. Let me look, then, at my notes, Your Honor, and talk to Mr. Wyatt and confirm.

THE COURT: Sure.

MS. BROWN: But I think --

THE COURT: Do you want us to come back here in five minutes or so?

MS. BROWN: That would be terrific.

Thank you, Your Honor.

THE COURT: Great. Why don't you -- you can also talk to counsel.

MS. BROWN: I appreciate that.

THE COURT: And you can step down, Ms. Mensing.

(The proceedings were recessed at 2:31 p.m. and reconvened at 2:43 p.m.)

THE COURT: All right. The jury's not present.

Yes.

MR. WYATT: Thank you, Your Honor. Geoff Wyatt for the defendants.

THE COURT: Yes. You're always brought up for the bad news.

What is the bad news? What have I done now?

MR. WYATT: Quick question to raise while this witness is still on cross-examination.

As Your Honor knows, there is the question about the conviction of the driver that there's been briefing on, a responsive brief has been put in. The responsive brief takes the position that because Mr. Richardson refers to his character as the reason why he knows he did not do what he's been accused of doing, the conviction should come in.

THE COURT: Let me just -- maybe I can -- before you -- before you proceed, let me just tell you what my thought process is.

I was not going to allow any of that in. That is

to say his statements to the effect, I never -- and by the way, I haven't read it. Okay? So I'm just generally paraphrasing what I understand was elicited during the course of the testimony was that his statements like I would never have done that because, one, I have two daughters, or two, I've never been accused of anything, or three -- or whatever other reasons why I would not have done it.

I don't think any of that comes in.

Similarly, I don't think the conviction comes in.

Now, if, in fact, I let in the conviction, I would certainly let in all the other stuff, within reason.

So I've taken -- my position is it's just -- none of it comes in. It's all -- and I'm not -- I'm not trying to trivialize it. And I'm not suggesting it's not real. It wasn't in his mind.

I'm just saying that people can't get on the stand or testify and say, I'm telling the truth and let me tell you why I'm telling the truth. I have two children. I never lie, or I have this or I have that and so forth. You don't allow that. That's not of an evidentiary value.

So I wouldn't allow any of that. Though I haven't seen what the proposed testimony is.

Now, you may proceed.

MR. WYATT: I appreciate, Your Honor. It's a good table setting.

Because I think part of the issue with Mr. Richardson is the denial is intertwined with language somewhat along the lines what Your Honor just said. And so to get the denial in, you almost have to have some of this that comes along with it.

THE COURT: Well, I have to see it.

MR. WYATT: Understood. And I -- I don't mean to cut you off.

THE COURT: You didn't cut me off. I cut you off. Go ahead.

MR. WYATT: Okay. Good.

I'm raising it now. I don't think we need to resolve this right now because we're not about to play that testimony, but because there's parallel testimony that's come in from this witness to the effect she's not a bad person, she's not a liar, and she doesn't make up stories, I think that testimony either needs to be stricken or if this indeed does open the door to Mr. Richardson's convictions, then I think the door is also open for the plaintiff.

THE COURT: Well, Number One -- well, Number 2 -- or maybe it's the last number, I don't care. They're out. The conviction is out.

So you want to do the reverse, given that the conviction is out, what do you want me to do?

MR. WYATT: Well, we should either strike those

statements, or we should allow Mr. Richardson to have his denial in without his conviction coming in.

THE COURT: Okay. No. I'm not going to strike the plaintiff's statements made in the context of her responses to the questioning that she was given. Yeah, you have to go through -- if you want me to, I'd be delighted to look at a transcript of her statements and see if any of them should be stricken. But I'm not going to do it in the -- without having them in front of me and without having the context.

However, however, I appreciate the fact that you are raising it now before the conclusion of her testimony. And I understand there's no waiver or any of that.

MR. WYATT: I just want to make sure we -- if things were changing because of this, we want to be able to adjust to be consistent across the witnesses.

THE COURT: Yeah.

MR. WYATT: I think Your Honor actually, the way you just expressed it, aligns with the way I'm thinking about it as well. The witness answered a question the way that she answered it. She was asked a question and these are the answers that she gave. And I do view Mr. Richardson's testimony in much the same light.

But I think we can argue that point later, and I can actually show you the testimony and we go through it. But if that was going to change Your Honor's thinking about

this testimony, I wanted to do that while this witness was still on the stand so we weren't having to later trying to go back later and replow old ground.

THE COURT: Exactly. Thank you.

MR. WYATT: Thank you, Your Honor.

THE COURT: So where are we with this witness?

MS. BROWN: So, Your Honor, we are just about done. I will go to those -- that one interrogatory identifying the therapist.

THE COURT: Yes.

MS. BROWN: I will read that consistent with what the Court had me do last time.

I have one picture that was shown that I want to ask her if she knows who took it and when it was taken. And I have one additional question about one of these witnesses, and that's it.

THE COURT: All right. Bring in the jury.

Oh, who is the next witness after this witness?

MS. BRAHMBHATT: Your Honor, it will be David Yankowski.

THE COURT: Thank you.

MS. BRAHMBHATT: Thank you.

THE COURT: And do you want to resume, Ms. Mensing?

THE WITNESS: Sorry.

(The jury entered the courtroom.)

THE COURT: Be seated. Let the record reflect all jurors are present, parties are present.

You may continue.

MS. BROWN: Thank you very much, Your Honor.

Welcome back, jurors.

Welcome back, Ms. Mensing. I just have a few more questions for you today, ma'am, and then I'll be done. Okay?

THE WITNESS: Okay.

BY MS. BROWN:

Q. And with the Court's permission, I'm going to read what is D4062, another one of those interrogatories where we asked a question and you provided an answer and verified that it was true on September 22nd, 2025.

And what it was that we asked you, ma'am, was to provide a summary of -- this is Interrogatory Number 2 at page 6 of D4062, to provide a summary of any communications you had with anyone concerning the alleged incident.

And the individuals that you identified in that response to Interrogatory Number 2 were Ariel Watkins, that you spoke to her orally on March 26, 2019; Neal Young, that you spoke to him orally on March 26, 2019; Taylor Lowery, that you spoke to him two years ago; Melissa Mensing, that you spoke to her approximately one to two years after the incident; Patrick Romine, that you spoke to him on March 26, 2019.

Who's that?

A. That is my friend that -- it's just one of my friends.
Q. Where was he living at the time of the incident?
A. Youngsville.
Q. Okay. And how did you know him?
A. I met him -- he used to date my son's father's stepsister.
Q. All right. David Yankowski, who I understand we'll hear from today, that you spoke to him on March 26, 2019.
And you identified Jenny Smith, that you spoke to her as well. Do you recall that?
A. I thought that I did. Evidently, I did not. But you just said that I told all of these people on the same day, and I did not ever say that I told every one of them on the day of the incident.
Q. Yes, ma'am. I tried to read the days that you said you told these folks. And as to Jenny Smith, there was a particular time period you identified. We don't need to go into the details of. But is it your recollection now that you didn't talk to Jenny Smith about this at all?
A. Apparently not.
Q. Okay.
A. I was mistaken.
Q. Yes, ma'am. And as it relates to Ariel Watkins on this list, I understand at the time she was your best friend, correct?

A. Correct.
Q. And you don't speak to her anymore?
A. No, I do not.
Q. Why is that?
A. Because she's not relevant. I don't, like -- we don't get along no more -- anymore. Sorry.
Q. I thought I heard you say something had happened on your direct examination; is that true?
A. She got mad about something --
Q. About?
A. -- that I don't need to go into.
Q. Did it have to do with your substance abuse?
A. It was, like, before that. So, no.

THE COURT: I think we've covered it. Thank you.

MS. BROWN: Yes.

THE COURTROOM DEPUTY CLERK: Before you move on, was that page 6?

MS. BROWN: It was -- the interrogatory question is page 6.

THE COURTROOM DEPUTY CLERK: Thank you.

MS. BROWN: And the answer is page 7 going onto 8. Thank you.

And then I'm going to switch to this microphone, and if I could -- actually, if you could pull up Mr. Delaney P04980.

BY MS. BROWN:

Q. Just one final question quick that I want to run by you about a picture, slide that was shown to you by Mr. Boundas. Do you recall answering some questions about this slide?

A. What about it?

Q. Do you recall --

A. What are you referring -- yes I recall, but what are you referring to about it?

Q. Sure. I'm going to ask you a couple questions. I want to orientate whether you recall it. And you do, correct?

A. Yes.

Q. Who took these pictures, do you know?

A. It wasn't me. I don't know.

Q. When was the first time you saw these pictures?

A. Today, but I know the house because I lived in it.

Q. Yep. Do you know whether these pictures were taken while Mr. Young was still living there?

A. He still lives there now.

Q. Okay. Do you know if these pictures were taken prior to the 2019 incident or after?

A. I didn't take the pictures. Couldn't tell you when they were taken. Don't know.

Q. All right.

A. I have no idea.

Q. Okay. And in terms of the bright light on the left one,

is that coming from the car dealership next door, to the best of your understanding?

A. Correct.

MS. BROWN: Ms. Mensing, I appreciate your time. Thank you very much. I have nothing further.

THE WITNESS: Okay.

THE COURT: Thank you. Any redirect?

MR. BOUNDAS: I do have some.

THE COURT: Okay. I think there are a few more questions that your lawyer has.

THE WITNESS: Sorry. Sorry. Sorry. Sorry.

MR. BOUNDAS: You don't mind if I ask you a few more questions.

THE WITNESS: Shoot.

REDIRECT EXAMINATION

BY MR. BOUNDAS:

Q. I'll try to move along. So you were criticized because you didn't reach out to Uber and report this incident. Do you remember that?

A. Correct.

Q. Was there anything on the Uber app when you pulled it up that said one of our drivers sexually assaults you, you know, let us know?

A. Not that I saw.

Q. And by the way, when you filed this lawsuit, Uber got

BRIANNA MENSING - REDIRECT

notice of your complaint, right?

MS. BROWN: Objection. Foundation.

THE WITNESS: I imagine so. That's how they're here, right. They were notified.

MS. BROWN: I object on foundation.

MR. BOUNDAS: How about -- I can ask it differently.

BY MR. BOUNDAS:

Q. You were cross-examined and criticized about not contacting Uber about this complaint, right?

A. Um-hum. Yes, sir.

Q. Okay. Now you know that they know about it, right?

A. Yeah.

Q. And they don't believe you, right?

A. Exactly.

MS. BROWN: Objection, Your Honor.

THE COURT: Okay. Well, let's move on.

BY MR. BOUNDAS:

Q. Okay. You were shown some text messages. I'm just going to hold it up. You remember the text messages to friends?

A. (The witness nodded their head.)

Q. You were saying I didn't mean for these lawyers to drag you into anything. Were you giving them a heads-up that they were going to be contacted by lawyers?

BRIANNA MENSING - REDIRECT

A. Yes.
Q. Were you engaged in some plot to try to get all of these people to testify?
A. No, I wasn't.
Q. Let's talk about this thigh-licking business. Do you remember all of that?
A. Yeah. I never said that one time.
Q. Okay. But I want to talk to you about it because it came up, right? So remember they showed you what were called discovery responses?
A. Yes.
Q. And that one of them said -- two of them said something about licking the thigh, right?
A. Yes.
Q. First of all, have those words ever come out of your mouth about this incident?
A. No.
Q. Okay. Did you type up those discovery responses?
A. No.
Q. Did you write them?
A. No.
Q. When you -- this was something that was actually typed up by somebody in our office, right?
A. That was like over the phone, I'm assuming, because that's the first time I said anything to anybody.

BRIANNA MENSING - REDIRECT

Q. Now, you read it, it's a mistake, right?
A. Yes.
Q. And when you got -- when you were getting ready for your deposition because, you know, Uber's lawyers were going to question you. Do you remember that?
A. Yes.
Q. And you actually did then, at that point, look through these discovery responses more carefully, right?
A. Yes.
Q. All right. And I'm going to show -- this was marked as an exhibit. It was already shown. It's the July 2025.
So -- so this was right before your deposition, right?
A. Yeah.
Q. Okay. And when you -- at that point you actually did a detailed review of this document, right?
A. Yes.
Q. Okay.
And let me show you. Did you correct mistakes in them?
A. I sure did.
Q. Let's take a look. So page 3 --
THE COURTROOM DEPUTY CLERK: I'm sorry. Exhibit number, please.
It's on the front page.
MR. BOUNDAS: It's not on the front page of mine.
THE COURT: Is this 4046?

BRIANNA MENSING - REDIRECT

What are you showing the witness?

MR. BOUNDAS: It's the July 2025.

THE COURT: Oh, 4045. D-4045.

THE COURTROOM DEPUTY CLERK: Thank you.

MR. BOUNDAS: Thank you, Your Honor. My copy was an old one without a sticker, so.

BY MR. BOUNDAS:

Q. Okay. So looking at 4045, did you -- at that point when you were getting ready to be questioned by Uber's lawyers, did you go through and actually correct mistakes?

A. Yes.

Q. Okay. This whole thing about the thigh licking, was it just a mistake?

A. Yes.

Q. Okay. Let's keep going. Page 4. You crossed some things -- is that your handwriting?

A. It sure is.

Q. So you fixed those, right?

A. Yes.

Q. Page 5, fixed that?

A. Definitely my handwriting, yes, sir.

Q. Okay. Let's go to page 10, which is this. So here when we're talking -- you were talking about the incident, you actually read what was written there that you did not type, right?

BRIANNA MENSING - REDIRECT

A. Correct.
Q. And you actually corrected it yourself, right?
A. Correct.
Q. To make it --
A. Correct, yes.
Q. And, you know, Uber's lawyers -- lawyer, Ms. Brown -- were showing you all of these typewritten documents about what you -- well, about what somebody else wrote about what you said, right?
A. Correct.
Q. They didn't show you the actual testimony that you gave under oath, did they?
A. No.
Q. And when they asked you under oath what you -- what the driver said to you, you said the same thing you told the jury, right?
A. Correct.
Q. And when they had a psychiatrist interview you, did she record that interview?
A. Yes.
Q. Okay. And on that recorded interview, did you tell her the same thing you told the jury?
A. Yes.
Q. Okay. So have the words ever from you, Brianna, ever to anybody -- friend, family, lawyer, psychiatrist, me, jury --

ever changed?
A. No.
Q. Did you ever tell anyone that the driver said he wanted to lick your thigh?
A. I've never said those words ever.
Q. Just a couple more questions.
You were asked -- well, I want to ask you this question.
Can both of these two statements be true: Is it true that you've used drugs and alcohol throughout your life?
A. Yes. It started at a very young age.
Q. Okay. Can the second statement also be true, that you were assaulted by Uber's driver in March of 2019?
A. Yes.
Q. And you were asked about drugs and alcohol and how they affected your memory, right?
A. Yes.
Q. Do you remember lots of things in your life?
A. Yeah.
Q. I mean, it's not like you're walking vacant. You know your son's birthday, right?
A. Yes.
Q. You just told the jury Neal's address from six years ago off the top of your head, right?
A. Yes.
Q. And does your use of drugs and alcohol, does that

somehow mean that you are hallucinating this Uber event?
A. According to them. But no, I'm not hallucinating.
Q. Look, I could go on with all the things in your life that you remember, right?
A. Oh, yeah.
Q. And one of those things is being assaulted by an Uber driver, isn't it?
A. That's correct.
Q. Is that something you'll ever forget?
A. No, it is not.
MR. BOUNDAS: That's all the questions I have.
THE COURT: Anything further?
MS. BROWN: No, Your Honor. Thank you.
THE COURT: Thank you very much. You're excused. Call your next witness.
THE WITNESS: Thank you.
MS. BRAHMBHATT: Apologize, Your Honor. We're going to get Mr. Yankowski.
Your Honor, we call Mr. David Yankowski.
THE COURT: Okay.
DAVID YANKOWSKI, PLAINTIFF'S WITNESS, SWORN
DIRECT EXAMINATION
BY MS. BRAHMBHATT:
MS. BRAHMBHATT: Thank you. May I proceed, Your Honor?

THE COURTROOM DEPUTY CLERK: Please state your full name for the record, and spell your last name.

THE WITNESS: David Vito Yankowski, Y-A-N-K-O-W-S-K-I.

MS. BRAHMBHATT: May I proceed? Thank you.

BY MS. BRAHMBHATT:

Q. Good afternoon, Mr. Yankowski.

A. Hi.

Q. I know you just introduced yourself or got sworn in. Can you introduce yourself to the jury, please?

A. Oh. Hi. I'm Dave Yankowski.

Q. And, Mr. Yankowski, you and I have met before, correct?

A. Yes, temporarily.

Q. All right. And we talked on the phone a couple of times, right?

A. Yeah.

Q. Okay. And when we talked, what was the thing that I told you was the most important thing for you to do?

A. The truth, the whole truth.

Q. Okay. Thank you.

Can I call you "Dave"?

A. Yeah. It's easier.

Q. Dave, are you represented by a law firm today?

A. No.

Q. So my law firm does not proceed you -- represent you in

these proceedings, correct?
A. No.
Q. Did we hire a lawyer for you?
A. No.
Q. Did we offer to hire a lawyer for you?
A. No.
Q. Where did you live?
A. I live in Lake Royale, which is near Raleigh, North Carolina.
Q. How far is it of a drive from Lake Royale to Charlotte, if you know?
A. It's -- it's like 200 -- somewhere around 200 miles, I guess.
Q. Did you drive here from Lake Royale to testify?
A. Yes.
Q. How long of a drive was that for you?
A. For me, about three and a half hours.
Q. Okay. Dave, let's talk a little bit about your background. Where did you grow up? Where were you born?
A. I was born and raised in Vermont.
Q. And how long did you live in Vermont?
A. Until I was probably 20 -- right around 20, I guess. Then I moved to Boston.
Q. I'm sorry, to Boston?
A. Yes.

Q. After Boston where did you go?
A. Almost everywhere. I've lived in a lot of places. I worked for a company that moved me around.
Q. Currently you're in Lake Royale, correct?
A. Yes, ma'am.
Q. Are you currently employed?
A. No. I'm on disability.
Q. How long have you been in disability?
A. Two years.
Q. Prior to getting on disability, what was your job?
A. I've been sales manager, vice president, owner. I've lived all the ranks.
Q. Was there an employment that you were with for a long period of time?
A. I was with Mattress Giant for about 10 years. I was upper management, VP.
Q. Okay. Do you know Ms. Brianna Mensing?
A. Yes.
Q. And how do you know her?
A. We were friends. Her father and I worked together, and then just through your mutual, we just met each other.
Q. Did you and her -- where did you and her father work together?
A. At Rooms To Go.
Q. Do you recall what year that was?

A. What year?
Q. Or years, I should say.
A. It was right around 2007, 2008, I think.
Q. Okay. Did you and Brianna's dad share a campsite?
A. Yes, we did. We shared a campsite.
Q. And what year was that?
A. That was going to probably be probably 2010, 2000 -- something like that. They had the campsite, and then I just -- I liked it. And I had an opportunity, and I bought a big camper, and I said well, I will just go stay there. I mean, how can you miss living on a lake?
Q. That was in 2010 or 2011; is that right?
A. Right around there. Best of my recall.
Q. Was it that time frame that you met Brianna?
A. No. I knew her -- I met her prior to that. They used to come out -- I mean, they'd go to a lake. I mean, when four-wheelers and Jet Skis living on a lake, camp. It was a great time.
Q. Do you recall what year that was?
A. As I said, I think that's like starting in 2008, '7. I really don't exactly remember. I haven't had a need to recall that exactly.
Q. Thank you, Dave.
How often would you see Brianna and her family when they were up at the lake?

A. Every couple few weeks.
Q. And how would you describe your relationship between you and Brianna?
A. It was just a -- it was an older guy and a kid for a long time. But then when she grew up, we ended up becoming just friends, you know. I -- I was raising two other kids, and she'd help guide me on ideas how to be a parent because I've never been a parent. So she just was in the same age bracket. So I'd advise her; she'd advise me.
Q. She referred to you as an uncle type. Does that sound about, right?
A. Yeah. It was -- yeah. That's a good definition.
Q. Okay. At some point did you start seeing Brianna and her family less frequently?
A. Yeah. I was always busy, and then I moved out of town for a while. I lived over in Ohio. And then I also I had rental properties that I visited. So yeah, it got to the point I didn't see her very often. I'd keep in touch on the phone, or when we did get together, we'd meet for lunch.
Q. You just mentioned the phone. How often do you speak to Brianna on the phone?
A. Every few weeks maybe.
Q. And that's been consistent since when? Do you have a year?
A. Probably going back five, six, seven years, eight years

maybe.

Q. And what are some of the things that you and Brianna talk about on the phone?

A. It used to be about kids and raising kids, but it's -- now it's just how she's doing, how she's doing. As I said, it got to the point where I'm like an uncle or a family member, just hoping the best for her to be -- have a good life.

Q. And without getting into specifics, do you have knowledge of some difficult times in her life?

A. Yeah. I think we all have them.

Q. Okay. Was there a time where she told you about a disturbing event with an Uber driver?

A. Yeah. Yeah.

Q. And what did she tell you about that, please?

A. She just said she had an issue. And I kind of pried it out of her. She said there was a situation where somebody went beyond what they're supposed to do.

Q. What does that mean?

A. They became like advanced. They made an advance on her, and they said that the guy touched her. And I said that's -- that's not acceptable. That can't be. That's not right.

Q. Do you recall around what time of -- the time frame that she told you about the incident? Was it a couple weeks after or a month?

A. I think it was a couple -- like a week or so afterwards.
Q. Okay.
A. At the time she was living with another gentleman, a friend that I know. And I think I mentioned -- we just -- I followed up that they were coming up to the lake that weekend or not.
Q. Is that gentleman Neal Young?
A. Yeah. Yeah.
Q. And how long have you known Neal?
A. Since I moved. I moved to Lake Royale, and I bought a separate lot myself I think seven years ago, eight years ago.
Q. Okay. And just to be clear, you said that Brianna -- you talked to Brianna about the Uber assault within about a week or two of it happening; is that right?
A. I never knew it was Uber. Just some driver. But then later on she said it was Uber.
Q. Okay. Dave, I want to talk to you about a text that you sent to our office about Uber, that Uber's attorney brought about during their opening statement about them reaching out to you. Do you recall that text you sent to our office?
A. Yeah. That was wrong.
Q. Well, let's break it down. First of all, did Uber contact you?
A. Yes, they did.
Q. And their lawyer said that because you were not

represented that they wanted to talk to you, right?
A. Yeah. And I said I don't want to talk to them.
Q. Did they also ask if you needed a lawyer?
A. I think she almost suggested it.
Q. Would it help if you saw the text message to refresh your recollection?
A. I'm not really sure. Yeah, I'll take a look. Yeah.
THE COURTROOM DEPUTY CLERK: Do you want that admitted?
THE COURT: No, no, no. Just show -- time out. Just show him the document.
MS. BRAHMBHATT: Sorry. I don't have an extra copy.
May I approach?
THE COURT: Well, show it to counsel so they see.
MR. BROWN: Your Honor, I know which one it is.
THE COURT: Okay. Take a look at it now, sir, and see if it refreshes your recollection.
THE WITNESS: Yeah, that sounds about right. Yeah.
THE COURT: Okay. Now.
MS. BRAHMBHATT: Thank you.
THE COURT: Go ahead.
BY MS. BRAHMBHATT:
Q. So according to this text message --
THE COURTROOM DEPUTY CLERK: Is this admitted?

MS. BRAHMBHATT: May we admit this, Your Honor?
THE COURT: No objection. 41 --
MR. BROWN: No objection, Your Honor.
THE COURT: Okay. 4691, admitted.
THE COURTROOM DEPUTY CLERK: Thank you.
MS. BRAHMBHATT: Thank you.
(Plaintiff's Exhibit Number P-4691 was received into evidence and published.)
BY MS. BRAHMBHATT:
Q. Let me just back up. Did Uber also ask if you needed a lawyer?
A. Yes. According to this, yes. She suggested that, yes.
MR. BROWN: I'm sorry to interrupt. Is there any way you can make it bigger, if possible? Thank you. Beautiful. Thank you.
MS. BRAHMBHATT: Sorry about that, Mr. Brown.
MR. BROWN: Good now.
BY MS. BRAHMBHATT:
Q. And then you said something about being paid and represented for your time, right?
A. I was angry with this person that contacted me. I was like, Why are you calling me?
Q. But you're not implying that Uber should pay you for your testimony, right?
A. No. I was saying -- I'm doing this out of a kindness of

my heart to do what's the right thing. Why are you calling me? You're the other people. I thought it was really -- it was just bad. It's just wrong.

Q. Mr. Yankowski, do you recall a trial subpoena being served upon you to appear at trial?

A. Yeah.

Q. And outside of the amount that was on your check that you were paid as a daily witness and mileage fee as required, has my law firm paid you to be here today to testify?

A. No. No money could buy me to do this.

Q. I'm sorry. What was that?

A. No one could pay me to do this.

MS. BRAHMBHATT: No further questions, Your Honor.

MR. BROWN: Just a few questions, Your Honor. If you could leave that up, Counsel, and we'll start with that.

CROSS-EXAMINATION

BY MR. BROWN:

Q. May it please the Court, courtroom personnel, members of the jury. Good afternoon.

Sir, how you doing. Good afternoon.

A. Nervous.

Q. Don't need to be nervous. My name is Mike Brown. I'm here obviously on behalf of Uber Technologies, Inc. I just got a few questions for you.

Let's start with this one. You've got the document up

there, right?
A. Okay.
Q. So the text that you sent said, Unless I am paid -- you told Uber, us, that unless you were paid you wouldn't talk to us.
A. No. I think my exact words were, They don't pay me. Nobody's paying me. And I didn't think it was right that they were contacting me because I don't need to talk to you.
Q. Yes, sir. Yes, sir. But your text says, I decline and ask nicely not to be contacted again unless I am paid. You wrote that, right?
A. Yeah. But the concept was not -- you're not paying me. I'm not asking for money. I'm doing this out of respect. I'm doing this for the goodness -- for the goodness of the world. So no, you can't pay me for that.
Q. Then why did you say unless I'm paid then if you weren't looking to be paid?
A. Because I didn't plan on being paid because I'm doing it for the right reasons. Do you have to get paid to do things for the right reasons?
Q. I hear you. Please forgive me, sir, because I'm just confused. Why did you write unless I am paid --
A. Maybe this was the way I was trying to explain it. I was upset. I was angry. It's like, Why are they contacting me and offering to represent me and offering -- asking me

questions when it's like, Who are you? What are you? I don't want to talk to you.
Q. You sent the text to the plaintiff's lawyers.
A. Yeah, telling her what are you guys doing. Why are you contacting me?
Q. Yes, sir. But the text that you wrote, you wrote to the plaintiff's lawyer. You didn't write it to Uber's lawyers.
A. I don't want to talk to Uber's lawyers in advance because they have nothing to do with me.
Q. Yes, sir. I'm really only trying to get one thing clarified. I'm not trying to give you a hard time --
A. I would say make it easy.
Q. -- Mr. Yankowski.
A. It has nothing to do with you can't pay me. Someone can't pay me to testify for honesty and what happened.
Q. Yes, sir.
A. That's why I'm here.
Q. How come it says unless I am paid?
A. I just said it. It's just the way it came out.
Q. Yes, sir.
A. But nobody is going to pay me. Nobody can pay me to tell the truth or to sway my truth. It is what it is, and that's the way it's going to be.
Q. They just asked you to talk. Did they tell you to say a specific --

THE COURT: I think we're just engaging in argument.

MR. BROWN: Sure. Sure.

THE COURT: So let's continue on. I'm not -- I don't want to curtail the examination, but I don't want to just get into argument.

MR. BROWN: I'm just trying to get it straight.

THE WITNESS: It has nothing to do with money. I was trying to set the stage. And money ha nothing to do with this.

BY MR. BROWN:

Q. Yes, sir. And first of all, thank you for answering my questions. I really do appreciate it.

A. Yeah.

Q. You have known the family for quite some time, Ms. Mensing's family. Is that a fair statement?

A. Yes, sir.

Q. You've known them for -- when did you first meet them. You said she was about 14 or 15 years old?

A. I think it was somewhere around 2008, 2009, somewhere in that time frame.

Q. So she mentioned to our jury today that she's 31. So you've known her 15, 16 years.

A. Somewhere like that.

Q. And her family as well, right?

A. Yes.

Q. You actually were renting space on the lot owned by her family for a while there and put your camper there, correct?

A. Yes.

Q. And this has been what's going on until you ultimately bought your own lot, you were sharing a lot with the Mensing family, correct?

A. Yes, that's correct.

Q. Now, I have in my notes that there came a time where the plaintiff actually lived in your camper for a while.

A. She would stay there periodically --

Q. Okay.

A. -- overnight.

Q. Did she stay there while you were also staying in the camper?

A. If it was, it was going to be other people there, like my kids.

Q. Yeah.

A. Yeah. I think she may have stayed there for a few times when I had family up, yeah. I would never have somebody her age alone. That's not right.

Q. Sure. Did you ever get an indication when you went back to your camper that there had been any drug use in your camper?

MS. BRAHMBHATT: Objection, Your Honor. This is

outside the scope.

THE COURT: I'll allow it.

THE WITNESS: My daughter smoked pot.

BY MR. BROWN:

Q. I'm sorry?

A. My daughter smoked marijuana. So I cautioned them about that, but I --

Q. Yes, sir. And I was probably speak -- I'm speaking more specifically to Ms. Mensing. Did you ever get any, after she stayed there, any evidence that there was drug use --

A. I don't smoke -- I don't smoke anything, so no, I was never involved in it.

Q. How about drugs such as heroin?

A. I'm not aware of that, no.

Q. You never found anything like that in your camper?

A. I never really noticed anything like that.

Q. Yes, sir.

MR. BROWN: Trying to move it along, Judge.

THE COURT: Take your time.

BY MR. BROWN:

Q. You said that Ms. Mensing told you about the incident. You weren't sure how long after it occurred?

A. Thinking back, I think it was -- it was a weird couple of weeks because it was still -- she was upset.

Q. Yes, sir.

A. She was definitely upset.
Q. And it sounded like it wasn't in the first 24 hours after it occurred that she told you, correct?
A. No. Probably the first week or thereabouts.
Q. Weeks or days, but not in the first 24 hours, right?
A. Oh, no, no, not that I can imagine.
Q. So you never got a chance to observe what she would have been like in the 24 hours following her alleged interaction with Mr. Richardson, would you?
A. No. I just knew that she was changed. She was worried about something. She was very definitely upset.
Q. Okay. And did she -- you were under the impression that the only thing that she was upset about was this?
A. Yeah. That something happened, but she didn't want to go until it with me until after a little bit of time.
Q. Were you aware of her drug use when she -- I'm sorry.
Let me ask you this: At the time that she talked to you about this, were you aware of her use of drugs?
A. Not directly. I knew -- no, not really.
Q. And when you say "not directly," if I could just ask you what you meant by --
A. She had an older boyfriend that was a problem.
Q. Mr. Young?
A. Who?
Q. Mr. Young?

A. Oh, gosh, no. No, no.
Q. A different one?
A. Yeah, some old guy. The father of her child.
Q. When you say "old guy," how old are we talking about?
A. He's just not that good of a guy.
Q. Yes, sir. You mentioned old. How much older than Ms. Mensing was the boyfriend you're talking about?
A. They're about the same age, I think.
Q. I thought you just said he was old. Are you saying Ms. Mensing --
A. No. Her -- the boyfriend.
Q. That's what I'm talking about. How old was the boyfriend.
A. An old boyfriend, prior to the one she currently has. Not age wise.
Q. Okay. Just previously.
A. Okay.
Q. Were you aware that she had a relationship with Mr. Young?
A. Yeah.
Q. Okay. And how much older was Mr. Young than Ms. Mensing when she --
A. I have no idea. I never thought about it. I just knew that they were good together. He was helping her. She was doing well. It was a good thing.

Q. Thank you, sir. Hold on one second. I don't think I have much left.

Sir, did there come a time when Ms. Mensing was staying in your camper when you had to restrain her?

A. There was one incident on her birthday where her boyfriend and she had a big fight.

Q. Yes, sir.

A. And she was really anxious and she wanted to drive, because she had been drinking. And we all said, No. And I kind of held her to say, No, no, don't drive. That's not good. Don't drive.

Q. Yes, sir.

A. And I tried to, you know, restrict her, but you can't restrict --

Q. Do you remember what year that was that you had to restrict her to try to keep her from driving while intoxicated?

A. It was in that semi-area because it had to have been before that because she wasn't living with Neal at the time.

Q. Did you -- so if you were to give a year estimate, was it before 2009?

A. Yeah, I'd say probably before 2009.

MR. BROWN: Thank you, sir. I appreciate it very much. Thanks for coming and testifying today.

THE COURT: Okay. Anything further?

MS. BRAHMBHATT: Yes, just one question, please.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. BRAHMBHATT:

Q. Dave, is there any doubt in your mind that Brianna told you about that incident with the Uber driver?

A. No. She told me. I was angry, and I said, You can't let someone like that get away with that because they're going to do it again. And that's just the way I feel. You know, somebody that does things -- sorry to say it. When you're bad, you're bad. And unless somebody corrects it or changes your direction, you're not going to change direction in your life.

MS. BRAHMBHATT: Okay. Thank you for being here today.

THE WITNESS: All right. Thanks.

THE COURT: Thank you. You're excused.

MR. BROWN: Your Honor, I just got --

THE COURT: Oh, wait one minute.

MR. BROWN: Sorry, Judge. Just two questions.

RECROSS-EXAMINATION

BY MR. BROWN:

Q. Did you encourage her to call the police?

A. At the time, I probably wouldn't have. I didn't think to do that. I said probably, Let's go beat him up.

Q. You're talking about beating him up, but you didn't tell her to call the police and report the incident?
A. No, that wasn't my point.

MR. BROWN: Thank you, sir.

THE WITNESS: I don't remember. How about that?

MR. BROWN: All good.

THE WITNESS: I probably would have, but I don't remember.

THE COURT: Anything else?

MS. BRAHMBHATT: No further questions, Your Honor.

THE COURT: Thank you very much for coming. You're excused.

Okay. Call your next witness.

So we have some video depositions?

MR. BOUNDAS: So we have some video-recorded depositions.

THE COURT: Ladies and gentlemen of the jury, you are about to see some recorded testimony. This testimony was given at various depositions. The deposition, I'm sure you understand, is an examination of a witness at a time before the trial takes place, and the testimony is just like -- just as if the witness were present. It's testimony under oath.

And the parties have said -- I don't know agreed or not, the parties have designated certain portions of witnesses testimony to be played for you and that should be

viewed by you as if the witness was presently in court giving this testimony.

Okay.

MR. BOUNDAS: Your Honor, if I could ask for a short break because I want to make sure that we --

THE COURT: Yes, let's take -- let's take about five minutes, eight minutes. We'll try to get it all organized to be played for you. So we're in recess now. Remember the admonitions given to you.

(The jury exited the courtroom.)

THE COURT: Is there anything I have to do in connection with any of these?

MR. BOUNDAS: I don't think so. I think it's just making sure we're on the same page.

THE COURT: Everybody have a seat and you talk and we'll just take a break.

(The proceedings were recessed at 3:29 p.m. and reconvened at 3:37 p.m.)

(The jury entered the courtroom.)

THE COURT: Please be seated. Let the record reflect all jurors are present, the parties are present.

You may commence with the depositions.

MR. BOUNDAS: Plaintiffs are playing the deposition of Melissa Mensing.

THE COURT: Sorry?

MR. BOUNDAS: Would you like a copy of the transcript?

THE COURT: Yes.

THE COURTROOM DEPUTY CLERK: Thank you.

(Deposition of Melissa Mensing played to the Court and jury.)

MR. BOUNDAS: Can we take this down? There is objectionable content on this document.

THE COURT: Don't play the part which has been objected to.

MR. BOUNDAS: We don't have a problem with her testimony. It's just there were things on that document that are admitted or relevant. That's all.

THE COURT: Okay. I'll strike it.

MR. SMITH: The Court's indulgence, Your Honor.

The parties are suggesting we just do the audio.

THE COURT: Okay.

MR. SMITH: That might solve this problem.

THE COURT: Go ahead.

(Deposition played to the Court and jury.)

MR. BOUNDAS: That concludes the offer, Your Honor.

THE COURT: Okay.

So, ladies and gentlemen, it's 4:00. We're going to take our recess for the day. Remember the admonition given to you. Don't discuss the case, allow anyone to

discuss it with you, form or express any opinion.

I'll see you tomorrow at 9:15. We're right on schedule.

(The jury exited the courtroom.)

THE COURT: Okay. Let the record reflect the jury has retired.

So let's talk about witnesses. Where are we?

I know where we are. Where will we be?

MR. SMITH: One moment, Your Honor.

THE COURT: Does anyone even care to talk to me?

MR. BOUNDAS: Yes, I do care.

THE COURT: I know I'm remote. I'm even more remote if you have nothing to say.

MR. BOUNDAS: No, I was adding up.

So the plaintiff has remaining -- there are 10 deposition clips that total about two hours.

THE COURT: Okay.

MR. BOUNDAS: In total, both sides.

THE COURT: No. A lot less.

MR. BOUNDAS: Oh, it's an hour?

MS. BRAHMBHATT: Yes.

MR. BOUNDAS: Am I wrong? Oh.

Because we played Melissa Mensing, that's correct.

THE COURT: So what?

MR. BOUNDAS: It's more like an hour and a half.

THE COURT: Okay. Then what?
MR. BOUNDAS: Then I believe the defendant is calling Greg Brown and Todd Gaddis.
THE COURT: Okay. Wait. Are you -- after your -- playing your clips, are you then, other than Dr. Valliere, are you finished?
MR. BOUNDAS: Yes, that would be it.
THE COURT: Okay. So you have about, in terms of testimony tomorrow, you have about an hour, hour and a half. Is that it, roughly?
MR. BOUNDAS: That is it, roughly, yes.
THE COURT: Okay. That brings us to 9:30, 10:30, that brings us to quarter to 11:00.
Now we turn to the defense. What's your plan?
MS. BROWN: Your Honor, I'll let Ms. Power discuss the video that's left.
THE COURT: Pardon me?
MS. BROWN: Ms. Power will give an estimate on the video. We would play Ariel Watkins, who is the best friend. We would play the driver. And you probably have the estimates on how long those are.
MS. POWER: Sure. And Jenny Smith, Your Honor, the doctor that was referenced.
I will hesitate to say how long the driver is. We gave the plaintiff our affirmatives. I have yet to hear back

from you all if you have affirmatives or counters. The driver's entire deposition was just a bit over an hour.

THE COURT: Well, I'd be very surprised if we have the driver's entire deposition, in light of all of the objections. So let's hammer it out now, if we can.

But putting that aside for a minute, leaving the driver aside, what do you have? You have a therapist?

MS. BROWN: Correct.

THE COURT: Dr. Jenny or whatever her name is.

MS. BROWN: Dr. Reminick.

THE COURT: But you have that on Friday.

MS. BROWN: Correct.

THE COURT: I'm talking about tomorrow.

MS. BROWN: Correct, Your Honor. We would have Uber witness Todd Gaddis.

THE COURT: Sorry?

MS. BROWN: Todd Gaddis, an Uber witness.

THE COURT: And how long is he going to be?

MS. BROWN: Very short, Your Honor. Under an hour.

THE COURT: About what?

MS. BROWN: Under an hour, I would anticipate.

THE COURT: Now, what is his testimony? What is he testifying to?

MS. BROWN: Your Honor, I would anticipate three areas of testimony. It would be, one, the sort of timeline

of her Uber rides and usage and accounts; two, the GPS data in the case for this particular ride; three, the mobile events data for this particular ride.

THE COURT: Okay. And he's been deposed or not?

MS. BROWN: Many times, Your Honor. And he's testified as well at trial.

MR. SMITH: Your Honor, he has not been deposed in this case about these issues. We -- we moved to strike him from the witness list a few weeks ago. Your Honor denied that motion. But one of the reasons we moved to strike him was because he had never been disclosed as a witness in this particular case on these particular facts.

He was deposed in the Dean case, you might recall, for those particular facts, but not in this case for these particular facts. The first time we ever thought he was ever going to be talking about the Brianna Mensing case is when we got their witness list after he's never been disclosed about this before, so.

MS. BROWN: Your Honor, we did discuss this at pretrial conference a couple weeks ago now. And then they filed a motion on it, so they've made these arguments before. The Court has considered them and denied the motion.

He's been on the witness list for as long as we had to serve disclosures on the witness list. It's been a long time now. And we repeatedly offered a deposition, Your

Honor, of both Mr. Gaddis and Ms. O'Keefe, who we are not calling, and they declined.

THE COURT: You declined?

MR. SMITH: No. I think one issue is we asked them for dates, and the last time we asked them for dates we didn't hear back on dates.

MS. BROWN: We offered this and they declined and said they wanted to move to strike instead.

MR. SMITH: So this after --

MS. BROWN: Just to finish the loop here, Your Honor.

To avoid even motion practice on this, we said, Don't worry. We'll give you a deposition.

They said, no, we're going to move to strike. We don't want a deposition.

That's what they did. They filed a motion instead. The Court denied it. And we talked about it at the pretrial conference. And the Court said that it was fine.

MR. SMITH: Here's the thing, Your Honor. After the Court -- I think we were well within our rights to move to strike and not accept their deposition at that time. After the Court denied our motion to strike, we asked them, Are you still bringing Gaddis and O'Keefe? Please give us dates. Twice. And they did not respond to that and give us dates for that, so.

THE COURT: Where is Mr. Gaddis now?

MS. BROWN: Your Honor, I believe he is on his way here from San Francisco. I think he's arriving tonight.

THE COURT: Okay. Well, you can take his deposition this evening.

MR. SMITH: Okay.

THE COURT: You all --

MR. SMITH: And --

THE COURT: -- have nothing to do, so take his deposition.

MR. SMITH: Perfect.

I do have one issue that I'd like some clarity. Is Mr. Gaddis -- I would strongly object to Mr. Gaddis being able to talk about any post-incident Uber use in this case.

THE COURT: Well, let's talk about that. What is the relevance of post-Uber use in this case?

MS. BROWN: It is relevant, Your Honor. And we have an expert who will testify that lack of avoidance, meaning continuing to use Uber, suggests that this had no effect. That is Dr. Reminick's opinion.

THE COURT: I'm not saying -- I'm not talking about Dr. Reminick.

MS. BROWN: Yep.

THE COURT: I'm talking about this witness.

MS. BROWN: Sure.

THE COURT: There's evidence in the record that this witness -- pardon me -- the plaintiff used Uber 30 times, I don't know, whatever it is.

MS. BROWN: Yep. Yep.

THE COURT: Okay. So why do we need Gaddis on that issue?

MS. BROWN: Well, if they want to stipulate to putting in all of those records -- I mean, on all of these issues, if they want to just stipulate to it, I don't need a witness. But I thought I would have to put a witness on to get this into evidence.

MR. SMITH: It's in the record. I'm sorry, your Honor.

MS. BROWN: It's not in evidence.

THE COURT: Isn't it? I thought I moved it into evidence.

MR. SMITH: She admitted to it on the stand today.

THE COURT: Well, I let it into evidence, didn't I?

MS. BROWN: Well, she testified to the number, Your Honor, correct?

THE COURT: Didn't I let the document in?

MR. SMITH: Yes, Your Honor.

THE COURT: Fine. It's in.

MS. BROWN: Okay, Your Honor.

THE COURT: So we don't need Mr. Gaddis on that.

MS. BROWN: Can I just say one thing on this, Your Honor?
THE COURT: You can say whatever you want to say. I'm just trying to figure out why we need the witness --
MS. BROWN: Understood.
THE COURT: -- if it's already in evidence.
MS. BROWN: Because there are eight profiles of the eight different accounts, and Your Honor only let one of them into evidence and told me I couldn't get the other seven in.
THE COURT: Well, let's talk about that for a minute. That's a different issue.
MS. BROWN: Okay.
THE COURT: That's an issue of whether or not it's relevant that she used different profiles. And I'm trying to figure out what is the relevance that she used different profiles. She has a son. She's now filed a lawsuit. Why is it relevant that she used different profiles?
MS. BROWN: The different profiles, Your Honor, are an indication of fraud.
THE COURT: An indication of what?
MS. BROWN: Fraud.
THE COURT: Oh.
MS. BROWN: And Mr. Gaddis will testify to that.
THE COURT: Okay. That's out. That's out, out, out. Okay. We don't have -- that's what I thought it was,

so it's out.

Okay. Now I can explain why later, but I'm not going to go into now.

Next. So we don't have Gaddis on her profiles.

Now, we have two other issues. We have timeline and the GPS. I'm not clear in my mind why these are two different issues, but let's take the timeline.

MS. BROWN: Do you mean the mobile events data, Your Honor?

THE COURT: I don't know what -- I mean what you mean. What do you mean?

MS. BROWN: Okay. So there's two other topics. There's is the GPS data from the ride that Mr. -- that shows this stop that she doesn't remember at the gas station that Mr. Gaddis, in the ordinary course, has access to that in Uber's files. That's what it shows. That's the document we showed her at her deposition. She has no idea about it. That's part of our defense.

THE COURT: Okay. So let's stop a minute.

Okay. Yes. Why is that -- why would that not be relevant?

MR. SMITH: It's -- the fact of the GPS and the mobile events log, I'm not saying it's not relevant. We -- our problem with Mr. Gaddis from this was really just we had not been able -- he had been not disclosed. He is not an

expert on this.

THE COURT: Wait a minute. Wait a minute. Let's assume he qualified to testify and so forth. I have no idea whether he will. You're going to take his deposition.

Be that as it may, if he were to come forward and say, and qualified to say, that the data shows that the plaintiff stopped at X place or at a location prior to being dropped off, why wouldn't that be relevant?

MR. SMITH: Well, I'm not sure what -- I guess the problem with the stop is that no one has identified, neither the driver nor Ms. Mensing, what happened at that stop or what it meant. And we're essentially going to have a stop where -- what I think counsel wants to do is have this stop and say in closing, No one knows what happened at that stop.

THE COURT: That's right.

MR. SMITH: But the stop isn't consequential in anyone's mind.

THE COURT: Yes, it is. It's consequential for the defense because they say here is an event that occurred just prior to the alleged incident, and she doesn't remember it.

MS. BROWN: Thank you, Your Honor.

THE COURT: Don't thank me. I don't want to be thanked by anyone. Rarely thanked by anybody.

But the point is why isn't that relevant? It seems to me it is relevant. She doesn't remember of being stopped.

I have no idea whether the stop was 20 minutes, one minute, 30 seconds. Maybe he can testify to that; maybe he can't.

MS. BROWN: He can.

THE COURT: Pardon?

MS. BROWN: He will. It's a five-minute stop.

THE COURT: And maybe he's qualified to do it and maybe he's not. I don't know. That's why we're going to have an all-nighter. So we're going to get to the bottom of the stop. So fine. Okay. At least -- at least as a subject it's admissible. Okay?

Now, subject to tomorrow, you're demonstrating to me that it's not.

MS. LONDON: It's three.

THE COURT: What else?

MR. SMITH: And the third, I think we're looking for clarity on the third issue, the rider mobile events.

THE COURT: Okay. What is that?

MS. BROWN: So, Your Honor, when you open your Uber -- if you're the rider and you open your Uber app, Uber can collect data of where you are when you're doing that. We have collected that and produced that to plaintiffs.

Mr. Gaddis would testify to what that data shows where Ms. Mensing was the night of the incident as she waited for the Uber. I asked her today if she knows what she was doing, and she mentioned being out on the street. And the

data itself actually shows her wandering the street at 1:00 a.m. across the street in a church. It shows this going on for a period of time, and we want that data in.

MR. SMITH: There is a church across from the street 1010 East Martin Street, Raleigh, North Carolina. It has a big parking lot.

MS. BROWN: She doesn't have a car. Why was she there?

MR. SMITH: She's waiting for an Uber. She's waiting for you to come pick her up.

MS. BROWN: This is cross, though, right? I mean, the data shows what the data shows. It's 1:00 in the morning.

THE COURT: I don't know that it's cross because has he ever been there?

MS. BROWN: Well, what he'll do is show the data, the GPS coordinates on a satellite map. And they can say, Well, of course, she was in the vestibule of the church because fill in the blank what --

THE COURT: Maybe she wasn't in the church. Maybe she was in the parking lot --

MS. BROWN: Correct. Correct.

THE COURT: -- waiting for the Uber.

MS. BROWN: All of these things go to weight, not admissibility.

MR. SMITH: If I can say one thing, Your Honor. I apologize.

THE COURT: Wait. One a time. Go ahead.

MR. SMITH: They have an expert, Mr. Robert Osgood, I think, who is a GPS expert. They pulled him down off of their witness to bring Mr. Gaddis instead. The only reason I bring it up is because Mr. Osgood says in his expert report, GPS data, you have a ping in one place, you could be there or you could be 35 yards away.

THE COURT: You can ask that. It's cross-examination.

MR. SMITH: Fair.

THE COURT: I'm not putting in cross-examination. Have at it. You can ask him, Are you aware of the fact -- you say she's in the church, but have you seen what's in front of the church?

MR. SMITH: I --

THE COURT: Do you know whether or not there's a parking lot in front of the church? Do you know how long it took -- how long did it take?

By the way, I am curious. How long did it take from the time that the request for the Uber occurred to her actual pickup? Do you have that information?

MS. BROWN: We do, Your Honor. It's about 20 minutes.

THE COURT: Twenty minutes?

MS. BROWN: Yes, sir.

THE COURT: Took twenty minutes for the Uber to get there?

MS. BROWN: At 1:00 in the morning, yeah.

THE COURT: Maybe take Lyft. Might have been quicker. A bit more expensive, I guess. Wait until Waymo comes.

MR. SMITH: Solve all those problems.

THE COURT: Well, we won't have these kinds of cases.

So anyway, fine. Twenty minutes. She waited 20 minutes. And you're going to show that she was wandering about in that 20 minutes.

MS. BROWN: Yes, sir.

THE COURT: Okay. Fine. You're entitled to show it. I don't know what it means.

What does it mean? What does it mean? It means that she was waiting for the Uber.

MS. BROWN: Look, it's for the jury to decide whether or not her testimony that she had one beer that night is credible or not. And this is a piece of evidence that I will argue shows that actually she was using drugs and alcohol with Mr. Woodham that night. And the circumstances will be for the jury to decide.

THE COURT: Wait a minute. Wait a minute. Wait a minute. There has to be -- the jury can't speculate.

MS. BROWN: Of course.

THE COURT: Are you going to argue -- let's say they say 20 minutes. And you're going to argue that she was using drugs that night?

MS. BROWN: No. What I'm going to say, Your Honor, is that we asked her if she remembers how long it took to wait. She doesn't.

THE COURT: And she said she didn't.

MS. BROWN: We asked her why she was picked up not at his house but down the street. She's not sure.

And what the data shows is that she was actually outside across the street, in the middle of the street. She doesn't remember that. That goes to her recollection on the night. And they can draw whatever inference they want as to why she doesn't remember. But, nevertheless, we have data that shows she was outside that we're entitled to present to the jury.

THE COURT: Right. I -- I think you are -- I'm just trying to figure out what you can argue from it.

MS. BROWN: Well --

MR. SMITH: May I be heard?

THE COURT: I'm just trying to figure this out, how this works. So it's 20 minutes.

MS. BROWN: Yes, sir.

THE COURT: By the way, does it also show -- of the 20 minutes, does it show the amount of time she was out on the street?

MS. BROWN: Yes, sir. Well, I mean, there will be GPS pings at certain periods during the --

THE COURT: How long was she out on the street?

MS. BROWN: Different pockets of the 20 minutes. Like in the beginning, she's out for, say, five different minutes on a couple of different blocks. At the end seven minutes on other blocks in the other direction across the street. I'm mean, she's walking around outside --

THE COURT: Waiting for the Uber.

MS. BROWN: Potentially, yes. She just doesn't remember that. And so it's a fair piece of evidence to bring to the jury that we ask do you know how long. She said no. It was not an insignificant period of time that she was outside in the middle of the night.

MR. SMITH: Your Honor, may I be heard on a couple of issues?

You can argue -- there are lots of things you can argue, but there has to be some sort of logical chain to get there. And being outside in the middle of the night doesn't mean -- it sounds like counsel wants to say because you're outside at 1:00 in the morning, you must be doing drugs in a

church parking lot. That's a little bit of a stretch.

But what I've heard from her is she's going to say it's a 20-minute stop -- or a 20-minute wait; is that right?

MS. BROWN: Approximately.

MR. SMITH: I'm not sure. Maybe I need to look at the documents she's talking about. But the one we have in evidence right now says request was at 1:21 a.m. and the trip started at 1:25 a.m. That's four minutes.

MS. BROWN: Yep.

MR. SMITH: Like --

THE COURT: This is why we're going to have a deposition.

MS. BROWN: Okay.

THE COURT: Okay? This is why we're going to have the deposition, to try to nail this down and figure out. And I think I'll reserve judgment as to whether or not -- if, in fact, she was wandering for 20 minutes, then I think that comes into evidence she's wandering for 20 minutes. I don't know what you can say about it. I think you have to be somewhat careful. You can draw reasonable inferences. I don't know that you can -- you cannot draw unreasonable inferences or simply speculate.

MS. BROWN: Yes, sir.

THE COURT: And I don't know if you want the jury to speculate is that she was using drugs at that time or

drinking at that time, then I have to give some more thought to that as to whether or not that's a fair or reasonable inference from the testimony.

MS. BROWN: Thank you, Your Honor.

THE COURT: Maybe that's what want to argue. Okay. But please let's have the factual basis for it first.

MS. BROWN: Yes, Your Honor.

THE COURT: Okay. Now, are we all nice and clear on that one?

MS. BROWN: We are. Thank you.

THE COURT: All right. So that leaves us with -- okay. So in the form of Mr. Gaddis, we have who else?

MS. BROWN: Ariel, the best friend.

THE COURT: The friend. Have you reached an agreement as to what part of the deposition of the friend comes in?

MS. BROWN: They don't want any of it, so I think it is just ours, right?

THE COURT: They're not offering any counter?

MS. BROWN: Correct. Correct.

THE COURT: Okay. And that friend's deposition is what length?

MS. POWER: Approximately 24 minutes, Your Honor.

THE COURT: Okay. Is there any objection to any portion of the 24 minutes?

MR. BOUNDAS: We do have counters, Your Honor.

THE COURT: That's what I asked. At least that's what I tried to ask.

MS. BROWN: I thought did not.

MR. SMITH: I'm sure we have some objections.

THE COURT: Well, I want to deal with this. That's why we have these very pleasant sessions afterwards because I want to deal with it without the jury sitting there wondering what is going on in this case.

This all to be done outside the presence of the jury, like now. But you're not ready to do it now. So tomorrow we will gather at 8:00 and go through all of this. So when the jury comes in at 9:15 -- maybe I'll say 8:15 -- 8:15 tomorrow. When the jury comes in, they get whatever we rule admissible or I rule admissible. I have to refer to myself as to we, it, the Court, me.

So anyway, we'll just sort of do it that way. Okay. 8:15. But I want everything teed up. That is to say I want to know if there is a dispute as to Mr. Gaddis, if there is a dispute as to what is relevant in terms of the friend. If there -- and then with respect to Mr. Johnson --

MR. SMITH: Richardson.

MS. POWER: Richardson.

THE COURT: Richardson. Pardon me. Mr. Richardson.

Let's have a little bit of discussion. I don't -- I don't -- you know, I'm of the opinion that I'm not going to allow any of this bolstering of why he believes he's telling the truth.

First of all, in thinking about the plaintiff's testimony, she didn't really testify as to why she believes she's telling the truth. I mean, she says I'm admitting this. I'm admitting that. I'm admitting the third thing and so forth.

Now, from that you can conclude she's admitting all of these things, and they're not necessarily in her interests to admit them, given that they are, to some extent, criminal conduct, and also some extent contrary to her interests in putting forward her case.

So I don't think it's -- I mean, I have to tell you, I don't even -- I basically don't understand your argument that somehow it's, you know, goose and gander sauce because it doesn't seem to be it is. But I have to -- I can only do it if I look at the exact words that somebody is saying.

But believe me, I'm not going to allow in things like I have two daughters, so why should I not be concerned about this type of thing. I cannot tell you how many sex offenders have families. Quite a few. Quite a few. That doesn't mean that they're more likely, but it doesn't mean

they're less likely.

MR. WYATT: Well -- sorry.

THE COURT: I don't know what the statistics show. Maybe they are less likely, but we don't do things on probabilities.

MR. WYATT: Can I respond to that quickly, Your Honor. Geoff Wyatt for the defendants.

I'm hearing what Your Honor is saying is something of -- I don't want to call it a tentative ruling, but we're getting sort of a preview of what you think about this testimony. The plaintiffs filed a brief this morning that raised a new issue that we have not addressed in our opening brief. And Your Honor just mentioned how it would be helpful to see the actual testimony.

Could this be an issue that we also tee up tomorrow?

THE COURT: Sure. I'd like to do it before.

MR. WYATT: Yeah.

THE COURT: First of all, I think what you have to do is you have to go through the testimony and be somewhat conservative in what you're going to show. I'd like you to take the first cut at it --

MR. WYATT: Yes.

THE COURT: -- given what I've been saying about it.

Now, in that mind, it doesn't mean that either one you should give up an argument that you think is an appropriate argument and then sit down with plaintiff's counsel and see whether there's -- continues to be a disagreement. If there's a disagreement, I'll rule on it.

Now, I think it would will be useful -- is there a transcript of the deposition?

MR. WYATT: There is.

THE COURT: Fine. Efile it under -- I guess you have to do it under seal, or whatever it is, today so I can read through it myself.

MR. WYATT: Yes.

THE COURT: If I read through it myself, I'll be better prepared.

MR. WYATT: Understood, Your Honor. And I think just if I can preview my sort of view of the universe and what is --

THE COURT: Sure. Your universe.

MR. WYATT: I mean, to the extent it helps the Court in its review of the transcript.

I mean, the case is obviously really boiling down because of the way the legal issues have shaken out to a question of what happened here. And it's almost a classic he-said/she-said situation. And so I do think it is important for the jury to hear the fullest explanation from

both parties in this, which are really the driver and the plaintiff, as to what happened that night. And this is part of how he is telling his story.

And I do think that the plaintiff was able to say a couple of things to the jury about why the jury should believe what she's saying, notwithstanding these other things in her life. And I think the driver --

THE COURT: I think you should identify those for me.

MR. WYATT: We will do that.

THE COURT: Okay.

MR. WYATT: Okay. And I'll stop there. I was just going to give you a preview. We'll do the rest tomorrow.

THE COURT: Okay. I'm going to call on plaintiff's legal expert here because he's been brought all the way to North Carolina, and has had absolutely no opportunity to appear on the record. So it's important for billing purposes that he be allowed to speak.

MR. KAUFMAN: Your Honor, good afternoon, Your Honor, Andrew Kaufman for the plaintiff.

THE COURT: Yes.

MR. KAUFMAN: As a plaintiff's lawyer, we, of course, do not bill. So just for the record make that crystal clear.

THE COURT: I remember.

MR. KAUFMAN: We do have an outstanding, unopposed motion to dispense common benefit expenses. So if the Court's feeling generous.

I don't have much to add. I think the Court is right about take a look at the transcript. We'll look at the designations. I don't know if we'll get some narrow designations, but we'll talk about that offline.

I do think that there is sort of a conflating of two separate ideas here and separate federal rules. What Mr. Wyatt is talking about is when you get to bring in certain bad acts or a conviction to challenge credibility and truthfulness, and that's Rule 609, of course, and Rule 404.

And really the independent question of whether the driver witness can say I don't remember this, but it didn't happen because I'm not that kind of guy, and nobody can even come close to saying something negative about my nature. So I think they are just separate questions.

If the Court allows testimony like that from the driver, then we get to the question of whether, well, does this prior conviction come in. But it's sort of a step-wise analysis. And I think we can talk about it in the morning.

THE COURT: I'm not sure. You sort of lose me at the very end because I'm not sure that the 25-year-old conviction which arose out of some dispute, odd set of circumstances as I can -- as I can understand them, which I

don't have a full understanding of, would necessarily go to this person's character for truthfulness, or lack of violence, whatever it is.

It seems to me that what you are introducing it for basically is propensity. Because he acted this way 25 years ago, it's more likely that he acts -- that he committed the act in this particular case. And that is classic out. That's classic out.

So the question is, well, is it still going to be used for impeachment because he's painting himself one way when, in fact, he is another way.

And then the answer is well, the other way, does this 25-year-old misdemeanor conviction really show another side of him, or rebut his assertions of lack of violence or truthfulness or -- truthfulness, I guess, or go to credibility. And I'm having a hard time with that. Which is why traditionally the criminal convictions have time periods on them as well as subject matter restrictions.

Anyway, we avoid that entire problem if I don't allow any of this self-bolstering statements, which you're still urging me to consider. And which I'm probably not going to allow. But let them -- let them first -- they want -- they're sort of arguing a parity.

They're saying this is, you know, two-witness case basically. One person says X, the other person says not X.

And the person who says X, we allowed to testify a particular way; therefore, it's only fair that the person who says X or the opposite gets to testify in the same way.

So we start -- we can start with that and see whether or not, in fact, she was allowed to testify a particular way within their understanding of the ambit of the -- of bolstering her own credibility. I want that first way.

MR. KAUFMAN: Okay.

THE COURT: If the answer to that is she didn't really do that -- I mean, her credibility, of course, is at issue. But the question is did she make statements to enhance her credibility that are similar or of the same character it's a type that the driver would want to make. I don't know. I don't see it. That's where they lose me.

MR. KAUFMAN: We'll frame it up. I hear what Your Honor is saying. I do. And I think his credibility is at issue too. They put it at issue in their opening. And they said he is a poor historian. They said -- they certainly strongly insinuated he's not telling the truth.

So I think we do have a very similar -- there are parallels here. Whether they're perfectly parallel, I think that is the question Your Honor is asking.

THE COURT: There's ways to do it. Absolutely.

First of all, I'm not suggesting that credibility

is not an issue. It's the issue. It's the -- it's the evidentiary issue. Okay. That's number one.

But the way one does it is you call witnesses. The evidence could provides. The evidence of truthfulness. I've known Jones. He's always been truthful, something like that. Jones can't gets up and say, you know what, you're wondering whether I'm truthful or not. Let me tell you. I am truthful.

Really? Really. It would be interesting trials.

MR. KAUFMAN: I think the testimony is not quite like that, Your Honor. But I understand what you're saying. Let us put it in front of you and we'll talk about it more tomorrow, if that works.

THE COURT: Great.

Okay. So just to plan out our day tomorrow. We'll meet at 8:15. We'll go over these issues. We'll do the -- you'll conclude your testimony. You'll move into your case. And hopefully we will have all of that in tomorrow, save and except for your expert who is going to follow their expert.

MS. BROWN: Correct.

THE COURT: Right?

MR. KAUFMAN: Yes, Your Honor.

THE COURT: And the other thing that we'll do tomorrow afternoon, if we have time, and I anticipate we will, is go over jury instructions.

MR. KAUFMAN: Okay.

MR. SMITH: One question. Could I inquire, since we're going to do this Gaddis deposition tonight. I heard he's flying in. Could you guys let us know when he's getting in?

MS. BROWN: Absolutely. As soon as I get out.

MR. SMITH: Perfect. We just want to coordinate and make sure we can do it at a semi reasonable hour.

THE COURT: You know where each other is staying? Have you traded that information?

No, no.

MR. SMITH: I've got phone numbers. So we figure -- we can track each other down.

THE COURT: Anything else?

I have a question for people from North Carolina. Is anybody here from North Carolina? No.

MR. SMITH: I'm from South Carolina.

THE COURT: No, I don't want South Carolina. I want North Carolina.

There's one hand.

MS. POWER: Our local counsel is in the building, but I think he has stepped out, Your Honor.

THE COURT: But you are, sir. In the last row. What's your name? Stand up.

MR. SANDERS: Holston Sanders.

THE COURT: Mr. Sanders, I have a question for you. Why is the team, the baseball team, from North Carolina last night, they were called the 49ers?

MR. SANDERS: You know, I'm not a real big baseball guy.

THE COURT: Well, I'd like somebody to answer that question. Unfortunately, they played like the 49ers.

Okay. Thank you. We're in recess.

MR. SMITH: Thank you, Your Honor.

MS. BRAHMBHATT: Thank you, Your Honor.

(The proceedings concluded at 4:36 p.m.)

* * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 15th day of April 2026.

/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CRC
U.S. Official Court Reporter