UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Charles R. Breyer, Judge

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, ) No. 3:23-MD-03084-CRB

WHB 823 v. Uber Techs, Inc., et al.
No. 3:24-cv-04900

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

WHB 823,

Plaintiff,

vs.

UBER TECHNOLOGIES, INC., et al.,

Defendants.

No. 3:25-cv-00737-CB

VOLUME II

Pages 254 - 356

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE CHARLES R. BREYER
UNITED STATES SENIOR DISTRICT COURT JUDGE
THURSDAY, APRIL 16th, 2026 AT 8:40 A.M.

JILLIAN M. TURNER, RMR, CRR, CRC
Official U.S. District Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:

For Plaintiffs:

SARAH R. LONDON, ESQ.
ANDREW KAUFMAN, ESQ.
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, California 94108

JOHN T. BOUNDAS, ESQ.
SEJAL BRAHMBHATT, ESQ.
Williams Hart & Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017

WILLIAM L. SMITH, ESQ.
ALEXANDRA M. WALSH, ESQ.
Anapol Weiss
6060 Center Drive, 10th Floor
Los Angeles, California 900045

THIEN AN V. TRUONG, ESQ.
Simmons Hanly Conroy
112 Madison Avenue
New York, New York 10016

ROOPAL P. LUHANA, ESQ.
Chaffin Luhana LLP
3200 Main Street
Weirton, West Virginia 26062

For Defendants:

ALLISON M. BROWN, ESQ.
LAURA VARTAIN HORN, ESQ.
CAROLINE POWER, ESQ.
GEOFFREY M. WYATT, ESQ.
Kirkland & Ellis LLP
2005 Market Street, Suite 1000
Philadelphia, Pennsylvania 19103

MICHAEL A. BROWN, ESQ.
Nelson Mullins
100 S. Charles Street, Suite 1600
Baltimore, Maryland 21201

# I N D E X


PAGE

PLAINTIFF'S WITNESSES

(VIA VIDEO DEPOSITION:)

SONNY WONG

GREG BROWN

PHILLIP CARDENAS

ROGER KAISER

NEAL YOUNG

DEFENDANTS' WITNESSES

(VIA VIDEO DEPOSITION:)

ARIEL WATKINS LANKFORD

DR. JENNY GRAY SMITH

JEFFERY RICHARDSON

PLAINTIFF'S EXHIBITS

| NO. | RECEIVED |
|---|---|
| P-00636 | 305 |
| P-01396 | 305 |
| P-04713 | 305 |
| P-4968 | 306 |
| P-4970 | 306 |

DEFENDANT'S EXHIBITS

| NO. | RECEIVED |
|---|---|
| D-4140 | 306 |
| CHARGE CONFERENCE | 310 |

(Court called to order on Thursday, April 16, 2026, commencing at 8:40 a.m.)

P R O C E E D I N G S

THE COURTROOM DEPUTY CLERK: You may be seated.

THE COURT: Okay. Let the record show that the parties are present, the jury is not present.

So let's discuss the deposition of the driver, Mr. Richardson. Okay.

The Court has read the -- thank you very much. The Court has read the entire transcript of the deposition and has as well read Uber's reply brief in support of the admission of certain testimony.

So essentially as I understand the argument is that it's -- it's an argument that is based upon the fact that the plaintiff in this case, as well as a witness who testified for the plaintiff, essentially gave testimony of the type that would be characterized as character testimony, and, therefore, it's appropriate for this -- for the driver to similarly testify as to why he should be believed in his testimony. That's the --

MR. WYATT: I think that's -- that's pretty much it, Your Honor. I think -- I think there's a question whether any of his testimony really is character testimony or whether --

THE COURT: Well, it isn't character testimony as

it's envisioned in the -- in the evidence code. I mean, the evidence -- there is a whole procedure, a process, and an evidence code section which says that in order to -- if one wants to give character testimony or bolster credibility of a witness who has testified, there is a manner in which it's done. It's done through reputation testimony, and that's not this.

So it wouldn't come in -- it wouldn't be admissible as traditional character testimony. So it would not be admissible on that basis. The question is well, in some sort of fairness, sort of a gestalt, sort of a view of the case since the plaintiff came in and said, Well, I -- I mean, you excerpt it. And I think accurately, excerpt portions of her testimony, isn't it fair to allow the witness to do it.

But they're in very different situations, you see. You see, when the plaintiff testified on the stand, essentially the examination centered around whether she was telling the truth, whether she was lying. And in the sense if you sat up there as a witness, and the plaintiff in this case, you were being accused of lying.

And so in response to that, she said she's not a liar. I mean, I don't know how else you respond to it. I mean, I guess there are a lot of ways to respond to it, but her response was no, I'm not a liar. I'm telling the truth, in light of the types of questions that were being propounded

to her.

And that's not bolstering your own credibility. While it reflects on a person's credibility, it simply is in response to a charge that she is giving false testimony.

I don't -- what I'm saying to you is I don't really see the parallel, other than one can characterize it as these are -- since credibility of he-said/she-said is at stake here since she testified as to why she's credible, which I don't know that she really did. She simply said I'm telling the truth. I'm telling the truth. That's what she said. I don't lie. I guess it matters. I don't lie, that's maybe broader.

But I hardly think that what you have offered, which is his statements to the effect that he's got a daughter, he wouldn't lie, he's not that kind of person. That's quite different in the Court's view. So I'm not going to permit it. I'm going to exclude that type of testimony.

I'm also -- I am going to exclude testimony -- I don't know whether it's even going to be offered. But there is a series of questions about Uber hiring the lawyer. And I think all of that goes out. And I can give my reasons why.

But, you know, I think Uber -- I think counsel for Uber acted entirely appropriately. A driver in all of these cases is accused of criminal wrongdoing. And so knowing that, it's entirely appropriate that Uber seeks outside

counsel, even if they pay for it. And I don't think that's -- you know, lawyers be out of work. Not that I particularly want it. That's not my task. But, you know, I've listened to it time and time again.

And so that is out.

But one aspect that may be included, which is the conversations that that the witness had with Uber counsel. I don't think we have any of the substance of it, but I do think we have the length of time that these conversations took place, and I think that's appropriate.

I don't know whether you want to get into what was discussed or not, I have no idea. I don't know that he has a memory of what was discussed during that time period. I think matter of fact I think he says he doesn't have a memory. He doesn't have a memory, 11-minute, 12-minute conversation. I don't know when, I forgot. It's probably in here, but he can't remember anything. And, of course, he can't remember anything, I mean, almost anything about this case.

Okay. Well, that's the way it is.

MR. WYATT: May I just follow-up briefly, Your Honor?

THE COURT: Take your time. Go right ahead.

MR. WYATT: Good morning, Your Honor.

Geoff Wyatt for the defendants.

First of all, I appreciate your attention for the briefing to this. I know we got it in late last night. So thank you for making the time to read it before today and to think through the issues.

By way of follow-up, just to sort of understand how to implement Your Honor's ruling, because I do think in some cases it's not so clear, and there may be ways to cut this so that we get out the stuff that I think the Court is focused mostly on, but still get, to use the phrase the Court used a minute ago, the part where he's responding to the charge against him. Because I think that's --

THE COURT: Let me be more definite because I think that's a very good point. Because I think some of it comes in. And I'm now looking -- if I can find it easily, which, of course -- okay. So let's look at page 25.

MR. WYATT: I'm there.

THE COURT: Okay. The question, line 2: "When did you first learn of the plaintiff's allegations about you in this case?

"Answer: When I received the subpoena," and et cetera, et cetera.

Now, the question: "During the time that you drove for Uber, do you recall if you've -- if you were ever accused by any passengers of a sexual assault?"

I don't know why that would come in. He says no.

I mean, I don't know -- I don't know that it wouldn't necessarily.

MR. WYATT: Well, I think these questions just go to whether he's --

THE COURT: Yeah.

MR. WYATT: -- you know, got any recollection of anything related to this event.

THE COURT: I think it does too. And I think you can put in line 17.

"When you heard of Plaintiff's allegation, do you remember how you reacted?

"Answer: Shock, simple and plain."

Stenographer requested clarification.

"Simple and plain. Shock. Pure shock. I couldn't believe it."

Okay. Then I think the next sentence goes out because he says, "I wouldn't say upsetting but surprising because I know my character."

That's just -- that's just saying this is inconsistent with my character. So that's out.

MR. WYATT: Can we cut it off after surprising or just the whole answer is out?

THE COURT: Well, I would leave it in. I mean, I think in fairness to the driver.

MR. WYATT: Okay.

THE COURT: I would leave in -- you could put a period after "Surprising."

What else do you need to know?

MR. WYATT: Just one other place, Your Honor. Page 69, which I think is where a lot of the discussion is focused previously, because this is the part where the reference is made to the daughter in college and serving as a role model.

THE COURT: That all goes out.

MR. WYATT: If we look at the second paragraph, I think the second paragraph he does reference the word "character," but he's really talking about his reaction to the charges against him. He talks about how the whole proceeding caught him offguard. He talks about how it hurts when somebody puts something negative against your character, and then you don't work a lifetime trying to lead a good image and have somebody come out of the blue and try to strike it down.

THE COURT: It's all out.

MR. WYATT: This to me, Your Honor, is -- if I can just make one more pitch for it.

I mean, this is him responding to the charge. We can leave out the part that talks about the daughter, the role model, the life. But I do think this is him saying somebody is accusing ma of doing something wrong, and it

feels completely wrong to me because I know I didn't do it. I mean, I think that's what he's trying to express. He's using the word "character," and we, as attorneys, are trained are focus on that word because of the rules of evidence, but I really don't think that that is the purpose --

THE COURT: What do you propose reading it -- tell me specifically on page 69 what you would read in.

MR. WYATT: I would read in the question --

THE COURT: Well, okay. The question, but he says this is about my character.

MR. WYATT: But he doesn't -- if you leave out that first paragraph, I sort of thought that was the focus of the concern about the character response because he really is talking about the kind of person he is and so on.

If we leave it with the second paragraph, he really doesn't go back to that in the same way. He's talking about the impact it had on him to be accused of something that he does not agree that he did. And I do think that's an important part of his testimony.

I think that if we extract that first paragraph, it goes a long way toward resolving the issues. And this will wind up being, I think, as otherwise modifying the deposition the only other place that we're getting that word "character" into the transcript.

MR. KAUFMAN: Good morning.

THE COURT: Good morning.

MR. KAUFMAN: I think it's exactly what the Court just excluded. In addition, it's cumulative to what the Court is allowing in, which is how did you react to these allegations, shock, surprised, et cetera.

THE COURT: You see, it's all right, and why I left in the shock, surprise, he actually says it twice in both times.

MR. WYATT: Yes.

THE COURT: Is that it -- that's fair. I mean, that's how he reacted to it. Now he is saying in this response it's also inconsistent with who I am. That's what has to go out. That's what has to go out.

So I'm not going to allow that in. I'm not allowing it in.

MR. WYATT: Understood.

THE COURT: Anything else?

MR. WYATT: No. I think with that guidance we can figure out the rest, Your Honor. I appreciate it.

Sorry. One other question.

THE COURT: Sure. What?

MR. SMITH: Just one other issue. I mean, before we get to working this out.

At page 67, line 16. Or I guess it's the question is before that on page 67, line 9, where the question is "You

mentioned a couple times in this deposition that it's been a little rough from February through now with your health."

And then the next full page is about how he has afib, and he's got doctors, and he's going to have a toe amputated, and then a foot amputated. I mean, it's -- I think it's irrelevant to the issues here. He's already explained that he's in the hospital. They've given the jury the context for that. And it's just to bolster sympathy for him as he's a sympathetic witness because he's in the hospital. I just want to put that on the record --

THE COURT: No. I think that's -- I think that also should be excluded. It's clear why he's not there. I mean, nobody -- I haven't seen the video, but my guess is the video demonstrates he's in bed, right?

MR. WYATT: He is.

THE COURT: Okay. So, I mean, I don't think anybody thinks he's not coming in, though he could come in, because he's -- doesn't have a health issue. And I'm quite sure you're not going to argue that he -- he should have been brought in?

MR. SMITH: No.

MR. WYATT: Well, I do think -- if I may respond to that.

THE COURT: Yes.

MR. WYATT: I do think it gives the jury a sense of

who this person is. And I also think it gives some color to why he can't recall anything. I think at some point earlier in the deposition he does link those things. He's been preoccupied by being in the hospital.

THE COURT: So you're saying it goes to the manner in which he's testifying?

MR. WYATT: It does, yes. I think it provides important context.

THE COURT: I agree with you.

MR. WYATT: I appreciate you, Your Honor.

And then the last -- the only issue I wanted to raise, just because we didn't touch on it, but I assume the Court is not revisiting the issue of the conviction?

THE COURT: No. The conviction is out.

MR. WYATT: Thank you.

THE COURT: The conviction is out.

His deactivation with Uber is out.

MR. WYATT: Okay.

THE COURT: The fact that his wife is in the room, that's it.

MR. WYATT: Thank you, Your Honor.

THE COURT: Okay. Any more "guidance"?

MR. KAUFMAN: We have a couple of issues that can be discussed now or it could wait to later.

THE COURT: Oh, I love discussing things now.

Yeah.

MR. KAUFMAN: The first is an issue relating to jury instructions, and the second is an issue relating to Dr. Reminick's testimony tomorrow.

And I think we have a couple of deposition video issues that are more pertinent.

MR. BOUNDAS: Yeah, I just think in the interest of time --

THE COURT: We can talk.

MR. BOUNDAS: The depositions.

THE COURT: The issues you raised, we can talk about afterwards.

MR. KAUFMAN: Thank you, Your Honor.

MR. WYATT: Thank you, Your Honor.

MR. BOUNDAS: So, Your Honor, I think we have two depositions. One is Jenny Smith, the prison psychiatrist. You know, after looking at all of this, I think our only -- we just want to make sure any references to prison or jail --

MS. BROWN: Of course.

MR. BOUNDAS: -- have been deleted. And if that's the case, I think we're just going to let it play as is.

MS. BROWN: Good.

MR. BOUNDAS: The second one is much more concerning. It's the deposition of Ms. Watkins Lankford. I think the Court may recall that's the former best friend of

Ms. Mensing. And she talks about Ms. Mensing not telling her about the Uber incident.

Obviously, we don't love that testimony, but that's in. We get it. But then she goes on to -- on and on speculating, giving opinions about Plaintiff's drug use, her boyfriend's drug use, relaying incredibly prejudicial incidents. And I can go through them if you'd like.

THE COURT: Well, I wouldn't imagine any of that comes in. Well, it comes in that she didn't -- contrary to the plaintiff's assertion, I guess it was the plaintiff's assertion, that she did tell her friend.

MS. BROWN: Um-hum.

THE COURT: This goes to rebuttal, but her drug use and so forth, I don't know that that -- that would come in. It would depend on -- I'd have to know more about it.

MR. BOUNDAS: I would go to specific. Because we're not making objections to everything, but I can give you -- I can also hand you if you'd like --

THE COURT: Pardon me?

MR. BOUNDAS: I can hand you --

THE COURT: Yes, I think that is a good idea.

MS. POWER: Your Honor, if I may.

THE COURT: Yes.

MS. POWER: The parties are in the midst of complying with Your Honor's --

THE COURT: I'm sorry. Go ahead.

MS. POWER: Your Honor, Caroline Power for defendants. Good morning.

The parties are in the midst of complying with Your Honor's procedure for exchanging objections and responses and providing Your Honor with the clips, the objections, and the responses and the space for Your Honor to rule. Would that be a more fulsome way for you to review this testimony and rule upon it?

THE COURT: I don't know. Would it? I mean.

MS. BROWN: I think maybe if you can just point us to where you're objecting to. Only because we want to -- it needs to get played now.

MR. BOUNDAS: I'm going to point to specific. That's why I gave His Honor the play list so we can just go right through it.

MS. BROWN: Okay.

MR. BOUNDAS: So we don't have any objections up until you get to page 5, which is on the bottom right-hand corner, Your Honor.

THE COURT: Okay.

MR. BOUNDAS: There is a section. It's 10:07.

THE COURT: I need a pen.

MR. BOUNDAS: It's 10:07 through 11:04. And this is actually -- we had raised this in opening statement. It's

a -- and it's an incident she's relating where she was pregnant with her daughter. Ms. Mensing took her to a crack dealer's house. There was a -- crack rock fell out in the car. And we just think this is -- you know, crosses the line of relevance.

MS. BROWN: Well, Your Honor, the issue is this: Is that Ms. Mensing testified yesterday that on the evening in question in the middle of a very serious drug addiction, she was not using drugs. And that's inconsistent with the medical records. That's inconsistent with Ms. Watkins' testimony. And this particular incident shows the extent of the drug addiction, the extent of the fact that --

THE COURT: She says so between 2017 and 2018, in a two-year period she describes an incident.

MS. BROWN: Correct, Your Honor.

THE COURT: Okay. That's out. It's highly prejudicial.

MR. BOUNDAS: Okay.

THE COURT: Certainly the prejudice outweighs its probative value.

MR. BOUNDAS: The next, Your Honor, same page.

THE COURT: So I'm excluding -- so it's clear, I'm excluding from 10:07 through where?

MR. BOUNDAS: I think it would be 11:04. I mean, there is a reference in 11:05 to -- that's okay. We

understand that. We'll leave that in.

THE COURT: Well, that's out as well. 11:04, 11:05, 11:06.

MR. BOUNDAS: Then that would leave --

THE COURT: 11:12 and 11:13.

MS. BROWN: So, Your Honor --

THE COURT: So 11:13 is in.

MR. BOUNDAS: Okay.

MS. BROWN: So, Your Honor, I believe, 11:07: "Have you ever seen Ms. Mensing using substances or abusing alcohol?"

That, I would submit, should stay in.

THE COURT: No. Out. Out.

MS. BROWN: But, Your Honor, that's the point, right?

THE COURT: But she says it in 11:13.

MS. BROWN: Well, I guess my --

THE COURT: Okay. Then the way to do it, if you want -- I'm just trying to do it from a convenience point of view.

MS. BROWN: I understand.

THE COURT: Then exclude, "Other than the incident you just described involving there being crack in your car, comma."

MS. BROWN: Yes.

THE COURT: That's out.

MS. BROWN: Yes, Your Honor.

THE COURT: So you can start with 11:07: "Have you ever seen Ms. Mensing either using substances or alcohol abuse," if you want that in.

MS. BROWN: Thank you, Your Honor.

MR. BOUNDAS: And, Your Honor, then I know you just mentioned this, but 11:13 through 12:03, she says: "How often did Ms. Mensing use drugs in 2018, 2019?

"Every day."

But if you look at her testimony, she actually says, by March 2019 the relationship was dwindling and she saw her every now and then.

THE COURT: Well, that's argument.

MR. BOUNDAS: Okay. All right.

THE COURT: That's argument. You're saying what she meant by that. That's argument.

MR. BOUNDAS: Okay.

THE COURT: But it comes in.

MR. BOUNDAS: Yes. So then next -- that eliminates my next objection. I'll just go to the page 712 -- 7 of 12, line 1603 is just a whole -- well, let me -- it's two things but it's all about Neal Young and relating incidences that Mr. Young used drugs, that he was feeding her drugs, hearsay conversations about, you know, Mr. Young saying he doesn't

want to give her money to buy drugs. She was driving a Hummer while she was clearly intoxicated. And then asking whether Mr. Young knew she was using drugs at the time.

I mean, this whole thing about Mr. Young, his drug use, his knowledge of her drug use, it's speculation. It's irrelevant. There's hearsay in there.

THE COURT: Well, it's hearsay.

MS. BROWN: Well, Your Honor, this part is critical, though, because she was living with Mr. Young.

THE COURT: It's hearsay.

MS. BROWN: Well, I think we need to look at the part because some of --

THE COURT: Okay. Go look at the part and tell me.

MS. BROWN: Okay.

THE COURT: Just -- we're going to move step by step.

MS. BROWN: Yes, Your Honor.

THE COURT: Look at it.

MS. BROWN: Um-hum.

THE COURT: And you tell me not why it's important. I know everything is always important. That's not a -- there's not a rule of evidence which says if it's important, it comes in; if it's unimportant, it stays out. That's not a general -- the rules committee -- which met here yesterday -- if you wanted that rule, you could have said let's have that

rule, but we don't have that rule. We have other rules.

So the question is, is it hearsay? Is what she is saying about Mr. Young's drug usage and about Mr. Young in general. These are statements. Are they not being offered for the truth of the matter?

MS. BROWN: They are, Your Honor. And I would like to address the hearsay issue.

THE COURT: That's what I'm asking.

MS. BROWN: Okay, Your Honor.

So she's testifying -- she's asked do you know a man named Neal Young. He says yes.

How she knows him is not that someone told her about it, but that she stayed at his house, and that's the testimony she gives at 16:08 and 16:09. "We stayed at Neal's house for a little while." They were watching the dog or something like that.

And the testimony that she gives is not hearsay because she's describing what she saw when she stayed at the house. And what she saw is that Mr. Young was providing her with drugs and alcohol. And that's in direct contradiction to the testimony we heard yesterday that she wasn't doing drugs and alcohol with Mr. Young. And so it's not hearsay. It's a personal knowledge based on personal observation based on living with Mr. Young.

THE COURT: I don't understand it. 16:07.

MS. BROWN: Yes.

THE COURT: Okay. Let's start at 16:03. "Do you know a man named Neal Young?

"Answer: Unfortunately, yes, I do.

"Question: Do you mind if I ask you why it's unfortunate?

"Answer: He is just -- the last time I saw him he was just as bad as she was. I -- we stayed at Neal's house for a little while, the father of my child, me. She wasn't living there at the time."

MS. BROWN: Um-hum.

THE COURT: "She" I guess was the plaintiff.

MS. BROWN: Correct.

THE COURT: "She wasn't living there at the time, and he had -- we had a dog over there. We had a dog and somehow my dog ended up from" -- I don't know wherever that is. Is that around here, this place called Fuquay-Varina all the way to Louisburg in the shelter out there. When I asked how my dog got out there was, well, your ex-boyfriend took him out there and dropped him off and just dumped him. But that wasn't true. It was Neal. Neal would enable Bree. He would -- he just wasn't a good -- he claimed he loved her, but he clearly didn't because he was feeding her drugs and alcohol and giving her all the things that she needed to sustain that."

Well, first of all, she doesn't lay a foundation. If anything, she says she wasn't there at the time. That is the plaintiff wasn't even there at the time.

Now she's saying that -- that he was feeding her drugs. I mean, it sounds like an opinion. I don't know what it's based on. Is it based on her observations? Is it based on that Mr. Young said that? Or is it based on her speculation that that was what was happening. And when is it?

Is it actually, you know, at the time of the incident? Is it happening some other time? And -- and by the way, she is -- because there's a two-year period here.

It's out. It's out.

MS. BROWN: And, Your Honor, just to complete -- if I could just complete the record on that.

THE COURT: Sure.

MS. BROWN: This is a percipient witness who lived with a man that she is describing as providing the plaintiffs with the drugs and alcohol.

THE COURT: The percipient witness isn't coming in and testifying.

MS. BROWN: Well, she is. I mean, this is Ms. Watkins who saw this because she lived in this man's house, so I would submit there is --

THE COURT: When she wasn't there.

MS. BROWN: But, Your Honor, she's not describing what Ms. -- what the plaintiff did. She's describing watching Mr. Young provide the drugs and alcohol. It's of no moment that she was living there at the time. They were together. What she saw was a continued provision of drugs and alcohol to the plaintiff in direct contradiction to her testimony. So it's her personal observation of the person she's describing.

And perhaps if Your Honor looks at just a little bit further down, I mean, they follow up on it.

When you say that Neal was feeding her drugs, was it anything in particular? And she says based on her personal observation, whatever she wanted he would give it to her. I need this for today. I need that for today. He would give her money, and she would go out and get whatever she needed. This is her observation based on living in this house.

Then she gives an example of her pulling up -- Ms. Watkins gives an example of the plaintiff pulling up in a brand-new Hummer. And the plaintiff admitting Neal just bought it for me. And the plaintiff observing that she was driving that Hummer intoxicated.

THE COURT: When? When?

MR. BOUNDAS: And that's part of this whole thing, that they didn't lay the foundation of when this happened. I

don't know that she's allowed to speculate.

THE COURT: Well, I mean, I'm not saying whether it happened or not.

MR. BOUNDAS: Yeah.

THE COURT: I mean, this is her testimony. I mean, but when did it happen?

MS. BROWN: Well, at the relevant time period, Your Honor.

THE COURT: Well, how do we know that?

MS. BROWN: We know that because there's testimony that their relationship dwindled at the end of 2019, and the relevant time period, the day of the incident, is March of 2019. And this is preceded by do you know what kind of recreational drugs she was using in 2019. And so the inquiry is the relevant time period, Your Honor.

And if they want to argue in closing, well, that could have been 2020, well, that's -- that's their argument. But this is the testimony of the best friend, the witness who knew her the best, and observed not only her, but her boyfriend that she was living with at the time of the incident.

And, Your Honor, if I could point the Court as well to line 17:20, I mean, there is an additional description of watching this happen when they were both in the house today.

Did you hear a conversation in which Ms. Mensing

described drug use or needing drugs to Mr. Young? And she describes watching this happen in the house. Screaming and yelling about needing money because she was going to buy drugs.

THE COURT: I just said that. I just don't know when it happened.

MS. BROWN: Well, Your Honor, the entire deposition is being focused on the relevant time period. And we know that based on the testimony I just read to the Court about the use in 2019.

THE COURT: So you're saying because there is a year -- a two-year period, or a year, maybe it's a year, period.

MS. BROWN: But they stopped being friends at the end of 2019, Your Honor. So this is the serious addiction that -- she becomes involuntarily committed in 2018. This is becoming --

THE COURT: Pardon me? Sorry?

MS. BROWN: Her drug use and alcohol use become incredibly serious in 2018, the months leading up to the Uber ride. And, in fact, the therapy and the medical care she's receiving is terminated in January of 2019 because she needs heightened care that she doesn't get. And this is the time period when Ms. Watkins is her best friend. And this is the relevant time period that she's describing, the end of 2018

into 2019.

We know it's not after the fact because they don't talk after the fact. Their friendship falls apart after the fact. This is critical to the time leading up to it and the time of the Uber ride. And we know that's right because she doesn't have personal knowledge after that because she never speaks to her again after that.

THE COURT: Your response?

MR. BOUNDAS: Your Honor, first of all, they could have laid the foundation for all of this. There is hearsay about Mr. Young saying I don't want to give her money today because she's going to go buy drugs. I mean, it is prejudicial.

But more to the point, it's just -- she's just kind of spewing out these anecdotes about, you know, opinions and what she thinks Mr. Young was feeding her with drugs, when, why. Then she says he was giving her money to buy drugs that we don't, you know, when.

MS. BROWN: But --

MR. BOUNDAS: Did she see this. This is just rife with evidentiary issues.

MS. BROWN: I disagree, Your Honor. This is a witness who knew her the best. This plaintiff took the stand yesterday and said that Ms. Watkins was her best friend to whom she spoke every single --

THE COURT: No, that's not the issue. The issue is whether she is saying things based upon her observations or her speculation that that's what was happening.

MS. BROWN: Yes, Your Honor. And if I could --

THE COURT: That's the question, whether -- that's the evidentiary question. And the question is did you lay a foundation if it's so significant -- did you lay a foundation to show that what she is saying is based upon her personal observation as distinct from her conclusion that that was what was happening.

MS. BROWN: Yes, Your Honor. I understand that. And if you look at 18:14 --

THE COURT: Okay.

MS. BROWN: -- based on your observations of Mr. Young and Ms. Mensing, do you believe Mr. Young --

THE COURT: I would allow that in.

MS. BROWN: Yes, Your Honor.

THE COURT: That -- 18:14 and through 18:18 I would allow in.

MS. BROWN: Yes.

THE COURT: But the question is going back, as far back as --

MS. BROWN: Well, Your Honor, we start at 16:03. This is based on something she saw. We know this is personal observation because she's talking about living at the house

and watching what's happening. I mean, what -- she couldn't have a better personal knowledge perspective than being the best friend of the plaintiff --

THE COURT: Well --

MS. BROWN: -- and living in the house of the boyfriend and observing what she describes at 16:03, and what she describes at 17:24 where she said there was a day I walked into their bedroom and witnessed this fight over drug money.

THE COURT: Okay. Let's go through the testimony.

MS. BROWN: Yep. So I guess, Your Honor, if we start at 16:03.

THE COURT: Okay. 16:03.

MS. BROWN: We're laying the foundation do you know Mr. Young. She says yes.

Do you mind if I ask why? And this business about the dog is sort of how they know each other. And she says he was feeding her drugs and alcohol.

THE COURT: But we don't exactly, and we don't know whether or not that's based on her observations or her surmise. That's -- there's no foundation that that's what it was based on.

MS. BROWN: Well, if we go to the next page --

THE COURT: We've got -- we're going to go through this piece by piece.

MR. BOUNDAS: If you go to the next line: "Was it any particular drug?"

And then she says: "Whatever she wanted, he would just give it to her."

She doesn't -- that furthers the point that she's just kind of --

THE COURT: Okay. Okay.

From 16:0 -- well, 16:03 --

MS. BROWN: Well 16:03.

THE COURT: 16:03 is in. 16:04 is in. 16:05 is out.

MS. BROWN: Well, Your Honor, shouldn't what -- what should be in of that answer that Ms. Watkins was living with Mr. Neal Young for a time? Because you know him unfortunately --

THE COURT: Okay. Fine.

MS. BROWN: So it should be the last -- "I stayed at Neal's house for a while. She," that's the plaintiff, "wasn't living there at the time."

THE COURT: Period. 16:10. So you can go -- you can leave in 16:03 to 16:10.

Now forget about the dog. Nobody cares.

MS. BROWN: That's fine.

THE COURT: PETA will now rail against me. I am sure it was a wonderful dog. I love dogs. But that's out.

"He wasn't just a good person." All of that is out. 16:11.

Okay. 16:11 through -- well, I'm having a hard time looking at this and -- well, she did say that he didn't supply her with any drugs and money.

MS. BROWN: Correct.

THE COURT: He did say that. So 17:19 is out.

MS. BROWN: Well, why would the --

THE COURT: 17:20 through 18:18 is in. And that's the ruling on that testimony.

MS. BROWN: Okay, Your Honor.

Just on the Hummer incident, why would --

THE COURT: Out. Out. Out.

MS. BROWN: Okay.

THE COURT: What does the Hummer after to do with it?

MS. BROWN: Well, she was intoxicated. I mean, she said she wasn't drinking with Neal Young, and this is a witness who observed her --

THE COURT: Out.

MS. BROWN: Understood.

THE COURT: Next. Okay. What else do we have?

MR. BOUNDAS: Okay. So then I think you allowed in 18:14 to 18 already.

THE COURT: I allowed in -- yes. Yes, that's it.

MR. BOUNDAS: And the next -- we really just have two more objections.

THE COURT: Go ahead.

MR. BOUNDAS: One relates to the entirety of page 9, which is she's being asked about Ms. Mensing's current, you know -- another boyfriend Mr. Lowery. And then she just goes on a tirade how he's bad off.

THE COURT: That's allowed. What does that have to do with anything?

MS. POWER: Your Honor, if I may. There were originally designations from that witness. So if I understand correctly, the plaintiffs no longer intend to play those designations?

MR. BOUNDAS: Wait. We didn't designate those.

MS. BROWN: Mr. Lowery's testimony.

MR. BOUNDAS: We're withdrawing Lowery?

MS. POWER: That's my question.

MR. BOUNDAS: The answer is yes. I'm being told the answer is yes. Okay. I was just hoping we didn't designate this. That's really bad.

MS. BROWN: But Mr. Lowery is someone she say she told?

THE COURT: Are you going to play Mr. Lowery?

MS. BROWN: We might. We might.

THE COURT: I don't know what we might. Today is

Thursday. It's the day that you either do it or you don't do it. So let's get with the program.

Are you going to play it? Then I have to rule on it.

MS. BROWN: We will not, Your Honor. We will not play Mr. Lowery.

THE COURT: Okay. Anything else?

MR. BOUNDAS: Last one. Page 11 of 12. At the bottom, 27:16: "Has there been a point in time where you knew Ms. Mensing to be claimed to have stopped using drugs?" She says no.

THE COURT: That's out.

MS. BROWN: Why would that be out? It's based --

THE COURT: Because she hasn't been -- she hasn't -- the question is like today, is she using drugs today?

MS. BROWN: They're not friends today. This is a point in time where you knew, based on your personal knowledge, Ms. Mensing to be clean. I mean --

THE COURT: I see. And she knew her from when to when?

MS. BROWN: They were best friends prior to the end of 2019.

THE COURT: Okay.

MS. BROWN: So it is her personal knowledge, and

there was no period of time when they were best friends that she knew her to be clean.

THE COURT: It's in.

MS. BROWN: Thank you.

MR. BOUNDAS: That's all we have, Your Honor.

MS. BROWN: Thank you, Your Honor.

THE COURT: Okay.

We're all set?

MS. BROWN: Just a couple of things, Your Honor.

THE COURT: Sure.

MS. BROWN: I don't know if the Court had the opportunity to look at our overarching objections to some of the remaining short clips of Uber witnesses that the plaintiff still intends to play.

And, Your Honor, for example, they're intending to play a former head of safety, Mr. Cardenas, who left Uber in 2016, three years before this alleged ride took place, about reading an article he had never seen before. And there appears to be, Your Honor, no issue that is left in this case that all of these little clips from folks who deal with safety issues at Uber would be appropriate to play.

And so, for example, as we explained, Your Honor, in the sort of overarching designation brief, many of these little clips go to safety practices, corporate conduct, issues that corporate structure, previous testimony, paling

of riders and drivers.

THE COURT: Okay. Let's talk about the Uber -- the designated Uber people.

MS. TRUONG: Yes, Your Honor.

THE COURT: Take each one and tell me what it is they're going to say in so many words.

MS. TRUONG: Yes, Your Honor. Ann Truong for plaintiffs.

We will be playing -- the first video is of Mr. Sunny Wong, and he will be testifying to the fact that this was indeed an Uber ride, and it was a driver that was dispatched solely by Uber.

The second clip we will be playing, I believe, is --

THE COURT: Okay. Let's take a look at the first one. Do you have any objection to the first one?

MS. BROWN: Well, your Honor, there is testimony about there is no menu of drivers. What is the relevance of that? I mean, the Court is going to instruct if this happened, we're liable. And so this doesn't make any sense. This is completely irrelevant. It's an Uber witness that has no relevant testimony.

THE COURT: Let me think about why. What is the relevance of his testimony?

MS. TRUONG: As part of the common carrier claim,

Your Honor, we want to make clear that this was an Uber ride. There is no question of that. And this was an Uber driver solely chosen by Uber that Ms. Mensing had no choice in who was provided to her on the day of the incident.

MS. BROWN: That's irrelevant, Your Honor.

THE COURT: Well, I think it's -- I think it's -- it's irrelevant to the jury making a determination as to whether or not Uber is liable.

However, it is relevant to painting the picture that it was an Uber ride and that it was dispatched by Uber. In other words, while it's not contested, I think it is part of the plaintiff's case.

MS. BROWN: Well, I would object, though, Your Honor, to --

THE COURT: Yeah.

MS. BROWN: -- this -- if we look at the actual designations, this Q and A, Ms. Mensing did not pick from a menu of drivers, not that I'm aware of. What is the relevance of that? We are not disputing, and they already have the ride receipt in. Mr. Richardson was the driver. And the trip took place. And in evidence is the trip receipt. Why are we talking about a menu?

THE COURT: I'm going to allow it. Go ahead. Because it describes the event.

MS. TRUONG: Your Honor, our next clip will be from

Greg Brown. The first clip we have is just to introduce him to the jury, his background, the context of him being a Uber employee, and how he's coming to testify.

The bulk of his testimony will be discussing the mobile event logs, the trip data, the GPS, as well as Uber's understanding as to the underreporting issues with respect to sexual assault crimes on the platform.

THE COURT: Okay. That comes in.

MS. BROWN: Your Honor, there is -- there remains an image in Mr. Brown's clip on deactivation, and consistent with --

THE COURT: The deactivation should be out.

MS. TRUONG: My understanding, Your Honor, is there will be testimony, but because it was a picture-in-picture image, we will be making sure that the document itself doesn't show. But the testimony I think is not related to that document, if I understand correctly.

MR. SMITH: The testimony is not related to the deactivation.

MS. BROWN: Okay. I just want to make sure there is not a document on deactivation, consistent with the Court's ruling.

THE COURT: I agree.

MR. SMITH: There's not.

THE COURT: Next.

MS. TRUONG: Next we have Roger Kaiser, Your Honor. This was a witness we had discussed that was shown in the opening slide where he talks about Uber's understanding that sexual assault in any form and any variation can be deeply impactful, and he specifically testifies as to a hypothetical regarding the very incident that Ms. Mensing experienced, which is the groping of a thigh, nonconsensual, and how that can impact the victim.

THE COURT: I think that's significant. It's an admission that Uber believes that this type of conduct is inappropriate.

MS. BROWN: May I be heard on that, Your Honor?

THE COURT: Yes.

MS. BROWN: Two issues. One is that to set up these questions, they pull up a document that has a whole list of other riders' complaints of sexual misconduct. It's highly prejudicial.

THE COURT: That should be eliminated.

MS. BROWN: And the lead-up to the question is the description of another rider's JIRA ticket, which is also prejudicial and confusing.

THE COURT: That should be eliminated as well.

MR. SMITH: We have eliminated it, Your Honor.

MS. BROWN: Thank you, Your Honor.

As you know, Your Honor, we've had extensive

questions about trauma and the exclusion of Plaintiff's past trauma, and yet they're asking Mr. Kaiser if anyone were to downplay the kind of traumatic and lasting harm that could happen to someone during an Uber ride, you would disagree with that. That's unfair. They have chosen to limit their case to exclude her prior trauma, and now they want to play Uber witnesses talking --

THE COURT: "Lasting" means a lot of different things. It could mean continuing, which is what your objection is, because they're not asking for continuing compensation. But "lasting" can be an impression. That is that it stays with you forever, or not. I don't know. You look puzzled. But I'm just saying lasting is a word that has more than one meaning.

MS. BROWN: Well, I think we --

THE COURT: And I'm now explaining the other meaning and, therefore, I'm allowing it.

MS. BROWN: Okay. Your Honor --

THE COURT: Next. Moving ahead.

MS. TRUONG: The final witness, Your Honor, is Philip Cardenas. He testifies also as to his impressions on the impact of sexual assault and how it can have a profound impact on victims. And I believe he also discusses the underreporting issue and how he agrees that studies and research corroborate that.

THE COURT: It will come in as an admission.

MS. BROWN: But, Your Honor, Mr. Cardenas left Uber in 2016. And the gist of these questions, he's shown an article he's never seen before, and he's asked about questions about an article he's never seen before. I would object to all of this, Your Honor, having nothing to do with this case.

THE COURT: I haven't seen it.

MS. TRUONG: Your Honor, my understanding is he --

THE COURT: I'm just wondering whether it's cumulative, in light of what the last witness is going to testify to.

MS. TRUONG: Your Honor, it's not cumulative because it's so central to this case what Uber is arguing is that incidents of this nature should not have impact, should be downplayed in some manner. And now we have two very high-ranking Uber employees, one of whom is the head of their global security, saying that's not true. We shouldn't be doing that. We shouldn't interpret any type of sexual assault. We shouldn't minimize anything of that nature. It should come in.

THE COURT: I think it's important because it justifies -- it justifies, if found to be true, it justifies a damage award. That's what it justifies.

MS. BROWN: But, Your Honor -- they already have

that admission, Your Honor. And then this is now coming through a witness who left the company years before this ride, and the admissions are coming through a document --

THE COURT: Is there some rule that if you make an admission on behalf of the company before the incident occurs it's somehow not admissible?

MS. BROWN: No, Your Honor. But there is a foundation requirement, and they show him a document he's never seen before.

THE COURT: I don't know about this document.

MS. BROWN: All right, Your Honor. Well, if -- if we can show you -- it's Exhibit 501. Have you seen this document before? Not to my recollection.

THE COURT: I think what we'll do is I'll probably look at this -- I can look at it before -- they'll play it and until after the recess.

MS. TRUONG: That's fine, Your Honor.

May I just make one comment on the document? The reason we show it to the witness is to establish the foundation as to what we're talking about for sexual violence and sexual assault. So we use that definition to help orientate the witness into how we're going to carry on with the testimony. Just wanted to make that point.

MS. BROWN: But they don't establish foundation because he says I've never seen it.

THE COURT: It doesn't make any difference. It makes a difference as to whether or not he understands the term that's used in it. It doesn't make a difference if you haven't seen it. It's not is this an authentic document. Yes, it would make a difference if that was the question. But that's not the question. The question is one of the definitional purposes, and so it would come in for that basis. But they've agreed to wait on that.

MS. BROWN: Thank you, Your Honor.

THE COURT: So I'll look at it and give you a fair shot at dealing with it.

MS. BROWN: Thank you, Your Honor.

THE COURT: Okay. It's now 9:30. I knew we could fill the time.

So are we ready?

THE COURTROOM DEPUTY CLERK: No.

THE COURT: We have technical issues. Five-minute recess. System going down.

THE COURTROOM DEPUTY CLERK: Thank you.

(The proceedings were recessed at 9:33 a.m. and reconvened at 9:42 a.m.)

MS. BROWN: And, Your Honor, one update to report.

We are not going to call Mr. Gaddis, who was going to be deposed last night. So it's just these video clips.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Let the record reflect the jury is present, parties are present.

Ladies and gentlemen of the jury, we have used this time. Even though you were waiting for some period of time, we've actually used it to do some streamlining of the case.

So with that, I turn to the plaintiff to call your next witness.

MR. SMITH: Thank you, Your Honor.

This time the plaintiff calls Sonny Wong, the senior manager of applied science and safety manager, by video.

(Video deposition of Sonny Wong played for the Court and jury.)

MR. SMITH: That concludes Mr. Wong's testimony.

At this time the plaintiff is now calling Greg Brown, who is the director and head of central safety at Uber, by video.

(Video deposition of Greg Brown played for the Court and jury.)

MR. SMITH: That concludes the testimony of Mr. Greg Brown.

At this time the plaintiff is calling Mr. Phillip Cardenas. He's the former head of global safety and quality at Uber. And this is also a video.

MS. POWER: If I may, Your Honor.

MR. SMITH: Apologies, Your Honor. I forgot that there was an issue with one of the exhibits.

THE COURT: I looked at the exhibit. There is no issue. You may play it.

MR. SMITH: Okay. Thank you, Your Honor.

(Video deposition of Phillip Cardenas played for the Court and jury.)

MR. SMITH: I apologize, Your Honor. I'm told that we need to verify that we've implemented the Court's rulings appropriately. I want to make sure if that's done. So if we could have maybe three minutes. I don't know if you want to excuse the jury.

THE COURT: Ladies and gentlemen of the jury, if you want to talk among yourselves, you may.

MR. SMITH: Okay. Thanks for your patience.

At this time, the plaintiff calls Roger Kaiser, who is the former head of safety for Uber. This is also a video.

(Video deposition of Roger Kaiser played for the Court and jury.)

THE COURT: It's not on the screen.

(Video deposition of Roger Kaiser played for the Court and jury.)

MR. SMITH: Still not seeing it. I'll turn it this way so you can see.

(Video deposition of Roger Kaiser played for the Court and jury.)

MR. SMITH: That concludes the testimony of Mr. Kaiser.

At this time the plaintiff calls Neal Young, who is the plaintiff's friend, by video.

Thank you.

(Video deposition of Neal Young played for the Court and jury.)

MR. SMITH: That concludes the videos we have, Your Honor. And we'd like to keep our case open for Dr. Valliere, but that's the end of our video presentation.

THE COURT: Okay. Ladies and gentlemen, we're going to take a recess now. We will be in recess until 10 after 11:00.

Remember the admonition given to you. Don't discuss the case. Don't allow anyone to discuss it with you, form or express any opinion.

(The jury exited the courtroom.)

THE COURT: The jury has retired. Then we'll commence with -- I'll make an announcement that the plaintiff has one additional witness who will be here tomorrow, but that we are proceeding now with the defense case.

MS. BROWN: Thank you, Your Honor.

THE COURT: All right?

MS. BROWN: Thank you.

THE COURT: Okay. Thank you.

(The proceedings were recessed at 10:47 a.m. and reconvened at 11:14 a.m.)

THE COURT: Okay. We're ready to proceed. Bring in the jury.

(The jury entered the courtroom.)

THE COURT: Okay. Please be seated. Let the record reflect all jurors are present, parties are present.

Ladies and gentlemen, the plaintiff has one additional witness, but that witness will be testifying tomorrow morning because of scheduling issues. And so we are starting now with the defense case.

You may proceed.

MS. BROWN: Thank you very much.

Good morning, everyone. We will start by playing 13 minutes from Ms. Ariel Watkins, the plaintiff's best friend at the time.

THE COURT: Okay.

MS. BROWN: Thank you.

THE COURT: Thank you.

(Video deposition of Ariel Watkins played for the Court and jury.)

MR. SMITH: Excuse me, Your Honor. I think we might have an issue with the video.

If we could confer with counsel for a second, Your Honor.

(Counsel conferred off the record.)

THE COURT: I think that was out.

MR. BOUNDAS: Your Honor, it was.

THE COURT: Ladies and gentlemen, I'm striking the last sentence in question that was the response that was given. You are instructed to disregard. You may continue.

(Video deposition of Ariel Watkins Lankford played for the Court and jury.)

THE COURT: That's out. Wait. Counsel, I believe that's out.

MR. SMITH: We're not controlling the video, Your Honor. It's not.

THE COURT: Oh. Well, whoever is doing it, that's --

(Video deposition of Ariel Watkins Lankford played for the Court and jury.)

MS. BROWN: That concludes this deposition clip.

Next we'll play Ms. Mensing's treating psychiatrist, Dr. Smith, and that will be 19 minutes. Thank you, Your Honor.

THE COURT: 19 minutes?

MS. BROWN: Yes.

THE COURT: Okay.

(Video deposition of Dr. Jenny Gray Smith played for the Court and jury.)

MS. BROWN: That concludes Dr. Smith, Your Honor.

The final video we will play right now is the driver, Jeffrey Richardson and that video is 27 minutes. Thank you.

THE COURT: Okay.

(Video deposition of Jeffery Richardson played for the Court and the jury.)

MR. SMITH: Sorry to interrupt. If we can stop the video. The exhibits should be -- I'm confused as to why they're not showing up. The version I watched last night has the exhibits up on the screen.

MR. DICKSON: My video doesn't have the exhibits.

THE COURT: Maybe what we'll do. This is a technological issue, but I don't want to hold the jury back. Maybe we can take our noon recess now, and you can run through the deposition and make sure that it's shown at the same time.

MS. BROWN: And, Your Honor, I'll defer to the Court, of course. But for efficiency, if we want to just finish the video, we would have no objection to you putting up the exhibits later today or tomorrow.

MR. SMITH: Why don't we put them up during -- on the ELMO. Is that possible?

THE COURTROOM DEPUTY CLERK: Usually only one technology.

MR. SMITH: I think it would assist the jury to see.

THE COURT: Let's take our recess. And we'll be in recess until 1:15. Give us a little bit more time. Then we'll resume with this testimony. It's anticipated we'll have a short day today, in any event.

So remember the admonition given to you. Don't discuss the case, allow anyone to discuss it with you, form or express any opinion. I'll see you at 1:15.

(The jury exited the courtroom.)

THE COURT: Okay. The jury has departed. So why don't we resume at 1:15. Let's see where we are.

I don't see any reason necessarily to play back any of the testimony.

MR. SMITH: We can pick up right from where we are. I think it's still talking about that exhibit.

MR. BROWN: It's like 10 minutes left in the video.

MS. BROWN: It's a shame to keep the jurors --

MR. SMITH: There are two exhibits.

THE COURT: First of all, the jury's left.

Secondly, we're coming back at 1:15. If there's only 10 minutes left, there's only 10 minutes left. That's fine. All right.

MS. BROWN: Your Honor, there is --

THE COURT: Yes.

MS. BROWN: -- one small issue we had confirmed with counsel on, and we're hoping to talk to the Court briefly about it in chambers. At the appropriate time either now or after the jury leaves for the day. It's a bit of a sensitive issue.

THE COURT: Why don't you come back.

(Discussion held off the record with Court and counsel.)

(The proceedings were recessed at 12:08 p.m. and reconvened at 1:15 p.m.)

THE COURT: Let the record show that the parties are present, the jury is not. So are we all set to recommence?

MS. BROWN: We are.

MR. SMITH: I think so.

THE COURT: Great. Bring in the jury.

(The jury entered the courtroom.)

THE COURT: Please be seated. Let the record reflect all jurors are present. The parties are present.

So, ladies and gentlemen of jury, we're going to continue now with the deposition of the driver.

You may proceed.

(Video deposition of Jeffery Richardson played for

the Court and jury.)

MS. BROWN: And, Your Honor, that then concludes the video depositions for today. And I understand the next thing we'll do is wait for the witness from plaintiffs to appear tomorrow.

MR. SMITH: And we just have a couple of exhibits to read in, the numbers that I mentioned.

THE COURT: Go ahead.

MR. SMITH: From the Phillip Cardenas deposition, it was P-01396.

From the Greg Brown --

THE COURT: Admitted. Admitted.

(Plaintiff's Exhibit Number P-01396 was received into evidence and published.)

MR. SMITH: From the Greg Brown deposition, P-04713.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04713 was received into evidence and published.)

MR. SMITH: And P-00636.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-00636 was received into evidence and published.)

MR. SMITH: And then from this deposition of Mr. Richardson, P-4970.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-4970 was received into evidence and published.)

MR. SMITH: And P-4968.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-4968 was received into evidence and published.)

MS. BROWN: And, Your Honor, from the deposition of Dr. Jenny Smith, the medical record that was shown on the screen is D-4140.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4140 was received into evidence and published.)

MS. BROWN: Thank you.

THE COURT: Okay. Ladies and gentlemen of the jury, we're going to adjourn for today.

Let me give you the timetable.

We will resume tomorrow. We will resume tomorrow and we will have some witnesses and conclude the evidentiary portion of the trial I guess is -- before noon or somewhere. I don't know how long the testimony will be. Anyway, it will be a somewhat shorter day than it is -- than our normal day. Though I don't know if you call today our normal day.

But anyway, at that point we will recess until Monday morning. Monday morning you will hear the Court's

instructions as to the law. The parties are going to make an argument, and the case is going to be given to you for deliberation. So you will have the case to decide on Monday. I can't tell exactly what time it is, but you will have -- you'll be able to commence your deliberations on Monday.

So with that, I'd like to once again admonish you not to discuss the case, allow anyone to discuss it with you, form or express any opinion. And I will see you tomorrow morning, 9:15.

(The jury exited the courtroom.)

THE COURT: Okay. So the jury has retired.

Let's deal with the -- first the testimony tomorrow. Then we'll go into the charging conference.

So I think we'll start with Dr. Valliere; is that right?

MR. SMITH: Oh, I -- I'm not sure. I think they have an objection. I don't know.

THE COURT: Maybe we ought to hear the objection.

MR. WYATT: Good afternoon, Your Honor. Geoff Wyatt for the defendants.

I think the objection, or it's a question perhaps, of the actual scope of the testimony given the narrowing of the case. Just looking back the sort of the briefing on this, there was at some point a tendered order from the Court that suggested the case was going to be narrowed and because

of the timing of it, I won't recount it in detail. It was unclear to us whether the Court's ultimate relying on the scope address the objections that we raised to the offer of proof. An offer of proof was given to showcase what the plaintiffs were going to put on in light of the narrower scope of the case. We said that's too broad, and that's what I'm going to address now. But I just wanted to set the table.

So there are sort of two things that resulted that impact on Dr. Valliere in light of the narrowing of the case. One is that the plaintiff has abandoned any claim of sort of long-term mental health issues. Anything beyond what we've been referring to as essentially garden variety emotional distress.

And also because of the narrowing of the case by virtue of the Court's common carrier rulings, breach of care, duty of care, those issues are not in the case either. And I think Dr. Valliere's offer of proof suggests that we may at least possibly get into both of those issues. And so let me just call out a couple of examples.

On the issue of mental health diagnoses long-term, there's a couple of instances in the offer of proof that give us concern. So one is it states that Dr. Valliere -- this is at page 2 of the offer of proof.

THE COURT: I think it might be useful if I have

this in front of me.

MR. WYATT: Do you all have a copy?

MR. SMITH: I don't have a copy. I didn't know we were going to talk about the offer of proof right now.

MS. BROWN: Your Honor, we could print that right now.

MR. SMITH: Would you mind printing a copy for me too?

MS. BROWN: Sure. Rachel, would you mind printing two copies, please.

MR. SMITH: Thank you. I appreciate it.

THE COURT: All right. So let's wait. Then we can go through it and see if anybody has a problem.

MR. SMITH: Never mind. Apparently, I have it. Okay. We'll wait. Maybe that one can go to the judge.

MR. WYATT: Yeah.

MS. BROWN: Your Honor, in the interest of being efficient, would the Court like to move? I believe they have some objections to Dr. Reminick that we --

THE COURT: I'll wait.

MS. BROWN: Okay. Okay.

THE COURT: Well, you know we could talk about the charge -- about the instructions. Shall we do that?

MR. WYATT: Happy to do that, Your Honor.

THE COURT: Okay. Let's do that. So here we go.

Let me tell you the instructions I intend to give, subject to further discussion. And they are taken from the document entitled "Joint and Contested Proposed Jury Instructions, Document Number 5679." So here we go. I'll read the captions.

Duty of jury. The Uber defendants. Corporations and partnerships. I'll take out partnerships, but corporations.

Wealth of parties.

Burden of proof, however, I'm going to modify it so it would read when a party has the burden of proving any claim by the greater weight of the evidence, it means that you must be persuaded by the evidence that the claim is more probably true than not true.

So I've changed preponderance, which is a term that is used in the Ninth Circuit, to the greater weight, which seems to be a term that is used in the Fourth Circuit. Okay.

What is evidence.

What is not evidence.

I don't know if we've had any evidence for a limited purpose, have we? I can't recall.

MS. BROWN: We have not.

MR. KAUFMAN: I don't think so, Your Honor, but we have a day to go.

THE COURT: But we have a day to go. So unless I

hear evidence for a limited purpose, I won't -- I'll give it if I hear it; and I won't give it if I don't hear it.

MR. KAUFMAN: Your Honor, are you expecting us to stop you if we want to discuss anything?

THE COURT: Yes. Yes, I am expecting you to stop me.

MR. KAUFMAN: Can I just ask on the burden of proof instruction.

THE COURT: Sure.

MR. KAUFMAN: The tentative that was given to us included the phrase or affirmative defense. And as you just read it, it omits that phrase, I think correctly so. So we just wanted to confirm that --

THE COURT: Yeah, there is no affirmative defense.

MR. WYATT: You're right.

THE COURT: The defense is it didn't happen. That's not an affirmative defense.

All right. Continuing.

Direct and circumstantial evidence. I tailored that. Eliminating -- I'll read it to you in its entirety as I propose to give it. Evidence may be direct or circumstantial. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

I've taken out the definition of direct evidence and circumstantial evidence since no one really seems to understand it anyway, and especially the way it's written.

Credibility of witnesses.

Expert opinion.

Taking notes.

Common carrier liability. It actually appears on page 14 is the one that I read to the jury during the jury selection. And I'll read it again so there's no question about it.

It's going to read as follows: In this case, Plaintiff claims that her Uber driver, Jeffery Richardson, touched her -- well, I say sexually, but I don't know that that's necessarily the -- touched her without her consent. I don't know that sexually is the operative word. I need some discussion about that, because it's a battery. And a battery is you don't have to have a sexual context to it. And it may be that some jury would think, well, you know he didn't touch her in this area or that area. It's not really sexual. So I'm not going to use the word sexually.

MR. KAUFMAN: We agree, Your Honor.

THE COURT: Touched her without her consent.

Uber is liable if the driver committed -- and you want -- we're talking out an assault or.

MR. KAUFMAN: That's correct, Your Honor.

THE COURT: -- committed a battery against her. To prove her claim against Uber, Plaintiff must show the driver committed a battery against her. Period.

That's the full extent of that instruction.

MR. WYATT: Your Honor, we'll just stand on our prior submissions on common carrier. There are many. Your Honor, knows them all, I'm sure.

THE COURT: Right.

MR. WYATT: Just under Rule 501(c), our objection -- to cover us blanket-wise, I think this is what we did last time. We'll just stand on any submission that we made.

THE COURT: That's fine. And it's deemed that you are making them here at the charging conference.

MR. WYATT: I appreciate that, Your Honor.

MR. KAUFMAN: Your Honor, Plaintiff would request one additional sentence in the common carrier instruction. This is the sentence that the Court gave, instructed the jury during voir dire. This is on pages 91 to 92 of the trial transcript.

The Court stated: The law assigns certain responsibilities to an entity that provides transportation services. End quote.

We would request that sentence be given right before the words Uber is liable. And the reason we request

that instruction is to dispel any impression among the jury that there is something unusual or surprising or unexplained about why Uber is liable for the driver's conduct in this case. I think the Court saw in voir dire there's at least some people who may struggle with that idea.

MR. WYATT: Can you give me the page, line on that, please?

MR. KAUFMAN: It was page 91, line 23 to 92, the first line or two.

THE COURT: I will give that.

MR. WYATT: I guess we would object just because it's a little bit ambiguous, the law. I'm not looking at the line, but it sounded like the law imposes some sort of duty. I think the instructions as given make it clear that the only issue the jury has to decide on the liability side of things will be battery. So I think the tentative is sufficient to make the point that the instruction is trying to make on the common carrier issue.

THE COURT: Well, I'll think about it some more. Let you know tomorrow morning.

MR. KAUFMAN: Thank you.

MR. WYATT: Thank you.

THE COURT: But I'll consider both arguments.

Okay. I'm not giving the assault.

I'm leaving the battery.

And the battery will read as follows: To prove that the Uber driver, Jeffery Richardson, committed a battery against her, Plaintiff must prove three things: First, that Mr. Richardson intentionally caused bodily contact with the plaintiff; second, that such bodily contact actually offended a reasonable sensible person with dignity; third, that such a bodily contact occurred without the plaintiff's consent. A person acts intentionally if he desires to cause the consequences of his act or believes that the consequences are substantially certain to occur. Intent may be proven by direct evidence or inferred from the circumstances.

So I will give that.

No proximate cause.

MR. WYATT: And we'll stand on our prior submission.

THE COURT: Right.

No aggravation.

MR. WYATT: Same.

THE COURT: And no intervening circumstances.

MR. WYATT: Same.

THE COURT: Personal injury damages. There's a modification of that? I mean, the one I would give is as follows. It's the one on page 33:

If you found Uber liable to Plaintiff, then the plaintiff is entitled to recover nominal damages, even

without proof of actual damages. Nominal damages consists of some trivial amount, such as $1, in recognition of a technical injury to the plaintiff.

The plaintiff may also be entitled to recover actual damages. On this issue, the burden of proof is on the plaintiff. That means the plaintiff must prove by the greater weight of the evidence -- I guess that's what I'll say -- the amount of actual damages caused by the driver's wrongful conduct. Actual damages are the fair compensation to be awarded a person for any injury caused by the wrongful conduct of another. Damages for personal injury include fair compensation for the actual physical pain -- well, here, you're not asking for that. That's the modification that I think I received yesterday.

Didn't I receive some instruction? I think I didn't make it up.

MR. WYATT: Saw it this morning.

THE COURT: Maybe I got it from you.

MR. KAUFMAN: There is a submission from Uber on the last paragraph of the tentative, and then Plaintiff submitted a proposed modification to that paragraph a little while ago. So that -- that's the disputed issue, the last paragraph beginning Plaintiff is only claiming. I don't think we've submitted any -- anything additional on the preceding paragraphs.

MR. WYATT: Yeah. So we'll agree to your submission on the last paragraph, on the 24-hour window. But I do think -- I was going to raise the same point Your Honor just raised about the actual physical pain language.

I think that's not in play. And I think that's pointed out actually by your submission today, which says that you're only looking at personal injury, only mental suffering.

MR. KAUFMAN: That's right.

THE COURT: Okay. It will be the mental suffering.

MR. KAUFMAN: Correct.

THE COURT: Experienced by the plaintiff by the wrongful conduct of the driver. There is no fixed formula for placing a value on mental suffering.

We'll put in that 24-hour limitation that you suggested.

MR. KAUFMAN: Thank you.

MR. WYATT: And that's -- I don't have --

THE COURT: And leave -- and conclude with: You'll determine what is fair compensation by applying logic and common sense to the evidence.

Okay. I'll get you that in final form.

I'll get you all of the instructions in final form tomorrow so you can prepare your closing if you're going to do a big show.

MR. KAUFMAN: I'm sure we will.
THE COURT: Electronics.
Okay. I think I will give you instruction on no punitive damages.
There is something called the final mandate. I will give that, modified by the greater weight of the evidence.
It seems awfully duplicative of the earlier ones, so I'm just trying to figure out why I'm giving both of them.
MR. KAUFMAN: The pattern instructions have these flourishes to them. We saw a little bit of that in Arizona, and I think you see it here too.
THE COURT: Well, I want to do what is usually done here. So if both of them are usually given, I'll give both of them.
MR. WYATT: I believe they are. I agree. It's a much longer form here than, for example, California.
THE COURT: Well, I'm going to do what they do here.
Okay. One question. Does the defendant intend to ask Dr. Valliere about her compensation? I'll tell you why I'm asking the question. If the question is yes -- or either side asking this question.
If it is -- first of all, it's appropriate. It's an appropriate question and it could come into evidence. If

it does come into evidence, then I want to give the instruction that was given in the Arizona litigation that she's been retained for multiple cases, and -- because some people might wonder if a person is getting a million dollars or 500 -- what did she get?

MR. SMITH: It's not that much, Your Honor. I think right now in the MDL it's 90,000. I'm not sure for this case.

THE COURT: She's getting $90,000 for a case in which the damages may be nominal or some far less amount. That would hit the jury the wrong way. I mean, I think they're entitled to that instruction, if that's what you're -- if that's what you're going to pursue.

MS. BROWN: And, Your Honor, if we limit it to her compensation for this case, there would be no such instruction, correct?

MR. SMITH: It would be impossible to actually do that. She doesn't bill, like, for the WHB 823.

MR. KAUFMAN: She has no case-specific report. She has a general report, Your Honor, which I think will be highlighted in her cross-examination. So there is no work for this case other than physically traveling here and testifying.

MS. BROWN: So what I would want to do, because I think we need either an agreement that neither expert will be

questioned on compensation, which I would actually be fine with. What I don't want to happen, of course, is that I can't question on the amount of time she spent of this case, or I can't question her on comp at all without opening the door to other litigation, which I don't want to do, and then my expert gets questioned on an hourly fee and how much she made in this case.

MR. SMITH: Is Reminick case specific?

MS. BROWN: Correct. She is.

MR. SMITH: That's the difference, though. I don't know how to assess that.

MS. BROWN: Right. I think we just have to come up with a way --

MR. SMITH: Can we just do the hourly -- I don't mean to cut you off.

MS. BROWN: That's fine. I mean, I think what we can agree to is you can ask each expert, you're, of course, being compensated for your time, and your hourly fee is whatever, and we can stop there. I would also agree no comp questions here. But we can take this offline.

THE COURT: If you both do that, that's fine.

MR. SMITH: Hourly fee. We will do hourly fee.

THE COURT: You charge so much an hour.

MS. BROWN: That's fine.

THE COURT: You don't ask how many hours you

charged.

MS. BROWN: That's fine.

THE COURT: Then I don't have to get into the fact that there are 3,762 cases --

MS. BROWN: Right.

THE COURT: -- that I have.

MS. BROWN: Right.

THE COURT: Right. Okay.

MR. SMITH: One -- maybe we can talk about that when we get to Valliere here.

THE COURT: Why don't you have a further discussion. See if you can agree on it. If you can agree on it, that's fine. If you can't, then I can deal it tomorrow.

MS. BROWN: Just to answer the Court's question, I have no intention of asking a question that is going to open the door to the number of cases pending in the MDL.

MR. SMITH: The opened one, she was left in the dark about this case, and she's a general expert. And so to rebut that opening, we have to explain, you know, what it means to be a general case expert, that sort of thing.

MS. BROWN: I disagree strenuously. The only expert they're calling doesn't know anything about the plaintiff, and that is fair cross, without opening the door to work she's done for other cases.

Now, they certainly can direct her and say we

didn't ask you to look at anything case specific. We asked you to come in here and talk about general issues. But there is no way that pointing out she doesn't know anything about Brianna Mensing opens the door to other MDL cases. That's entirely improper.

MR. SMITH: Well, if I may.

I don't think that's entirely true. Because she was provided the complaint, and I think another maybe document that was case specific, you know, in the sense of having the bellwether allegations to be generally familiar with them in the same way she was in the Dean trial. But, you know, the larger point is she can't review 3,000 cases for everybody, and, you know.

MS. BROWN: Well, that's not -- that's not true. They have designated her as case specific in particular cases, and they have given individual depositions. For example, I took her deposition on WHB 6, another case this firm has, and she had reviewed individual depositions in that case. She wrote a report about individual issues in that case.

So this is an expert that can do it when they want her to, and they didn't do it here. And that's fair cross, without opening the door to MDL cases.

MR. SMITH: I don't think that was the MDL that she's talking about, so.

MS. BROWN: My point is you've had her do case specific before.

MR. SMITH: We have not.

MS. BROWN: Mr. Brown just has because it's his case.

MS. LUHANA: The MDL has not.

MS. BROWN: I mean, I don't know what to tell you. But counsel at your table has done that with the expert who is coming for your table's behalf.

My point, Your Honor, is I'm not going to ask questions about compensation that open the door to the MDL or pointing out that they're bringing an expert who doesn't know anything about the plaintiff. I would submit to the Court it does not open the door to other litigation.

THE COURT: Let me think about that.

Now, I think the defense -- first of all, I think the defense can make the point that she has not examined this particular case and she's not giving an opinion that is, quote, case specific. That is, that the facts of this case, she's not opining -- well, I have to be careful because in a sense she is talking about -- she's talking about issues that are issues that -- that there is -- that testimony has been elicited on.

For example, she's not making a claim immediately, reacting a particular way; or two -- or not making it -- not

making a claim at all until a lawsuit is filed and not discussing it with everybody at a particular time.

So how she reacted, how she behaved are facts that are case specific. And this witness -- otherwise you have no relevance to her testimony. This witness is giving testimony as to the fact that in sexual assault cases, this is a common -- this is a common occurrence.

MS. BROWN: Your Honor --

THE COURT: That's true, right?

MS. BROWN: But maybe not even relevant anymore now that they've dropped their assault claim. Now we have a physical battery claim. I mean, query whether there is even any relevance to Dr. Valliere anymore.

THE COURT: I don't think that's -- you can do well on that one. I mean, I just said what I think is the relevance.

MS. BROWN: I understand, Your Honor.

THE COURT: Okay. So now the question is -- okay. So let's just take it further. Because I'm not -- I'm interested in sort of playing it out a bit more.

So she's giving testimony I think is certainly relevant, significant, and explains to the jury in a larger sense that there is a -- I guess she'll say is statistically significant number of people in her experience that don't report these types of offenses or act -- consistent with the

way the plaintiff acted in this case. Okay.

Now, you certainly can point out, I think in cross-examination, well, you didn't interview her. You didn't take her -- her -- talk to her. Maybe she did or didn't, I don't know. You can read the deposition, whatever the evidence is. And so you don't know for a fact whether this particular person -- evidence -- of failure to, as an example, call Uber was a result of what you described the general reluctance of a victim of an assault contacting Uber -- or complaining at the time to either the police or the rideshare carrier.

Okay. That's -- I think that's fair cross-examination.

Now, the question is whether the plaintiff nevertheless should be entitled to demonstrate that this witness has been asked to testify in other cases. I mean, I'm not quite sure what they want to do here. Maybe I should wait because I don't know why that would come in, is my point. And if that doesn't come in -- let's assume that that simply doesn't come in.

Then what can you say -- because I'm now going the full circle back -- what can you say about compensation for her? That you will say you have offered -- that you will say I am compensated at X dollars per hour for my work on this particular case -- on this case. She's going to say that.

No questions asked as to how many hours because it's not case specific.

And so let's just leave it at that for a moment and now go to your expert. Go ahead.

Before we get there.

MR. BOUNDAS: I thought you were directing it to their expert.

THE COURT: No, I was just saying your expert. I just went through the whole Dr. Valliere.

MR. BOUNDAS: Right.

THE COURT: Now, I thought that was an appropriate context or restrictions or agreement. It doesn't have to be an agreement. I thought was what we were going to allow.

Now we go to their witness. And, again, in the context of compensation, because that's how all of this arose, and she is going to be asked the question, what do you charge an hour? X dollars.

You want to be able, I guess, is what you're telling me, is to say that she, what, spent 50 hours on it or 30 hours or 20 hours or?

MS. BROWN: I --

THE COURT: You want to be able to get into the number of hours?

MS. BROWN: No, sir. In our own expert, that's not --

THE COURT: So what do you want to do?

MR. BOUNDAS: With their expert?

THE COURT: Um-hum.

MR. BOUNDAS: Well, she's case specific. What I wanted to do was -- or we wanted to do -- is you make X dollars an hour, and on this specific case you spent, you know, 50 hours because --

THE COURT: Why shouldn't they be allowed to do that?

MS. BROWN: Well, the issue is, Your Honor, we don't have a number that Dr. Valliere spent in this case. But if they -- honestly, as the Court has laid it out, I'm fine with it. If they want to cross on how much our expert made case specific and the hours, that's fine. It's not an issue for us.

THE COURT: Okay?

MS. BROWN: Thanks.

THE COURT: Okay.

Everybody happy? Well -- not everybody's happy.

And then, you know, the concluding and general instructions at the end.

Anything else on instructions?

MR. WYATT: Not here, Your Honor.

MR. KAUFMAN: Nothing from the plaintiff, Your Honor.

THE COURT: That's it?

MR. WYATT: Yep.

MS. BROWN: We have to go back to.

MR. WYATT: That's it on instructions. We do have to go back to Dr. Valliere.

MR. KAUFMAN: And Dr. Reminick.

MR. WYATT: May I hand this up, Your Honor?

THE COURT: Okay. I have before me Plaintiff's trial brief.

MR. WYATT: Yes, Your Honor.

THE COURT: What do you want to direct my attention to?

MR. WYATT: So going back to sort of the two issues that I have concerns of Dr. Valliere is going to get into that are no longer in the case. So the first of which is mental health diagnoses beyond sort of the immediate impact that were damages to in this case.

So starting with page 2's at lines 12 through 14, the offer of proof states that Dr. Valliere will opine that everyone reacts individually to assault based in part on what their experiences are, which have a role in contributing to their level of disbelief, confusion, and so forth. That should be out.

Our position has been that an individual's experience can't really be backed out of their reaction to

something in the moment. And that was the basis for our argument that even trying to limit damages to a 24-hour window doesn't eliminate the relevance of the past experiences of the plaintiff, which have been kept out of the case.

So I don't think Dr. Valliere should be reintroducing the idea that somebody's experiences, their life experiences, condition them to respond to assault in any particular way.

I just worry that by opening that door you're quickly going to get to, well, what are this person's experiences. And if the jury asks that question, then they're going to have a distorted view of what the relevant experiences of what the plaintiff are. So that's one issue.

THE COURT: Okay. Let's address that, because that's key. I mean, there's almost no point of putting her on if she couldn't testify to that. Because people have all sorts of expectations of how people should react if they're sexually assaulted. I mean, and -- you know, maybe -- everybody in the courtroom, with the exception of the audience, is in the position that we've heard all this testimony once before, so we have a pretty good idea of what it is.

But your argument, if I have it right, your argument is, Judge, since you limited the testimony as to --

as to her experiences, you limited it and excluded it completely, you included some things and you left -- you excluded certain things, which we thought should be concluded. Now speaking on behalf of Uber, this now becomes irrelevant because it's incomplete. You say it's incomplete. That's your argument.

And so I could hear the response from the --

MR. SMITH: I think it's missing a piece. So everyone acts -- everyone reacts individualistically. That's not just to the pain or the suffering that comes from the assault.

The next piece is the next bullet down in the offer of proof. It's that people -- there's a common stereotype that victims of sexual assault will immediately identify what is going on as an assault, be so shocked and infuriated they will scream, yell, physically resist, try to escape, that they will immediately want to report to law enforcement and get justice and go through the process, all of those things are together --

THE COURT: Here's what I think. Here's what I think.

Number one, I think as a principle I would disagree with you. That is to say if certain things are excluded as being, in this particular case, an exclusion of other incidences which affected her were based upon a 403

determination. I wasn't saying they wouldn't have some relevance. And I think you've have identified how they might have some relevance.

I just said that their prejudicial effect outweighs their probative value. And because some have been excluded doesn't mean the issue itself has been excluded, nor does it mean that the reaction that is -- that Dr. Valliere will testify to is somehow ineffective or in error.

The irony of your position, which hasn't escaped me, it may escape you, is that if I did put all of that in, all of that in, if anything, it would give an a force (phonetic) UIR argument to her claim, that is the witness's claim, that a person wouldn't mention it, might not mention. If, in fact, it's a trauma that in a person's background is almost a transitory or less than -- well, I've got to be careful not to project on the witness -- on the plaintiff my views of how a person would react.

But all I'm saying is I can understand an argument that if a person has been heavily traumatized over the years, one more trauma, one more trauma may be of marginal impact in the overall scheme of things. Of course, this is a different kind of trauma. It's a trauma from -- from a stranger. And a trauma in these circumstances that I don't think anything in her background directly related to this kind of trauma.

Anyway, whether it's an a force UIR argument or not

isn't the question, because that's speculative on my part. The question really is, is it -- is it somehow either irrelevant or -- that is a fact that now she acted in a particular way. And I've excluded certain other indicia of earlier trauma. Does that make it irrelevant or inappropriate for her to testify to. And the answer is no, she's allowed to testify as to this.

MR. WYATT: And I appreciate that. I think part of what I'm trying to do here is Your Honor's absolutely right that we've had the benefit of hearing this testimony previously, or one version of it. But this is a very different case with different ground rules and different claims.

And so I'm just trying to peek around corners and see where this could go. She's making a reference to experience here in a single sentence. It may be totally innocuous in a way that Your Honor sort of just described, but it may not be, right?

So we suddenly start hearing a lot about how important somebody's experience and background is, and we don't really have that in this case, that is going to become a problem. So in some ways I am more just trying to spot -- at least with this one, spot potential problems and then ask for anything right now. But just prime everybody for that in the event that this testimony gets into areas that have

otherwise been kind of otherwise been off-limits in this case.

The next issue is on page 5, and it's line 7 through 8. And it's similar because it also implicates background issues but of another person, the driver in this case.

Dr. Valliere has proffered to opine that common offenders often have problematic personality traits or distorted beliefs. And I just don't see how that can be connected to this case.

THE COURT: I don't either. What does this have -- no. There's no evidence of that.

The evidence is his wife is standing in -- his wife is a 27-year-old marriage is standing in the room. And so the likelihood, no matter what happened, of his saying oh, yes, by the way, I did that -- he either was telling the truth or not the truth.

And the fact is if the truth were that he did this act and remembered it, it certainly is -- none of this applies because of the fact that the overall factor is that his wife is standing there. He's not going to say he did it, probably.

MR. KAUFMAN: Your Honor, we certainly weren't intending this to be a line-by-line recitation of what Dr. Valliere would say. The overall point of the paragraph

is that people come in with a preconceived notion that a sex offender is someone you see on *Law & Order* who is sort of this crazed maniac who you know him when you see him.

And one important thing Dr. Valliere explains is that's actually not how this works. A large number of sex offenders are what she calls opportunistic, or what Uber calls --

THE COURT: I think that can be testified to.

MR. KAUFMAN: And I think the personality line in there is just sort of explaining what may motivate those kind of people. So it's just part of the broader context. But the overall point is relevant. I think the specific words, if they're problematic, certainly don't need to come in.

THE COURT: Well, I think I'd be careful. I think it is too -- I think it's too prejudicial if she starts referencing people who are pedophiles.

Now, the plaintiff was how old at the time? She was 21?

MR. SMITH: 23.

MR. KAUFMAN: 23.

THE COURT: She was 23 at the time?

MR. SMITH: At the time, yes.

THE COURT: Okay. I think the use of any type of reference to a pedophile is pretty prejudicial. So it's out.

MR. KAUFMAN: I understand, Your Honor.

MR. WYATT: If I may move to another example, Your Honor. On page 3, lines 13 through 15.

As background, one of the things that Dr. Valliere testifies to is sort of what are the kinds of reactions people have to sexual assault. And there may be versions of that testimony that work within the confines of this narrowed case, but we have to be careful because if the way people react extends beyond 24 hours, we really shouldn't be talking about that.

And at lines 13 through 15, there is a discussion of how trauma causes neurobiological changes to the body. And that definitely has a permanent sounding aspect to it that I think would be inappropriate in the confines of this case.

And so that's just an example. I just want to sort of draw a line around if we're going to be talking about long-term consequences, people are changed for years, they never recover, those types of things, I think we're going to have a problem.

THE COURT: And the answer is I don't know enough about neurobiological trauma. I mean, she would have to tie it to the content -- pardon me -- the evidence of how the plaintiff reacted within the 24-hour period.

MR. WYATT: That's all I'm saying.

THE COURT: If she ties it to it, say that can be a

consequence of these types of changes, then she has an opinion as to that. Okay?

MR. WYATT: And then one final example, Your Honor. Just switching to the other issue of duty of care, breach of duty of care.

On page 5, on lines 14 through 15, there is a statement that offenders seek out environments like the Uber environment that present opportunities for sexual misconduct. And then similarly, same page, lines 24 through 26, there's a statement that by driving for Uber, offenders don't have to work to get access to potential victims.

These are both statements that are describing or at least strongly implying that there are safety issues with the Uber platform. And that really should not be something that we are talking about.

THE COURT: I don't think it is. I take a different interpretation. If that's what it's offered for, then I would rule it out. But I think it's being offered for why is a person who presents himself as somebody during his normal operations and so forth -- normal operation of his life and so forth, lawful, not engaged in this business, and then takes advantage -- or then utilizes a situation such as I'm here in the car alone at this time in this facility and conduct myself a particular way.

It explains it why -- why this is -- why it is --

it's an act guided by an opportunity. That is the opportunity presents itself, whereas the normal course of a person's life you may not have those opportunities.

Maybe I'm not being terribly clear, but I'm saying that it's important that a jury understands, if they accept the testimony of the witness, that a person can have completely, quote, normal crime-free, assault-free life for some period of time, and then take advantage of an opportunity such as this, knowing that the likelihood of apprehension is minimal, if that. Dark, stranger, rural setting, in his own car in which he can control his departure, and which there are no cameras, no recordation, and which he can deny it if it comes up. I mean, it's -- it's a crime of opportunity.

And if she's testifying as to that, which I think she did the last time, I can understand she'd be allowed to testify to that. Subject to cross, of course.

Okay.

MR. WYATT: And I think that's right. I think that's a general way to describe opportunistic behavior. What concerns me, at least the way that it's written here, is that it's tied very specifically to the Uber environment and going to drive for Uber as a sort of preplanned -- a preplanned path. That's not opportunistic. It doesn't even fit the theory that is being pressed here.

Again, I don't know how the testimony is going to come in.

THE COURT: I think you have to caution her not to make that suggestion.

MR. SMITH: Understood, Your Honor.

THE COURT: I agree with that.

MR. WYATT: That's it, Your Honor. Thank you.

THE COURT: Okay. So now moving to the final act.

MR. BOUNDAS: Your Honor, so we have --

THE COURT: Well, I hope you have something for me to look at.

MR. BOUNDAS: Yes, I do. In fact, if I can hand this up.

This is Dr. Reminick's report and rebuttal report.

THE COURT: Thank you.

Okay. What do you want me to look at?

MR. BOUNDAS: So the issue is if you look at page 2 and 3, she lists her enumerated opinions.

THE COURT: On page 2 and 3?

MR. BOUNDAS: Of her report.

THE COURT: Of her report. Not her -- not her rebuttal report, her initial.

MR. BOUNDAS: Her initial report, yes, that's right, Your Honor.

THE COURT: Okay. Two -- it is hard to see. Tell

me what opinion you think should come in.

MS. BROWN: Sure, Your Honor.

THE COURT: The first one obviously would come in.

MS. BROWN: Sure. Your Honor, there are four opinions. And, of course, Plaintiffs already raised the objections and the Court ruled on it. And you ruled that her opinions would come in except for these two, which we understand.

Her credibility as a witness and that she's lying about the sobriety on the night of the alleged incident. So I think those were excluded. And I think we're revisiting that now, Your Honor.

THE COURT: Let's revisit it.

MS. BROWN: Okay. The four things she will testify about, Your Honor: Ms. Mensing's alcohol and substance use are extensive.

THE COURT: Yes.

MS. BROWN: That her recall and memory are significantly impaired as a result of that.

THE COURT: Okay. Wait a minute. I'm just trying to find that.

MS. BROWN: And so, Your Honor, for example, if you look at page 12 of his report -- of her report --

THE COURT: Okay. Wait a minute.

MS. BROWN: Her first report.

THE COURT: Yes. Let me look at it.

MS. BROWN: Sure.

THE COURT: And where should I look at it?

MS. BROWN: On page 12, her memory was impaired. She could not remember details of events. Her insight and judgment were poor.

And this is based on her independent medical examination of the plaintiff, which she conducted in this case, Your Honor.

THE COURT: Okay.

MS. BROWN: And she intends to speak --

THE COURT: So this witness says that in her view, her expert view, her memory was impaired. She could not remember details of events. Her insight and judgment were poor.

I don't know about her insight and judgment. I'm trying to figure out how that has anything to do with anything, but --

MR. BOUNDAS: I don't see it either, Your Honor.

THE COURT: Her judgment was getting into the Uber, from her point of view.

MS. BROWN: Well, Your Honor, but obviously what is critical here is the memory evaluation.

THE COURT: That's why I have it in front of me, because I think -- I think it's important to rule in and rule

out that which she can testify to. So I would not have her testify, as an example, her insight and judgment were poor. That's out.

Unless you can explain to me why it should be in. I don't understand that.

Now, her memory was impaired. Let's take a look at that one first. Yes.

MR. BOUNDAS: Okay. So on that specific topic if she's saying that due to her drug and alcohol use her memory was impaired, you know, first of all, I'm not sure it really fits this case. She's not saying that she doesn't remember this incident. It is just --

THE COURT: Well, no. Well, I'll explain that.

I mean, my view is that your memory can be impaired in a number of ways. One is you could not have a recollection. Or two, an impaired memory is a memory that is imperfect, that she remembers things or confuses things that didn't happen or it happened in a different way.

MR. BOUNDAS: Okay.

THE COURT: So that is an impairment of a memory.

MR. BOUNDAS: And I understand that.

THE COURT: I think it's all subject to cross.

MR. BOUNDAS: That one I can see. But -- but just as an example, Your Honor, their Opinion Number 1, the extensive history of trauma and drug abuse, if you read her

report, she's talking about being beaten by her father, child custody issues. She lists a page and a half of criminal --

MS. BROWN: We understand that's all out. We don't intent to elicit that.

MR. BOUNDAS: Right. But the point is that Dr. Reminick's entire report, other than maybe what we just talked about, is related to her current psychological functioning, all of it. And it's all colored by her past, which includes her alcohol and drug use, but it also includes a host of other issues.

We're not even here to discuss her current -- whether she has PTSD today, her current psychiatric functioning, none of that -- and if you look at each one of these opinions, they all are related to current issues. And the report is just a litany of past traumas that have been ruled inadmissible.

THE COURT: But wait a minute. Here is what I think Uber is saying. Something can be out for one purpose but considered for another purpose. That's the long and short of it.

In other words, let's assume a person had a prior -- an incident that had an enormous impact on their life. They were sexually assaulted when they were -- and maybe repeatedly -- when they were children and something. It comes in and she says, okay, I was sexually assaulted in

this case. Okay.

Now, let's say for a variety of reasons the earlier incidences of trauma don't come in. Either through remoteness or too prejudicial or whatever, they simply don't come into evidence.

But an expert says I want to tell you that this person's memory has been impaired by the trauma that she has suffered. That doesn't make her opinion invalid. In other words, if she is basing her opinion on things that occurred prior to it, her opinion being she doesn't have -- her memory is impaired of the incident, or people who have had this type of trauma have an impaired memory, I think you could -- I think you could say that.

Otherwise, it creates an enormous obstacle for a defendant who wants to assert the memory is impaired but can't go back and -- and -- and -- and rely on the evidence that has been excluded.

MS. BROWN: Yes, Your Honor.

THE COURT: It's just -- it's just unfair. I mean, it's unfair.

I think that they can't ask her, well, are you basing your opinion on the fact that she was A, B, C, D, E, and F, things that I've excluded. Nor -- and this is the cautionary tail -- can you.

MR. BOUNDAS: Can you.

THE COURT: If you attack -- if you attack her testimony that her memory is impaired, whatever that means, she may very well be able to identify those things that led her to the conclusion that the memory is impaired.

MR. BOUNDAS: And I understand that, Your Honor. I think I -- the memory impairment I'm -- I'm conceding. Okay?

But there is so much -- that's really actually not one of her opinions. But if you look at her five opinions, none of them have to do with memory impairment. I acknowledge that that's in her report.

THE COURT: It is in her report.

MR. BOUNDAS: That's fine. But there is a litany -- look, her five main opinions that she list, none of those are admissible.

THE COURT: Maybe that's the best way to proceed so we're not here --

MS. BROWN: Yes, Your Honor.

THE COURT: -- all day.

Number 2 --

MS. BROWN: Well --

THE COURT: I'm now going through the summary of opinions.

MS. BROWN: Okay.

THE COURT: Number 2 is out.

I don't know about Number 3.

MS. BROWN: Would it be easier, Your Honor, if I gave you the four we intended to elicit? Because I think in light of the Court's rulings --

THE COURT: I think it would be useful.

MS. BROWN: So as we already discussed Number 1, extensive alcohol and substance abuse, we've already talked about that.

2, memory and recall significantly impaired, we've talked about that.

3, based on her review of the medical records, there is no evidence in the medical records that she reported the Uber incident to her health care providers.

THE COURT: Okay. Let's stop there. That seems appropriate.

MR. BOUNDAS: That's not an expert opinion. That's just a fact.

THE COURT: I understand that. I would allow that.

MR. BOUNDAS: If she wants to say that, that's fine.

THE COURT: Yes, she does want to say that, that's fine.

MR. BOUNDAS: If that's going to be -- yeah.

THE COURT: That's fine.

MS. BROWN: Your Honor, as detailed on page 12 of Dr. Reminick's report, the final opinion we will elicit is

that her continued use of rideshare shows a lack of avoidance, as that term is used in the psychiatric field.

THE COURT: And that's fine.

MS. BROWN: Thank you, Your Honor.

MR. BOUNDAS: And just so -- okay. Continued use --

THE COURT: That's it. I see about a 15-minute, 10-minute presentation.

MS. BROWN: Well, we didn't go through the medical records, Your Honor, with the plaintiff because -- for many reasons. One, not to -- to try to be sensitive. And two, there is probably lack of foundation there. So there is a handful of medical records on point Number 1. But I agree with you it will be a short examination.

MR. BOUNDAS: Yeah. The only -- I have two caveats on point Number 1, which is number one, we're talking about only drug abuse trauma when she's talking about what traumas have been experienced, right?

MS. BROWN: Correct. Drug and alcohol is Number 1.

THE COURT: Drug and alcohol.

MR. BOUNDAS: Oh, of course, both. Sure. Or whatever else they say she --

THE COURT: Not whatever else, because there's a lot of other else.

MR. BOUNDAS: Correct. I'm just saying substance

abuse.

MS. BROWN: Yes.

MR. BOUNDAS: Okay. So -- but the Court has already excluded something a little broader than what we've talked about, which is not just the plaintiff's credibility, but Dr. Reminick issued all of these opinions about how the plaintiff lies to medical -- literally says she's dishonest with medical providers, lies to people. And so if they want to go through her history of alcohol and drug abuse, at some point I'm going to object and say this is, you know, how much can we do of this. But not to show this is her toxicology report, and she said she wasn't using drugs. You've already excluded that.

MS. BROWN: Well, I think that is a little different. And we already had this discussion with the Court. And what the Court ruled on is you would exclude hearsay from providers who were concluding that she wasn't telling the truth, but if we used a medical record, and there are at least two, that say client reported to me she was not honest about her substance abuse, the Court would allow that as an admission.

THE COURT: What I'd like you to do is as to any of those types of documents, show it to Plaintiff's counsel and then we'll see if there is an issue.

MS. BROWN: Thank you.

MR. BOUNDAS: Okay. That's fine.

I just want to point out that we -- we did brief this issue, and a psychiatrist in the Fourth Circuit is not allowed to opine on someone's credibility.

MS. BROWN: Correct. And that's not our intention, Your Honor. It is an admission within a medical record. And we will show it to counsel and be prepared to show it to Your Honor.

MR. BOUNDAS: So -- okay. I'll look at the documents.

THE COURT: Just so you say it's an admission, you have to focus on who's admitting it, right?

MS. BROWN: Um-hum.

THE COURT: And you're telling me that the plaintiff said that.

MS. BROWN: Yes, Your Honor.

THE COURT: So you have a statement of the plaintiff.

MS. BROWN: Correct.

THE COURT: And how does that statement look? Does the plaintiff say I lied?

MS. BROWN: Yes, Your Honor.

THE COURT: The plaintiff says it?

MS. BROWN: Yes, Your Honor.

MR. BOUNDAS: I --

THE COURT: Okay. You're not telling me that the -- that the provider said that the plaintiff said that she lied.

MS. BROWN: Well, I think there's two types of records. There's one --

THE COURT: Not that right.

MS. BROWN: Well, there's records where the provider is making that judgment.

THE COURT: And that's out.

MS. BROWN: And I understand the Court's ruling on that.

Then there are records where the provider is writing what the plaintiff said.

THE COURT: Nope. That's exactly what I thought you were doing.

Explain to me why that's not -- why that's not hearsay.

MS. BROWN: Sure, Your Honor. Because it's an admission of a party opponent --

THE COURT: No, it's not.

MS. BROWN: -- contained within a business record.

THE COURT: No, it's not.

How many police reports have you looked at? When you look at police reports, the police officer said I sat down with Jones and Jones told me X.

You think that comes in?

MS. BROWN: Yes, Your Honor. I do.

THE COURT: No, it doesn't.

MS. BROWN: I think it's different than the provider or the police report making an assumption. This is -- and there are quotes around it, Your Honor.

THE COURT: You're right.

Wait a minute. It's different. I agree. It is the provider who is making the statement. It is the provider who is saying the plaintiff told me X. It's not plaintiff who is saying it; it's the provider saying that the plaintiff said it.

MS. BROWN: Well --

THE COURT: That is hearsay.

MS. BROWN: Then what I would submit, Your Honor, is that we would use, for example, a medical record that the plaintiff signed and was asked --

THE COURT: I better look at it.

MS. BROWN: All right. We'll --

THE COURT: And it better -- I just want you and I, the two of us, the three of us --

MR. BOUNDAS: Three of us.

THE COURT: -- everybody on the same page. And the page is if it's -- if a provider says the plaintiff said it to me, that's not necessarily admissible. It's not really an

admission. It's a statement by -- now, there are exceptions to medical records and so forth. And I can take a look at those to see whether they come in and overcome hearsay objections.

But I want to look at it from the point of view of the -- of who is the speaker, whose record is it. You can say, well, it's a record of the patient. No. Who prepared the record? Who wrote the record?

If the record is written by the provider, then we have to take a look and see whether, as an exception to the hearsay rule because it's a medical record, it comes in.

I have to look at the law in the circuit because I'm not familiar with it. But it is hearsay, and the question is an exception to the hearsay rule. Like an admission, it's an exception to the hearsay rule.

MS. BROWN: Yes, Your Honor. We'll file something. We'll put the actual documents in something for the Court and file something with the Fourth Circuit law on that.

THE COURT: I appreciate that.

MS. BROWN: Thank you.

MR. BOUNDAS: Okay. So I just want to -- so we're limiting to the four topics: Extensive drug and alcohol drug use, check. How that -- or that she has recall memory issues. No evidence that she's seen that Ms. Mensing reported the Uber incident to providers, which seems like it

would be one question. And then this issue of -- not that she's dishonest or a liar, but that there are actual records showing that she has made statements -- well, her statements. I don't want to -- I think we're on the same page.

MS. BROWN: I think what we'll do --

MR. BOUNDAS: Admissible evidence of the plaintiff's statement that shows she was being dishonest about this drug use.

MS. BROWN: Yes.

MR. BOUNDAS: Okay? And those are the four topics. I just want to make sure --

MS. BROWN: And the lack of avoidance in continuing to take Uber.

MR. BOUNDAS: Well, where is that? Is that in there?

MS. BROWN: It's in her report.

THE COURT: Let it in.

MR. BOUNDAS: It's fine.

THE COURT: Let it in.

MR. BOUNDAS: I think I'm -- I just want to know the ground rules and what it is because she's got a bunch of stuff in this report, and I think --

THE COURT: The report is not coming in.

MS. BROWN: Thank you.

MR. BOUNDAS: I think we're clear. Thank you, Your

Honor.

THE COURT: So let's talk about closings, which will be Monday, right?

MR. SMITH: I believe so.

THE COURT: Right. Okay. So it seems to me this is a very, very simple case, right? As we all acknowledge, it's simply, yeah, did the plaintiff prove by a -- by the greater weight of the evidence that she was -- I was going to say assaulted but that's out -- that she was touched by the Uber driver? And then if so, what are her damages?

So it's hard for me to see why the parties would take -- each side would take more than 20 minutes to argue it.

Good. So hearing no objection.

MS. BROWN: I object a little bit, Your Honor.

THE COURT: Well, maybe there is a period of a shock when I said 20 minutes.

MS. BROWN: Right.

THE COURT: Okay. Go ahead. I'm just -- go ahead. How much time do you think you need?

MS. BROWN: I think we could do it in under an hour, Your Honor.

THE COURT: Oh, yes, of course you can.

MR. SMITH: I need four hours, Your Honor.

THE COURT: Well, good. Three and a half. No one

will be here, but we'll all show up for your last half hour. Or if you prefer the first half hour.

This is what I think will be fair: I think 45 minutes a side is really more than enough. More than enough.

I will tell you that the -- I don't want to -- since the plaintiffs will be allowed to go in the beginning and at the end, since they have the burden of proof, they should devote at least -- if they're going to use 45 minutes, they should devote half an hour to their opening and 15 minutes to their rebuttal. But that's, of course, I'm not saying if you're going to use only 15 minutes. But you can't use 15 minutes and then half an hour for rebuttal. Okay?

MR. SMITH: Understood.

THE COURT: You wouldn't do it anyway.

45 minutes, that's more than enough, right?

MR. SMITH: Yes.

THE COURT: You don't have to say anything. Because as soon as you say something, somebody at Kirkland Ellis is going to -- they're all going to get annoyed with you for having exceeded.

But I think 45 minutes is fine. If you can't do it in 45 minutes, you can't do it. Period. That's true of both sides.

Okay. What else? Anything else?

MR. SMITH: Nothing from us, Your Honor.

MS. BROWN: Nothing.

THE COURT: Okay. I instruct the jury before argument. And the parties will have to give their closings behind the podium.

MR. SMITH: That's a good clarification. Appreciate it.

THE COURT: Okay. All right. So I'll work on those several instructions that are still up in the air and we'll deal with it. Thank you.

See you tomorrow at 9:15.

MR. BROWN: Thank you, Judge.

THE COURT: I would expect that we would be finished before the morning with these two witnesses.

MR. SMITH: Let's hope.

THE COURT: You don't think so?

MS. BROWN: I don't.

MR. SMITH: I don't know how long the crosses would be, I guess.

THE COURT: Oh, I forgot about cross. Well, I beg your pardon. Of course. If we go into the afternoon, we go into the afternoon. It's fine. You're not limited. I mean, one day, but you're not going to be limited.

Okay. See you tomorrow.

MR. BROWN: Thank you, Judge.

THE COURT: Thank you.

(The proceedings concluded at 2:51 p.m.)

* * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 16th day of April 2026.

/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CRC
U.S. Official Court Reporter