UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Charles R. Breyer, Judge

| | | |
|---|---|---|
| IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, | ) | No. 3:23-MD-03084-CRB |
| WHB 823 v. Uber Techs, Inc., et al. No. 3:24-cv-04900 | ) | |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| WHB 823, | ) | No. 3:25-cv-00737-CB |
| Plaintiff, | ) | |
| vs. | ) | VOLUME III |
| UBER TECHNOLOGIES, INC., et al., | ) | Pages 357 - 545 |
| Defendants. | ) | |

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE CHARLES R. BREYER
UNITED STATES SENIOR DISTRICT COURT JUDGE
FRIDAY, APRIL 17, 2026 AT 9:15 A.M.

JILLIAN M. TURNER, RMR, CRR, CRC
Official U.S. District Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:

For Plaintiffs:

SARAH R. LONDON, ESQ.
ANDREW KAUFMAN, ESQ.
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, California 94108

JOHN T. BOUNDAS, ESQ.
SEJAL BRAHMBHATT, ESQ.
Williams Hart & Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017

WILLIAM L. SMITH, ESQ.
ALEXANDRA M. WALSH, ESQ.
Anapol Weiss
6060 Center Drive, 10th Floor
Los Angeles, California 900045

THIEN AN V. TRUONG, ESQ.
Simmons Hanly Conroy
112 Madison Avenue
New York, New York 10016

ROOPAL P. LUHANA, ESQ.
Chaffin Luhana LLP
3200 Main Street
Weirton, West Virginia 26062

For Defendants:

ALLISON M. BROWN, ESQ.
LAURA VARTAIN HORN, ESQ.
CAROLINE POWER, ESQ.
GEOFFREY M. WYATT, ESQ.
Kirkland & Ellis LLP
2005 Market Street, Suite 1000
Philadelphia, Pennsylvania 19103

MICHAEL A. BROWN, ESQ.
Nelson Mullins
100 S. Charles Street, Suite 1600
Baltimore, Maryland 21201

# I N D E X


| | PAGE |
|---|---|
| **PLAINTIFF'S WITNESSES** | |
| VERONIQUE VALLIERE | |
| Direct Examination by Mr. Smith | 366 |
| Cross-Examination by Ms. Brown | 403 |
| Redirect Examination by Mr. Smith | 427 |
| **DEFENDANTS' WITNESSES** | |
| ALISON REMINICK | |
| Direct Examination by Ms. Brown | 432 |
| Cross-Examination by Mr. Boundas | 504 |
| Redirect Examination by Ms. Brown | 535 |

PLAINTIFF'S EXHIBITS

| NO. | RECEIVED |
|---|---|
| P-01256 | 390 |
| P-1528 | 386 |
| P-04982 | 394 |

DEFENDANTS' EXHIBITS

| NO. | RECEIVED |
|---|---|
| D-4131 | 482 |
| D-4135 | 485 |
| D-4143 | 486 |
| D-4143 | 493 |
| D-4145 | 487 |

DEFENDANTS' EXHIBITS (Cont.)



| NO. | DESCRIPTION | ENTERED |
|---|---|---|
| D-4145 | | 488 |
| D-4149 | | 480 |

| | |
|---|---|
| RULE 50 MOTION | 440 |
| RENEWED RULE 50 MOTION | 542 |

(Court called to order on Friday, April 17, 2026, commencing at 9:15 a.m.)

P R O C E E D I N G S

THE COURT: All right. Let the record reflect the parties are present, the jury is not. Good morning.

MR. WYATT: Good morning.

THE COURT: I read the brief, Uber's brief, about the admissibility. I think they're correct. It seems to come in -- I don't know if -- business records, I'm not sure, but this doesn't really seem to fit the medical exception and 803. So I haven't seen the document. Maybe it's here? Is the document here? Pardon me. Have you seen the documents? I mean, do you have any -- if you have any response to that, of course.

MR. BOUNDAS: Yeah, Your Honor, on the general issue of medical records, we understand. We're not going to argue that. But there are certain records and certain slides that have what we believe would be, A, inadmissible content, and, B, hearsay.

THE COURT: Okay.

MR. BOUNDAS: But we can --

THE COURT: Go ahead. Go ahead.

MR. BOUNDAS: If you want get the jury in and get started with the doctor, we can -- because I have quite a few objections to their slides.

THE COURT: Okay. So let's not do that now. Is there anything else --

MR. BOUNDAS: No.

THE COURT: -- before the witness testifies?

MR. BOUNDAS: Oh, not from us.

MR. SMITH: No. They have some objections. They have objections to some slides that my colleague is going to address. Documents I think it is.

THE COURT: Sure.

MR. SMITH: Address up front.

THE COURT: Good morning.

MS. TRUONG: Good morning, Your Honor.

MR. WYATT: Objection to our slides?

MS. TRUONG: No. Excuse me. I believe that Uber had raised objections to certain slides that we intend to use for Dr. Valliere.

THE COURT: Yes, let's address those.

MS. BROWN: I think we just resolved those, right? The two Brianna-specific exhibits you guys withdrew?

MS. TRUONG: Yes.

MS. BROWN: Okay?

MS. TRUONG: And then the other.

MS. BROWN: And the other was the disclosure issue that I think we resolved.

MS. TRUONG: Okay. Then everything is good.

THE COURT: Everything's good. Everything's good. This is why it's such a delight to try a case in North Carolina. This is wonderful here.

Ms. Vartain, are you going to move your point of operation to?

MS. VARTAIN: Maybe a satellite office, Your Honor.

THE COURT: Great.

MR. WYATT: Your Honor, just to preview two things. We'll make an oral motion under Rule 50 at the close at Plaintiff's case. And I will just need two minutes for that. But I wanted to raise it so that we could find a way to fit it in there.

THE COURT: Fine.

MR. WYATT: And then I will have one jury instruction issue that we can deal with later.

THE COURT: Well, we have a couple of minutes. What's the jury instruction issue?

MR. WYATT: There was one change we discussed yesterday, and if I can just hand up the page.

THE COURT: Sure.

Just give it to me. Thank you.

The question is sexually. I think we're taking that out.

MR. WYATT: That's what I wanted to revisit, Your Honor.

THE COURT: Yes.

MR. WYATT: And I think it is a case where the allegation, the theory, obviously, is related to an alleged sexual assault. And we think it should stay in there because battery requires proof, not merely the touching, but of an offensive touching. And the theory of what's offensive about the touching in this case is that it was sexual in nature.

And so I think it is appropriate to focus the jury's attention on that inspect of Plaintiff's claim. I don't think there is any scenario where the Plaintiffs are going to be changing their theory in their closing or at any other point in their case. And so I don't think -- we wouldn't be here if this were not sort of a sexual assault allegation. It would be part of a different proceeding.

THE COURT: Well, but that's like saying we wouldn't be here if the touching was incidental, you know, like in a crowd. I mean, we could just all go back to law school.

MR. WYATT: Well, it's a little different than that. I'm making a slightly different point, Your Honor, which is that it wouldn't be part of this MDL. It may still be part of a case if there were some other kind of offensive, but it wouldn't be part of the sexual assault allegation.

THE COURT: But a case is a case.

MR. WYATT: Of course.

THE COURT: That it's a collective in an MDL as a procedural matter, not a substantive matter.

MR. WYATT: I agree with that. Just I am making a broader point, that it is a specific type of case, and so I think it makes sense to describe it as such.

THE COURT: And I'm making an even broader point that the law is such that any touching that is not incidental, and as defined in the battery. I mean, the instruction on the battery is -- is -- I think addresses your point, your smaller point.

Your larger point being that this is being tried as a sexual case, that's fine. First of all, it's correct.

Secondly -- well, it's correct, but it's not an element. And the problem is, as I said yesterday, the problem is that people have different ideas about what is sexual and what is not sexual. I mean, maybe -- maybe they don't; maybe they do, I don't know. But it introduces the potential of a disagreement over something that is a matter of law is irrelevant. That's the point.

So I'm going to take it out.

MR. WYATT: Understood, Your Honor.

THE COURT: Thank you.

MR. KAUFMAN: Thank you.

THE COURT: Very good job.

MR. KAUFMAN: Thank you.

THE COURT: Excellent job.

MR. KAUFMAN: Very late preparing.

THE COURT: Well, very good.

All right. So let's bring in the jury, get started.

(The jury entered the courtroom.)

THE COURT: Please be seated. Let the record reflect the jury is present, all parties are present.

We are now returning, ladies and gentlemen of the jury, to the plaintiff's case.

And you may call your next witness.

MR. SMITH: Thank you, Your Honor.

Good morning, everybody.

At this time the plaintiff calls Dr. Veronique Valliere to the stand.

THE COURT: Okay.

VERONIQUE VALLIERE, PLAINTIFF WITNESS, SWORN

THE COURTROOM DEPUTY CLERK: Please state your full name for the record, and spell your last name.

THE WITNESS: Dr. Veronique Valliere, V-A-L-L-I-E-R-E.

DIRECT EXAMINATION

BY MR. SMITH:

Q. Good morning, Dr. Valliere. How are you?

A. Good morning. Good. Thanks.

Q. Could you just introduce yourself again to the jury?
A. Sure. I'm Dr. Valliere. I'm a licensed psychologist in Pennsylvania and New York, and I work in clinical and forensic psychology.
Q. Did you help us put together some slides today to help guide the jury through your opinions and your testimony?
A. Yes.
Q. If I could get the PowerPoint.
All right. Briefly, could you summarize for the jury what expertise you bring to this case?
A. Sure. I have a bachelor's that I received in psychology in May 1987 from St. Mary's College in Maryland, and then a doctorate in clinical psychology that I received from Rutgers University in January 1993. I did all the post-doc stuff, licensed in '95.
Throughout my career I've worked in the field of interpersonal violence. So I've worked with sex offenders, victims of sexual assault and domestic violence, domestic violence offenders, people who abuse children, substance abuse, and in an outpatient setting primarily.
In about 2000 -- yeah, so I have two outpatient clinics now.
Q. Okay. And did we ask you to help answer some questions for the jury today?
A. You did.

Q. What are the questions that we see here on the slide?
A. Basically to describe and provide education about sex offender behavior and what facilitates sexual assault, how victims respond to sexual offending and sexual assault, and what kind of things in the environment make it an ideal environment for sexual assault.
Q. Okay. Now, before we get to digging in on those opinions, I'd like to talk a little bit more about what qualifies you to give you those opinions. Is that okay?
A. Sure.
Q. You told us about your education. Can you give us a little more background on that?
A. I'm not sure what background.
Q. Well, did you have -- what were some interesting classes you maybe took in preparing in getting your degree and developing your expertise in this area?
A. Well, I took classes in forensic psychology, neuropsychology, treatment of trauma and other mental disorders. I did my dissertation on alcohol and sexual assault, so interviewed many offenders to do that dissertation.
I did a predoctoral internship at a facility for traumatized kids working with -- they were pretty cool boys who were acting out like crazy. So it was a fun time, so.
Q. Do you hold any licenses?

A. I do. I'm licensed as a psychologist in Pennsylvania That I received in '95, and then in New York a few years ago.

Q. What do you do for work?

A. I run an -- two outpatient clinics. One where we treat victims of abuse and other mental health disorders as young as four and five years old on up through adulthood.

And then I have a violent offenders outpatient program. So we treat offenders on parole or probation or ordered by the Court who are convicted of sexual offending or through child protection for child abuse or domestic violence or community violence offenders.

Q. Have you served on any boards relating to your work in sexual assault?

A. I have. I'm a member of Pennsylvania Sexual Offender Assessment Board. That's our Megan's board. So we evaluate individuals to see if they are sexually violent predators or need different requirements for notification and things. I was appointed by the governor in 1987 and have been continuously appointed since then.

Q. Since 1987 every governor of Pennsylvania has appointed you to this board?

A. Yes. And now I feel old.

Q. Well, I apologize for that.

A. No.

Q. Have you also served as a consultant?

A. Yes. I've really had a privileged career. I've been invited to train the FBI, the Bureau of Indian Affairs, the Department of Defense, the Department of Justice. I've trained state police. I've been lucky to be invited internationally to train in some fun places, like training prosecutors and law enforcement in Canada and St. Thomas and some cool places like that.
Q. In fact, where were you yesterday?
A. In South Carolina at the National Advocacy Center. I was training the Department of Justice investigators on sexual offenders.
Q. And do you plan today to give the same kind of information you gave to the Department of Justice to this jury here?
A. Some of it, yep.
Q. Has Uber ever asked you to consult for them?
A. No.
Q. Have you also published in the field of sexual assault?
A. I have. I've published some book chapters and some articles, but most recently published in a book in 2019 on understanding victims of violence, and then unmasking the sex offender where I talk all about understanding offenders and what motivates them. And then another book on -- with an attorney friend of mine on prosecuting intimate violence.
Q. And you're testifying in a courtroom today. Is this

your first time in a courtroom testifying?

A. No.

Q. Okay. Have you provided testimony in other settings about sexual assault?

A. Yeah. I was invited to testify in Pennsylvania congress to pass a law to law experts to talk about victim behavior, and testified in front of United States Congress on the issue of sexual assault in the military when they're investigating that.

Q. Okay.

What about this slide here? Can you tell the jury about this slide?

A. Yeah. This is one -- one of the interesting court drawings. I testified in the first Cosby trial on victim response, so --

Q. And do you do work for both plaintiffs and defendants?

A. I do not particularly in my role here today. So when I testify for sexually violent predator hearings, which I do a lot, if I come find that somebody's not a sexually violent predator, we don't have a hearing so I don't testify at all. But I have worked with the defense in sentencing issues, explaining defendant behavior, whatever.

But in this particular role that I have today, which is providing education about victims and offenders, I don't typically testify for the defense because they don't need

that kind of testimony, and I've never been asked. So in this role I've always testified for the plaintiffs or the Government.

Q. Okay. Have you also made media appearances?

A. I have.

Q. Can you tell us a little bit about that?

A. I've been on the news a couple times, morning shows. I've been in major publications like The New York Times, the Atlantic Huffington Post. I did a TED Talk. And I've been on some documentaries.

Q. Okay. But, you know, this is a very serious thing. You're doing it seems like, you know, 24/7. What do you do for fun?

A. I do some fun things. I'm a little artistic, so I do some fun things, but I spend time with these little maniacs. They're fun.

Q. What are their names?

A. Stormy and Sunny.

Q. Which one is which?

A. The one with the tongue out is Stormy. You can kind of tell she's a little rowdier, so --

Q. All right.

Let's talk a little bit about what you did to prepare to answer the questions that we've asked you to talk about today.

How did you prepare for your assignment here?

A. In this role I reviewed hundreds of Uber documents, internal documents, training documents, depositions, memos, policy statements. So anything that might be relevant in the files that would help my opinion, as well as then obviously applying all my years of working with thousands of offenders, hundreds and hundreds of victims, and the body of research I'm familiar with in the field to apply to translating that information into my opinion.

Q. You mentioned the body of research. Can you tell us a little bit -- or some of the literature topics that you're up to date on in the field that are relevant to your opinions?

A. Sure. Particularly relevant to here is trauma and its impact on victims; victim reaction to assault; the miss and misinformation we still maintain societally about victims, about offenders, about how quote/unquote real victims act or real offenders act; how that impacts jury decision-making, law enforcement investigation; and the rateness and stereotypes that continue to be perpetuated; as well as research on what criminal factors facilitate sexual assault; what deterrences; what the best management of offenders are.

Q. But in this case we didn't ask you to look at and render specific opinions about Ms. Mensing, did we?

A. No.

Q. And you're not here to tell the jury whether this

incident did or did not happen, right?

A. No. That's your job, completely.

Q. But you do evaluate sexual assault victims; is that right?

A. I do.

Q. And what do you do when you do that work with sexual assault victims?

A. Well, it depends on what the referral issue is. Sometimes they're sent to me and the Court or the child protection wants to know what treatment they need or what will be helpful. Sometimes I value victims in a -- in a particular case to see what kind of harm or injury has persisted after an assault and how they've been affected by it.

Q. And even if you were doing an evaluation of a victim of sexual assault, would you ever be commenting on whether or not the incident happened?

A. No. That's not my job. I mean, I'm not an investigator. When somebody comes to me, I take them at their face, and I see if what they're reporting, symptoms or thoughts or feelings, are consistent with any diagnoses. I mean, it would really be unethical for me to be like, Nah, that didn't happen. You go home.

It's like going to the hospital and saying you have chest pain, and the doctor is like, mmm, do I believe you.

No, we don't do that, so.
Q. And even though we haven't asked you to give specific opinions about Ms. Mensing's case, are you aware of the basic facts from your review of the complaint and the answer?
A. I am.
Q. Is there anything that you saw in there that you thought made it that you couldn't give your opinions to this jury today?
A. Oh, no.
Q. Okay. Did you prepare a report in this case and provide your opinions to both sides?
A. I did.
Q. Okay. And did you sit for a deposition where Uber's lawyers had the opportunity to ask you questions about all of your opinions?
A. Yes.
Q. Okay. And are the opinions you're offering here today generally applicable across cases?
A. They are, because it's general education so that when you're making your important decision, you don't rely on things that are inaccurate or -- or just note borne out.
Q. But this work you're doing here, this is all part of your job, right?
A. It is.
Q. Okay. So you're being compensated for your time?

A. I hope so, yes.

Q. You expect to be compensated for your time regardless of the outcome of this case, right?

A. Absolutely.

Q. What's your rate?

A. It's 450 an hour.

Q. All right. Okay.

MR. SMITH: If I can get the ELMO. Okay. Thank you, Mr. Dickson.

BY MR. SMITH:

Q. All right. Let's talk about the opinions you have in this case.

Could you tell the jury your three opinions here that you're prepared to talk about?

A. Sure. Basically, that we still societally subscribe to miss and misinformation sexual assault victims and offenders that a rideshare offers a unique opportunistic environment for offenders to -- that provides offenders opportunities, and that there are many, many, many ways to respond to trauma, and none of them are unexpected necessarily. And offenders understand victim behavior and exploit that, like some of the common things like not reporting, things like that.

Q. Okay. So let's dig in.

MR. SMITH: If I can get the PowerPoint one more

time. Thank you, Mr. Dickson.

BY MR. SMITH:

Q. Okay. What is sexual assault? Let's maybe start there.

A. Well, sexual assault is a term that's an umbrella term that captures all kinds of sexually motivated offensive touching. Sexual assault is different than sexual harassment or other kinds of sexual abuse because sexual assault necessarily requires physical touch of some kind. But it's characterized by a nonreciprocal interaction that's motivated by the offender and exacted by the offender that causes fear, violation of somebody's psychological or physical integrity, humiliation or use of the word indignity of the victim. And the offender's in control of it because there's generally a power or status differential, whether it's physical power or psychological power, or just the difficulties in power related to a physical environment, like in a rideshare being in somebody else's car.

Q. Is there a range of sexual assault?

A. Absolutely. And, you know, it goes all the way from indecent touching or personalized touching or all the way to kind of traded offenses.

Q. Let me ask you this: What about a grab, where somebody just grabs you right here? Is that a sexual assault? Could it be?

A. It definitely could be, especially, you know, we have

zones in our body that are clearly sexualized and private. Grabbing somebody's inner thigh is far different than grabbing their ankle, so --
Q. Can any sexual assault impact a victim, even if it's not rape or it doesn't involve penetration?
A. Oh, absolutely. All kinds of physically violating events can be very terrifying to a victim.
Q. So let's talk more about the people who commit sexual assault. Sort of basic demographics level, what percentage of sex offenders are men versus women?
A. Well, I don't like to say percentages, but the vast majority are men.
Q. Okay. And then based on your research, what motivates offenders to, you know, hurt someone in this way?
A. Well, sometimes offenders are motivated by what we would call sexual deviance or arousal to inappropriate things. But lots of times offenders are opportunistic. So they're people who have character issues or are willing to violate the rights of others to get gratified if they're provided an appropriate opportunity.
I think we have a stereotype of sex offenders being, like, these creepy guys who run around drooling in their trench coats. That's just not the way it works. While there are a teeny few people like that, a lot of individuals have, like I said, personality traits that facilitate that. They

feel like they're entitled. They feel like victims are lower than them. They feel like they have the privilege to take what they want. They disregards the rights of others.

And so provided an opportunity, when there's not a lot of friction or not a lot of barriers between them and getting gratified, they'll act on that opportunity. So they evaluate victims, they evaluate situations to see if "Can I get away with this and can I get what I need out of it?"

Q. You talked a little bit about opportunistic sexual offending. Does that mean those acts are, you know, acts of uncontrollable passion?

A. No. They're instrumental decisions and risk analysis that an offender takes to think are they going to get away with it? Are they got going to get reported? Is this going to be, you know, effective for them? Is the environment tolerant of this? Can I just get what I want without the risk being too high?

Q. Okay. Are there patterns you see among sex offenders sexual offenders?

A. Well, there are. Typically offenders are not the "jump out of bushes and drag you into the bushes" type of people. They're people who facilitate some kind of connection or relationship with their victim, whether it's a long-term relationship or an authorized relationship, like a teacher or coach or somebody who would be expected to have access to

you.

And then they test the environment. They see what the risks are of being caught. If they're in a role for a long time, they can understand like, for instance, working with Catholic priests. They soon -- they learned over time that their environment would protect them, so they became more and more -- their abuse of their parishioners became more and more prevalent because they knew the Catholic church would protect their name over intervening and the abuse.

So they test the environment. They have to target somebody, whether it's somebody they met online or somebody they have access to in their role. They target somebody for specific reasons. Then they'll test that person for resistance. They might -- in an adult-to-adult situation, they may touch them. They may ask personal questions. They may violate your physical integrity to see how resistant you are, how reactive you are, how willing you are to disrupt the peace, so to speak. And then they can commit their crime.

Q. And how do they -- how do offenders operate to get what they want? Do they always use a weapon?

A. Oh, they rarely use weapons. You don't need to use a weapon to sexually assault someone. You are the weapon.

Q. And how about, how do they -- do they plan to avoid accountability in some way?

A. Oh, absolutely. Offenders always have an answer and a

plan for when they get caught.

So they may just deny. They may just say they don't remember anything. They may devalue or deflect or degrade the victim to try to discredit the allegation. They may have an alternative explanation. For instance, even -- even to the degree of raping somebody, if they leave DNA, all they'll say is well, it was consensual. If that is an age appropriate partner, then it's up to the victim to prove that it wasn't consensual. So they always have explanations so that they have plausible deniability. They plan this.

Q. You mentioned an offender maybe saying I don't remember. Is it significant to you if an offender, after being presenting with an accusation of sexual assault, says I don't recall anything about that?

A. Well, I don't recall -- when I'm interviewing people, I understand that I don't recall -- you can't recall what you did if you can't recall what you didn't do. So that's not an admission or -- it's not a denial. You know, people know when they've done or haven't done something against the law. I mean, I know for a fact I've got a speeding ticket. No one is going to say have you ever gotten a speeding ticket and I'm going to say I don't remember. So that's an event that's meaningful.

Q. What about minimizing the severity of the assault? Do offenders do that?

A. Oh, absolutely. And that's one really effective way. If they say I was just joking, or it was an accident, or I thought you were into it, or it wasn't that big of a deal. Like, you know, come on, you're being oversensitive. It wasn't that big of a deal. I didn't mean anything by it.

And so what they try to do is confuse the victim and dissuade them from making a big deal about it or change their experience of it to make them feel ashamed or self-conscience or uncomfortable calling them out on behavior.

Q. And in your clinical experience when an offender minimizes a sexual assault, or maybe saying it was just a touch, or tries to emphasize how short it was, like, it was only one to two seconds, what does that tell you?

A. Well, first of all, it's an admission.

But, second of all, it tells me that they're, like, weaponizing the victim's confusion or uncertainty. Particularly, as women, we're really socialized not to be problems. And so, you know, to have to persist to insist on your experience that this was bad and this was offensive and it was really upsetting to you and have somebody keep talking you out of it is -- is -- is pretty effective in getting the victim to feel foolish about making the allegation, or having a negative response to something that they are just -- that the offender is just playing off as a joke or no big deal.

Q. Okay. Let's now talk about your second opinion.

Oh, do I have the PowerPoint? Let's see. All right. There we go.

And we're talking about how offenders exploit rideshare environments to commit sexual assault.

So just generally are there situations that are ripe for offending?

A. There are. Typically, you know, one of the things that we say is that, you know, it takes one person to commit an offense but a whole village to let them get away with it. And one of the things that allows and facilitates sexual assault is environments that are not protective and environments that don't offer enough deterrence for offenders to offend.

I mentioned the Catholic church. But in an environment where the offender has control of that environment, where they can isolate a victim, where they have easy access, where they're endorsed by somebody trusted, or endorsed by a brand or a company, that can be a really easy environment. That's why we see Boy Scouts or priests or doctors or people who are automatically trusted because of their role commit these kinds of offenses.

The environment gets even more attractive when victims are easily provided, and they're easily provided in a way that may isolate them or they have access to victims with vulnerabilities. Whether that vulnerability is just riding

at home late at night, going home to an empty house, not knowing where they are, like coming to a strange city or going to a strange place. And it even -- the reliance on the offender to provide them a safe passage somewhere, all of those things provide a very good opportunity for somebody predisposed to -- to harm another person.

Q. So all of those factors you just talked about, are those present in a rideshare environment?

A. Absolutely. Including the offender being in a place that he's comfortable in, his own car. It's -- he's got his DNA in the car. He knows how to work the child locks. He knows what's in his car and what's not in his car. And, you know, we -- offenders offend when they're more comfortable.

So one of the ways to deter them is keep them uncomfortable. Make them feel supervised. Make them feel like there are going to be big consequences. That's part of the management we do in our program, utilizing parole and probation and supervision techniques.

Q. Well, why do offenders -- well, do offenders like being associated with rideshare?

A. Well, they do.

Q. Why?

A. Well, offenders understand the rideshare environment so well they pretend to be Uber drivers or Lyft drivers to get people in their cars, so they obviously know that. But they

know that for all the reasons, and the lack of accountability.

Being a rideshare driver, a limo driver, anything like that is something we do not allow any of our -- our offender clients to participate in.

Q. And does having that stamp as a rideshare driver, does that facilitate trust among passengers or among victims?

A. Well, I think so. I think that's common sense. I mean, you know, we can say that getting in a car with a Lyft or Uber or rideshare driver is, you know, at a granular level, being in a car with a stranger. But that's not what we think when we make that. We're not getting in a car with a stranger; we're getting in a car with our driver who is, you know, on our app, and he's not a stranger to us because it's Darrell with 4.75 stars or whatever.

Somebody has endorsed that person, not -- it's not -- we're not making the choice to just randomly get in with a guy who pulls up at the curb. It's similar to choosing, you know, to ride with your sister's boyfriend's best friend because your sister says, Oh, he's a cool guy. You know, I know him. Get in the car with him. He'll take you home.

Q. All right. You mentioned earlier that you did look at some Uber documents. I'd like to point your attention to one of them now.

A. Sure.

Q. Is this document one of the root cause analyses that you saw in Uber's files?

A. Yeah. It's one of the -- really long document, I think. 2022 or '23.

Q. Okay. And it's -- it's -- can you just explain a little bit about what these factors are that are leading up to the driver sexually assaulting the rider?

A. Well, my understanding of this is that Uber did its own analysis of all the factors that contribute to sexual assault happening on the platform and identified the risk factors that they know --

MR. SMITH: I'm sorry, Dr. Valliere. I apologize. Can we take the document down for one second? I should have moved it into evidence before letting you talk about it. This is P-1528.

THE COURT: Admitted.

MR. SMITH: Thank you, Your Honor. I apologize.

(Plaintiff's Exhibit Number P-1528 was received into evidence and published.)

BY MR. SMITH:

Q. I'm sorry, Dr. Valliere. I cut you off. If you can just pick up where you left off about what these factors are that Uber identified as leading up to a sexual assault, potentially.

A. Right. So they analyzed them. And you can see in the

opportunistic scenario that I'm talking about, they marked the issue of power imbalance.

With a single rider, you know, the driver may be bigger than the rider. There's an intoxicated rider. The rider may be younger if there's an age difference. The other power and imbalance, like a male driver with a smaller woman rider. And then the guest rider who has no access to the safety tools on the app.

And then they identified environmental factors. Nights, dropoff in remote locations, weekends, as well as the physical proximity. Anything that decreases the distance between the driver and the rider, like if the rider sits in the front seat, that increases the chances, the risk of sexual assault.

Q. You mentioned the power imbalance. If a man is much bigger and much taller than a woman, is that -- does that play into the power imbalance?

A. Well, sure.

Q. Can you explain how?

A. Well, as a woman, you automatically know someone who is going to overpower you. And, you know, there is an automatic power imbalance in that they have control of how you're moving, where you're moving, whether you remain in that car or not. And so it can be very threatening to be a smaller person in a car with somebody bigger, particularly if that

person is acting unexpectedly or unpredictably.

Q. Okay. Let's talk about your third opinion, you know, the victim's respond to assault in a myriad of ways and offenders exploit that. Is that okay?

A. Sure.

Q. I'd like to start with reporting. Is there research and literature out there about how often sexual assault victims report their assaults to the police?

A. Just I think the Me Too movement showed that sexual assault is the most underreported crime to police, and offenders are very well aware of that because there's -- unless we caught them really young, all of the offenders -- the vast majority of offenders I've ever treated, have gotten away with crimes ahead of time. So in their mind they already know that victims don't go to the police.

Q. And what are some other reasons that people might not report to the police?

A. There's tons of good reasons not to go to the police. You could feel ashamed. You could feel humiliated. You may be in a place where you don't have access to resources or you don't know. Particularly in this situation, if you're traveling to a strange city, reporting to police may be practically -- just not practical for you because you're not going to fly back and forth to do reports.

But a lot of times victims feel like they will be

dismissed or disbelieved, particularly if, in their mind, they think the sexual assault was not serious or won't be taken seriously enough. If somebody has a background where they have problematic interactions with law enforcement, if they come from, you know, a community or a socioeconomic status where police aren't looked at very positively, they may not be helpful. They fear being dismissed or blamed. You know, often victims get interrogated about what they did to cause their own situation.

And so there are lots of reasons that people don't go to the police, including confusion about what happened and just not wanting to deal with it.

Q. Is it consistent with what you see clinically for a victim to fear that, you know, her personal history, like one that concludes substance use, would be used against her if she reports?

A. Absolutely. If a victim is not a quote/unquote perfect or blameless victim, their credibility is diminished. Research shows that victims with mental health disorders, substance abuse disorders, are sex workers, kids with behavioral problems, all of those are preyed on by offenders because the offender knows that their credibility is automatically compromised.

And if a victim is sexually assaulted during a time when they may be using drugs or engaged in behavior that they fear

collateral consequences for, it diminishes the chance of reporting. Like, for instance, a college student who is underage drinking and gets raped won't go to the police because they're afraid they're going to get in trouble for underage drinking. Something like that.

Q. Does Uber know about underreporting?

A. They do.

MR. SMITH: Okay. I'd like to show you an exhibit. It's P-01256. And move it into evidence, Your Honor.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-01256 was received into evidence and published.)

MR. SMITH: If I could have the PowerPoint again maybe.

BY MR. SMITH:

Q. What is this document that we're looking at on the screen now?

A. This is from a training that Uber received and provided themselves from the Arizona Coalition Against Sexual Violence. And I believe it was in 2016 they trained themselves on sexual assault.

Q. So is there any dispute between those who know what they're talking about as to whether sexual assault is underreported?

A. No.

Q. Let's talk about what this Arizona coalition training showed. It says "Barriers to reporting here." Do you see that?

A. I do.

Q. And we see "Fear of not being believed. They may worry they won't be believed and bad past experience with the police." Can you explain these two for the jury?

A. Yeah, I mentioned those. Victims often fear they won't be believed, particularly if they don't have, quote/unquote, evidence. Victims are very well aware that most sexual assault is referred to as he-said/she-said, and they know very well, as do offenders, that mostly we believe what he said. And it's particularly if the victim feels burdened by, you know, no proof except their own testimony and their own reporting.

And if they've been -- if they've had experiences where they haven't been believed in the past, that's even more salient for them, or they feel like there's something about them that will be used to discredit them as a person, it's going to be very difficult for them.

Q. We talked about the police a little bit, but what about Uber? Why wouldn't a passenger report a sexual assault to Uber?

A. They may -- they may not know they should or could. They may not know -- they may not see any benefit to it or

purpose of it. It may be difficult. They may fear not being believed or taken seriously by Uber. They may be fearful that Uber will contact the driver who obviously knows where they live, and they may be fearful of retaliation if they don't know how that process works.

They may fear alerting that perpetrator that there's a problem, which may bring their fears to light about a stranger knowing about them. There's a lot of reasons.

Q. In thinking about barriers to reporting, is a victim's anticipation or fear that her assault might be minimized another barrier to reporting?

A. Oh, sure. I mean, it's very hard to -- it's very hard to be a problem. And if you feel like you're going to be treated as a problem or accused of some kind of ulterior motive or what you went through wasn't serious enough for people to take seriously, then it's just not worth trying to put your -- yourself out there for something you feel very violated against and it's going to be dismissed.

MR. SMITH: Okay. And, Mr. Dickson, can we actually go to page 42 of this document.

If we could zoom in and make that whole section where there is text a little bit bigger so everybody can see.

BY MR. SMITH:

Q. What is this page of this document talking about, Dr. Valliere, in this training that Uber received?

A. I believe it's a guidebook on what not to do when speaking to victims who are reporting.

Q. And what are some of the things they say you shouldn't do? Let's just start up at the top.

A. Well, obviously they recognize the importance of not minimizing an assault for somebody, because if someone has overridden the barriers to reporting and call in, it's serious to them. It's serious enough for them to feel like they need to alert a company that there's a danger.

Q. And what about right down here at the bottom, the last thing it says. "There's no excuse for sexually assaulting someone." Is that something you agree with?

A. Absolutely.

Q. And that's something Uber was trained about?

A. Yes.

Q. Did you see anything in Uber's documents indicating that Uber understands that it is very normal for a sexual assault victim not to report sexual assault for years after it happened?

A. Right. That's part of -- in their training they were talking about the underreporting and that some victims don't come forward for years. Some don't come forward -- many don't come forward at all ever to any kind of public or authority figure. They may tell somebody in their life, but they don't come forward in a reporting kind of manner.

MR. SMITH: Okay. So let's maybe look at another training document. This is P-04982, and we'd offer it into evidence.

THE COURT: Admitted.

(Plaintiff's Exhibit Number P-04982 was received into evidence and published.)

BY MR. SMITH:

Q. What is this document that we see up here on the screen, Dr. Valliere?

A. This is their training manual for training the incident response team that they provided in 2020 in collaboration with RAINN.

Q. And let's go to page 24, this document. What do we see here? These are all the things we were just talking about?

A. Absolutely. It's well known that people don't report because of the things I've described: Self-blame, being confused, being responsible, and not knowing what good it will do, or if they'll be believed, or nothing will happen anyway.

Q. And then are there some notes down here -- oops. I think I went too far.

A. Yes. Yes.

Q. I just want to direct your attention to one piece, if I can see it.

MS. BROWN: Your Honor, I do have an objection. I

do have an objection to this section on traumatic events and how you react -- how a person reacts to trauma.

THE COURT: Well, how a person reacts to trauma would be admissible.

MS. BROWN: In light of the Court's rulings, Your Honor, regarding --

THE COURT: How they react. I mean, I don't see why it wouldn't be.

MS. BROWN: Understood.

THE COURT: I mean, I'll allow it subject to a motion to strike.

BY MR. SMITH:

Q. All right. This is part of the page that we were just looking at a second ago. And I just want to zoom in here at this portion here. It says -- let's see. Let's zoom in.

Is that okay for everybody?

Okay. It says, "There are a wide range of reasons people don't report their experiences with sexual assault and assault to authorities, and, oftentimes, even hide from friends and family members. Sexual assault is often not disclosed to anyone for many years. Some people may never disclose. When it happens, disclosure is often a process" -- oh, excuse me. Thank you. -- "and got a single event."

Do you see that?

A. I do.

Q. Is that consistent with what you were discussing earlier?

A. Absolutely.

Q. Okay.

And if we stay on this document and we go to page 27.

MR. SMITH: I'll still stay at the ELMO, if that's okay.

MS. BROWN: Your Honor, I do object to this page of the document, Your Honor. This was a motion *in limine* issue.

MR. SMITH: Sorry. I meant 28. I apologize, Your Honor. Thank you.

THE COURT: If the jury saw page 27, they are instructed to disregard it.

MR. SMITH: Yes.

THE COURT: Go ahead.

BY MR. SMITH:

Q. Okay. I want to talk about this section right here. It says, "There are many reasons for delayed and lack of reporting that we'll talk through, but the most important points to remember is that they're common. And if someone waits a day, a week, or a year to report, that doesn't prove an incident didn't happen. Your job is to take that delayed report as seriously as the report of someone who calls the minute after an incident occurs."

Do you see that?

A. I do.

Q. And is that consistent with what you were discussing earlier?

A. Yes. Absolutely.

Q. And Uber was trained on the fact that just because an assault isn't reported for a period of time does not mean it didn't happen, right?

A. Correct.

Q. Okay. We talked about barriers to reporting. Are there triggers for reporting?

A. Yeah. That's one of the important questions I ask, not usually in my practice. I don't ask why didn't you tell; I ask what made you tell now. And very often it could be because the victim just can't get over it so they have persistent issues with the event that they haven't gotten over.

Oftentimes it's knowledge of other victims or protection of other victims. So they may find out that other people have come forward and now they feel like, okay. Now, somebody will believe me because other people are saying it too.

They may learn or feel or gain the feeling that they're morally obligated to protect future victims, like often in a family if a sibling feels like another sibling is about to be targeted, they'll finally tell because they feel, you know,

it's really important to protect other people. They -- there may be forced disclosure or accidental disclosure where somebody else tells for them.

But those are some of the common triggers for deciding to tell.

Q. Okay. Are there -- are there things in society -- because one big question is credibility, right? Are there things in society that make people often just automatically question a victim's credibility?

A. Absolutely. I train all over with law enforcement, and the estimations I get of victims lying about sexual assault is so high, it's like, oh, it's 50 percent or whatever, which is completely untrue. They ascribe all kinds of motives to victims, they want attention, they want money, this is retaliate against the perpetrator, or their husband, it's a custody battle. So victims always carry the burden of having their credibility and their motivation to report questioned.

Q. If someone has a drug or substance addiction issue, does that make it okay to sexually assault them?

A. No. In fact, many, many victims who are -- I think I mentioned this before -- have addiction issues are sexually assaulted because they're so vulnerable. But also many victims who have been sexually assaulted develop substance abuse problems. That was part of how I became involved in the sexual assault field was I ran an outpatient substance

abuse clinic, and most of the clients that I worked with who were women had been sexually assaulted.

Q. And there's been a lot of discussion in this trial about memory and implications about what a victim should remember.

What if a victim doesn't remember every single detail about an assault or the day of the assault? What does that mean to you?

A. That doesn't mean much at all to me that they don't remember, for a variety of reasons. A very stressful event that has -- accompanied by fear or terrier or anxiety gets disorganized, and people remember what's most salient or most important to them about that day. Also, the demands on memory in this particular system are just impractical. And our memory fades for things that aren't important to us in the past.

Q. You do trainings on this topic all the time, right?

A. Right.

Q. Is there a particular exercise you run through when you're doing trainings on memory to just try to drive this point home?

A. Occasionally, yes.

Q. Can you run us through that exercise?

A. Sure. I ask people to remember, think hard about -- you know, pick a day of the week, like think hard about where you were three Thursdays ago. What did you do that day? What

did you wear? What did you drink? Who did you talk to? How many people knew what you were doing that day? Where were you? You know, how long did you spend at dinner that day? What did you have for dinner?

We can't remember any of those things, unless it's a routine. Like, oh, I know Thursday is the day of my staff meeting, so I know I was at work. I know Thursday my meeting we ended earlier.

Do you remember what you wore? Do you remember who you talked to? Do you remember who knew where you were? No.

And then when you put that in the context of a traumatic event or a very disturbing or unique event, you're not -- that's even going to be more compromised. You're going to focus on the event itself because it's an unusual event that's more salient to your memory, not part of your routine or regular behavior.

Q. Are there false reports of sexual assault?

A. Sure.

Q. And how prevalent are false reports of sexual assault?

A. It's low. It's no different than any other crime.

So by false, we mean fabricated, not unprovable. Because lots of times there's -- there's not -- there's legally barriers to prosecuting sexual assault. So we're talking about fabricated, just made up. And that's very low. It's 2 to 8 or 10 percent. It's like every other crime that

has false or fabricated allegations in them.

Q. And does Uber know this as well?

A. Yes.

Q. Was that included -- let's look at the document we were looking at earlier, which is P-1256. And go to page .00022, Mr. Dickson, please.

And down here at the bottom it says "Myth and Truth." Can you tell us about what it's saying here?

A. Well, it's -- the stereotype is that people easily fabricate allegations of sexual assault for some kind of reason, to get themselves out of trouble, get attention, get a brief on whatever. But the truth is it's very low. This is the vast minority of allegations.

Q. And in your experience in work, when you do see fabricated allegations, what are common aspects or features of those?

A. Well, they usually happen in a timely manner to get -- if somebody wants to get out of trouble, they got to lie close to the time that they're in trouble. So they're rarely delayed and they're pretty dramatic.

If you're going to make up something, you want to be believed. So you want somebody to have sympathy for you. You want to be blameless. We don't lie to make ourselves look worse or minimize something bad, so it tends to be more dramatic and align more with stereotypes about sexual

assault.

One of the false allegations I can think about is had a foster child who fabricated being raped because she was really out with her boyfriend and knew she could get kicked out of her foster home. So she said someone grabbed her on the way home from school. It fell apart pretty quick, but it fit the stereotype of the stranger danger and the drama, and, you know, everybody being afraid for her while she was missing versus knowing she was with her boyfriend.

Q. And would you expect a victim of sexual assault who is really assaulted in an Uber to use a Uber again?

A. Well, sure.

Q. Why?

A. That just doesn't make any sense. In fact, if -- if -- and psychologically if we find that somebody is unable to perform an act because something happened, like if you get bit by a dog or got in a car accident and you couldn't drive anymore, that's like a phobia. That's not functioning well. And people may have incredibly important reasons to continue to use rideshare.

Like they don't have their own car, or they don't want to engage in dangerous behavior. And sometimes what victims will do is they will engage in safety-increasing behaviors, like not ride late at night anymore, not ride alone anymore, keep somebody on Facetime the whole time. They're aware of

the danger, but they may compensate in other ways or decide not to ride in riskier situations that they feel facilitated that offender's behavior.

Q. And maybe not sit in the front seat anymore?

A. Not sit in the front seat. Maybe sit directly behind the driver. Maybe not take a water that the driver offers you. Try to pick a driver that looks less sketchy to you or is your same gender.

Q. Dr. Valliere, I appreciate your time today. One last for you.

For all the opinions that you shared with your jury today, do you hold those to a reasonable degree of certainty as an expert?

A. I do.

MR. SMITH: Thank you, Dr. Valliere. Pass the witness.

THE COURT: Cross.

MS. BROWN: Thank you, Your Honor.

May I proceed?

THE COURT: Yes.

MS. BROWN: Good morning, everyone.

CROSS-EXAMINATION

BY MS. BROWN:

Q. Good morning, Dr. Valliere. How are you?

A. Good morning. Good. Thanks.

Q. I'm Alli Brown. And I'm here on behalf of Uber, and I have some questions for you. Okay?
A. Sure.
Q. Our jury, Dr. Valliere, they are here to decide whether or not Mr. Richardson touched Ms. Mensing back in 2019.
And to be fair, you're not here to say that he did, right?
A. Or didn't.
Q. Yes, ma'am.
You are not here to say one way or another whether the allegations that Ms. Mensing has made in this case are true and are supported by the evidence, correct?
A. Right. I'm here to provide information so that your decision isn't based on inaccurate or false information about victims or perps.
Q. Sure. And we're going to talk about a little bit about some of the information you gave our jurors already.
And we are calling you "doctor," and appropriately so. But to be clear you're not a medical doctor, correct?
A. Oh, no. No.
Q. And our jury is going to hear from a psychiatrist after you. You're not a psychiatrist, right, Doctor?
A. No. I specialize way more in the evaluation and treatment of victims and offenders.
Q. And you never evaluated Ms. Mensing, the plaintiff in

this case, correct?

A. Correct.

Q. You never, for example, sat down with her and interviewed her to ask her some of the questions on the topics that you spoke to our jurors about this morning, correct?

A. Right.

Q. You've never even met her, right?

A. Right.

Q. You wouldn't know if she's out here in this audience or not, right?

A. I wouldn't.

Q. All right. Never spoke to her on the phone?

A. Nope.

Q. Never looked at her medical records, right?

A. I haven't, no.

Q. And do you know the name of the driver who has been accused of something terrible in this case?

A. I think I saw it. I can't recall it right now, but I don't know him at all.

Q. Sure. And fair to say you don't know anything about him, correct?

A. No.

Q. Nothing about his history driving with Uber or anything like that?

A. I do not.

Q. Nothing about his testimony in this case about whether or not the terrible things he's been accused of actually happened, right?

A. Not much. Just I think I know that he said he didn't remember anything.

Q. And I want to talk to you a little bit about that. As I understood your testimony, somebody who says they can't remember something that took place seven years ago, that could be consistent with somebody who committed a sexual assault. Is that your testimony?

A. It's just -- typically people know if they've engaged in violating behavior or serious behavior. I know for a fact if somebody said to me, you know, you kissed Joe seven years ago. I'd be like that did not happen. I did not kiss Joe because I've never kissed another person. If I said I don't remember, I'm acknowledging the possibility that that could have happened.

Q. Well, as it relates to Mr. Richardson's testimony in this case, that's not something you've reviewed, correct?

A. Right.

Q. And you've certainly not spoken to him to understand his side of the story, correct?

A. Absolutely I haven't interviewed him.

Q. And you're not meaning to suggest to our jurors that you

know anything about the meaning of what Mr. Richardson's testimony under oath was, correct?

A. Nope. I was just asked what -- what, if I was interviewing an offender what "I don't know" would mean to me.

Q. Because our jury has heard both from Mr. Richardson and from Ms. Mensing a lot of answers I don't know. Are you aware of that?

A. I am not.

Q. And whether somebody says I don't know or I can't remember about an event that took place back in 2019, you're not meaning to suggest one way or another that indicates that this event that is the subject of this lawsuit did or did not take place, correct?

A. Right. I'm just saying if you commit a criminal or a significant act, that should be part of your recollection unless you do it a lot.

Q. And if you didn't commit a criminal act, if instead you just drove for Uber for a couple of years in between your truck driving -- truck driving time and nothing ever happened, there wouldn't be anything to remember, right?

MR. SMITH: Objection. Improper hypothetical. Assumes facts.

THE COURT: Yeah. We don't have any evidence one way or the other concerning the driver's history.

MS. BROWN: Okay.

THE COURT: So that question is improper.

MS. BROWN: Okay.

THE COURT: And the objection is sustained.

BY MS. BROWN:

Q. If somebody was accused of doing something they didn't do and they answered I don't remember, that could be consistent with not having done anything, correct?

A. That's a complicated question. I don't find that highly consistent with -- with something -- if you know you did not do something or you're not -- that is just not in your behavior or repertoire, you would say you did not do it.

Q. Let's talk a little bit about -- to be clear, you're not going to offer any opinions about Ms. Mensing or Mr. Richardson at all, correct?

A. No.

Q. And the truth is, Doctor, that's a little bit intentional, right?

A. That I did not?

Q. Yes, ma'am.

A. Oh, yeah.

THE COURT: Well, well, wait a minute. Wait a minute. I'm sorry.

It's intentional? I don't know what you mean by that. Do you want to clarify that?

MS. BROWN: Sure.

BY MS. BROWN:

Q. You actually recommend that in order to have a successful case, folks like these lawyers putting on experts like you, they shouldn't give experts like you case-specific information, right?

A. When the purpose is to provide the jury information and education, not knowing anything about the case can be very useful because it doesn't look like an expert is trying to bolster or be on the victim's side. If I were to provide a personal evaluation of a victim, I would need to. It depends on the referral issue. So I would never testify blind about a particular person if I've never evaluated them.

Q. Well, ma'am, one of the things you did is you wrote a book -- we saw -- I think one of your slides had all of your books -- or a couple of your books on it. Do you remember that?

A. Right.

Q. And this is one of them, right?

A. Yes.

Q. "Successful Prosecution of Inmate Violence," right?

A. "Intimate Violence."

Q. "Intimate Violence." I apologize.

And you wrote it with a lawyer. And it provides some tips about how to try a case, right?

A. Right.
Q. And it includes some advice for lawyers about how to put on a case, including how to present an expert witness like yourself, right?
A. In the criminal case where victim behavior is being used by the defense to discredit the victim or something, providing this kind of education is really important. And then it just provides foundational information for the jury that is not victim specific.
Q. And my question was a little bit different. My question was your book includes some advice for lawyers about how to put on a case, including how to present, or put before a jury, an expert witness like yourself, correct?
A. Right. I thought I addressed your question.
Q. All right. And in this book with tips for lawyers, one of the things you talk about is the human lie detector objection to an expert like yourself, correct?
A. I don't remember that. That could be what the lawyer wrote.
Q. Okay.
A. She wrote parts of the book. But an expert should never ever comment on a victim's credibility or be a human lie detector.
Q. Right. And one of the things your book given tips to lawyers for successfully prosecuting a case talks about is

that the way that you can avoid an expert like yourself being accused of being biased is to not look at any case specific information, right?

A. Right. And it's not just an accusation about being biased; it's to provide objective information that isn't geared towards particular support in one way.

Q. And so that's -- you sort of put that tip to work here, and you haven't, in this case, looked at any case-specific information about Ms. Mensing or Mr. Richardson, correct?

A. Right. That wasn't what I was tasked to do, make an opinion on this case. My task here was to provide education.

Q. And you spoke a little bit, Doctor, about credibility issues. And you would agree the fact of the matter of is, is that our jurors are going to determine the credibility of each witness that has come before them in this case, correct?

A. I hope so, yes. That's the jury's job.

Q. Correct. And you understand, because you've testified before, that the Court will actually instruct our jurors on different factors that they should consider when evaluating the credibility of witnesses who have come before them in this trial. Do you understand that?

A. I assume so, yes.

Q. And some of those factors are some things that you spoke to our jurors about today. And so you weren't meaning to suggest, Dr. Valliere, that it's not important for our

jurors, when evaluating the credibility of witnesses who have come before them, to consider the witness's memory. You didn't mean to suggest that?
A. No. They just need to keep in mind how memory works and not have unrealistic expectations.
Q. And you didn't mean to suggest, for example, that our jurors, when evaluating the credibility of people who have come before them, shouldn't consider a witness's bias or potential prejudice, right?
A. Sure.
Q. And one of the ways someone can be biased is if they have an interest in the outcome of a lawsuit, right?
A. I guess if they alter their truth or their testimony to push for a particular outcome.
Q. Sure. You understand that this is a civil case. It's a lawsuit for money, correct?
A. Correct.
Q. And one of the biases our jurors will have to evaluate is whether somebody with an interest, a financial interest in this case, has a bias, right?
A. Unfortunately, the court system is set up on bias, like you -- obviously the defense has a bias, the plaintiff has a bias. So they have to take all of that into account.
Q. Sure. And you weren't meaning to suggest that it wouldn't be important for our jurors when evaluating the

credibility of the witnesses who have come been them that they shouldn't evaluate things about whether other evidence contradicts some of the testimony that they've received from that very witness stand where you are now, right?

A. Sure.

Q. That's important in evaluating credibility, right?

A. If it's relevant contradiction, sure.

Q. And another thing that's important is the reasonableness of witnesses's testimony in light of all of the evidence, right?

A. Yes.

Q. And you weren't meaning to suggest, by pointing out things about memory and reporting, that our jurors shouldn't follow the Court's instruction on what is important to evaluate when determination a witness's credibility, correct?

A. Oh, absolutely not. That evaluation just needs proper information to evaluate it.

Q. Okay. Now, one of the things you were speaking about, Doctor, you were given general information, as I understand it, about myths that people might have about victims of sexual assault should or should not behave, correct?

A. I was giving or was given?

Q. You were providing our jurors with some information about that, right?

A. Yes.

Q. And as I understand the gist of your testimony is essentially there's no one way somebody who has been a victim of sexual assault will act, correct?

A. No. You can't tell if somebody has been abused based on some expectation that real victims act a certain way.

Q. Right. For example, someone shouldn't assume that if you delay reporting you haven't actually been assaulted, correct?

A. Yes.

Q. Okay. But it's also true that if somebody delayed reporting, it could be the case that the event didn't happen, correct?

A. So they wait -- I'm just -- this question always kind of confuses me because it implies that somebody waits a long time to lie or starts to lie a long time ago and then sets up evidence a long time ago and comes forward and tells a lie. So that's what delayed disclosure would imply for a false allegation.

Q. A false accuser may make a delayed complaint, correct?

A. They may.

Q. And a truthful accuser may make a delayed complaint, correct?

A. Right.

Q. That can happen on the side of somebody's telling the truth, and it can happen on the side of somebody is falsely

making an allegation, correct?
A. True. It's much more common for people to delay true allegations than to decide to wait a long time to lie.
Q. Somebody can make a report only in the context of a lawsuit and be telling the truth, correct?
A. Sure.
Q. And somebody can also make a report only in the context of a lawsuit and not be telling the truth?
A. It's possible.
Q. And I noticed you gave some statistics to our jurors about the percentage of false reports of sexual assault, correct?
A. Right.
Q. And those statistics relate to reports to the police or the authorities, correct?
A. I believe so. I think that's the research, is to police and law enforcement.
Q. Right. When you're talking about underreporting or false reporting, the statistics that you gave, that's all in the context to reporting to law enforcement, correct?
A. I can't say every single study is, but for the most part that's how we get those stats.
Q. Well, what you have not done, Doctor, is an evaluation of the number of false reports that take place only in the context of lawsuits, correct?

A. Right.
Q. So you don't know, for example, how many people who only make a report in the context like this are not telling the truth, right?
A. I do not.
Q. You talked a little bit about memory and how your memory might not be perfect if you are the victim of sexual assault, correct?
A. Our memories aren't perfect at all.
Q. That's right.
A. Right.
Q. And so someone who is telling the truth and did experience a terrible sexual assault, they may not remember everything perfectly, correct?
A. Right.
Q. But the same is true for somebody who is not telling the truth and who is making an allegation that is not supported by the truth. That person might be evidencing a memory that is faulty, correct?
A. Typically, when people fabricate something, they want it to be entirely consistent, entirely scripted because their goal is to be believed. And so if it's a very sophisticated lie, a good interviewer may be able to break that down. But typically you don't find these significant inconsistencies in a script.

Q. Well, and one of the things you testified to, though, in the Cosby trial is just that there's no -- it is impossible to know based on behavior whether somebody was, in fact, sexually assaulted or not, correct?

A. Right. People can act completely normal the next day. They can fall apart. And so what you need to look for is just consistency in the person's internal and external state. If they say they're afraid and you noticed that they can't eat their breakfast, or they have diarrhea, or they are checking all of their locks, those behaviors are consistent to that reported state.

THE COURT: Can I ask. Counsel, I don't want to interrupt you. We've been going about an hour and 15 minutes. I thought I'd take a jury break at this time.

MS. BROWN: Absolutely. Perfect timing.

THE COURT: Ladies and gentlemen, we're going to take our recess now. We'll be in recess for 15 minutes.

Remember the admonition given to you. Don't discuss the case, allow anyone to discuss it with you, form or express any opinion. See you back here in the courtroom.

(The jury exited the courtroom.)

(The proceedings were recessed at 10:30 a.m. and reconvened at 10:44 a.m.)

(The jury entered the courtroom.)

THE COURT: Please be seated.

Let the record reflect the jurors are present, the parties are present.

You may continue.

MS. BROWN: Thank you very much. Welcome back, everyone.

BY MS. BROWN:

Q. Welcome back, Doctor. I don't have too much more. Just a little bit longer.

I want to wrap up some of the factors you spoke to the jury about that we were talking about. One was memory, as you recall. Correct?

A. Right.

Q. And as we talked about, you could have poor memory and be making a truthful report, and you can have full -- poor memory and be making a false report, correct?

A. I suppose so.

Q. Could be true for both sides, correct?

A. I suppose it can.

Q. And that's true also for the timing of the report. You could be truthful and have a delayed report, or you could be truthful and you can be making a false accusation and have a delayed report as well?

A. It's possible.

Q. Same with an immediate report. You make an immediate report, you could be telling the truth. You make an

immediate report, you could be making a false report, correct?
A. Yes, it's possible.
Q. And you have some experience with false reports, correct?
A. I do.
Q. You have evaluated cases in which people have made allegations that were not truthful, correct?
A. Right.
Q. And those actually were allegations that were made to the authorities or law enforcement or other authorities; is that right?
A. Typically, mandated reporter situations where it might be investigated by child protection.
Q. You've never evaluated or studied false reports that are made in the context of a lawsuit, correct?
A. Correct.
MR. SMITH: Asked and answered, Your Honor.
THE COURT: I'll allow it.
Go ahead.
MS. BROWN: Thank you.
BY MS. BROWN:
Q. A false accuser may be very detailed and specific about the allegations, correct?
A. Sure.

Q. They may also be vague, correct?
A. That's not a very effective way to lie in a litigation situation, but I guess they could.
Q. Sure. And they could provide facts and then change them up -- a false accuser can provide facts and then change them up as they figure out things are wrong, correct?
A. I guess.
Q. And a false accuser can completely change the facts and come up with another story, weeks or months or years later, correct?
A. Anything's possible.
Q. Sure. It is -- in terms of possibilities, it's impossible to know based on factors like the time of reporting, memory, or continued use, for example, of Uber, it's impossible to know based on those factors alone whether somebody is telling the truth or not, correct?
A. Well, all of that information will come in a context, which will guide the possibility of knowing.
Q. Sure. And that's really the job of our jurors, to take that -- all information together, sift through it, and figure out what is the most credible, and what makes the most sense, right?
A. Right. And the most sense would be in the context of what the person says in their individual context.
Q. I don't know what you mean by that.

A. Well, it may not make sense in a vacuum to say well, you should never use an Uber again. But if somebody explains, I don't have a license. I can't afford a car. I have to use an Uber to get to work. In that individual's context, these things make sense.

So these things discreetly all alone in and of themselves cannot determine whether something happened or didn't happen.

Q. You got to look at the facts, right?

A. You got to look at the whole picture.

Q. And if the facts show that you continued to take Ubers in the middle of the night to nonessential places, those are facts our jurors have to consider, correct?

A. Sure. That meaning would be determined by the person telling you why they did that.

Q. Sure I want to talk to you a little bit about -- you showed some Uber documents about Uber being trained on how to respond to reports of potential sexual assault, correct?

A. Right.

Q. And that training had to do with folks who report to Uber or report to law enforcement, correct?

A. My understanding is report to Uber, right.

Q. Um-hum. And that training did not include what Uber should or should not do when it receives a lawsuit against it, correct?

A. Not to my knowledge.

Q. And you don't have any issue with a company or a person or anybody defending themselves in a lawsuit against allegations they don't believe to be true, right?

A. Obviously.

Q. Okay. One of the things you talked about is offenders and how they try essentially to commit a crime in a way they won't get caught, correct?

A. True.

Q. And so what that means is they try to get their victim to a spot where no one is going to see what they're about to do, correct?

A. It depends.

Q. Sure.

A. I mean --

Q. The idea is if you're going to commit a terrible crime, like sexual assault, you want to try to do it in a way that no one is going to find out, as I understand your testimony, correct?

A. Right. They want to get away with it.

Q. Sure. And so trying to get away with it would include committing a crime where other people are not around or where you don't think anyone is going to see or know that you are there, correct?

A. Not necessarily. Or that the abuse can be camouflaged

or explained away. I mean, sexual assault happens in frat parties. It happens in all kinds of places, so --

Q. You spoke a little bit about substance abuse, and you have some experience in that area, correct?

A. I do.

Q. One of the things that can cause lapses or distortions in someone's memory is a significant history of substance abuse, correct?

A. For the time that they're intoxicated. Substance abuse, unless there's accompanied by head injuries or other things, the effect of substance abuse on memory can't be determined unless you do significant testing and things like that. But substance abuse does not affect memory when you're not intoxicated; it affects it when you're intoxicated.

Q. You haven't reviewed Ms. Mensing's medical records to see whether or not her treating physicians believed she suffered from any memory impairment, correct?

MR. SMITH: Objection, Your Honor. Hearsay.

THE COURT: I'll allow it. Cross.

THE WITNESS: I haven't looked at any medical records.

MS. BROWN: I want to ask you some questions. Can I trouble you for the microphone? I'm going to go to the ELMO, if that's okay, your Honor. Would that be okay?

THE COURT: Sure. Of course.

THE COURTROOM DEPUTY CLERK: Thank you.
MS. BROWN: Yeah. Thank you.
And may I have the ELMO, please. Thank you.
BY MS. BROWN:
Q. I want to ask you a question about an Uber document that you showed our jury. Do you remember showing this document, Dr. Valliere?
A. I do.
Q. Okay. And this came from an Uber presentation that you reviewed before coming in here to talk to our jury, correct?
A. Right. A pretty long document.
Q. It's really long, right? Like 500 pages, correct?
A. Yeah, something like that.
Q. And you reviewed and analyzed the whole thing before coming in here to talk about it and putting it in your slide deck, right?
A. I didn't analyze the whole entire document, no.
Q. Did you pick this page out or did the lawyers?
A. We picked it out to represent and capture my -- some elements of my testimony.
Q. And certainly before doing that, you felt comfortable with the information that's contained on this slide, right?
A. With the factor analysis in terms of the opportunistic scenario, right.
Q. And one of the things that you have on this slide here

is the issue of riders and drivers who have duplicate accounts or multiple accounts, correct?

A. Right.

Q. And you know from looking at this document and this very voluminous PowerPoint deck that drivers or riders who have duplicate or multiple accounts are an indicia or a sign of fraudulent activity, correct?

MR. SMITH: Objection, Your Honor. There's no evidence in this case that there's a duplicate or fraudulent account at the time of the incident.

THE COURT: Yeah. Sustained.

And the jury is instructed to disregard the questions.

BY MS. BROWN:

Q. Going back --

THE COURT: There's no evidence in this case in which that type of issue has been raised.

MS. BROWN: Your Honor --

THE COURT: Wait. I want to caution the jury.

So it's important that you do disregard that. And we'll continue. And if you want to be heard on that subject, we will do so outside the presence of the jury.

MS. BROWN: Thank you, Your Honor.

THE COURT: Go on to a different subject.

MS. BROWN: Can I conclude the question on these

two boxes on the document she's shown?

THE COURT: I don't know which question -- what you're pointing to.

MS. BROWN: These two boxes.

THE COURT: Which one? Intoxicated driver.

MS. BROWN: Multiple devices.

THE COURT: No. I actually think that that's inappropriate. There's no evidence in this case based upon that, and I'm going to instruct you not to.

MS. BROWN: Thank you, Your Honor.

THE COURT: Follow that.

BY MS. BROWN:

Q. Did you -- you looked at all of the information contained in this document, correct, as it relates to this slide?

A. Yes.

Q. Okay. And, finally, then, Dr. Valliere, you went through a number of different factors. We talked a bit about credibility. We talked about the fact that you don't know anything about Ms. Mensing.

You would agree, finally, that when it comes to the credibility of the evidence and the witnesses that came before our jurors, that's a decision that our jury is going to make, correct?

A. Absolutely.

MS. BROWN: All right. Thanks very much.

THE COURT: Thank you. Anything further?

REDIRECT EXAMINATION

BY MR. SMITH:

Q. Hi, Dr. Valliere. I just have a few questions to wrap up.

Hey, everyone.

You were asked some questions from Ms. Brown about whether you conducted an evaluation of the plaintiff in this case. And Ms. Brown, you know, said in her opening statement, and I think she was implying with you here on the stand, that you were kept in the dark about the plaintiff.

But I just want to make some things really clear. We didn't ask you to render specific opinions about Ms. Mensing and her memory and any at that, right?

A. Nope, not at all.

Q. If we asked you before we came in here and said, Dr. Valliere, I want you to evaluate whether or not Ms. Mensing was telling the truth, what would you have said to us?

MS. BROWN: Objection, Your Honor.

THE COURT: I'll allow it.

THE WITNESS: That it would be unethical for me to do that. That's not my role.

BY MR. SMITH:

Q. Why would it be unethical for you to do that?

A. Because my job as an evaluator would be to listen to the person, ask the right questions, analyze what they were presenting me, and see if it's consistent with any diagnostic issues, any experiential issues, and to capture their psychological state and experience and help them to articulate that.

Q. Okay. Is there anything out there that you asked us for, documents, or any information that you needed for your opinions that we didn't give you?

A. No.

Q. Okay. And a lot of the things that you talked about with the jury, are they reflected in the documents that are in Uber's files?

A. Many of the things, yes.

Q. Like barriers to reporting?

A. Barriers to reporting, delay of disclosure, the level of false allegations. In fact, they know a lot about how offenders utilize their rideshare environment as evidenced by the documents. So they know the insensitive things to say. They know the things that society does to victims, as well as offenders do to victims. And they know the -- the elements and factors that exacerbate risk of sexual assault in a rideshare environment.

Q. You were asked some questions about a book you wrote on prosecuting offenders of intimate violence.
A. Right.
Q. Can you tell us about that book? Why did you write that book? Why was it important? What were you trying to do with that book?
A. One of the things that happens in prosecuting intimate violence is there are these jury misinformations. There are these societal misunderstandings of how offenders operate. Very often offenders have such a profound influence over their victim they can keep them from participating in prosecuting very serious crimes, like in domestic violence.
And so part of that was to assist prosecutors and not solely relying on the victim and the victim's testimony alone, but finding ways to corroborate or to educate the jury, or to investigate that help -- help the burden or the weight of the entire case be solely on the victim's participation, to be a team and working in that prosecution.
Q. And you wrote that book with a lawyer; is that right?
A. I did.
Q. Why was that important? Why did you need to write the book with a lawyer?
A. Well, I'm not a lawyer. So I wrote all the stuff about victim behavior, victim response, interviewing victims without traumatizing them, areas to investigate with

offenders. And she wrote the courtroom tips, the 404(b), all the numbers and lawyer bingo that go on for statutes and stuff.

Q. Perfect.

I saw Ms. Brown indicating towards me, that you give lawyers the book. I saw she had a copy of it. Is the book a secret?

A. No. It's for sale on Amazon. So I appreciate defense attorneys at this point.

Q. And then we talked a little bit about reporting and this idea that there's delayed reporting and not delayed reporting.

Are public reports or reports to the police, are those the only reports that count?

A. Oh, no. Very often victims disclose in what we call an informal way to non-authority figures -- moms, sisters, cousins, friends, lovers. So all of those matter as well. And they are one of the things we talk about in that book is, you know, they serve as corroboration.

Q. So when a victim reports their assault to their family and friends, the ones they trust, is it accurate to describe that assault as being not reported?

A. It's accurate to describe that report as being not reported to authorities.

Q. Okay. I would like to ask you about -- you were asked

about if you looked into Mr. Richardson and you reviewed anything about him.

In your clinical -- and you didn't, right? You didn't review anything about Mr. Richardson?

A. I did, no.

Q. But in your clinical experience, and in writing this book about prosecuting sexual offenses, have you noticed anything about the scrutiny that is placed on victims of sexual assault versus the scrutiny that is placed on the offenders of sexual assault, their histories?

A. Well, that's one of the things that we -- we talk about keeping in mind is victims can be interviewed over and over and over, which may naturally produce minor inconsistencies or failures of memory that get captured, versus the offender who may never, never, ever, ever, ever be interviewed because they can just say, no, I want a lawyer. And so nothing about them or their version of events or anything may ever get presented.

MR. SMITH: Thank you. No further questions.

MS. BROWN: No questions for me. Thank you.

THE COURT: Thank you, Doctor. I appreciate.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused. Call your next witness.

May I -- I want to do is talk to the lawyers

outside the presence of the jury. The jury can stay here. We'll all go outside here. And the jury can talk.

I want to talk the lawyers off the record.

(Discussion held off the record with the Court and counsel.)

MS. BROWN: Permission to take the stand, Your Honor?

THE COURT: Yeah, we're ready to proceed with your witness. Yeah.

MS. BROWN: Terrific, Your Honor.

Uber would call Dr. Alison Reminick to the stand.

Your Honor, would the Court like a copy of the PowerPoint?

THE COURT: Yes, that would be useful. I may have it.

MS. BROWN: I don't know if you do.

ALISON REMINICK, DEFENDANTS' WITNESS, SWORN

THE COURT: Please state your full name for the record, and spell your last name.

THE WITNESS: My name is Alison Reminick. Last name is R-E-M-I-N-I-C-K.

THE COURT: You may proceed.

MS. BROWN: Thank you very much, Your Honor.

DIRECT EXAMINATION

BY MS. BROWN:
Q. And my understanding, we're just going do a little bit of your testimony before we take a break, with qualifications and sort of what you did and what you're here to talk to our jury about. Okay?
So can we start, Dr. Reminick, will you tell them who you are and where you're from?
A. Yeah. I'm Dr. Alison Reminick. I'm from California. I am a board-certified psychiatrist. I've been doing this for about two decades. I'm currently the director of Women's Reproductive Mental Health at UCSD, University of California, San Diego.
Q. Excellent. I want to talk a little bit about your education and training. But before we do that, are you prepared to talk to our jurors about the plaintiff, Ms. Brianna Mensing, today?
A. Yes, I am.
Q. Did you have the opportunity to review many of her medical records?
A. Yes, I did. Extensive.
Q. Did you have the opportunity to review her sworn testimony under oath on a number of different dates?
A. I did.
Q. Did you have the opportunity to review Dr. Jenny Smith, her treating psychiatrist's, testimony?

A. I did.
Q. What about some of her friends or family members that our jurors have heard from, Ariel Watkins Lankford, for example. Did you read that one?
A. I did.
Q. Okay. And did you have the opportunity to meet with and evaluate Ms. Mensing?
A. I did.
Q. All right. And are you prepared to talk about those things today?
A. Yes, I am.
Q. All right. If we could go to the PowerPoint. Did we work together and put together some slides --
A. Yeah.
Q. -- so you could talk to our jury?
A. Yes.
Q. Okay. Tell us a little bit, if you would, about the education and training that went into becoming a psychiatrist?
A. Sure. It's a long road, but I did four years of undergraduate at Tufts University. I was -- got my bachelor's in science in biopsychology. And then I took some time to do research at Mass. General Hospital in their psychiatry program with women. It was also a perinatal psychiatry program. We did research. I did that for three

years.

Then I went to the Boston University School of Medicine for four years. And I did my internship at Mass. General Hospital in medicine.

And then after that, I went to do three years of psychiatry residency of UCLA, University of California, Los Angeles.

Q. Where are you originally from?

A. I'm from New York.

Q. And you're in California now?

A. Now I'm in San Diego.

Q. Okay. Tell us a little bit about board certifications and licenses. Are these things you need to be a practicing psychiatrist? Do you have them?

A. I do, yeah.

Q. Okay.

A. And you need them. And so it's basically a test that you take every 10 years. And you have to do a lot of maintenance of educations over the course of a year, three years, they kind of review it. And I'm licensed in California only now as a psychiatrist.

Q. Okay. We listed here that you're a member of the American Psychiatric Association. What is that, Doctor?

A. So it's just a group of psychiatrists that really kind of get involved in education and policy, and they put out

like a lot of guidelines for evidence-based practices in psychiatry.

Q. Okay. Let's talk a little bit about your current practice and clinical experience. Tell us about that and sort of what a typical day is like for you.

A. Sure. Yeah. So after -- after I graduated residency at University of California, Los Angeles, I was recruited by Rush University Medical Center. And I was the director -- I started the Women's Reproductive Mental Health program there. And it's still going. So I did that for three years. I was also the director of outpatient psychiatry services there.

And then for the past 11 years, so since July of 2015, I have been the director at University of California, San Diego, their Women's Reproductive Mental Health program. So on a daily basis, we see almost exclusively women during different points in their life where they're seeking psychiatric care.

And so I teach residents on Tuesdays and Wednesday afternoons. We see a lot of patients during that time period. And I've been doing that for 11 years. It's about like two or 3,000 patients I'll see per year, individual patients. All women.

Q. And do you see those folks in person? Do you do any of these visit online? How does that work?

A. So before COVID, it was always exclusively in person.

Since COVID some of our patients, especially those who are pregnant, postpartum with baby, want to do it over a video. So we have a lot more telehealth visits as well.

Q. Do any of your patients suffer from substance abuse addiction issues?

A. Many.

Q. And do you have experience treating them and following them and understanding the symptoms that coincide with substance abuse?

A. I do.

Q. Okay. What about sexual abuse? Have you treated any patients who have suffered from sexual assault, sexual misconduct, sexual abuse?

A. Yes, unfortunately. It's about treating women, and many women have suffered from sexual assault. About 50 percent of women.

Q. We spoke a little bit, Dr. Reminick, about some of the things you did in this case. And let's talk a little bit about that.

Did you review Ms. Mensing's medical records?

A. I did. All of them.

Q. Would you consider there to have been a lot available for your review?

A. Not as much as I would have expected, but there was certainly enough that it took hours and hours to review all

of it.
Q. And did the medical records you were able to access and review, did they span multiple years?
A. They did.
Q. Okay. We spoke a little bit about testimony. You read and reviewed and analyzed all of the depositions of folks in this case, correct?
A. I did.
Q. And then just tell us a little bit about the format of the clinical evaluation of Ms. Mensing that you conducted?
A. Yeah, of course. It was -- so I was asked to do an independent medical evaluation of Ms. Mensing. I went into it like I would with any patient. So I reviewed whatever medical records I had. I was allotted three hours to interview her, and we took breaks, but really kind of just dove into her background. So we call it her like social history. Got a sense of where she was born, raised, any issues with growing up.

We went into substance abuse history. We talked about psychiatric history. We talked about medical events. And so it kind of expand -- we went through her entire lifespan of medical events and anything that was salient.
Q. Did you also have the opportunity to ask her some questions about the Uber ride that's the subject of this lawsuit?

A. Yes, of course I did. Yeah.
Q. Okay. And you mentioned you sort of used or approached this interview or this evaluation in the same way you would with a patient you were seeing outside of a lawsuit, correct?
A. Yes. Exactly the same way.
Q. Is a large part of your time spent testifying in lawsuits?
A. No. This is my first time in front of a jury, so. I've been an expert witness two other times outside of this, but this is my first time in front of a jury.
Q. The majority of your time is spent treating patients, correct?
A. Yes. The majority of my time.
Q. We're compensating you for your time; is that correct?
A. Yes.
Q. And what is your hourly rate, Dr. Reminick?
A. It's 600 an hour, but that's also what I charge my patients in private practice. I have a small private practice.
Q. Okay. And so you charge us for your work in this case the same you would charge a patient who came to see you in our own practice; is that correct?
A. Yes, yes.
MS. BROWN: And, your Honor, would it make sense to just review the summary of the opinions before we break, or

do you want to break right now?

THE COURT: No. Let's break now.

MS. BROWN: Okay.

THE COURT: So, ladies and gentlemen, we are going to take a recess now. We have some issues to go over.

In terms of scheduling, I think you are going to be -- there's some delivery of food. I would suggest that you eat it during this recess because it's our intention not to take a luncheon break but to go through the testimony because at that point, at the end, at the conclusion of the testimony, you'll be discharged for the day.

So I think you would rather -- I don't know what you'd rather do. But I think it makes some sense to bring a conclusion to the testimony and then liberate you so that you may follow whatever pursuits you have. And then we'll talk about where we are in the case.

But right now, remember the admonition given to you. Don't discuss the case, allow anyone to discuss it with you, form or express any opinion. And I'll see you back here a bit later. And have a nice snack.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated. Let the record reflect the jurors have retired.

For the record, at the conclusion of the -- at the conclusion of the plaintiff's case, the defense moved

pursuant to Rule 50 -- 50? 52?

MS. BROWN: 54?

MR. WYATT: 50.

THE COURT: -- for judgment, which is denied.

So let's now move to Dr. Reminick.

MR. WYATT: Sorry, Your Honor. Can I state the reasons. I can do it after this if you prefer.

THE COURT: Sure. Go right ahead.

MR. WYATT: First of all, Your Honor, I appreciate the opportunity.

We renew our arguments on the common carrier issues, including that Uber is not a carrier, is not a common carrier, and even if it were, there would be no non-delegable duties absent a showing that the driver wasn't an employee of Uber. There has been no evidence presented at trial that changes our arguments or effects the force of our arguments under our prior submission. So we renew those.

We also renew our arguments with respect to causation and damages that in a case like this one with a complex mental health history, you would need expert testimony in order for the jury to parse the claimed emotional distress or other mental injuries alleged in this case from the preexisting conditions in order to establish that.

And then the final argument, Your Honor, is that

even absent expert testimony, there's not sufficient evidence to support a finding of actual damages in this case. The plaintiff's therapists indicated through her testimony that the plaintiff had never raised this issue in their sessions, and that she attributed her symptoms to other situations in her life. And that the plaintiff herself testified on the stand twice that she's not seeking money damages in this case.

THE COURT: Okay. Thank you.

MR. WYATT: Thank you, Your Honor.

THE COURT: Okay. So let's move on to Dr. Reminick.

MR. BOUNDAS: Your Honor, we have some issues to bring up with respect to Dr. Reminick's testimony and her slides.

Ms. Brown, would you happen to have the full-size slides?

MS. BROWN: I gave -- do we have a third. Did you make three? I think so.

MR. BOUNDAS: Okay. Thank you for doing that.

THE COURT: I mean, I have two copies. I can give you one of mine.

MR. BOUNDAS: If you have a full-size. What I got were two to a page.

No, I don't need them.

MS. BROWN: I gave them to the Court earlier.

THE COURT: I have them. But I assume, Ms. Brown, that what I have in front of me, what you handed me, is what you intend to use with this witness.

MS. BROWN: Yes, sir.

THE COURT: Do you have that complete copy?

Counsel, do you have that complete copy?

MR. BOUNDAS: I do have a complete copy. I want to make sure that you have a big enough to read because the ones I have are two to a page. Okay.

Okay. So I'm trying to get to --

So the objection we have, Your Honor, is if we go to page 8 -- It's Slide 16. I have it differently.

THE COURT: It's not on my page 8.

MS. BROWN: I think --

MR. BOUNDAS: No. It's Slide 16.

MS. BROWN: John, I think you should use this copy so it matches.

MR. BOUNDAS: Oh, do we have different numbers?

THE COURT: What I'm now looking -- for the ease of the Court if you simply refer to the number that is on the bottom left-hand side.

MR. BOUNDAS: I will do that, Your Honor. I didn't have this. And I apologize for wasting your time.

THE COURT: Okay. So now we're looking at what

page, bottom left-hand side?

MR. BOUNDAS: I'm trying to get to --

THE COURT: Take your time. We have plenty of time.

MR. BOUNDAS: I understand. I'm just trying to -- actually eliminated some objections if it's makes Ms. Brown feel any better.

MS. BROWN: It does. Thank you.

THE COURT: It makes her feel a lot better.

MS. BROWN: A lot better. So much better.

MR. BOUNDAS: Your Honor, we have one just kind of an overarching objection I'd like to make on the record and also hopefully persuade you.

So we cited -- well, we specifically had a motion *in limine* on Dr. Reminick's testimony specifically relating to her ability to testify as to the credibility of our plaintiff, of Ms. Mensing. And the Court granted that motion *in limine*, disallowing her to testify as to credibility.

In that motion we cited Fourth Circuit cases that were very clear. We cited *U.S. v. Cecil*, 836 F.2d, 1431 from 1995. It says the authorities are uniformed that a psychiatrist may not testify as to the credibility of a witness. That issue is one for the jury.

We cited *U.S. v. Dorsey*, another Fourth Circuit case, 1995. The evaluation of the credibility of a witness

is in the exclusive province of the jury.

So in the Fourth Circuit, psychiatrists are not allowed to testify on the credibility of any witness, let alone the plaintiff, in the case.

The Court already granted our motion *in limine* on this issue. It appears to me that in large -- well, at least in part, that's what Reminick -- Dr. Reminick is intending to do.

I understand she's going to go through Plaintiff's drug and alcohol history, and you allowed that. But the issue about her saying that, you know, she was dishonest to this medical provider or she didn't tell the truth here, there, that's classic credibility testimony.

THE COURT: Well, I thought that what was being offered -- and you correct me, Ms. Brown, if I'm wrong -- were statements in which Plaintiff said that she wasn't being truthful.

MS. BROWN: Correct, Your Honor.

THE COURT: So I don't think that that's an opinion of the -- of the psychiatrist; it's an admission of the witness that she gave untrue -- that she gave untrue statements. That can come in, but it can't come in the context, therefore, you shouldn't believe her.

MS. BROWN: Of course.

THE COURT: I mean, that's -- anything that borders

on whether this witness is credible is inadmissible. The question is whether she did in the past say things which were false. That comes in.

MS. BROWN: Thank you.

THE COURT: And it's limited to that.

MR. BOUNDAS: Okay, Your Honor. Just to --

THE COURT: Go ahead.

MR. BOUNDAS: To close the loop on the record there. If that's the case, that is not the subject of expert testimony. There's not -- a psychiatrist is not -- there's no expert opinion --

THE COURT: That's right.

MR. BOUNDAS: -- that the medical record says X, Y, or Z.

THE COURT: I think that's correct.

But she can be called as any witness. She's called as an expert, I understand. But -- and there may be things that may be an expert can read and so forth understanding a context, but it's not the subject of expert testimony. So --

MR. BOUNDAS: But it's coming in anyway? I just want to --

THE COURT: Well, I'll do some more thinking about it.

MR. BOUNDAS: Okay. And that's the argument.

THE COURT: Actually, we know what happened was

basically this witness was proffered on, essentially, the subject of damages. That is to say given the history of the abuse, alcohol abuse and other issues in her past, can she then -- what then could one say from an expert's point of view as to the scope of damages. I think that's -- that's how it arose.

Then the plaintiff said that they were limiting their damage claim to a finite period of time, basically the 24 hours in which the incident allegedly occurred, and that they are not seeking any damages post that 24-hour period.

So that's -- that's how this --

MR. BOUNDAS: Evolved.

THE COURT: That's how it -- it then evolved. I don't know when that actually occurred. I think perhaps a week before the trial. Is that some reasonable proximity?

MR. BOUNDAS: Sure. It was at pretrial.

THE COURT: So I haven't given it a lot of thought. And I didn't want to, in a sense, basically exclude the defense expert, if the defense expert can give relevant testimony.

Now, the fact that she's an expert and it can be given by another person, I'm certainly going to still allow it because it just seems unfair coming on the eve of trial to suddenly say, well, we're not interested in that, and then they're sitting there flatfooted because they don't, in a

sense, because they don't have a witness lined up to testify that which a witness could testify to based upon that witness's observations of the records.

Anyway, that sort of outlines the history a little bit, the context. So in the event that there is an appeal, an appellate court can take a look at the context in which this comes up, because I think it's unusual in some senses.

But your overall objection, though, is entirely appropriate. That is to say what she's going to testify to, maybe what others can testify to, I don't know. I haven't heard her testimony yet. But that's what we're about to do.

MR. BOUNDAS: Okay. Thank you, Your Honor.

I just want to make that record. And if she's allowed to testify, we'll move forward.

I also wanted to point out on the Slide 16 --

THE COURT: Okay. Now where do I look? Bottom of page?

MR. BOUNDAS: Bottom left-hand corner, Number 16.

THE COURT: Okay. Hold on.

What am I looking at?

MR. BOUNDAS: So it says, "Although she denies use" -- you see that's in red underlined?

And the objection is -- and I think this covers some other slides -- is that this is sort of double hearsay. I mean, this is somebody saying that that's what the

plaintiff -- well, we don't know if that's what the plaintiff told her. That's just somebody writing that down.

MR. WYATT: The question is whether she denies.

THE COURT: The sentence "She denies use" -- or "Although she denies use," okay. And you believe it comes in under 804 -- 803, 802? What is it?

MR. BOUNDAS: It's 803(4), as a matter of record.

THE COURT: 803(4). Here's is the danger. The danger is oh, it's pretty untethered. Denies use. Denies any use? Denies all use? When did she deny use? It's -- I am going to exclude the phrase "Although, she denies use." So that will go out as being too prejudicial.

MR. WYATT: I think these are all statements made in connection with pursuing treatment, which would be -- I mean, the case is coming at it two ways. So while some of them say they're admissions, this is quite an admission because it's going both directions --

THE COURT: I'm going to take it out. It's cumulative to about 14 other times she says things like this. So it's out. You guys should modify that.

What's your next objection?

MR. BOUNDAS: Okay, Your Honor. If we move forward, this is going to be --

MS. BROWN: I'm sorry, Your Honor. The -- in terms of the date of the positive drug screen on those three drugs

you'll allow, but we should delete "Plaintiff denies use"?

THE COURT: "Although, she denies use."

MS. BROWN: Okay. I understand.

THE COURT: Those four words.

MS. BROWN: Perfect.

THE COURT: Now on page 18.

MS. BROWN: Okay. Thank you.

MR. BOUNDAS: I'm on page -- I want to make sure everyone's ready.

THE COURT: What page are we on?

MR. BOUNDAS: I'm on the bottom left-hand corner page 19.

THE COURT: Page 18, my question is --

MR. BOUNDAS: Oh.

THE COURT: -- the words, on the bottom, but they're not highlighted, it says, "and that Travis was not." I don't even know what that means, but it seems to be irrelevant.

MR. BOUNDAS: Yeah.

THE COURT: So will you eliminate "and that Travis was not"?

MS. BROWN: Sure.

THE COURT: On Slide 18.

MR. WYATT: Yes, Your Honor.

THE COURT: Okay. Now we're on page 19.

MR. BOUNDAS: Oh, Your Honor. I mean, on that same slide, we've got three lines up.

THE COURT: No. Wait. I'm going back to 18?

MR. BOUNDAS: I'm sorry, Your Honor.

THE COURT: Okay.

MR. BOUNDAS: If you go three lines up from the yellow highlighted section, it says, "OPC confronted client at CT," that's the plaintiff, "with lying." So now we've got triple hearsay.

Also, this is some other person accusing her of being -- it's not even hearsay. It's just someone else is accusing her of being a liar. That person who is making the accusation is not sitting in that witness stand and cannot be cross-examined.

THE COURT: I think that sentence comes out.

MR. WYATT: I'm sorry. OPT is the person treating her. This is the doctor's records. And it's the context for the line that comes up at the end where she does admit that she drank a few beers last week. So it's all part and parcel as the same.

MR. KAUFMAN: Your Honor, I'm sorry. Can Dr. Reminick leave the courtroom?

THE COURT: Pardon?

MR. KAUFMAN: Can Dr. Reminick leave the courtroom. I thought she left before.

THE COURT: Yeah. Thank you.

(Dr. Reminick exited the courtroom.)

THE COURT: I still think the sentence "After OPT confronted CT with lying to OPT about her use, client became quiet and started to withdraw," that sentence goes out. The rest can come in, with the exceptions "and that Travis was not."

Okay. Moving ahead.

MR. BOUNDAS: Okay. Moving ahead. Slide 21, bottom left-hand corner. And this is just a blanket objection I just want to get a ruling on one way or the other.

Throughout the slides there's a yellow bar and a green bar running down. It's 2018 to 2019 daily crack cocaine use, daily alcohol use. And that reappears in every slide. We think it's just argument. If the doctor is entitled to show records, but that's --

THE COURT: I mean, did she say I used it every day?

MS. BROWN: Yes.

THE COURT: Here's my question: Is it in the record that from 2018, 2019, that's two years, she used crack cocaine every day? Did she say that?

MS. BROWN: Yes, Your Honor. That's why we have these records. They're establishing the timeline.

THE COURT: No, no, no. You have to answer my question here.

MS. BROWN: Yes. I'm going to point the Court to the records.

THE COURT: Okay. Where is it?

MS. BROWN: If you go to Slide 9.

THE COURT: 9.

MS. BROWN: Yes.

THE COURT: Okay.

MS. BROWN: This is a chart of what she was using when, Your Honor. And this is cocaine from age of regular use, age of first use, age 22; age of last use, 24; and the frequency daily, as much as I could get.

So what we're doing with Dr. Reminick is using the information either in the records or the testimony to concentrate just on the relevant time period and establish what was being used and with what frequency. So there's nothing on this slide that doesn't come from the record.

Same, Your Honor, I would look at the alcohol bar that we have comes from this record as well. Age of first use, 13; regular use, 15; and last use, 2022. And that says daily.

MR. BOUNDAS: And, Your Honor, on that point -- and let's start with the alcohol use.

First of all, this -- we don't know where this

information is coming from. This, again, is somebody apparently writing down -- we don't know whether -- I assume wherever they got this information.

The other thing is just as a practical matter, you know, starting at 15 and going through August '22 and drinking four beers and a pint of vodka a day, I think she would probably be dead by now.

You know, I think this is just somebody --

THE COURT: I think it's completely unreliable. It's completely and totally unreliable.

MS. BROWN: Can I hand you the medical record?

THE COURT: She says here daily use of hydrocodone. Daily.

MS. BROWN: Your Honor, can I --

THE COURT: At age 22. I mean, it could be true. I don't say it couldn't be true. I'm just saying where did they get that from.

MS. BROWN: Can I hand you the medical records so you can see the whole examination from --

THE COURT: Sure.

MS. BROWN: And for the record, I'd be handing to the Court what is D-4149. And it is a comprehensive clinical assessment that lasted 60 minutes of Brianna Mensing from October 5th, 2022, at Vision Behavioral Health Services.

MR. WYATT: And I would just point out, too, on the

slide it does indicate at the top it is a substance use history, and that's exactly what 803(4) contemplates being admitted as part of a medical record. It talks about statements made and reasonably pertinent to a medical diagnosis or treatment and describes medical history.

That's necessarily going to come from the patient. And it's going to be recorded in some way. I think the point can be made on cross that perhaps medical records are not always accurate if there is a basis to think that, but that's not a reason to exclude the document.

THE COURT: What -- so, oh, you're giving me the entirety of the record?

MS. BROWN: Correct, Your Honor.

THE COURT: Okay. What do you want me to look at it?

MS. BROWN: Well, it's .005 that has the chart.

THE COURT: Right.

MS. BROWN: Right. But this gives you the context of the comprehensive clinical assessment that resulted in a medical provider putting this information after a 60-minute evaluation with the plaintiff putting this information there.

THE COURT: And this is an assessment that occurred three years after the -- so three years after she says she has difficulty sleeping at night, she states she was taking X. She gets four hours of sleep at night. So we have

here -- we have here her medical condition as reported by her three years after the incident.

MS. BROWN: Yes, Your Honor.

THE COURT: So why does that come in?

MS. BROWN: Because it's an admission that was given to this provider in furtherance of seeking medical treatment.

THE COURT: No, no. Why is it relevant to this case?

MS. BROWN: Because it covers the relevant time period.

THE COURT: She says this is three years -- this is -- I'm sorry. Maybe I'm looking at the wrong thing.

MS. BROWN: I understand, Your Honor.

So the reason that -- it is covering a historical time period as well, Your Honor. So she was born in 1995. The incident took place when she was 23, in 2019. And so, for example, the line about cocaine use on this chart goes from regular use at age 22 through date of last use at 24; daily, as much as I can get. I'm really trying to focus this exam just on the relevant time period. And this medical record provides evidence of what the use was during that time period.

THE COURT: I'm sorry. You have to -- she is now giving her medical history in 2022, three years after the

incident. Okay. And she says -- and point -- I mean, obviously she started on alcohol age 13 and so forth. Fine. Father was an alcoholic. Fine.

Now we say current symptoms. That's in 2022. And she says what the problem is in 2022. That's out.

Now, we go to -- just point to me where I am looking at her daily use --

MS. BROWN: Sorry.

THE COURT: -- that she's saying I daily used it.

MS. BROWN: Sure, Your Honor.

THE COURT: In 2019, 2018.

MS. BROWN: Yes, Your Honor.

THE COURT: Where is it?

MS. BROWN: If you go to Bates ending 4149.0005, it's the very last number on the bottom hand right. This is the chart that we had been looking at in the PowerPoint. And the ages, Your Honor, is what is going to give you the dates that are relevant.

She was born in 1995. In 2019 she would have been 23. That's exactly in the middle of the use that's reported from age 22 to age 24. Daily use, as much as I could get.

THE COURT: At 24.

MS. BROWN: Excuse me.

THE COURT: Age 24.

MS. BROWN: No, no. Age 22, if you look at the

column that says age of first use. See that age 22, right? Do you see that, Your Honor?

THE COURT: Right.

MS. BROWN: Okay. And then regular use, 22; frequency, daily, as much as I could get; last use 24.

THE COURT: I think that comes in. Now that she's saying during this period of time this is what I did.

MS. BROWN: Yes, Your Honor.

THE COURT: Assuming that it was -- that she was asked that particular question. I mean, this is somebody's opinion of what she's saying, but I think it may come in.

She says -- the quote is "As much as I could get." Nothing else is quoted here. Though, the question is, is it being accurately reported. I think that's a question of cross-examination, but it does come in. That comes in.

MR. BOUNDAS: Okay.

THE COURT: Okay.

MR. BOUNDAS: All right. Thank you, Your Honor.

Just an issue with -- moving forward to -- it's going to be on the left hand --

THE COURT: In terms of things like daily crack cocaine use, daily alcohol use, the lawyers put that in, right? That's not in the medical records.

MS. BROWN: That's the medical -- oh, you mean on the -- on what page, Your Honor? Of the PowerPoint.

THE COURT: Yeah.

MS. BROWN: Correct.

THE COURT: So just point out that that's -- that's argument. It's fine. But I'm not saying it's not. It's fine.

MS. BROWN: Sure. I understand.

THE COURT: But it's not a medical record.

MS. BROWN: Well, it's based on a medical record that we just looked at, but I hear your point on that slide, I wrote your words.

THE COURT: It's always based on something else.

The fact is that's by virtue of the term. I'm just saying it doesn't come in.

MS. BROWN: I understand.

THE COURT: As a medical record.

Nevertheless, it can be coming in as part of your presentation, that's fine.

MS. BROWN: Is the Court ruling this medical record is not admissible?

THE COURT: No. Well, that's not a medical record.

MS. BROWN: No, no. The one we --

MR. BOUNDAS: I think we're talking about the bottom two lines on the slides.

MS. BROWN: Okay. I understand.

THE COURT: Yes.

Next.

MR. BOUNDAS: On Slide 22, bottom left-hand corner, we don't have an issue with the substance of the alcohol and drug use and what the client said, but this references her being afraid of being taken to court, losing her son and child custody.

MS. BROWN: Yeah, of course. Of course.

MR. BOUNDAS: If we can just get rid of that.

THE COURT: Okay. So we're talking out --

MS. BROWN: That sentence, of course.

MR. BOUNDAS: Then there is another one that says reported her neighbor asked her to get some coke for him for her dealer. It's triple -- well, in my opinion, triple hearsay, but it's at least double.

MS. BROWN: That's fine. We'll take that out.

MR. WYATT: It does establish that she has a dealer, Your Honor, which is relevant.

MR. BOUNDAS: Talking about drug dealers I think is -- we're crossing a line. We've already talked about her drug and alcohol abuse.

MS. BROWN: We're going to take it out.

THE COURT: Page 24, is that the next one?

MR. BOUNDAS: 24 is the next one. And the issue with this slide is it's in red, underlined, description lying, stealing.

THE COURT: That's out.

MR. BOUNDAS: It's just someone --

MS. BROWN: Can -- this actual evaluation, though, is important for Dr. Reminick to explain what it was an evaluation of? Can we leave the evaluation in and just take out lying and stealing?

THE COURT: Well, you can take out lying and stealing.

MS. BROWN: Uh-huh.

THE COURT: Now, the question is does that change your evaluation?

MS. BROWN: No, because this description of these factors, the doctor will explain what type of evaluation was being done and the significance of it.

THE COURT: Okay. Let me ask you this: This whole thing, Slide 24, what's the relevance of this?

MS. BROWN: The extent of her drug and alcohol abuse, Your Honor, during the relevant time period. Like we excluded all the pre-stuff, the post stuff. We are just zeroing in --

THE COURT: I mean, they are terrible things. Lack of empathy, lack of -- I mean, it's a character assassination of a person who purports to be a victim. I mean, no. That slide in its entirety is out.

MS. BROWN: Understood.

THE COURT: And she can't testify to any of this.

MR. BOUNDAS: Okay, Your Honor. And I understand you've ruled some of this. And I just want to make -- just for the record, that these records are things that they could have confronted the plaintiff with in cross-examination.

THE COURT: Well, they could point that out. That's argument. Yeah, that's argument.

If you wanted some explanation, obviously, if it's serious, you could ask the plaintiff what about this. I mean, that's right. It was saved for the expert. That's -- that's a trial -- that's an appropriate trial decision. And it's equally important, equally appropriate for the other side to comment that if this is so significant, why not ask her questions about it. Why not give her the opportunity to explain it, if it needs an explanation. If it needs one.

Okay. What's next?

MR. BOUNDAS: Okay. Next, 25, bottom left-hand corner. This -- is now they're asking -- I don't know how this is expert opinion. They're asking her to comment on the plaintiff's testimony.

THE COURT: I'm sorry. We must have the wrong --

MR. BOUNDAS: 25, bottom left-hand corner. I might have misspoke.

THE COURT: This is using heroin several times a day.

MR. BOUNDAS: Yeah. And then they're quoting the plaintiff's testimony, which actually, you know, she testified about, but --

THE COURT: Where is this?

MS. BROWN: Your Honor.

THE COURT: Okay. My question -- okay. So you have -- this is testimony she gave?

MS. BROWN: Correct, Your Honor.

THE COURT: In the deposition?

MS. BROWN: Yeah, that the doctor reviewed and relied on.

THE COURT: I mean, I think it's appropriate if she gave it.

MR. BOUNDAS: All right.

Trying to move through some of this. So we're going to Slide -- it's bottom left-hand corner -- 31. I'll let you get there, Your Honor.

THE COURT: Okay. This is a drug test which was given to her on August 18th, 2025; is that right?

MS. BROWN: Yes, Your Honor.

THE COURT: And you say it's admissible?

MS. BROWN: Yes, Your Honor.

THE COURT: Do you want to tell me why it's admissible?

MS. BROWN: Sure. Part of this witness's testimony

will be the fact of the substance abuse on her memory. And she testified here, obviously in 2026, the fact that the drug use is not in the history but has continued right up until the most recent medical records we have, speaks to whether that memory, the effect on the memory has continued and has been profound and is not something that resolved. Or, as Dr. Valliere said, would only be during the actual time you're using the drug.

So it's important, particularly in light of Dr. Valliere's testimony, to be able to show the jury this is not something in the far past, but this is unfortunately something she continues to struggle with today. And to the extent her memory has been impacted, it continues to be impacted.

THE COURT: You know we use this word "memory." I'm trying to figure out -- and the witness has testified to memory, and that her testimony of memory is that certain things are normally forgotten. So everybody has an impact over time and an impaired memory or loss of memory. She also testified that there were certain events that you wouldn't forget, even though you use drugs.

Now, is it -- is it -- your witness is going to say that what? That -- that -- that because she uses drugs in August of 2025, therefore, she forgot, what? Or her memory was impaired what?

MS. BROWN: No. So, Your Honor, the Court has obviously allowed in an explanation of the history of substance abuse and how it affected her memory. And the only point of using --

THE COURT: Substance abuse at the time.

And, by the way, that's consistent with the witness's testimony, that if, in fact, she was abusing drugs at the time of the incident, it could impact her ability to remember.

Now, you're giving me a document which says three, years, four years, five years, six years after the incident she used some drugs, which I think the document establishes, and, therefore, her memory is impaired. As to what?

MS. BROWN: Well, as to the testimony.

THE COURT: Did something happen in August 18, 2025, that's relevant to this case, other than a drug test?

MS. BROWN: Well, no. I mean, she came into court and gave her testimony.

THE COURT: Oh, fine.

MS. BROWN: So --

THE COURT: If you have evidence that she's under the influence of drugs when she testifies, that's fine. Of course. I'd let that in.

MS. BROWN: Right.

THE COURT: This is a year -- this is a year

earlier.

MS. BROWN: It's the --

THE COURT: Well, eight months earlier.

MS. BROWN: It's the most recent medical record we have.

THE COURT: That doesn't justify because it's the most recent -- you can introduce it because that's all you have. I mean, I don't know. If you want to say she's on drugs when she testified, you can say that, if it's a fair inference. I don't know whether it is or not. I'd have to think about it. This is out.

Next.

MR. BOUNDAS: Two more things, Your Honor. I appreciate you letting me rifle through this.

Okay. Now we're on the bottom left-hand corner, Number 33. And the objection we have to these slides -- it may be better -- it's the same objection to both slides. It may be better illustrated on Slide 34.

You'll note that they give the plaintiff's answer. The actual question she was asked was: "How many times have you been sexually assaulted?"

And that's the same thing is true of the previous slide. Those are questions about prior sexual assaults, which under Rule 412 and for other reasons, the Court had ruled admissible.

MS. BROWN: And, Your Honor, we already had this argument in connection with opening, and the Court ruled that these could be shown and used with --

THE COURT: I don't know that I've ruled on this.

Go right ahead. But it has to be justified on today. This is what I want to see.

MS. BROWN: I understand. I just was reorienting us that we already did this.

THE COURT: I'm oriented enough. You don't have to reorient me.

MS. BROWN: Your Honor, this is part of the IME that Dr. Reminick conducted.

THE COURT: Right.

MS. BROWN: This portion of the IME actually that they designated they want to cross Dr. Reminick on, this portion was her talking about her generally not remembering a lot of things. And the doctor saying why do you think that is, and her saying it's because of all of the drugs I have used.

This goes directly to the opinion that she's going to give the jury about the impact of substance abuse on her memory.

THE COURT: The hard thing I have is it's the opposite as to what you want to show. I mean, that's the curious thing. She doesn't say I forgot this incident. She

says she remembers this incident. So you want to show that there's things that she's forgotten.

You're right. I bet she's forgotten a lot. Then you go back and say, well, you didn't remember the time that your -- your -- so and so member of your family assaulted you. You can't -- or these prior incidences. You can't remember them, can you?

And -- and -- so we get into why you can't remember the prior episodes. But that's not relevant in this case.

MS. BROWN: Well, the --

THE COURT: And it's the use of these gloat -- you know, overarching terms like "impaired memory" or "forgetfulness." That's not what's going on here. That's not what's going on here.

And it's terribly misleading to the jury to suggest that that's what's going on here. And that's the problem. That's why -- you know, that's why this evidence should be excluded, because it's misleading from a so-called -- pardon me -- from an expert. Not so-called. She's obviously an expert.

No quarrel whatsoever about her qualifications. That's not the issue here. The issue here is whether or not she's giving relevant testimony.

Let me tell you there's a close question as to whether or not she should even be allowed to testify. Very

close question. However, because of the circumstances, I've tried to accommodate her testimony. But that doesn't mean that she's up here to give opinions like this. Especially when they're not relevant.

This is out. Out.

MR. GREENE: And, Judge --

THE COURT: Number 33.

MS. BROWN: I understand, Your Honor.

Just to make a record of it.

THE COURT: Sure.

MS. BROWN: This is the plaintiff's admission in the course of the IME that the reason she doesn't remember things is because of her drug use. And it is the reliance on that evaluation and that IME that in part informs the doctor's opinions that the Court --

THE COURT: Well, she better not give that opinion because this is out.

MS. BROWN: Okay. Well, Your Honor, when we went --

THE COURT: On that opinion -- if she informs her judgment that because she doesn't couldn't remember things involving prior sexual assaults or misconduct, therefore, she has, quote, an impaired memory that somehow relates to what she -- her testimony is in connection with this, there has to be a nexus between the two. There is no nexus. There's no

nexus.

MS. BROWN: And --

THE COURT: And actually what it is, is something else. What it is is an attempt to paint the plaintiff, which is your right to do, as a person with an impaired memory. And, therefore, she can't -- when it's impaired, she doesn't remember correctly the sexual assault. That's the nexus you want to draw.

If you have a witness that says that, sure. Of course. If she was under the influence of drugs at that time, she then would make up something, or her memory of it would not be accurate. That kind of testimony would come in. This is not that kind of testimony.

This is a very different kind of testimony. And what it is is a wholesale attack on the credibility of the witness by -- by this type of testimony.

So I find it inappropriate. I find if it has any marginal relevance, which I don't think it does, it's outweighed by its prejudicial effect. I think its goal is really antithetical to what the theory of the case is and to the credibility of the witness. So it's entirely contrary to what the evidence in the case is attempting to adduce.

Now, she may not be believed, but for her not to be believed because she forgot about a prior sexual assault, there's no nexus there.

MS. BROWN: Of course, Your Honor.

And just to be clear, that's not what this testimony is about. I 100 percent agree with the Court that an opinion based on the fact that she cannot recall a sexual assault when she's 17 is not relevant and would not be appropriate. That's not what this testimony is.

This testimony is her saying generally there are a lot of things I don't remember, and I think that's because of my significant drug abuse.

THE COURT: And there's no question that -- generally there are things that she doesn't remember is fine. And the jury can make a determination as to whether or not -- well, I don't even know. I can't even articulate it because she did remember it.

You see the problem you have is that she did testify that she remembered it. If she got up and said, you know -- and you get it all the time, by the way, in rape cases where I don't remember the rape. I don't remember. Yet there's DNA that establishes it.

And she says, for example, I don't remember giving consent. That happens with great frequency in sexual assault cases.

It's -- I have to congratulate you for being clever because I think actually you've taken the absence of a memory, and said that that's probative as to what her

credibility is. And it isn't in this case because she said she remembered things.

Again, I go back and tell you what would have been probative is if you had a witness who says that a person under the influence of drugs at the time will make up things that didn't happen. That's not this witness's testimony, and that's not what these documents show. So I'm excluding it.

Next.

I'm making my record.

Next. Out.

MR. BOUNDAS: Okay. Next, Your Honor, Slide, bottom left-hand corner, 35.

THE COURT: It's a picture.

MR. BOUNDAS: Well, yeah, it's a picture. So what it is, I think, is that it's the intention to play video clips of the plaintiff saying she didn't remember certain things.

THE COURT: Well, it's out. It's out.

MS. BROWN: So, Your Honor, just so I understand. We went through the four opinions Dr. Reminick intends to give yesterday, and the Court permitted the opinion that Ms. Mensing's memory and recall are impaired. And it sounds to me like that we are now changing that ruling? I mean, I --

THE COURT: Well, I mean, thinking about how you're

demonstrating it with this type of testimony, which is highly prejudicial, yes, I guess I am changing my mind --

MS. BROWN: Well, this --

THE COURT: -- to some extent. Because, in fact, if you're using it -- I'm trying to figure out -- usually you could show that a witness's memory is impaired as a general proposition. But in this case, she is saying what she remembers.

Now, if you have testimony that shows that it's impaired --

MS. BROWN: Yes, Your Honor. So this --

THE COURT: I don't know that this does it, does it?

MS. BROWN: We can do a couple of things. There's a medical record we skipped over that Mr. Boundas is not objecting to that notes cognitive impairment.

THE COURT: I saw that.

MS. BROWN: That's in part what she's basing it on. And she's basing it on her IME. And she's basing it on her review of testimony not just to the Uber event whether you remember where you were, what you were doing, but through all sorts of questions that she was asked, Your Honor, that if you don't have an issue with your memory, you would remember. Where were you going to the doctor, where did you live, basic facts that somebody who is not unfortunately suffering from

an impaired memory would remember.

And she reviewed all of this deposition testimony, and it's part of her opinion and reliance material. This is a two and a half clip of some of the different things she was asked that she does not have a memory of.

THE COURT: Fine. I'll allow it in.

MS. BROWN: Thank you.

MR. BOUNDAS: The only issue I have, Your Honor, with this -- all the clips, there's one in particular, which is she was asked whether she recalls making a stop during the ride deviating from the route and going to a convenience store and making a stop.

Now, there's actually no record evidence of that. They were going to call Mr. Gaddis to talk about the GPS --

MS. BROWN: We'll take that clip out.

MR. BOUNDAS: Okay.

THE COURT: I would have allowed it.

Go ahead.

MR. BOUNDAS: And then the next slide, she's commenting on the plaintiff's interrogatory answers. Plaintiff has been cross-examined about that. It's kind of the same thing.

MS. BROWN: We'll take it out.

THE COURT: Okay.

MR. BOUNDAS: Okay. Hopefully -- I think I have

one more thing, Your Honor, which is going to be Slide -- or bottom left-hand corner, 39. And here we have -- we have the expert just comparing what she -- what our client said to what someone else said and commenting on, you know, sort of -- that they're at odds. I mean, that's argument.

MS. BROWN: This is -- this is important, Your Honor, in the sense that this is the treating psychiatrist. So the treater in the same role that she is. And just that she looked at the medical records and looked at the deposition testimony. And she did not support what the plaintiff said, which is that she was told about the incident.

MR. BOUNDAS: And that's in evidence. I mean, they got that evidence out, so why do they need an expert to say -- I mean, I don't even know it's expert testimony to say her interrogatory is different than what she said on the witness stand.

THE COURT: That would be -- this is argument.

MS. BROWN: Okay.

THE COURT: It's out.

MS. BROWN: I'll take it out.

MR. BOUNDAS: And that concludes it.

THE COURT: All right. So we're going to bring in the jury.

Why don't you take five minutes with the expert to

explain where we are. I'll obviously allow you to lead the witness.

MS. BROWN: Thank you.

THE COURT: Because I always allow leading questions. I do. I do all the too.

MR. SMITH: Your Honor --

THE COURTROOM DEPUTY CLERK: 10-minute break?

MR. SMITH: I have one --

THE COURT: We'll take 10 minutes.

MR. SMITH: Your Honor, I'm sorry. Before we take in a break. In terms of these medical records, you know, they're voluminous.

THE COURT: We're not going to allow the medical records in. Are they coming in?

MR. SMITH: I think there is one that's already been admitted. It's my understanding that maybe the page or two that was used would come in, not the 200 pages.

THE COURT: In terms of the medical records, you offer whatever you want to offer.

MS. BROWN: Sure.

THE COURT: But we'll reserve judgment until after the testimony.

MS. BROWN: Sure.

MR. SMITH: Okay. Thank you.

THE COURT: Okay. 10 minutes.

(The proceedings were recessed at 12:03 p.m. and reconvened at 12:22 p.m.)

(The jury entered the courtroom.)

THE COURT: Okay. Please be seated. Let the record reflect all jurors are present, parties are present.

You may proceed.

MS. BROWN: Thank you, Your Honor.

BY MS. BROWN:

Q. Welcome back from early lunch, Dr. Reminick. You may not know it, but you're the last witness standing in the way of the weekend for your jurors. So we're going to try to be as efficient as possible with everybody's time.

MS. BROWN: So with that, if we could go back, please, to the PowerPoint, Mr. Delaney. Thank you.

BY MS. BROWN:

Q. When we left off, we had been talking about --

MS. BROWN: Can you all see -- okay.

BY MS. BROWN:

Q. You were talking about the methodology and the process that you used to form your opinions in the case.

Would your tell our jurors, are you prepared to give these four opinions here today?

A. I am.

Q. And you're prepared to talk about Ms. Mensing's alcohol and substance abuse being extensive, correct?

A. Yes.
Q. That Ms. Mensing's memory and recall are significantly impaired, correct?
A. Yes.
Q. That Ms. Mensing did not report, based on your view of all of the evidence, the alleged Uber incident to her health care providers, correct?
A. Correct.
Q. And then, finally, are you prepared to talk a little bit about something in psychiatry called avoidance?
A. Correct.
Q. And that Ms. Mensing's continued use of rideshare shows a lack of avoidance?
A. Correct.
Q. And are you prepared to give those opinions to a reasonable degree of medical certainty?
A. Yes.
Q. Let's start with Topic Number 1. And we spoke a little bit, Dr. Reminick, about the fact that you've reviewed quite a number of medical records, correct?
A. Correct.
Q. And in trying to be sensitive, I did not show those records to the plaintiff. And I'm hoping instead if we could talk to you about them. Are you okay doing that?
A. Yeah. Of course.

Q. And I also want to be efficient with our jury's time. I want to just zero in our discussion on the years 2018 and 2019, sort of the relevant time period for our jurors as it relates to the Uber ride. Okay?
A. Yes.
Q. And so let's talk a little bit about were you able, when you reviewed the medical records, to get information about the extent and the details of Ms. Mensing's unfortunate substance abuse that was being reported to providers?
A. Yes.
Q. Okay. And we're going to have to talk in a little bit of detail of what was being used and how frequently. And fair to say you would agree as a psychiatrist this is a serious disease, correct?
A. Correct.
Q. And we don't mean by talking about this any judgment or shaming of Ms. Mensing by looking at the records and putting these facts out there, correct?
A. Not at all. It's a disease.
Q. It's difficult for people, correct?
A. Very.
Q. Okay.
A. And nobody chooses this.
Q. Of course.
Okay. So let's talk about -- this is a medical record

we have on our slide D-4149. Is this one of the medical records that you reviewed from Vision Behavioral Health Services?
A. Yes. Correct.
Q. And tell us a little bit about what is important for you from this medical record and what information you learned.
A. I lost my screen too. I don't know if that's --
MS. BROWN: We have an agreement in the deck that everything can be shown. Thank you.
THE COURTROOM DEPUTY CLERK: I need know the number that's on the record.
MS. BROWN: Sure. Is it helpful, Ms. Scott, if I just say the numbers as we go? Okay.
THE COURTROOM DEPUTY CLERK: All exhibits, whatever.
THE COURT: Yes. Subject to any motions.
MS. BROWN: Of course. So I'll just make sure we're clear. It's D-4149.
THE COURT: All right. Admitted.
(Defendants' Exhibit Number D-4149 was received into evidence and published.)
MS. BROWN: Thank you, Your Honor.
BY MS. BROWN:
Q. Dr. Reminick, looking at a chart of substance abuse history here -- I'm sorry, substance use history, and this is

a medical record from Vision Behavioral Health Services, what information does this medical record contain?

MR. BOUNDAS: Your Honor, I have an objection, and it's simply to preserve what we discussed pretrial. I don't have to keep standing up and objecting to these.

THE COURT: Okay. It's noted. And it's a continuing objection.

MR. BOUNDAS: Thank you.

MS. BROWN: May we proceed, Your Honor?

THE COURT: Yes.

MS. BROWN: Thank you.

BY MS. BROWN:

Q. What information -- we're wanting to concentrate on the period of time from 2018, 2019. Does this medical record provide you any information about the types of alcohol or drug that Ms. Mensing was using?

A. Yeah. This medical record was important to me because it showed the amount of alcohol that she was using on a daily basis. Also the use of marijuana and opioids and cocaine, and it was daily, and it was during this time period of when this incident happened.

Q. And so to orientate us, Ms. Mensing was born in 1995, correct?

A. Correct.

Q. Okay. And so when it says here -- and the incident

that's the subject of this lawsuit took place in 2019, correct?

A. Correct.

Q. And that would have been when Ms. Mensing was 23?

A. 23.

Q. Okay. And so, for example, if we look at the line of daily cocaine use, that appears to be between 2022 -- the age of 22 and 24, correct?

A. Correct.

Q. And so did you understand that to be daily cocaine use during the time period we're talking about here?

A. Correct. I think it was crack cocaine and alcohol use every day.

Q. Okay. And if we go to the next slide --

MS. BROWN: And this, for the record, is D-4131.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4131 was received into evidence and published.)

BY MS. BROWN:

Q. This appears to be another medical record -- a recent one from May of 2024 at an At-Home Counseling Services comprehensive clinical assessment. Why was this record important to you and what information did you learn from this?

A. Again, it was just another medical record from another

medical provider that kind of references time frame and how much she was using. And it was on a daily basis.

Q. Okay. And so similar to the record we had just looked at, if we look at towards the end of this medical record, it says, "Client reports around 22 years old, being introduced to crack cocaine and using daily. Client reports around 22 years old abusing prescription painkillers," correct?

A. Correct.

Q. Okay. And just -- did we work to make a little bit of a timeline just so we can understand what was happening with her substance abuse disease during this time period?

A. Right.

Q. Okay. And so the record we originally looked at was from January of 2018; is that --

A. Um-hum.

Q. Or that's where we're starting the use, because she was 22 years old at that time?

A. Right.

Q. Okay. Let's go to the next record.

We heard -- our jury heard some testimony from Ms. Mensing's boyfriend at the time of the Uber ride, Neal Young, and some testimony about his efforts to get Ms. Mensing to a rehab facility.

Are those efforts contained in one of the medical records you reviewed?

A. Yes.
Q. Okay. And tell us about what you learned from this medical record in terms of what happened?
A. At this point, she was with her boyfriend, Neal Young, and he was trying to get her into a rehab for her alcohol and substance use. And it sounded like she was very adamant about another going and had a chaotic moment where she jumped out of the car and did not actually eventually get to the rehab.
Q. Okay. And is it -- is it not uncommon for folks who are struggling with a difficult addiction to not want to at times seek help or go to a rehab facility?
A. Yeah, it's very common. It's why there's interventions and different things we do to try to get patients into their appropriate care.
Q. Okay. And so this record says, "Her current BF," I guess on boyfriend, "Neal took her to Triangle Springs Rehab facility. Client sat out in the parking lot chugging wine with another girl."
A. Um-hum.
Q. Based on your experience treating folks who have substance abuse diseases, this could be a reaction to somebody wanting to take you to somewhere you don't want to go, correct?
A. Correct.

Q. And this record that we looked at in terms of Mr. Young's efforts to get Ms. Mensing into rehab, we put that on our timeline in about the spring of 2018; is that accurate --
A. Yes.
Q. -- based on your review of the medical records?
A. Yes.
Q. Okay. Let's move a little forward so we can see what happened in that time period.
This is an admission record from a facility called Holly Hill Hospital. An admission from April 2018, it looks like for about a week. What was happening at this time with Ms. Mensing and what information did you learn as it related to her substance abuse disease?
A. This admission happened right after that incident with Neal Young where she was trying to fully, and was, intoxicated and police were called. And so she was admitted for suicidal ideation. And in the emergency room she was positive for cocaine and opiates during this time period, and showing that she was having daily use which needed to have intervention and help.
MS. BROWN: Okay. And, for the record, this record is D-4135.
THE COURT: Admitted.
(Defendants' Exhibit Number D-4135 was received

into evidence and published.)

MS. BROWN: And the record we looked at regarding Mr. Young, I think I didn't read that number, D-4143.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4143 was received into evidence and published.)

MS. BROWN: Thank you, Your Honor.

BY MS. BROWN:

Q. And we added that right about the same time period that Mr. Young tried to take her somewhere. She ultimately did get into Holly hill, correct?

A. She did.

Q. Okay. Let's move forward a little bit if we could.

This is an assessment coming out of that Holly Hill hospitalization; is that correct?

A. Correct.

Q. Okay. And it confirmed what was reported in terms of the drug she was using at the time, correct?

A. Correct.

Q. Okay. Let's move forward now and talk a little bit about some records you reviewed in the fall of 2018. So this would have been about six months or so before the Uber ride that's the subject of this lawsuit; is that right?

A. Right.

Q. Okay. And these records are from a facility called

Perkins Counseling. Did you review a fair amount of records from that facility?

A. I did.

MS. BROWN: Okay. And for the record, this record is D-4145.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4145 was received into evidence and published.)

BY MS. BROWN:

Q. Okay. And tell us what was significant to you about a visit Ms. Mensing had with the providers at Perkins Counseling in November of 2018?

A. Well, one is that she was denying use, which is typical for someone who is suffering from substances. And here is saying that she admitted it. So usually minimization and being dishonest about substances is part of the symptoms of substance addiction, substance disorder.

Q. Okay. And it sounds like we have highlighted here what she did report to the counselors at the time was she may have had a beer or two; is that right?

A. Right.

Q. Okay. And we'll kind of come back to that.

Did this report to her therapists on this date, did this get revisited at another visit with the Perkins team?

A. Correct.

Q. Okay. Let's move forward a little bit.

One of the things that we're going to talk about a little bit is whether Ms. Mensing's use of substances had an affect on her cognitive ability or her memory.

Do you see any evidence that that was investigated by the health care providers who were treating her?

A. I did.

Q. All right. And tell us -- we are looking at another Perkins medical record from the fall of 2018.

MS. BROWN: And, Your Honor, this is D-4145.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4145 was received into evidence and published.)

BY MS. BROWN:

Q. What information did you learn as it relates to the issue of memory, functioning, and cognitive ability?

A. Yeah. So she has a significant difficulty with cognitive impairment as it relates to her chronic substance abuse in multiple records.

Q. Okay. And is this one of the records that reflects that?

A. It's just one of them that highlights it.

Q. Okay. It says, "Currently diminished concentration or indecision (cognitive impairment)."

Does that -- as a treating psychiatrist, does that

relate to an impairment of memory in some sense?

A. Yeah. So if you don't have concentration, then you're not, you know, able to retain it and put it in your hippocampus for memory. So really poor concentration and decision, cognitive impairment just usually means that too, that there's really impaired short-term memory and long-term memory.

Q. And in your experience based on your training and education, can serious substance abuse diseases lead to problems with memory in the short-term and the long-term?

A. 100 percent.

Q. And this notation in her medical record of the cognitive impairment would have been in November of 2018, correct?

A. Correct.

Q. All right. Now, we spoke a moment ago about that Perkins record where she reported, well, she did actually have a beer or two.

Tell me what happened in a follow-up appointment with the Perkins team in November of 2008.

MS. BROWN: And, Your Honor, one again, this is D-4145.

THE WITNESS: Yeah. So this is her meeting with her Perkins counselor. I think it's pretty on point for somebody who has a history of addiction of just having difficulty with insight and really admitting how much

substances they were using, or alcohol. So she used that the night before Halloween. This is 2018.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4145 was received into evidence and published.)

MS. BROWN: Thank you, Your Honor.

BY MS. BROWN:

Q. And so we have looked at a medical record from November 1st where she said well, I might have had a beer or two.

And now we have a medical record that said that the provider asked that she be honest, and the client reported that she lied to the provider last week and actually did relapse on cocaine and alcohol the night before Halloween, correct?

A. Correct.

Q. And in your experience, is that not unusual from folks who were having a difficult time with substance abuse addiction?

A. It's really typical. So having insight and minimization of substance use and alcohol use is the norm. We always say it's kind of you just get the tip of the iceberg if they tell you anything about their substance or alcohol use. And that's of no fault of the patient. It is part of the disease process. It's a symptom.

Q. And when you say it's part of the disease process, is that part of having a disorder by which you are addicted to drugs and alcohol?

A. Yeah. It affects their rewards system. It affects their impulse control. It affects their decision-making. It affects their insight. And it affects their memory.

Q. And when we look at records like this, or when you made your review of records like this, did you conclude that Ms. Mensing was, in fact, addicted to these different substances during this time period?

A. Yes. She absolutely was addicted.

Q. And in your experience and training, when someone is addicted to these substances, is it easy or possible for them to just one day not use these substances?

A. No. I mean, given how much she said she was drinking on a daily basis, and the medical record that we saw, it was a pint of vodka. Going a day without it she would have significant withdrawal symptoms.

Q. Would the same be true for some of the other substances like crack cocaine and heroin that we also see referenced in the medical records?

A. Yeah. Usually when they're using, they're using daily. And there's not sober days.

Q. Okay. This medical record now that we just looked at was the middle of November. Let's keep moving forward.

During this same time period, is one of the things that you did review Ms. Mensing's own testimony on some of these issues?
A. Yes.
Q. Okay. And as it relates to this time period, 2018, 2019, what information did she testify to as it relates to her use of heroin?
A. She said she was using heroin daily.
Q. Okay.
A. Several times a day.
Q. Okay. And so if we go to the timeline, then, from the medical records, did you see reports of daily alcohol and daily crack cocaine use from 2018 to 2019?
A. Yes. It's really the height of her addiction and the height of her use.
Q. Okay. And then from her own testimony, did you learn a report of heroin use daily, several times a day, from 2018 to 2019?
A. Correct.
Q. Okay. I want to talk about something that happened at the end of that year, 2018. And, Dr. Reminick, did I hear you say that this is sort of the height of the difficulties based on the records you've reviewed that Ms. Mensing was undergoing; is that fair?
A. Yeah. Really, in totality I saw records from as early

as 2011 to as late as 2024. 2018 was particularly difficult for this patient, from Ms. -- excuse me -- for Ms. Mensing where she was using daily heroin, crack, and alcohol.

MS. BROWN: Okay. And we're looking at -- it looks like a letter from Perkins Counseling. Your Honor, D-4143.

THE COURT: Admitted.

(Defendants' Exhibit Number D-4143 was received into evidence and published.)

BY BY MS. BROWN:

Q. Tell us what happened in early January of 2019 as is reflected in this letter as it relates to Ms. Mensing's treatment for her substance abuse disease.

A. So it seems the Perkins counselor was seeing her for outpatient treatment. At certain point we figure that patients are in need of a higher level of care, which is what is noted by this provider. It's saying that this is no longer something that she can do on an outpatient basis, that Ms. Mensing needs a higher level of care, meaning inpatient care or -- PHP is partial hospitalization. So they'd be hospitalized from 9:00 to 3:00 five days a week.

And so really saying she needs much more intensive care. And so they discharged her with a referral to a higher level of care because she was so acute and her illness was so severe.

Q. What would be some of the challenges based on your

experience, why did -- in your experience, why would a provider say we can't keep seeing you on an outpatient basis anymore? What are some of the challenges?

A. I think specifically with her it was about --

MR. BOUNDAS: Your Honor, I'll object. She's speculating about the reasons for this. It's not in the document.

THE COURT: Sustained.

BY MS. BROWN:

Q. Okay. Based on your experience, Dr. Mensing [sic], when a provider indicates that someone needs a higher level of care and no longer be seen outpatient, what are the same reasons for that?

MR. BOUNDAS: Same objection. It's really the same question.

MS. BROWN: It's her experience, Your Honor. It's not specific.

THE COURT: Is this in her report.

MR. BOUNDAS: It is not in her report.

THE COURT: Sustained.

BY MS. BROWN:

Q. All right. Let's look at the letter. It talks about services were terminated due to the need for a more appropriate level of treatment. Do you see that?

A. Yes.

Q. What are the types of appropriate treatment that could be provided on an inpatient basis that could not be provided on an outpatient basis?

A. Well, with an inpatient hospitalization, the patient doesn't have access to substances or alcohol, and can be more medicated on a daily basis.

Q. And so if we go back to our timeline and we can sort of conclude the year 2018, early 2019 begins with this termination of outpatient services, correct?

A. Correct.

Q. And during this time period, if we just summarize the types, unfortunately, of substances that Ms. Mensing was abusing, does this list summarize her struggles?

A. Yes.

Q. Okay. Did you -- based on your review of the medical records and the deposition testimony, did you see any evidence that Ms. Mensing was able to get any medical care or inpatient, outpatient rehab between January 2019 and the Uber ride that is the subject of this lawsuit in March of 2019?

A. No.

Q. Okay. Any evidence of any kind of treatment by any provider during that time period?

A. No.

Q. Okay. Let's talk about your next opinion, Doctor, regarding Ms. Mensing's memory and recall being impaired.

Is one of the bases for those opinions the references in the medical records to cognitive impairment?

A. Yes.

Q. Okay. And did you see that in multiple places during the relevant time period in the medical records?

A. Yes.

Q. In your experience, does substance abuse -- can substance abuse lead to both short-term and long-term memory issues?

A. Yes.

Q. Does someone have to be actively using a drug or alcohol to suffer from memory issues?

A. No. It comes from chronic use that someone can have long-term cognitive impairment.

Q. And did you form the opinion based on all the evidence you reviewed here that Ms. Mensing's abuse problems led to cognitive issues and memory issues?

A. Yes.

Q. Okay. And would you say, based on your review of the evidence, that her lack of memory or struggles with memory is limited just to the description of the Uber ride?

A. No.

Q. Tell us more about that.

A. Her memory impairment seems pervasive. So, you know, large swaths of time she doesn't remember much. When

examining her, she often says I don't remember. I don't know. So she's -- I found her to be a pretty poor historian of her own history because of her cognitive impairment secondary to her substance abuse.

Q. And when you say questioning her, was that part of the clinical evaluation that you did --

A. Yes.

Q. -- of Ms. Mensing?

A. Sorry. That was part of my independent medical examination of her directly.

Q. And were you able to ask a series of questions similar to questions you might ask of patients of your own?

A. Yes.

Q. And it sounds like what you're saying is the way she answered, or wasn't able to answer, it in part formed your opinions here?

A. Yeah, it seemed significant that she did not remember many details of large swaths of her life, large periods of time.

Q. And when you looked, one of the things you did was you read her sworn testimony and looked at some of the video as well; is that correct?

A. Yes.

Q. Okay. And did you select a couple of sort of different areas to show our jurors of what you were talking about in

terms of the memory issues?
A. Yeah. Just some salient moments that I thought were notable for memory impairment kind of being pervasive and across the board, not just specific for this incident.
Q. Okay. Let's take a look at some of those.
(Video clip played to the Court and the jury.)
BY MS. BROWN:
Q. And so, Doctor, it looked like from these clips, Ms. Mensing was questioned about a number of different topics; is that right?
A. Correct.
Q. And in many places she wasn't able to recall things like treaters that she saw, things like that, correct?
A. Correct.
Q. Okay. And why were these examples important for you to put together to help explain your opinion?
A. Not just the day of the incident, but multiple periods and points of her life she suffers from memory loss.
Q. Let's move, Doctor, to your third opinion regarding your review of the medical records.
And did you find any evidence in all of the medical records that you reviewed that this Uber ride was reported to any of Ms. Mensing's providers?
A. No, I didn't see any reporting of the Uber incident to any medical providers across all of the medical records.

Q. Okay. And did you, however, see a number of different facilities and doctors and therapists and providers who regularly saw Ms. Mensing?

A. Yes.

Q. And based on your review of the details of their medical records, was Ms. Mensing providing information about things that might be bothering her, medications, things like that, was she interacting with these therapists and providers in an effort to better her care?

A. Yes. There were multiple other incidents that she mentioned and discussed with providers when they asked about any emotional disturbances or anything that was emotionally distressing, and she never provided them with this rideshare incident.

Q. Finally, let's talk about something our jury has already heard about, which is that Ms. Mensing continued to use Uber and continued to use Lyft, even after filing this lawsuit.

You're aware of that from the records you reviewed, correct?

A. Correct.

Q. Okay. And we have, as one of your opinions here, that that -- and here's her testimony that our jurors already heard. Your opinion is that this shows a lack of avoidance.

First of all, tell us what avoidance is and why that is significant to your evaluation?

A. Sure. So when evaluating the impact of something that was emotionally distressing, like what Ms. Mensing is alleging in this incident, we look for a number of things for a psychiatric diagnosis.

One is actual or perceived threat of death or serious bodily injury. That's the first criteria.

The second criteria is time. So there has to be symptoms over a period of time, months. Those symptoms include avoidance. So if somebody -- I'll use the incident in the ride. If somebody was using -- was assaulted in an Uber, they would probably 100 percent avoid taking an Uber. They would avoid --

MR. BOUNDAS: Your Honor, I'm going to object. This is total speculation. A 100 percent of people, what's the basis?

THE COURT: Is that based upon your?

THE WITNESS: Yes.

THE COURT: Conducting? It's 100 percent? Everybody?

THE WITNESS: Yes.

THE COURT: Everybody would avoid it.

THE WITNESS: Everybody would avoid people, places, or things that reminded them of the distressing event.

THE COURT: And what is that based on?

THE WITNESS: That is based upon a diagnosis in the

DSM-5.

THE COURT: DSM-5.

MR. BOUNDAS: I object.

THE COURT: Is this in the report, by the way?

MS. BROWN: Yes, Your Honor. I think I can ask a better question to help --

MR. BOUNDAS: Your Honor --

THE COURT: Wait a minute.

MR. BOUNDAS: This isn't in her report.

Number 2, I've read the DSM-5. It does not mention people getting in Ubers.

THE COURT: Let's get away from the testimony. Let's address her testimony here.

Was it in your report that 100 percent of people who have been assaulted in a rideshare program have -- have -- in subsequent to it have not taken a rideshare? Is that in your report?

MS. BROWN: Your Honor, I think it was -- I think she meant to say something different.

THE COURT: No, no. She said 100 of percent of people don't do it.

THE WITNESS: I'm sorry. I'm talking about a diagnosis. Can I clarify? Can I --

THE COURT: Wait a minute. Yes. Of course, you can clarify.

But the testimony, as I heard it, and I maybe a misheard it, that was 100 percent don't take -- don't put themself in the same situation that they were in when the assault occurred.

THE WITNESS: Yes. To have this diagnosis, 100 percent of people would avoid people, places, or things that remind them --

THE COURT: What diagnosis?

THE WITNESS: There is a diagnosis in the psychiatry DSM-5 that is about emotional disturbance and kind of looking at the diagnosis of that.

THE COURT: Well, wait a minute. We're getting really afar afield, because there is no testimony in this case concerning a psychiatrist diagnosis. And I think it's inappropriate to bring that in.

MS. BROWN: I can rephrase.

THE COURT: I don't think giving an opinion based upon the DSM, or the Diagnostics Statistical Manual, and that's -- I'm instructing the jury now not -- I'm instructing the jury to disregard this testimony as to the scientific or the psychiatric diagnosis under the DSM.

So you may now proceed.

MS. BROWN: I'll ask a better question.

BY MS. BROWN:

Q. I think, Doctor, it was my fault for asking a bad

question. Let me see if I can fix that.

Is the concept of avoidance in psychiatry, does that mean that if people in some circumstances have experienced something difficult, they may not want to be in the same place or around the same people moving forward, correct?

A. Correct. They avoid people, places, or things that remind them of that event.

Q. Okay. And as it relates to your experience in psychiatry, having studied it, having practiced it, it being what you do every day, are you aware of a diagnosable psychiatric disorder that is limited to events of 24 hours?

THE COURT: Well, I think this is not in the report, is it? Did she give a report on the DSM?

MS. BROWN: Yes, Your Honor.

THE COURT: Maybe I should look at the report. Do I have the report? I probably have it.

MS. BROWN: It's just my final question.

THE COURT: No. Whether it's your final question or not.

MR. BOUNDAS: I can give you a copy of the report.

MS. BROWN: Can we approach so I can explain, Your Honor?

THE COURT: Let me look at the report.

MR. BOUNDAS: I have a copy. Can I hand this up?

THE COURT: Yes.

THE COURTROOM DEPUTY CLERK: Thank you.

THE COURT: Just direct me in the report where there is a discussion of the DSM.

Ah. Okay. I'll allow you to ask questions.

Go ahead.

MS. BROWN: Thank you very much, Your Honor.

BY MS. BROWN:

Q. Doctor, to conclude this final point, we were talking about the concept of avoidance. And what that means in the fields of psychiatry is that you then don't go to the same place or be around certain people, you avoid those circumstances, correct?

A. Correct.

Q. Okay. And in terms of whether there is anything diagnosable in your profession based on a 24-hour period, are you aware of anything?

A. There is nothing.

MS. BROWN: Okay. Thank you very much.

THE COURT: Thank you.

MS. BROWN: I have no further questions.

CROSS-EXAMINATION

BY MR. BOUNDAS:

Q. Dr. Reminick.

A. Hi.

Q. Good afternoon.

A. Good afternoon.

Q. My name is John Boundas. I represent Ms. Mensing. You understand that, right?

A. Yes.

Q. Okay. We haven't met before, have we?

A. No.

Q. I want to start where you ended, if that's okay.

A. Yeah.

Q. So this -- the incident with Ms. Mensing in the Uber happened in March 2019, right?

A. Correct.

Q. Okay. And you talked about this concept of avoidance, that people would avoid situations where they were traumatized, right?

A. Correct.

Q. Okay. And you would agree that what happened -- if the driver late at night when Ms. Mensing was alone, forcefully grabbed her thigh and said "I want to keep it with me," that that would be a traumatic incident to a woman?

A. Not -- not in the sense that is psychiatrically significant or medically significant. It is upsetting, but there's nothing that we could diagnose or treat. It would be, you know, an hour of feeling frightened.

Q. Do you remember telling Ms. Mensing something different where you interviewed her?

A. I do not.
Q. Okay. We'll talk about that later.
So let's get back to avoidance. The Uber incident, March 2019, right?
A. Yes.
Q. Okay. When is Ms. Mensing's next Uber ride?
A. 2022.
Q. So she avoided Uber from April 2019 through December of 2019, 2020, right?
A. Correct.
Q. 2021, right?
A. Correct.
Q. Okay. And you know Uber --
A. So there's reasons why. There were circumstances where she could not access a rideshare.
Q. You're not saying that the entire time she couldn't access rideshare?
A. For the large majority of that time.
Q. Is that your belief?
A. Yes.
Q. Now, you know that Uber is a company that tracks the rides of individuals who ride on the service, right? If you ride, they know when they rode and when they didn't. Like you saw Ms. Mensing's records, right?
A. Yes.

Q. And they keep data on that, right?
A. They do.
Q. Have you seen statistics on how frequently women who report sexually assaults in Ubers take Uber again?
A. I haven't seen that data.
Q. Did you ask for that data?
A. From whom?
Q. From Uber.
A. No.
Q. You know they get reports -- if someone reports sexual assaults, they record that, right?
A. I believe -- I -- I don't know that part. That's not kind of in the scope of what I was asked to do.
Q. But if they do that, they also know if those people took rides subsequent to that, right?
A. It sounds like you're saying they would have that data.
Q. Yeah. Do you know if it's 100 percent?
A. Like I said, I don't know this data. I did not -- it's outside the scope of what I was asked to do in this case.
Q. Okay. You're testifying about Ms. Mensing's drug and alcohol use. And you mentioned that nobody chooses to have an addiction like this, right?
A. No.
Q. And Ms. Mensing, in particular, started using drugs and alcohol when she was little, like 11, right?

A. Yeah.
Q. And, in your opinion, should our jury view Ms. Mensing negatively or as an unworthy person because she has struggled with drug and alcohol use?
A. Unworthy? No, not at all.
Q. And there was some discussion about memory issues. And you talked about, you know, things Ms. Mensing remembered and didn't remember, right?
A. Correct.
Q. You -- you actually interviewed her, right?
A. I did.
Q. And there was an audio made of that interview, right?
A. Yes.
Q. Okay. And in that interview she actually told you specifically details of what happened in the Uber, right?
A. She told me some details.
Q. Right. She told you -- and I can play -- we will play the audio later, but she told you that the driver forcefully grabbed her in her thigh, right?
A. She did.
Q. Wanted to keep it with him, right?
A. Yeah. I think what I saw, too, across the records was that there were some inconsistencies in terms of what she initially reported.
Q. I'm asking what she told you.

You were talking about this memory. Did she tell you that?

A. She -- there was inconsistencies from the medical records versus what she told me on exam.

Q. Do you not want to answer that question about what she told you?

A. She did tell me that, that she was grabbed on the thigh.

Q. Right. And that the driver said I want to keep this with me, and then she ran into the house and other details, right?

A. Yes. Yes.

Q. Now, to be clear -- you started this testimony by saying you did something called an independent examination, right?

A. Correct.

Q. Okay. Now, to be clear, you're not Brianna Mensing's physician or psychiatrist, are you?

A. No.

Q. And when you saw her -- by the way, you never met her either. It was over Zoom, correct?

A. It was over Zoom.

Q. And when you were seeing her, she was absolutely not your patient, right?

A. She's not my patient.

Q. Your client was actually Uber and Uber's attorneys at that time, right?

A. No. I'm an independent medical examiner. I -- I was going into this without any judgment.

Q. Well, you've actually testified that you were seeing Ms. Mensing because, because you were hired by Uber and Uber's lawyers to evaluate her, right?

A. Uber asked me to do this independent medical examination.

Q. And -- well, just for today, Uber is paying you a minimum of $3,600 to sit in the witness stand, correct?

A. I don't know.

Q. You don't know? You have a fee schedule.

A. It's $600 an hour.

Q. Your fee schedule says a minimum for trial testimony --

A. For travel. I traveled here.

Q. Right. Okay. So $600 an hour, Uber is paying you. And you have met with Uber's lawyers, right?

A. I have.

Q. Met with them last night?

A. Um-hum.

Q. You met with them multiple times?

A. (The witness nodded their head.)

Q. Correct?

A. Yes. I'm getting paid for this.

Q. But you're getting paid for this by Uber, right?

A. Yes.

Q. Ms. Mensing is not paying for you, right?
A. No.
Q. Okay. And --
A. I do still try to be objective.
Q. When you put together that slide deck that you had, were those words on those slides, were those things that you wrote?
A. Which slides?
Q. The ones that you showed the jury.
A. Can you show me which ones?
Q. You just saw them.
A. I -- yes.
Q. So you --
A. I put together that deck.
Q. Okay. And did you actually choose -- personally choose each document that was shown to the jury?
A. Yes.
Q. And by the way, do you know what issues the jury is here to decide in this case?
A. I think they're here to decide if this happened and if there was emotional impact.
Q. Do you know if the jury is going to be asked to decide whether Ms. Mensing was a drug and alcohol user?
A. No. I don't think that is part of your.
Q. Right. And you're not here -- you have no personal

knowledge about whether this incident happened or not, correct?
A. I don't know.
Q. Okay. And let me ask you this, because I asked Ms. Mensing the exact same question. And I want to see how you answer them.
Can both of these things be true at the same time: One, Ms. Mensing was a drug and alcohol user; and two, she was also assaulted by an Uber driver?
A. Yes. Those two things can be true.
Q. And you know that actually people who are drug and alcohol users can be more vulnerable to sexual assault, right?
A. They can be.
Q. Now, you're a psychiatrist and a doctor, right?
A. Yes.
Q. Okay. And you just put on a presentation to show the jury that my client has been a drug and alcohol user, right, in part? That's how you started, right?
A. Yes. That she was using daily during this period of time.
Q. Right. And are you aware that before you came in to testify that everybody in this room was already aware that Ms. Mensing was a drug and alcohol user?
A. Yes. She's.

Q. Okay. And you know in the first -- I think I talked to her. She was on the witness stand. In the first five minutes she admitted that to the jury, right. You read her testimony?
A. I did. I also read -- the one thing that I had a hard time believing was the one beer that day.
Q. So are you here to judge her credibility, or is that these people's job?
A. I'm not here to judge her credibility.
Q. Right.
A. I'm -- I'm just describing what I know about substance abuse and my patients that use daily.
Q. Let's just say she had five beers. Would it be okay for her to be sexually assaulted?
A. Absolutely not, but it would affect her memory.
Q. Now --
A. If her memory is affected already.
Q. It's safe to say you reviewed hundreds of pages of Ms. Mensing's records?
A. Yes.
Q. Okay. And as a psychiatrist and a doctor, how often do you comb through your patient's records in order to show other people that that person is a drug user?
A. I don't understand the question.
Q. Well, I mean, have you ever gone through a person's

medical records in detail in order to present to people that that person is a drug and alcohol user, as a doctor?
A. I go through people's medical records to understand what diagnoses they have and what they're suffering with. And so I know when they come what their diagnoses are and how to treat them.
Q. And in order to look through these boxes -- did it require any psychiatric expertise to look through records and see whether they say cocaine or alcohol use or things like that? I mean, anyone in this room could have done that, right?
A. Absolutely not.
Q. You don't think people could just look through the records and find references to drug use?
A. No. I think there's a lot of acronyms and things we use as doctors. Doctors have a specific language. So looking through the medical charts, I don't think a layperson could look through medical charts and understand them the way I do.
Q. Okay.
A. That's why we go to medical school.
Q. And you went through three boxes of Ms. Mensing's medical records to see if she mentioned Uber, right?
A. I went to see if there was any mention at any point if she tried to get help about the emotional distress that she experienced in Uber, and I did not find anything that she

said to providers.
Q. All right. And so you reviewed Ms. Mensing's records. You reviewed her deposition, right?
A. I did.
Q. Her trial testimony, right?
A. I did.
Q. Depositions of her friend and -- some friends and family, right?
A. Yes. Yes.
Q. And one of your opinions was that Ms. Memory -- Ms. Mensing's memory has been affected by her drug and alcohol use, right?
A. Correct.
Q. Okay. Did Uber ask you to write a report regarding their driver's memory as to why he was unable to remember things about that night?
A. I was not asked to interview or examine a driver on this case.
Q. So we're talking about memory. You weren't asked to look at the driver and what his memory was, right?
A. I never interviewed or examined the driver.
Q. Okay. Did you -- were you asked to look at why he was unable to remember phone calls he had with Uber's attorneys just a few weeks ago?
A. I know nothing about the driver's side. I just know

Ms. Mensing.
Q. So you didn't look at his side of what his memories are, rights?
A. I did not.
Q. Okay. What's his name?
A. Richardson.
Q. Okay. Did you read his testimony?
A. I did not have a chance, no.
Q. Okay. And so you wrote two reports in this case for Uber, right?
Is that correct? You had one called a rebuttal report, one was the initial report?
A. I guess I'm a little confused because I didn't know we were going to talk about the rebuttal report since --
Q. I'm just asking if you did.
A. Oh, yeah.
Q. Would it be okay if I handed your report so we can refer to it?
A. Yeah. Yes.
MR. BOUNDAS: Your Honor, do you need a copy of her report?
BY MR. BOUNDAS:
Q. So you have your report in front of you?
A. I do.
Q. Okay. I want to put up just page 2 of your report. And

as your background it says, "I'm a board-certified psychiatrist who specializes in the mental health care needs for women with premenstrual syndrome, premenstrual dysphoric disorder, pregnancy, and postpartum mood disorder, and emotional disturbances during menopause," right?

A. Yes.

Q. None of those conditions apply to Ms. Mensing, correct?

A. No. But I mentioned that I see almost exclusively women, and women are often sexually assaulted. Almost 50 percent. So I see it often.

Q. Right.

A. No, I'm not specialized in sexual assault.

Q. Right. And you've co-authored numerous peer reviewed articles it says here?

A. I have.

Q. Okay. Let's look at the articles. You produced your CV attached to the report. I think it's going to be -- you can find it at Exhibit A of your report.

And does that list your publications?

A. Yes.

Q. Okay. So these publications that you've written relate to perinatal mental health disorders, right?

A. Correct.

Q. And perinatal, just for everyone, what does that mean?

A. Around the time of pregnancy.

Q. Perinatal, mood, and anxiety, right?
A. Yes.
Q. Postpartum depression, right?
A. Correct.
Q. Depression during pregnancy, right?
A. Correct.
Q. Okay. Bipolar disorder during pregnancy, right?
A. Correct.
Q. Major depression during pregnancy, right?
A. Um-hum. Yes.
Q. So have you ever written a publication relating to sexual assault?
A. I wrote guidelines for OBs performing obstetric exams for patients who have had trauma histories. So it's where the two intersect.
Q. Have you ever authored any publications on sexual assault or the effects of alcohol on memory?
A. I have not written an article about that.
Q. Okay. And have you written an article about substance abuse?
A. No. All of my experience is clinical, seeing patients, not in research.
Q. And in terms of presentations -- if we look, I'm not going to go through all of them -- but you have given a number of presentations, right?

A. Yes. My specialty is perinatal mood and anxiety disorders, and women's mental health.
Q. And all of the presentations have to do with pregnancy-related issues, right?
A. As I said, most of my experience is clinical for the most part.
Q. Right. But you've never given a presentation to other psychiatrists or doctors or anyone else on the subject of drugs and alcohol on memory, correct?
A. That specific topic, no.
Q. And you've never given a presentation to other psychiatrists or doctors on the subject of sexual assault, correct?
A. That, I have given a presentation on, but just to my residents.
Q. To medical residents?
A. To my psychiatry residents.
Q. Okay. Are you working on any other cases for Uber or Uber's attorneys?
A. No.
Q. Okay. If you look at your -- you have a Materials Considered List here. It's Exhibit C.
Well, while we're here, why don't we just talk about it. This is the fee schedule I mentioned. Is that your fee schedule?

A. Yes.
Q. Okay. So you charge $650 an hour for depositions, right?
A. Yes. This is -- it's how much I charge in my private practice as well.
Q. Okay. And for court or arbitration testimony, we talked about the 600 minimum, $3,600, right?
A. Yes, if I'm traveling, yes.
Q. Right. Which you are now, right?
A. Yes.
Q. When did you get into Charlotte?
A. Gosh, it was just yesterday.
Q. Are you charging $3,600 for yesterday also?
A. No, no, no.
Q. How many hours have you spent preparing for your testimony in this case?
A. I think it's just been six.
Q. Okay. Do you know how Uber's attorneys got in touch with you?
A. I do.
Q. Okay. How is that?
A. My friend and colleague referred me or recommended me. She is a psychiatrist that I graduated with at University of California, Los Angeles. And she recommended me --
Q. Okay.

A. -- for this.

Q. Has she worked with Uber?

A. I don't think so, no.

Q. Now, I want to talk about your materials considered list attached to your report. Is this list the documents that you considered?

A. Yes for this report.

Q. Right. And when you wrote and signed your initial report, you mentioned that you reviewed the records of K. Oravec, LMFT. What is LMFT?

A. That is a licensed marriage and family therapist.

Q. Okay. Who is she in this case?

A. I honestly don't remember.

Q. It says that you reviewed depositions of Phillip Cardona. Who is that?

A. I don't know what this is. Sorry.

Q. What?

A. I don't -- I don't actually recognize any of these names.

Q. This is straight from your report, correct?

Who is Theresa Cardona?

A. I don't know. I don't know where -- sorry. I don't know where this is from.

Q. I'll tell you. It's from -- it's attached to your report.

A. Okay.
Q. Okay.
A. I don't know Theresa Cardona or Phillip -- I don't think my memory is that bad that I would forget a complete deposition, so I don't know who those people are.
Q. Do you remember writing down that you reviewed these depositions?
A. No. I don't think this is my report. Maybe it got in there inadvertently.
Q. But I mean, you put -- how could the names of people --
A. My signature is not at the bottom of this, so I will just say -- I'm sorry. I don't know any of these people.
Q. Okay. So you don't know --
A. I looked at the deposition of Taylor Lowery, of Ariel Watkins, Brianna Mensing, of Melissa Mensing, of Neal Young. So those are the depositions that I reviewed for this case. This is not -- I -- this is not the case. I think this is something different that -- I don't know why you have in your hands.
Q. Well, no, I mean, it's your materials from this case. If we look, it says Mensing. And then records, Mensing, Mensing, Mensing, Mensing, Mensing, all the way down, right? Do you see that?
A. This is not something I wrote.
Q. You didn't write -- well, wait a second.

Didn't you sign this?
A. So go back one page.
Q. Okay.
A. This is me.
Q. This is not your report?
A. This is my report. This is my report.
Q. Right.
A. So that one page is not mine. This is mine. This is mine too.
Q. Okay. And then -- well, I'm just trying to figure out how you attached to your report a bunch of stuff about Ms. Mensing and then the depositions that you've never heard of. Like, how did you get these names? Who are they?
A. I can't tell you because I did not write this. I did not type this out. I did not write this. This one page, page 2.
Q. Did you read the materials considered in your report when you submitted your report that you signed?
A. I did, and it didn't look like that.
THE COURT: Okay. Why don't we move on.
MR. BOUNDAS: Got it.
THE COURT: Explored it enough. Okay.
MR. BOUNDAS: Okay.
THE WITNESS: I don't even see them in this report. I'm sorry. Not to belabor this point, but it's not in this

one.

THE COURT: Okay.

MR. BOUNDAS: We'll move on. Okay.

BY MR. BOUNDAS:

Q. Okay. So we talked about your fee schedule. I'm going to skip through some things just to move this along.

Okay. So what's the name of the person that Ms. Mensing went to visit on the night of the incident?

A. Trevor Woodham.

Q. Okay. And when was the last time Ms. Mensing testified that she had seen Mr. Woodham?

A. Since -- since the incident or prior to?

Q. Prior to.

A. I think she said years.

Q. Okay. Do you recall testifying in your deposition that, under oath, that Trevor Woodham -- she went to somebody's house that she usually did drugs with and was drinking during the time?

Do you remember the testimony?

A. As it relates to Trevor?

Q. Yes.

A. Can you read the line before? Or can I see it?

Q. I can show it to you.

A. Yeah. That's great. Thank you.

MR. BOUNDAS: Let me get a copy of your deposition.

Hand one up.

THE COURTROOM DEPUTY CLERK: Thank you.

THE WITNESS: Thank you so much.

MS. BROWN: May I have a copy as well?

THE COURT: Okay. What page do you want her to look at, please?

MR. BOUNDAS: I think it's 55, but I have to check my notes here.

BY MR. BOUNDAS:

Q. So it is page 55. And so the question on page 55, if you're there, line 19, was: "There's no witness who is with her night, the night of the incident or the morning of the incident, that has testified that Ms. Mensing was using alcohol or any substances, true?"

Do you remember that question?

MS. BROWN: Your Honor, I object. This is not inconsistent testimony.

THE COURT: I'm going to allow it.

Go ahead.

BY MR. BOUNDAS:

Q. Do you remember testifying that she went -- you testified under oath that you forgot his name, but she went to somebody's house that she usually did drugs with and was drinking with often during that time. You said that right?

A. So --

THE COURT: Well, the question is did you say that?

THE WITNESS: I think I'm answering it, but not based on the night of the incident.

THE COURT: Well, no. That's not really the question.

THE WITNESS: Oh, sorry.

THE COURT: Listen to the question.

BY MR. BOUNDAS:

Q. Did you say that? Was that your testimony?

A. I will say this looks like my deposition, and so I will say yes, I believe that I would have said this.

This is my words.

Q. Right. Exactly.

And you know that there's no evidence that she was drinking or usually doing drugs with Mr. Woodham during that time. In fact, you just said that she hadn't seen him in years, right?

A. Yeah. I don't -- I don't believe I'm mentioning Trevor Woodham here. I know that she was not using drugs, that he was not somebody she was going to his house often to use drugs. I think I'm referring to somebody else.

Q. You think so? Because you said she went to somebody's house that night.

A. I don't think I said that night.

MS. BROWN: I object, Your Honor. It's incomplete.

It forgets the first sentence to that answer, which gives context to it.

THE COURT: Why don't you read. Read the question starting with line 19.

MR. BOUNDAS: Yes.

THE COURT: And through the next page.

BY MR. BOUNDAS:

Q. So the question you were asked is: "And so there was no witness who was with her the night of the incident or the morning of the incident that has testified that Ms. Mensing was using alcohol or any other substances, true?"

Did I read that correctly?

A. You did.

THE COURT: Keep on going.

BY MR. BOUNDAS:

Q. And your answer was: "Forget his name. She went to somebody's house that she usually did drugs with and was drinking with often during that time."

Right?

A. Yes. It sounds like it's during that time, but not the morning or night of.

THE COURT: Excuse me. All you're being asked is were you asked that question and did you give that response.

THE WITNESS: I did. These are my words.

THE COURT: Fine. That's all that's being asked.

MR. BOUNDAS: Okay.

BY MR. BOUNDAS:

Q. And you know that Ms. Mensing during her interview did not testify that she was regularly using drugs or drinking with Mr. Woodham, correct?

A. Yeah, she hadn't seen him, so I think it was just the one time.

Q. Right. So it definitely wasn't someone she was usually doing drugs with, right?

A. No.

Q. Okay.

A. And he also did not testify or give deposition.

Q. I'm sorry?

A. And he also did not give a deposition.

THE COURT: Well, that has nothing to do with it.

THE WITNESS: Okay.

MR. BOUNDAS: Right.

THE COURT: You're not here to argue some case.

Okay. No. All you're being asked is were you asked the question and did you given the response. Now, if your reason for the response was that somebody else wasn't deposed in the case, that may be a reason. I don't know why it would be relevant, but that's a reason. But you're not being asked the reason for the testimony.

Okay. Let's -- try to wrap it up. Okay?

MR. BOUNDAS: Yes, sir. Yes, Your Honor.

BY MR. BOUNDAS:

Q. So let's talk about your interview, okay? You interviewed Ms. Mensing over Zoom on August 14, 2025, right?

A. Correct.

Q. And the view was video recorded, right?

A. Yes.

Q. And do you remember being asked in your deposition or stating in your deposition that you likely still had the recording but that you, quote, "I need to delete it"?

A. Yes.

Q. Do you remember saying that?

A. Yes.

Q. Okay. Do you know when you actually turned that recording over to Uber's attorneys? Because I just got it last month.

A. I don't know.

Q. Okay.

A. It came up recently.

Q. You mentioned earlier -- well, Ms. Mensing actually told you what happened the night of the Uber, correct? The Uber incident, right?

A. She did.

Q. And I want to show you what she actually told you, if I can. We have the transcript of your examination.

Would you like to see that?
A. Yes, please.
MR. BOUNDAS: Ms. Brown, would you like a copy?
MS. BROWN: That would be terrific. Thank you.
THE WITNESS: Thank you so much.
MR. BOUNDAS: Your Honor, I'll hand one up.
BY MR. BOUNDAS:
Q. Okay. So you -- and the reason I'm asking this is you talked about Ms. Mensing's memory. And I want to go to page 66.
Are you there?
A. No, not yet. Sorry. Give me a second.
Q. That's okay.
A. Okay. I'm here.
Q. Okay. And she told you she remembered getting picked up, right? Line 15. I mean, I can put the whole thing up if --
THE COURT: Well, why don't you read what you're going to read.
MR. BOUNDAS: Right.
THE COURT: Were these questions asked and these answers given?
MR. BOUNDAS: Yes.
THE WITNESS: Yes.

BY MR. BOUNDAS:

Q. And she said she went to open the door and "he grabs my inner thigh and says can I keep this with me. And I was like, no, what the -- I was like uh, and ran in the house. It freaked me the F out."

Do you remember her telling you that?

A. I do.

Q. And then she described the driver and said she could still remember his face, right?

A. Yes.

Q. And then she said after she got out of the car she tried to calm down. She tried to wake up her boyfriend. He wouldn't wake up and so she told him first thing in the morning. She told you that, right?

A. That's what she said.

Q. And then if we go down to line 24, when you asked her in her interview what happened, you asked, "Did he grab you tightly?"

And she said, "Yeah."

"Forceful?

"Yeah. He grabbed my inner thigh like," and then she said "right here," describing where she was grabbed, right?

A. Right.

Q. Okay. And then she said -- well, first of all, you told her, "You did nothing wrong, and it's a typical thing to

blame yourself after something so scary happened," right?
A. Yes.
Q. And you agree that in this incident Ms. Mensing has no fault, in your opinion, right?
A. If -- if this happened --
Q. Yeah.
A. -- I do not believe she would have had fault.
Q. Right.
A. Of course not.
Q. And also you mentioned that that something that would be scary to happen. That's pretty obvious, right?
A. That would be scary for anybody.
Q. Sure. And she said she was in fight or flight mode and she wanted to get away as fast as possible, right?
A. Yes.
Q. And then to go on, she -- you asked her, now we're at page 67, line 24, "Did he grab you tightly?"
And she said, "Yeah."
Right?
A. Yes.
Q. And then page 69, she continued on. She said, "I don't know how long he was there. I don't remember. Like, we had cameras. So I'm there, like, with a live feed camera." And then she said, "I don't know."
MS. BROWN: Counsel, can you read the whole thing,

please.

BY MR. BOUNDAS:

Q. "I don't know. I don't know. I don't know. I f'ing don't know."

Do you remember that?

A. Yes, I remember her saying that.

Q. And in describing this incident, she actually got very upset and needed to calm down, right?

A. Yeah.

Q. And you know that this was, at least when she was describing it to you, something that she described as being very disturbing at the time? And I'm talking about when it happened. Right?

A. Correct.

Q. And you have no doubt that, you know, if this happened to her, or any woman, that this would be an incident that could cause very serious distress, right?

A. I have to look at distress from a psychiatric and medical lens. It's just how I was trained. And this wouldn't kind of meet the criteria of a diagnosis based on there was no actual threat of death or a serious bodily injury.

Q. Do you remember telling her that what happened could cause certain symptoms? If you look at page 70, line 7.

A. So I think I can't talk about this.

Q. Okay. But you did tell her --
A. It wasn't -- but it wasn't based on this.
THE COURT: Okay. Let's move on. I think we get it.
BY MR. BOUNDAS:
Q. Bottom line, we just looked at, she told you what happened. She relaid the incident to you. And that was what was from her memory when she talked to you, right?
A. Yes.
Q. Okay.
We already talked about Ms. Mensing's use of Uber.
I just, you know, in the interests of wrapping this up, I'll just ask you a couple more questions.
A. Yeah.
Q. Despite all of your talk about memory issues, we just read for the jury what Ms. Mensing told you about the incident, right?
A. Yes.
Q. Okay. And you recorded that, right?
A. I did.
Q. Okay. And despite all the testimony you've given today about her drug and alcohol use and her memory, do you have any personal knowledge of whether or not this incident happened to Ms. Mensing?
A. I'm not going to take a position on whether this

happened or not.

THE COURT: I think the question is -- it's not whether you take a position. You are asked the question if you have any personal knowledge of whether it occurred.

THE WITNESS: I do not. I was not there.

THE COURT: Okay. That's the answer. Thank you very much.

MR. BOUNDAS: Thank you, Your Honor.

THE COURT: Anything further?

MS. BROWN: Just three questions, Your Honor.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MS. BROWN:

BY MS. BROWN:

Q. Dr. Reminick, we're almost done.

You were asked some questions about the way in which Ms. Mensing described the Uber ride to you when you had the independent medical evaluation. Do you recall that?

A. Yes.

Q. Did you have the opportunity to read and review the way she described the incident to our jury when she was here earlier this week?

A. Yes.

Q. Okay. One of the things our jury heard her describe was running from the side of the house all the way around the

house into the garage. Did she ever mention anything about that to you?

A. No.

Q. Did she ever tell you anything other than she walked into the house?

A. She said she went into the house, yeah. No, no garage.

Q. One of the things she mentioned to our jurors was that she came in inside and took a long hot shower. Did she mention anything about that to you when describing what she did when she went into the house?

A. No.

Q. Were there other inconsistencies --

MR. BOUNDAS: Your Honor --

THE COURT: Well, wait a minute. That's argument.

And, secondly, to be an inconsistency she would have had to have been asked a question. For example, what happened after you went into the house.

Did you ask that question?

MS. BROWN: I'll ask that question, Your Honor.

THE COURT: Go ahead.

MS. BROWN: Okay.

BY MS. BROWN:

Q. Part of your interview involved asking her what she did when she went into the house, correct?

A. Correct.

Q. And did she mention to you that she took a long hot shower when she went -- did she tell you that when she went into the house she took a long hot shower?

A. No.

Q. Okay.

MS. BROWN: No further questions. Thank you.

THE COURT: Okay. Nothing further?

MR. BOUNDAS: No, Your Honor. I think that's all we have.

THE COURT: Thank you very much, Doctor.

THE WITNESS: Okay. Thank you.

THE COURT: Anything further from the defense?

MS. BROWN: No, Your Honor. Thank you.

THE COURT: Ladies and gentlemen, you're excused. Ladies and gentlemen, we're going to take our recess now and -- wait a minute. I'm getting my --

Okay. So as I understand it, there's nothing further from the defense.

Does the plaintiff rest?

MR. BOUNDAS: The plaintiff --

MR. SMITH: Subject to making sure exhibit issues are handled, yes, Your Honor.

THE COURT: There may be some documents that come in on both sides, and we'll leave it open for that purpose.

But from a witness point of view, the parties rest;

is that correct?

MS. BROWN: That's right, Your Honor, subject to exhibits and a Rule 30.

THE COURT: Subject to certain exhibits.

MR. BOUNDAS: That's correct, Your Honor. We rest as well.

THE COURT: Ladies and gentlemen, your schedule is tomorrow -- tomorrow is Saturday. Then come Sunday. And then Monday you're back here again at 9:15. At 9:15 the Court will instruct you on the law. You will then hear the argument of counsel. And then you will have the case for decision. My guess is that you will have the case sometime prior to noon or thereabouts.

So with that, remember my admonition. Don't discuss the case, allow anyone to discuss with it, form or express any opinion. And I'll see you on Monday. Have a nice weekend.

(The jury exited the courtroom.)

THE COURT: Okay. The jury has retired. I don't think there is anything left.

MS. BROWN: I do have one.

THE COURT: Sure. Go right ahead, Counsel.

MS. BROWN: Your Honor, I would request that the Court strike the questioning about the material considered list. And the reason is, Your Honor, I've just been handed

the amended considered list. As the Court even pointed out, it was a typographical error that counsel knew about in that questioning, and it's irrelevant and unfairly prejudicial to us to have us remain in the record.

MR. BOUNDAS: Your Honor, my response would be two things.

One, it's not a typographical error to enter names of people who are involved in a separate case. And also they questioned my client a lot about issues in documents that she signed. So I think it goes both ways.

THE COURT: Well, I'm a little confused by it. Looking at the document -- I mean, looking at the document, it is in the copy I received. It was a part of the document, the document being the witness's report.

MR. BOUNDAS: It was.

THE COURT: So obviously I got a copy. Plaintiff's counsel got a copy. And so I think it's fair to ask questions about it, especially if there are things in it that appear to be inaccurate.

What I guess you're telling me, it was a lawyer's mistake to put it in or what?

MS. BROWN: Well, Your Honor, I think the distinction here is that obviously she signed her report. This was an annexed list that was typed up, she said not by her, the materials she reviewed, and --

THE COURT: But she's answered it.

MS. BROWN: Before she was deposed, counsel was provided with what's in my hand as the amended document considered list, which omitted that section that he questioned on because it was incorrect. And I think the Court said this looks like a typographical error. And indeed it was.

MR. BOUNDAS: Your Honor, it's not -- it's not a typographical error. I mean, it's incorrect information that this witness, as of the date she signed her report, submitted.

MS. BROWN: But I don't --

MR. BOUNDAS: If she amended it later, she amended it later. And they could have asked her about that. But they pointed out my client's errors in signed documents that she had.

THE COURT: I think it's fair. I think what the defense can do is to maybe do -- work out a stipulation which would say essentially that on such and such date an amended document list was submitted subsequent to the report. You can either put it in or not. I don't care.

MS. BROWN: Thank you, Your Honor.

THE COURT: Work out a stipulation to it so -- I think -- I mean, you can obviously call a witness in rebuttal on that if you wanted to so we don't want that to happen.

And it may not have been her mistake.

MS. BROWN: Correct.

THE COURT: That is to say she didn't do it.

MS. BROWN: Correct.

THE COURT: It was the lawyer's mistake. Not that they ever make mistakes. They are like the Court.

So anyway, I want you to be able to clear that up so it doesn't leave the impression that it was the witness who -- well, I have to be careful. The witness did submit it. The witness submitted it, but it was redrafted, as I understand it.

MR. BOUNDAS: Well, Your Honor, I understand with that. We're fine with that stipulation. But we would -- it's a two-way street. We would like a stipulation that our client also amended her --

THE COURT: No, I'm not going to do that.

However, I think you can -- I think in fairness the way you draft the stipulation is that you can point out that it was in the part -- don't say it was in her report --

MR. BOUNDAS: Yes.

THE COURT: -- which she acknowledged. And then an amended report was filed in which those were deleted.

So, in other words, it sort of -- it gives the chronology without ascribing the origin of the mistake.

MR. SMITH: Your Honor, there's some confusion

actually. The documents were not deleted from the amended -- on the amended considered list. They're actually included in the amended considered list.

THE COURT: My sense is the -- why don't the two of you get together and see if you can get a stipulation. If you can't, I'll be here at 9:00. If you can't --

MS. BROWN: Thank you.

THE COURT: -- then we will deal with it. Okay?

See if you can, by having a conversation, you can deal with it. Okay?

Anything else?

MR. WYATT: Your Honor, if I may.

THE COURT: Yes. Of course.

MR. WYATT: Geoff Wyatt for the defendants.

I'll renew our Rule 50 motion. I will stand on what I submitted previously, and add the testimony we just heard, that there's no evidence in the medical records, any of them, that there was any discussion of the incident that is the basis of this lawsuit. And I will also request --

THE COURT: Wait. That's not a legal objection.

MR. WYATT: It goes to the sufficiency of the evidence as to actual damages.

THE COURT: I see.

MR. WYATT: That point.

And then I'll ask if we may submit a written

document to back up this argument before Monday.

THE COURT: Sure.

MR. WYATT: Thank you, Your Honor.

THE COURT: Submit anything you want.

Okay.

MR. KAUFMAN: Your Honor, we just wanted to ask if the Court has prepared a verdict form?

THE COURT: Yes. I'm trying to find out.

All it says -- I think it's Plaintiff's verdict form, proposed. It's two lines. The first one says -- I don't have it in front of me. I don't know.

MR. SMITH: Did Jeffery Richardson assault.

MR. KAUFMAN: Battery.

MR. SMITH: Ours had the assault in there. That needs to come out.

THE COURT: The assault is out.

MR. KAUFMAN: Yeah.

THE COURT: It's a battery.

MR. KAUFMAN: It's not so much the content. I think our people just want to be able to see it so they can use it.

THE COURT: Okay.

THE COURTROOM DEPUTY CLERK: Judge, I have it in my email. It says, "Do you find that Jeffrey Richardson committed an assault or battery against the plaintiff?"

THE COURT: And the assault --

THE COURTROOM DEPUTY CLERK: "Yes or no."

THE COURT: The assault or battery -- the assault or, those two words will be deleted. Committed a battery against the plaintiff. Answer yes or no.

Second question should say if yes, what do you find.

THE COURTROOM DEPUTY CLERK: It says, "In what amount, if any, was Plaintiff damaged?"

THE COURT: "What amount, if any, was Plaintiff's damage?"

MS. BROWN: There's no "if."

MR. WYATT: It should say "If you find," or there should be some sort of --

THE COURT: I should say "If yes."

"If your answer to Question Number 1 is yes" --

MS. BROWN: Correct.

THE COURT: -- "then please answer Question Number 2."

MR. WYATT: Right. And "If no, proceed no further."

MR. KAUFMAN: I think we can --

THE COURT: How -- they seem pretty alert, you know. I don't know that this is a tough form for them to get through.

By the way, if they can't get through this form.

MR. KAUFMAN: Thank you, Your Honor.

THE COURT: Anything else?

MR. KAUFMAN: Not from us.

MR. WYATT: Not from us, Your Honor.

THE COURT: Okay. Thank you very much.

I do want to tell you that I met with the Chief Judge to ask him what was the practice was here on time limits for closing arguments. And he said, well, he reminds the lawyers that the most effective argument he heard was from a lawyer from out of town who said to the judge, who offered to give him an hour or so to talk, and he says all I need is 12 minutes. If I go to 13 minutes, you cut me off.

He said, really?

He said, yep all I want to say is, and I can say is it in 12 minutes, and the jury was out 12 minutes.

Anyway.

MR. BOUNDAS: Did he win?

THE COURT: He won.

MR. BOUNDAS: Okay.

THE COURT: Okay. Have a nice weekend.

(The proceedings concluded at 1:48 p.m.)

* * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 17th day of April 2026.

/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CRC
U.S. Official Court Reporter