UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Charles R. Breyer, Judge

| | | |
|---|---|---|
| IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, | ) | No. 3:23-MD-03084-CRB |
| WHB 823 v. Uber Techs, Inc., et al. No. 3:24-cv-04900 | ) | |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| WHB 823, | ) | |
| Plaintiff, | ) | No. 3:25-cv-00737-CB |
| vs. | ) | |
| UBER TECHNOLOGIES, INC., et al., | ) | VOLUME IV |
| Defendants. | ) | Pages 546 - 643 |

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE CHARLES R. BREYER
UNITED STATES SENIOR DISTRICT COURT JUDGE
MONDAY, APRIL 20, 2026 AT 9:00 A.M.

JILLIAN M. TURNER, RMR, CRR, CRC
Official U.S. District Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:

For Plaintiffs:

SARAH R. LONDON, ESQ.
ANDREW KAUFMAN, ESQ.
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, California 94108

JOHN T. BOUNDAS, ESQ.
SEJAL BRAHMBHATT, ESQ.
Williams Hart & Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017

WILLIAM L. SMITH, ESQ.
ALEXANDRA M. WALSH, ESQ.
Anapol Weiss
6060 Center Drive, 10th Floor
Los Angeles, California 900045

THIEN AN V. TRUONG, ESQ.
Simmons Hanly Conroy
112 Madison Avenue
New York, New York 10016

ROOPAL P. LUHANA, ESQ.
Chaffin Luhana LLP
3200 Main Street
Weirton, West Virginia 26062

For Defendants:

ALLISON M. BROWN, ESQ.
LAURA VARTAIN HORN, ESQ.
CAROLINE POWER, ESQ.
GEOFFREY M. WYATT, ESQ.
Kirkland & Ellis LLP
2005 Market Street, Suite 1000
Philadelphia, Pennsylvania 19103

MICHAEL A. BROWN, ESQ.
Nelson Mullins
100 S. Charles Street, Suite 1600
Baltimore, Maryland 21201

# I N D E X


| | PAGE |
|---|---|
| JURY CHARGE | 563 |
| CLOSING ARGUMENT BY THE PLAINTIFF | 572 |
| CLOSING ARGUMENT BY THE DEFENDANTS | 587 |
| REBUTTAL ARGUMENT BY THE PLAINTIFF | 623 |
| FINAL JURY CHARGE INSTRUCTIONS | 631 |
| VERDICT | 639 |
| JURY POLLED | 640 |

(Court called to order on Monday, April 20, 2026, commencing at 9:00 a.m.)

P R O C E E D I N G S

THE COURT: Good morning, ladies and gentlemen. Let the record reflect that the parties are present. The jury is not present.

So the Court received several requests -- I don't know what you call them exactly -- dealing with closing argument and also to strike portions of Dr. Reminick's testimony. And I also have the opposition to that.

I think essentially, as I understand it, their argument is that this is: Her testimony and the subject was not within her scope of expertise, as I understand it.

MS. TRUONG: That's right, Your Honor. And it was in our review of the transcript just Dr. Reminick agreeing with counsel's summation of the contents of the medical records.

THE COURT: Well, I'm really trying to figure out what her expertise was. Is she a psychiatrist who specializes in gynecological matters? Is a gynecologic -- is she a gynecologist who deals with the psychiatric issues that a gynecologist would frequent in a practice? Is that her degree of expertise? Or does she have some other expertise?

MR. WYATT: Good morning, Your Honor. Geoff Wyatt for the defendants.

THE COURT: Good morning.

MR. WYATT: She's a psychiatrist and she specializes in women's issues. In the course of that, she encounters history of sexual assault in a number of her cases.

THE COURT: But women's issues as a result of certain gynecological occurrences. I mean, isn't -- you read through 12 articles that she's published and they're all confined to gynecology, as I understand it. What do I know? But they seem to be confined to gynecological issues as distinct from substance abuse issues.

MR. WYATT: She encounters those issues in her practice. She has a practical experience that goes beyond what she's published on.

And I think actually, as I read the submission, it's not focused as an expertise challenge under Rule 702. Instead, the argument is that she essentially served only as a prop through which to funnel in medical records, and that's simply not true. I mean, as we outlined in the opposition, she did offer a number of opinions on all of the topics that the plaintiffs raised.

And the other thing that's difficult about this sort of the posture in which it arises is this testimony came in on Friday. Plaintiffs were here. It did not occur to them certainly over the weekend that this testimony was

allegedly improper. And now we're faced with a situation where we're preparing for a closing based on multiple rulings on these issues before trial, during trial -- two rulings during trial on this. And on Sunday night at 11:55 suddenly our whole preparation for closing is under attack because the plaintiffs have now decided --

THE COURT: I think it is unfair. I mean, I think that's simply unfair at this stage.

Anyway, I think it's all a subject of argument. You can point out that she has no particular expertise in this area or expertise in gynecological matters. You can point out anything, any reasonable inference from the testimony I think you're entitled to do it.

It was admitted. It was admitted subject to a motion to strike. There was sufficient notice. So I think that in the fairness of a trial that's where the parties committed to try the case and that's what I think it should be tried on.

So your motion is denied.

MS. TRUONG: Thank you.

MR. WYATT: Thank you, Your Honor.

THE COURT: Next I have, let's see, a motion from plaintiffs on four issues that it is their expectation there may be some argument about or may not. I don't know. It's -- it's useless since I don't have a written response.

If you'd like to respond.

MS. BROWN: Sure.

THE COURT: Why don't we just take them one at a time.

MS. BROWN: And sure. And to make things easier, I'll start backwards, Your Honor.

THE COURT: Start.

MS. BROWN: Thank you, Your Honor. Alli Brown for the Uber defendants.

I do not intend to argue that she created multiple Uber accounts to commit fraud, consistent with the Court's rulings.

I do not intend to argue that she did not recall a stop during the incident ride.

I'm not really sure what they really mean by substance abuse caused her --

THE COURT: Before you leave three.

MS. BROWN: Uh-huh. Yeah.

THE COURT: Before you leave three, okay, this is helpful but, but the question is: What is the evidence independent of her recollection or absence of recollection of a stop?

MS. BROWN: Um-hum.

THE COURT: Is there any evidence in the record that the driver made a stop?

MS. BROWN: No. That's why I'm not going to talk about it at all.

THE COURT: Okay. So it's not a failure of recollection. We seem to be spending a lot of time in this case talking about if somebody says "I don't remember."

MS. BROWN: Right.

THE COURT: Does that mean it didn't happen, or does it mean that my state of mind is such? And especially when you want to argue, as I think you will, that her state of mind was impaired that night.

MS. BROWN: Right.

THE COURT: I don't think you can just say, well, she doesn't remember stopping. That's right, she doesn't remember stopping. But the question is she also doesn't remember many number of things which didn't occur that night.

So you're not going to argue in any way?

MS. BROWN: That's right, Your Honor.

THE COURT: Got it. Let's move to two since we're going backwards.

MS. BROWN: Sure, Your Honor.

So to preclude argument that plaintiff's substance and memory issues caused her to remember something that did not occur, I'm not sure I understand that. There is certainly evidence in the record that a fair argument can be she suffered from memory impairment. There is a medical

record that talks about cognitive impairment and expert testimony about the same. And there is an admission on the plaintiff herself that her substance abuse affected to recall things.

I plan to make argument from that. I'm not sure I'm going to say she made something up.

THE COURT: The evidence is what evidence is there she had an impairment that night? That's the question.

MS. BROWN: Sure. There is circumstantial evidence that she had an addiction that lasted more than a period of more than two years.

THE COURT: All right. You can argue it.

MS. BROWN: Thank you.

THE COURT: It's an argument you can make.

MS. BROWN: Thank you, Your Honor.

And I believe the same argument would apply plaintiff was likely intoxicated or otherwise impaired the night of the incident. The testimony in the case is that she suffered from an addiction that lasted during this period of time, was at the height of her addiction at this time, and that she had -- the expert testimony is that it would be difficult for someone to have a sober day during the height of an addiction like this, and I will argue from that.

THE COURT: And that testimony came from your gynecological psychiatrist.

MS. BROWN: And I'm not sure what the Court means by gynecological.

THE COURT: That's her expertise. I mean --

MS. BROWN: To be fair, there is nothing involving gynecological issues that she --

THE COURT: Pardon me?

MS. BROWN: What she specializes in is treating women who are pregnant. And that is not the exclusive nature of her practice. She treats all types of women's -- all types of women suffering from all types of issues that affect women as it relates to psychiatric issues. And some of her publications and some of her presentations have focused on women who are pregnant.

And so she's not a gynecologist. We're not talking about gynecological conditions. We're talking about women, women's health issues, and some women who are pregnant. So certainly she explained that her treatment of women includes women who have suffered sexual assault and includes women who are struggling with substance abuse.

MS. TRUONG: Your Honor, may I respond, please?

I think the Court has it right. Dr. Reminick did testify she is a specialist in reproductive health, women's reproductive health. That's her specialty.

I can talk on this issue two of our brief which goes to the memory component. Throughout this trial Uber's

defense has been substance abuse means that Ms. Mensing's memory is impaired; therefore, she cannot remember things. That's been the defense. And as the Court has noted, is entirely inconsistent with the facts of this case when Ms. Mensing remembers something.

And now there's a little bit of a twist here. Counsel wants to argue that the absence of that memory, that any memory is false. That is going directly to credibility and it's --

THE COURT: That's an argument. That's an argument.

MS. TRUONG: But, Your Honor --

THE COURT: But it's an argument you don't subscribe to and maybe the jury won't subscribe to, but it's an argument. She wants to argue that the absence of memory means that, I guess, that you make up things. Since you have no memory, you simply make it up. You remember something that didn't happen because you can't remember what happened. So it's like -- I think I -- I think actually said it right. And since there's a blank, since it didn't happen, she has no memory of it, she simply filled the blank with this -- with this event.

MS. TRUONG: So --

THE COURT: And if she wants to make that argument, she makes that argument. You come back and say that's not a

good argument, and you look for corroboration, things that she did afterward, things that she did respecting people and so forth, viewing videos and so forth. That's the argument. So it's an argument --

MS. TRUONG: Your Honor, if I --

THE COURT: -- on both sides.

MS. TRUONG: Thank you, Your Honor. And I understand the Court's ruling. If I may just make one point here?

THE COURT: Yes.

MS. TRUONG: It's an end run around the Court's exclusion of Dr. Reminick and not able to testify about credibility. And that's exactly what she's testifying in this case. She's calling plaintiff a liar because she's a substance abuser.

MS. BROWN: That's not fair, Your Honor.

MS. TRUONG: That's the end run.

MS. BROWN: That's not the testimony.

THE COURT: Wait, wait. One at a time.

That was my point, Your Honor, is that it is directly in violation of the Court's motion to exclude that portion of testimony which cannot go to credibility.

MS. BROWN: And that's not the testimony and that's not going to be the argument.

The argument is going to be based on evidence in

the medical records of how her treating physicians viewed her memory; and the evidence is going to be based on the only psychiatric expert testimony that came to our jurors about how substance abuse affect people's memory. And the argument is going to also be based on Ms. Mensing's admission herself.

THE COURT: I'm sorry. Is there evidence in the record that if you have an impaired memory you make up things?

MS. BROWN: No, Your Honor. And that's the part I don't really understand of their argument.

THE COURT: I don't understand it either.

MS. BROWN: Correct.

THE COURT: And I think that's her point.

MS. BROWN: I'm not going to say she made things up. I'm going to argue, and they should consider it's on the credibility list.

THE COURT: What do you mean "make things up"? Either the assault happened or not. Either she made it up or it actually happened. So isn't that exactly what you're saying? Aren't you say she made it up? I mean, I think you have to be honest in your argument.

MS. BROWN: Well, I think what I'm saying, Your Honor -- and that's a separate issue from the memory -- I don't believe that this incident happened.

THE COURT: Well, so, in other words, she made it

up?

MS. BROWN: Or she's misremembering what happened or her memory is so impaired by an unfortunate struggle with substance abuse that she's remembering things that didn't occur. Now --

THE COURT: She made it up.

MS. BROWN: I don't know. I don't know if that's someone making it up. Maybe she truly believes that's her memory, but it's wrong and it's not supported by the evidence. So --

THE COURT: That's a difference of whether you intentionally make it up or make it up unintentionally.

MS. BROWN: Can I --

THE COURT: You're saying unintentionally make it up. I'll be interested to hear the argument.

MS. BROWN: Thank you, Your Honor.

MS. TRUONG: Your Honor, can we be heard on the first point?

THE COURT: Sure.

MS. TRUONG: The issue of any argument with respect to degree or level of intoxication or inebriation.

I understand the Court has ruled that it can go to credibility with respect to Ms. Mensing's statement that she had one beer. But I think it's a stretch too far to allow Uber to come in here and say, Well, now we presume that if

you have any type of substance abuse addiction, that you are entirely under the influence.

THE COURT: Argue it. Argue it. That's what argument is it all about. I mean, I think there is a line between a reasonable inference and unreasonable inference. I'm not prepared to draw it right now. Okay?

MS. BROWN: Thank you, Your Honor.

THE COURT: Just argue.

MS. TRUONG: Thank you, Your Honor.

THE COURT: Okay. Bring in the jury.

Anything else? Oh, here we go. Yes. There is always something else.

MS. POWER: Good morning, Your Honor. Caroline Power for the defendant.

Just a housekeeping, I hope. The defendants previously moved into evidence certain plaintiff fact sheets and interrogatory responses. After conferring, we'd like to swap out for excerpted versions. And those are Exhibits: D-4062, D-4018, D-4019, D-4038, D-4045, and D-4046.

THE COURT: Is that agreed upon?

MR. BOUNDAS: Yes. No objection.

THE COURT: Okay. Done. Thank you.

MR. BOUNDAS: And on our end we just had a couple housekeeping matters.

We wanted to mark for identification P-04983, which

is plaintiff's opening demonstrative presentation. P-04984, which was plaintiff's demonstratives used with Dr. Valliere. And the finally we wanted to move into evidence Court Exhibits 1 through 6 filed at Docket 5923.

MS. POWER: I understand the Court exhibits are the deposition designations and associated exhibit chart.

THE COURT: Yeah.

MS. POWER: For the opening deck and the deck used with Dr. Valliere, for -- I guess I have a question of clarification. Is it the Court's preferred procedure that those be marked as exhibits as they are not marked for evidence?

THE COURT: No. They were read to the jury, right? I mean, this is what was shown to the jury.

MS POWER: Correct.

THE COURT: And it wasn't -- you see it wasn't reported by our court reporter, quite understandably. She didn't have to do it. So, yes, it's in evidence.

MS. POWER: Sorry. And to clarify, the deposition designation run times is what was played to the jury and not transcribed. Completely understand. My question is about the demonstrative slide decks.

THE COURT: Well, maybe it's the reverse. In other words, maybe in terms of what the -- see, I'm concerned about what the jury will look at in the evidence review, and they

shouldn't look at deposition testimony. They shouldn't. On the other hand, they should look at the exhibits if they wish. That's in evidence.

MS. POWER: Correct, Your Honor.

THE COURT: So I think I sort of got it backwards. I think -- both are in evidence, but the testimony is in evidence in a different way than the exhibits are. The exhibits can be taken back into the jury room and reviewed by the jurors. The deposition testimony, if they want to hear it, they should come out here and hear it in open court and we'll read it to them.

MS. POWER: Understood, Your Honor.

THE COURT: Or play it.

MS. POWER: So I see this falling into three buckets. The exhibits that have been admitted, of course, can go back with the jury. The deposition testimony I understand they'll need to come back to the courtroom and hear. The third bucket, the demonstrative slide decks that were displayed have been marked as exhibits, but they are not evidence; they're demonstrative.

MR. BOUNDAS: I'm not trying to move them into evidence.

THE COURT: Pardon?

MR. BOUNDAS: We were not trying to move them into evidence.

THE COURT: Okay. They're not in evidence.

MS. POWER: That's the clarification. Thank you, Your Honor.

MR. BOUNDAS: We were just marking them for identification.

MS. POWER: And the remaining designations that were played in court will be filed in court.

THE COURT: One other thing I did receive from Uber is a proposed final mandate instruction.

Mr. Wyatt.

MR. WYATT: Yes, Your Honor. Good morning.

THE COURT: Yes. I think it's appropriate. I think that is appropriate. That's what I would give them.

MS. TRUONG: That's fine, Your Honor. We don't have an objection.

THE COURT: Okay. Great.

Bring in the jury.

(The jury entered the courtroom.)

THE COURT: Please be seated. Let the record reflect all jurors are present, parties are present.

Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: I thought I'd face you. Maybe a frightening prospect for you to have to actually see me face to face, but there we are. I think it's appropriate because

I'm about to instruct you on the law.

And as I said at the outset, you are -- you've heard the evidence in this case. It will be your role to decide the evidence, what the evidence shows, and it will be your role in doing so to apply the law. And so I'm going to tell you what the law is as it relates to this particular case.

You are going to get a copy, each of you, of these instructions so you don't have to be concerned about writing something down. You can if you want, but you will each have a copy when you retire for your deliberations.

You must follow these instructions as well as the ones that I've previously given to you.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so at the beginning of the case.

Please do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence on what your verdict should be.

There are Uber defendants: Uber Technology, Inc.,

Raiser, LLC, and Raiser-CA, LLC.

The jury instructions and verdict form refer to these entities collectively as "Uber." You may have seen evidence that discusses one or more of these Uber defendants individually. In evaluating the evidence against the Uber defendants, you should treat these three defendants as if they are a single defendant. Your verdict must be the same as to all the Uber defendants. All parties are equally before the law. And a corporation is entitled to the same fair and conscientious consideration by you as any party.

In reaching a verdict you may not consider the wealth or poverty of any party. The party's wealth or poverty is not relevant to any of the issues that you must decide.

When a party has the burden of proving any claim by the greater weight of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true. You should base your decision on all of the evidence regardless of which party presented it.

The evidence you are to consider in deciding what the facts are considers the sworn video and testimony of any evidence, the exhibits that are received into evidence, any facts to which the lawyers have agreed, and any facts that I've instructed you to accept as true.

What is not evidence, in reaching your verdict you

may consider only the testimony and exhibits received in evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you.

Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, what they will say in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by any objection or by the Court's ruling on it.

Testimony that is excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered.

In addition, some evidence was received only for a limited purpose. When I've instructed you to consider certain evidence for a limited purpose, you must do so and you may not consider the evidence for any other purpose. And anything that you may have seen or heard when the Court was not in session is not evidence. You are to decide the case

solely on the evidence received at the trial.

The evidence you are to consider in deciding what the facts are consists of the sworn video and live testimony of any witness, the exhibits that are received into evidence, any facts to which the lawyers have agreed, and any facts that I've instructed you to accept as proof.

Evidence may be direct or circumstantial. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

In deciding this case you may decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interests in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes

different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences but do not decide the testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything the witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part that you think is true and ignore the rest. The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

You have heard testimony from expert witnesses who testified to opinions and the reasons for their opinions. The opinion testimony was allowed because of the specialized knowledge, skill, experience, training or education of these witnesses. Such opinion testimony should be judged just like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves considering the witness's specialized knowledge, skill, experience, training or education, the reasons given for the opinion, and all the

other evidence in this case.

You may have taken notes to help you remember the evidence. If you did take notes, please keep them to yourself until you go to the jury room to decide the case. When you leave, your notes should be left in the jury room. No one will read your notes. Whether or not you took notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

Now let me turn to the claim.

In this case plaintiff claims that her Uber driver, Jeffery Richardson, touched her without her consent.

The law assigns certain responsibilities to an entity like Uber that provides transportation services. Uber -- pardon me. Uber is liable if the driver committed a battery against the plaintiff.

To prove her claim against Uber, plaintiff must show that the driver committed a battery against her.

To prove that the Uber driver Jeffery Richardson committed battery against her, plaintiff must prove three things:

First, that Mr. Richardson intentionally caused --

First, that Mr. Richardson intentionally caused bodily contact with the plaintiff.

Second, that such bodily contact actually offended

a reasonable sense of personal dignity.

Third, that such a bodily contact occurred without the plaintiff's consent.

A person acts intentionally if he desires to cause the consequences of his act or believes that the consequences are substantially certain to occur. Intent may be proven by direct evidence or inferred from the circumstances.

Finally, as to this issue on which the plaintiff has the burden of proof, if you find by the greater weight of the evidence that the driver Jeffery Richardson committed a battery against plaintiff, then it would be your duty to answer this issue "Yes" in favor of the plaintiff. If on the other hand you fail to so find, then it would be your duty to answer this question "No" in favor of Uber.

If you found Uber liable to plaintiff, then the plaintiff is entitled to recover nominal damages even without proof of actual damages. Nominal damages consists of some trivial amount such as $1 in recognition of a technical injury to the plaintiff.

The plaintiff also may be -- pardon me.

The plaintiff may also be entitled to recover actual damages. On this issue the burden of proof is on the plaintiff. That means that the plaintiff must prove by the greater weight of evidence the amount of actual damages caused by the driver's wrongful conduct. Actual damages are

the fair compensation to be awarded a person for any injury caused by the wrongful conduct of another.

Damages for personal injury include fair compensation for the actual mental suffering experienced by the plaintiff as a result of the wrongful conduct of the driver. There is no fixed formula for placing a value on mental suffering.

Plaintiff claims mental suffering from the battery she alleges and the 24-hour period immediately following it. If you found that the battery occurred, you may award damages, if any, only for that time frame, from the time when the alleged battery occurred for the 24 hours following that. You will determine what is fair compensation by applying logic and common sense to the evidence.

You must not include in your award any damages to punish or make an example of Uber. Such damages would be punitive damages and they can not be part of your verdict. You must award only the damages that fairly compensated the plaintiff for any loss.

I instruct you that your findings on damages must be based on the evidence and the rules of law as I've given to you with respect to the measure of damages. You are not required to accept the amount of damages suggested by the parties or their attorneys. Your award must be fair and just. You should remember that you are not seeking to punish

either party, and you are not awarding or withholding anything on the basis of sympathy or pity.

If you find by the greater weight of the evidence the amount of actual damages caused by the wrongful conduct of the driver, then it would be your duty to write that amount in the blank space provided in the verdict. If on the other hand you fail to so find, then it would be your duty to write a nominal sum such as $1 in the blank space provided.

I will have some concluding instructions after the parties make their argument.

First we're going to hear from the plaintiff, then we're going to hear from the defense, and then the plaintiff has the opportunity to respond and then the case will be given to you.

So I'm going to resume my other seat and watch this. And we will start with the plaintiff.

MR. SMITH: Good morning. Good morning. Good morning. Good morning. Good morning. Good morning, sir. Good morning. Good morning. Good morning.

THE COURT: You may proceed.

MR. SMITH: Thank you, Your Honor. May it please the Court, Madam Court Reporter, Ms. Scott, and good morning everybody again.

It's interesting. It's been a week since I got to, like, stand up and talk to you eye to eye and kind of look

back at you. But I'm -- I'm really happy this morning. I'm going to have to say that I'm really happy this morning because we've had this long trial and, you know, both sides have been working on this case for years, years, and we finally are at this point where we can bring it to you and each of you -- I mean, it is incredible each of you spent a lot of time intently engaged, you weren't distracted and really focused on the evidence. And that was really important to us. I'm sure it was really important to Uber. On behalf of both sides I really thank you for that.

But now it's time for you to do that thing maybe you see on TV and heard about, and you go back in that room and deliberate and render your verdict. I told you last week that's to say the truth. To say the truth.

You might not know what's going to happen. You're going to go back there and you're going to have the evidence in the case, the documents that we introduced into the evidence. You heard us say, you know, "I move this into evidence." That will be back there with you. You'll have your notes, like the judge told you. You'll have the memories of the trial, the testimony, and you're going to have each other, and you're going to have a verdict form in this case.

If I could have the ELMO, please, for a few minutes, because I don't want you to be afraid of the verdict

form.

It's two questions. Zoom in a little bit here. Just two questions.

"Do you find that Jeffery Richardson committed a battery against plaintiff?" Yes or no. And if you answered "Yes," then what amount are the damages?

And I saw some of your faces when the judge talked about battery, because that's a word we really haven't used in this trial at all. That's the legal term when someone touches you without your consent in a way that's done to you. That's a legal term. But it describes sexual assault too. It describes any touching. A punch is a battery. A grab is a battery.

And so if I can get the PowerPoint now. Thank you.

In stepping back and thinking about who this case -- what this case is about and who we're here for, I mean, we really have to ask ourselves: Who is Brianna Mensing? And we heard she was a tomboy. She loved growing up with her siblings on the lake. She loved music. Loves music. Not loved; loves. Loves every kind of genre of music. She loved her grammy and confided in her for years until she passed away several years ago.

But when I took the weekend, I stepped back. I went and I looked at Brianna's testimony and something kept popping up in the things she told you on that first day. And

that word was accountability. She told you right here in that box right there that all she wants is accountability. All she wants is an apology. She wants to stick up for herself finally, and that's what we did here. I hope, I hope that's what we did here is stick up for Brianna, because this trial is about accountability. It's about one person on one side who's had to take accountability for every single blemish, flaw, and mistake she's ever made not just in front of you, but in front of the world, because everybody is paying attention to this trial. In front of the world her business is out there on Front Street. Just for accountability. Just for an apology.

And it's about a company that's running away from accountability, a company that refuses to say I'm sorry. But they are a transportation company doing business here in North Carolina and that means something. Because when you -- it's a privilege, it is a privilege to operate a business anywhere, and you have to accept the law and in the places you operate.

Okay. They get to take our money for a profit, and there is nothing else wrong with that. There's nothing wrong with that. But there is something wrong when you don't want to take responsibility for the things that happen for the service you provide. When it's good, it's great. But when in not fact, it's not good. In fact, when it's terrible,

when it's not to safe, they are responsible, but they won't accept that, don't accept that. They won't.

I just have to say this. The defense in this case -- and it's nothing against them; it's just the facts. The facts on this case it just on the facts. The defense in this case is not good. It is wrong. It is wrong. It is wrong. I mean, the trial has shown this.

And it's wrong to drag a woman through the mud and say because you have substance abuse issues, you can't remember things. And not just that, but the things that you do remember actually didn't happen. Because what you are saying, though, is because you have substance abuse issues, you are a liar. That is what they're saying.

I'm pretty confident they won't have the guts to say it to you. They will not tell you that she's making it up. What they will do is they will use innuendos and suggestion around memory to pretend like the things she does remember didn't happen. That's wrong. It's just wrong.

Look at what she said happened to her. He slapped and grabbed my leg. You saw her stand up. Right here (indicating) is where he grabbed her. She jumped out of the car. She ran away. She said no.

And was it a touch? Was it an incidental touch? No, it wasn't a touch. It was a grab. It was intentional. It was disgusting. It was violent. She felt violated and

disgusted.

When you look at these jury instructions that you'll have back there with you, intentionally caused bodily contact. Actually offended a reasonable sense of personal dignity without her consent. She didn't ask for it. She didn't invite it. She didn't want it. She didn't say, Hey, will you please grab me. No.

And how do we know it happened? How do we know it happened? Because despite what anyone is going to tell you, she did tell people. She told several people. She told her mom. And what did her mom say? Exactly what Brianna said, I don't know. She probably told me right after it happened. And she said the guy said something about keeping it with him and grabbed her by the leg.

You heard from Mr. Yankowski who drove 200 miles from Raleigh to come down here to talk to you and be in the room. What did she say? She told me about a week after it happened -- exactly what Brianna said -- the guy made an advance on her and it was wrong.

And if there's any fact that's more important than anything else in this case is this. I want you to listen to this testimony one more time.

(Video clip played to the Court and jury.)

MR. SMITH: I want to stop here for a minute, because you really have to think about what he just said. He

said I recall seeing her looking at the video camera footage in the morning after. That's not him saying I recall her telling me later that this happened. That's him saying I saw the aftermath. I saw her looking at the cameras. Okay?

If she were making this up, how would Neal Young have a memory of her checking cameras seven years ago? Why would that memory last in his brain seven years later at testimony to say something happened if it was nothing? If it was just made up or a fabrication? That doesn't make any sense. This happened. Neal Young is how you know it happened.

Ms. Brown, you know, I was kind of surprised in the opening because she only told you part of the story. She said Mr. Young -- or Mr. Young we asked him: Do you remember what she said about the incident? And he said, I couldn't remember. But what she didn't tell you was this part. We had to bring that to you. She was not going to show you that. We had to bring that to you and show he saw her. He saw her that day.

So let's talk about the driver, Mr. Richardson.

Mr. Richardson doesn't actually deny that he grabs people. I mean, did you -- if you listen to his testimony, he never actually denies it. What he says is I don't remember.

(Video clip played to the Court and jury.)

MR. SMITH: If you ask your boyfriend, your husband, your wife asks you, your girlfriend asks you, Hey, you know, when you get on the bus, ride on the plane, do you have a habit of grabbing women by theirs thighs, and you say "I don't remember," that means you might do it. That means it probably happens. Because any reasonable person would say to that question, No, no, I don't have a habit of that. I've never done it in my life and I would never do it. But Mr. Richardson, what does he say? I don't recall it ever happening. It's baffling.

But you have to remember how he got to that testimony. He got to that testimony after call after call, after meeting after meeting with Uber's lawyers. With Uber's lawyer. They talked and talked and talked. And what did Mr. Richardson say about those conversations? Because we should be able to know what he talked about with Uber. What did he say? I don't remember. I don't remember what we talked about. And when was it? Just a couple of weeks ago. And I can't remember what I said to Uber or what Uber said back to me.

You have to question -- I mean, Ms. Brown said this in opening. I was interested to see how it was going to happen. She said the evidence is going to show you what they were talking about in those conversations was logistics on how to get his testimony into this courtroom, how to do a

Zoom conference essentially. And, I don't know, let's just listen to the testimony.

The evidence is going to show that we had to coordinate and there was logistics to be set up.

(Video clip played to the Court and jury.)

MR. SMITH: Logistics?

And here are the text messages. You're going to have this exhibit back there with you. It's P-4970. And this is the text message from Uber to Mr. Richardson, a little chain setting it up. And what you have in that exhibit is both sides. We have the screen shot from Mr. Richardson's phone and we have this one.

And what it says -- you know, it almost didn't occur to me until I started looking at it closely. And this is what happens, because Mr. Richardson didn't tell us what happened and either didn't Uber.

(Audio clip played to the Court and jury.)

MR. SMITH: Oh, I'm sorry. I mixed up my days. What about Thursday? Would that work for you? 11:00 a.m. Thursday is March 26.

If you go back, if you look at the text messages or the phone call log, what you'll see is the last call with Mr. Richardson was March 24th. Instead, they had a meeting on March 26 where Uber says, Great, I'll see you then.

Did you hear anything in this trial about what they

were doing during that in-person meeting when they were seeing each other? No. Because they weren't talking about logistics. They were prepping him for his testimony.

Is it wrong for a driver to grab a passenger in her upper thigh during or at the end of an Uber ride?

(Video clip played for the Court and jury.)

MR. SMITH: It's the easiest question in the world. That is the easiest question in the world. And how did he answer is it? He gave you, I guess. I guess?

They prep with him, prep with him, and the best he can come up with is I guess it's wrong.

Yeah, it is.

That's the easiest question. And Uber knows it's the easiest question because their former head of safety had this to say.

(Video clip played to the Court and jury.)

MR. SMITH: Exactly. It's the same thing Dr. Valliere told you. Any sexual assault can impact a victim, right? All kinds of physical violating events can be very terrifying.

The witnesses in this case all agree, except for Mr. Richardson, that this is wrong, it's bad, it's has a profound impact on people. The only people in this courtroom who are actually going to be saying anything it's not a big deal is Uber. They're going to do that; but not their

witnesses, not their head of safety, not the sexual assault expert.

So if I can get the ELMO again.

When you really look at the evidence, when you really look at the evidence, the answer to this first question is "Yes." Yes, Mr. Richardson committed a battery against Brianna Mensing. Yes.

If I can go back to the presentation. Thank you.

So what are they going to say? What are they going to say in response? What's the only thing they can say? Well, drugs, drugs, drugs, drugs, drugs. We had three days of trial, and I think every question -- or every witness they brought here to talk about Brianna Mensing the only thing they focused on was drugs. Drugs.

Okay. But Brianna told you day one on direct examination from us yes, she has a problem. She has an addiction. She has a disease. She didn't run away from any of it. She didn't deny it. They showed her every instance of every drug and every medical file, and she said, yep, yep, yep, yep.

I mean, that is not easy to do. It's not easy to sit in that chair and have them comb through your medical records and bring out everything about you. It just isn't.

And so we asked their expert. You remember they brought a perinatal doctor to talk to you about sexual

assault. And we asked her, Well, can two things be true? Can it be true that Ms. Mensing does have a problem? She is a drug and alcohol user, but she was also assaulted by her Uber driver? And obviously the answer to that question is yes, those two things are true and they are true.

Uber knows, knows these things. And so the next thing they say is, well, she didn't report it to Uber. She didn't report it Uber immediately. Okay. But Uber knows in Uber's files they train their employees on this. If someone waits a day, a week, or a year to report, that does not prove that an incident didn't happen. That's what they train their employees on. When they're outside of court, that's what they tell each other.

When they come into court, when somebody tries to hold them accountable for what happens, nah, nah, throw it all the window. Throw it all out the window. We're going to scorch her. She's lying.

But she did report. She did report. I asked Dr. Valliere: Dr. Valliere, do the only reports that count are the reports to police and Uber? No. People often report in informal ways; to friends and family members, to cousins, to lovers. Those are the people Brianna reported to.

So then we know, though, that Uber never listened to Brianna. They never listened to her. They never gave her a shot. She filed this case in 2022, and they went to work.

They said she's lying from the jump. And they went out and they found every medical record of hers. They combed through them. You heard Ms. Brown say they reviewed 1,000 pages of medical records.

And then what did they do on the other side? Did they ever just step back and say, Okay. Okay. She made this allegation. Let's do some investigation. Let's look and see what happened here? No. They took the driver's side immediately without even knowing what it was. And then they waited until three weeks before trial. Before we come in here for a four-year long case, they waited three weeks before trial to even talk to him. To even ask him what's your side of the story? Before we say what we think your side of the story is, will you tell us. I don't remember.

That's because Uber knows and, Dr. Valliere told you, the victims, the victims of sexual assault always have to carry the burden, not just the burden of proof, but the burden of being unquestioned. They have to be perfect. She had to be perfect. And I don't even know if that would have been enough.

This was a battery, intentionally caused bodily contact. It actually offended her personal dignity and it was without her consent.

And so when you go back into that jury room, this is the most important rule that you guys have. It's the

burden of proof. And I just want to talk to you about it for a moment. Because if you're back there and someone says, you know, I'm not sure, I'm not certain that this happened. I think it did, but I can't be certain. I'm not positive. I just encourage you to tell them to stop, slow down, because that's not the rule. The rule is not certainty. The rule is more probable. More likely true than not true.

And I believe that we have proven this case overwhelmingly, especially when you consider Mr. Young's memory of seeing her with those security cameras. But it's just more probably true than not true.

What did Brianna say she wanted from this lawsuit? Accountability. Accountability. You heard what she experienced, a terror, a shame, she felt disgusted. She felt horrified. She was running through all those what ifs, what if, what if, what if. Because at that time you don't know if it's the end or if it's the beginning of what is going to happen. She had to wait until 2:00 a.m. until 7:10 that morning for the sun to rise to get a reprieve from the darkness. That's what she was going through. That's dignity. That's dignity that was taken from her, and it needs to be returned.

Now, Ms. Brown called this a lawsuit for money. I'm sure she's going to say it again. She's been saying it throughout the trial in question after question a lawsuit for

money. A lawsuit for money. What did Brianna say? Brianna said she wanted an apology. An apology. I promise you Ms. Brown is not going to stand up and she is not going to apologize because an apology means taking responsibility. An apology -- look, we've all gotten those apologies where someone says, I'm sorry that you feel that way. I'm sorry you feel that way. That's not an apology. An apology is I'm sorry I made you feel that way. You have to mean an apology. It has to mean something.

But the time for an apology is over. They had their chance. They have it today. I'll give it to them. Maybe we'll hear one.

But in our system when a company doesn't want to apologize that they have harmed somebody, the only justice any of us are entitled to is something called money damages. I don't know. I don't know what you put on that blank on the second question of the verdict form. That's for each of you as a community, as people in Charlotte, people in North Carolina, that's for you to decide. What is a women's dignity, this woman here, what is it worth? Because it means something. I think it means something.

It is unacceptable for a driver to grab a passenger. It's unacceptable. I think we all know that. They need to know it too.

Thank you.

In a few minutes Ms. Brown is going to talk to you, and I'm going to come back and wrap up.

THE COURT: Now we'll hear from the defense.

MS. BROWN: May I proceed, Your Honor?

THE COURT: Yes, please.

MS. BROWN: Okay. Good morning, everyone.

THE JURY: Good morning.

MS. BROWN: I want to start by thanking you all. You have given up the last week of your life to come in here and listen to evidence and we couldn't do it without you. We could not defend ourselves in this lawsuit without your jury service, and we are very grateful for it. So from me and from Mike and, most importantly, from the folks from Uber, thank you very much for your jury service in this case. We appreciate you.

So we made it. We're at the end of the case, and you have now seen everything the plaintiff's lawyers have to try to prove to you that the allegations that they made in this lawsuit are the truth and are supported by the evidence. And at the end of the case they have not come close to proving to you that it is more probably true than not true that Mr. Richardson committed a battery against Ms. Mensing and that Ms. Mensing is entitled to money damages for a 24-hour period. And that's what this case is about. This is a lawsuit for money.

You heard the evidence starting in opening statements. This is from the plaintiff's lawyers, and they told you in opening statements that she brought these claims seeking substantial money damages for pain and suffering. This is a lawsuit for money.

Ms. Mensing did not report to the police. She did not report to Uber. Despite the testimony and argument we just heard, she never asked anybody for an apology. She didn't bring a lawsuit against Mr. Richardson. She brought a lawsuit against Uber for money three years after this alleged incident took place.

And plaintiffs haven't come close to meeting their burden to you because they brought you not a single fact witness who had any details of about the allegations Ms. Mensing has made in this lawsuit. They didn't bring you a single expert witness who knew anything about the plaintiff at all. They brought you one expert, Dr. Valliere, and we'll talk about her. She didn't even know who Ms. Mensing was.

And you heard about Ms. Mensing's struggles, and we'll talk a little bit about that today.

But one thing we know is that she has treated with a number of doctors and therapists over the years who have been trying their best trying to help her. Not one of those doctors or therapists came in here to tell you that she had reported to them what she's reporting to you in the context

of a lawsuit.

And you heard, and I think counsel said we went after all the medical records. That's not true. When you file a lawsuit, the other side is entitled to your medical records just like they're entitled to records from us. There's nothing nefarious going on to us getting access to medical records in a lawsuit where the claims are emotional damages.

And then in thousands of pages of Ms. Mensing's medical records spanning this time period and after there's not a single mention of the Uber ride or any of the allegations that form the basis for this lawsuit. Not one.

And even though this is a lawsuit for money damages for 24 hours after this alleged battery took place, Ms. Mensing told you and swore under oath it was the truth that she doesn't have a memory of what happened in the 24 hours after the incident. This is something called an interrogatory where we ask a question and the plaintiff swears under oath what the answer is.

Plaintiff does not recall what she was doing in the 24 hours after the incident.

And you heard from Mr. Richardson who testified to you all from a hospital bed where he had just had his foot amputated. And he testified to you with oxygen. He's not a defendant in this lawsuit. Nobody sued Mr. Richardson. This

is not a criminal proceeding where he faces any criminal repercussions. He's got no stake in what's going on here. And he gave you his truth from a hospital bed. And he told you when he heard about these allegations, he was shocked, simple and plain. Simple and plain, pure shock. I couldn't believe it.

And he told you all of this not just from a hospital bed where he's struggling with sepsis --

MR. SMITH: Objection, Your Honor.

THE COURT: Sustained. Put that down, please.

Thank you.

MS. BROWN: This came --

THE COURT: The latter part of the sentence was not allowed.

MS. BROWN: It was, Your Honor?

MR. SMITH: It was not.

THE COURT: No. And it is not -- it is not. It is not allowed.

MS. BROWN: All right. I understand, Your Honor.

If we could skip to the next slide.

He told you from his hospital bed, with his wife there, he told you that he had no problem talking about these allegations with his wife of 20 years in the room, the mother of his two daughters. He had no problem with that because he knew this didn't happen.

And, you know, one of the things that Mr. Richardson could have done is he could have come in here and told you he remembered Ms. Mensing perfectly.  He could have told you I remember everything about that ride and that's why I know it didn't happen, and he didn't, because he doesn't -- because it was a regular ride that took place seven years.  Why would he remember anything?  He came in here and he told you what he knew.

Do you recall ever touching any passenger that you were driving for Uber without their consent?  No.

Do you recall ever grabbing the thigh of any passenger that you had in your car when you were driving for Uber?  No, I don't.

These are serious allegations that were made against Mr. Richardson, and he gave you testimony from his hospital bed with his wife in the room.

And one of the things that doesn't even make sense about the allegations that have come to you in this case is this:  Dr. Valliere told you that offenders try to commit these types of crimes in places where they won't get caught. They try to do this in a way where nobody will find out about it.

And one of the things that's being alleged here in this case that doesn't make sense is that what's being alleged here is that Mr. Richardson drove with Ms. Mensing

for 30 minutes, and he kept on the same route and he went directly to her boyfriend's house, where there were security cameras, where there was a car dealership next door with a floodlight that you saw in one of those pictures, where there were neighbors close by and a busy highway right in front of the house, and that's where he choose to commit a battery? It doesn't make sense.

And you heard from Ms. Mensing that she was able to exit the car right away. That her allegations here are that the touch was one to two seconds and then she immediately exited the car.

Plaintiff's lawyers in opening statement told you that Ms. Mensing told all of these people around the time the incident occurred and that she has been consistent with her recollection of the incident, and the evidence has not shown that in the case that has come before you over the past week.

What the evidence has shown is that her lawsuit allegations are not consistent, direct witnesses that came before you do not corroborate or confirm her lawsuit allegations, and that plaintiff's memory is not clear, and we'll talk about that. The evidence showed plaintiff's allegations are not consistent.

And one of the things that you learned about is that as part of filing a lawsuit you have to fill out something called a Plaintiff Fact Sheet, and you have to

provide information under oath. You have to swear under oath that you are providing truthful and accurate information of your claims.

And this is from the plaintiff's fact sheet. And what I did as we go through this I tried on put the exhibit number on those slides, so if you see something that you want to look at in the back room you have the number there. And this is one of the amended fact sheets. And it says the plaintiff completing this fact sheet is under oath and must provide information that is true and correct. And that makes sense. If you're going to sue someone and accuse them with something as a battery at issue in this case, you should swear to what the allegations are so that we can defend ourselves. And Ms. Mensing did that.

In October of 2024, she gave us a description of what her allegations in this case are. And the allegations that she swore, if you look at the bottom, the verification under penalty of perjury, she swore that when we made it to my destination, the Uber driver turned around, grabbed my thigh, and told me he wanted to lick them. It was my upper thigh.

And we showed that to Ms. Mensing when she was here. And we said, You swore back in October of 2024 that it was true and accurate to the best of your ability? And she said yes. And then she told you that wasn't the truth. She

said even though she swore that it was truthful and accurate that her allegation was he said he wanted to lick them, that's not what happened.

And it didn't happen once; it happened twice. Because just a few months later, once again, Ms. Mensing had the opportunity to read and review and swear under oath that the allegations, the serious allegations of the battery that she's making in this lawsuit were true.

And once again on December 16th of 2024, she certified that he turned around, that the driver told me he wanted to lick them, and it was my upper thigh. And once again when Ms. Mensing was here, she told you that those sworn allegations that she certified were true under penalty of perjury, she told you they were false. She said that wasn't right.

And we looked at another updated fact sheet where this time she had a totality different allegation. Signed and sworn to this time on July 9, 2024. This time all sorts of things changed. Now she alleged that the Uber driver asked her to sit in the front seat, still that he turned around, but this time that he grabbed her inner thigh and said, Can I keep this with me. It's a totally different allegation. And Ms. Mensing had no explanation for you all why the key allegations in her lawsuit have changed so significantly over time. When she swore under penalty of

perjury that these things were true and then came in here and told you they weren't.

And even this one Ms. Mensing said, well, it's closer to the truth. It's more accurate than the last one, but he didn't turn around. And she still had that in there on the third version of the fact sheet.

And you heard from Mr. Richardson that he has no memory of any -- of ever inviting anybody to sit in the front seat of his car. And he was really candid when he answered questions. I really don't remember every ride. Of course, he doesn't. Why would he remember every ride from seven years ago?

But what he does remember is I can't remember ever inviting anybody to sit in the front seat. And that kind of makes sense because he was questioned about his weight at the time. And he said, look, I was much heavier back then. I was over 500 pounds. And I was driving a Nissan Maxima. And it makes sense that Mr. Richardson, 500 pounds in a Nissan Maxima wouldn't be inviting people in the front seat where it was crowded to begin with.

But Ms. Mensing again changed her fact sheet this time on February 24 of 2026, just a few months ago. Because, of course, it doesn't make sense if it's true that he invited her to the front seat that he would be turning around. And so she had to change it for the fourth time and delete "turn

around" in the final version that was signed and certified just a few months prior to this trial.

Jurors, the truth doesn't change if you're making an allegation as serious as this. You know what it is and it stays the same. These allegations, the key and the core of her case changed multiple times over the course of this lawsuit.

And even though she certified multiple different versions with multiple different stories multiple different times, Mr. Brown just asked her: Had you ever said the words that the driver wanted to lick your thighs? She said, No, I never said those words. Well, who did? How did they get into sworn statements not once, not twice, but three times? It doesn't make any sense.

What we do know is years after suing us in 2022 Ms. Mensing continued to use Uber with set -- and she did that by setting up multiple different Uber accounts, and she told you that.

And Mr. Boundas was questioning Dr. Reminick about, well, there was a period --

MR. SMITH: Objection, Your Honor.

Can we have a sidebar?

THE COURT: Okay. One moment.

MR. SMITH: Can this be taken down.

(At sidebar on the record:)

THE COURT: Okay. Let the record reflect we're outside the presence of the jury.

MR. SMITH: There is simply no evidence in the case about Uber not being available to the plaintiff during this time period. That's what their --

MS. BROWN: There is.

MR. SMITH: Let me finish.

That's what their slide says. And the problem is there is an implication there because that's the time when she was in prison. There was a mill on this. They're saying Uber is not available during this time period. She wasn't in prison the entire time. They're drawing not a reasonable inference saying Uber was not available for a large time period.

THE COURT: You're saying the plaintiff is not available?

MR. SMITH: No. Yes, the plaintiff was not available because she was in prison for some time.

The slide says Uber was not available for a large period of time to her is the implication, but the only way to explain that she has to explain that why was Uber not because it's milled out.

MS. BROWN: Maybe --

THE COURT: The first question: What is the evidence in the record?

MS. BROWN: And every single one of my slides is cited. So before we object during closing argument, we should look at that. There is testimony of Dr. Reminick what exactly --

MR. SMITH: The --

MS. BROWN: Please.

MR. SMITH: You're right.

MS. BROWN: The question to Dr. Reminick was: In fact, she avoided Uber in 2019, 2020, 2021, 2022? And Dr. Reminick's answer was: Correct. But Uber was not available during the majority of that time. That's in the record and there was no objection to it and that's what I cited.

MR. SMITH: That was on cross, Your Honor, and we didn't want to bring more attention to it. The only way to explain it is to is because she was in prison.

MS. BROWN: It's record testimony, Your Honor. I'm going no farther than that. I'm suggesting nothing. But they asked the question. They asked the question, look, she was avoiding it during -- knowing she was in prison, they asked the question she avoided it.

THE COURT: I guess I'm having a hard time understanding the argument. So let's just take a moment.

MR. SMITH: Okay. Here's the argument. They have a duty to inform their witnesses before we come into trial

that you can't talk about milled issues, something milled out. You can't. It's a fundamental duty we have as lawyers. Okay? We do that because you should expect an expert witness who is getting paid all this money to come testify to trust the expert witness, No, there is milled issues, so she can't say. Then when you ask a question on cross, they opened the door to because they started talking about avoidance, you say no, there were three years. And she wasn't in prison for the entire time for her to blurt out on cross-examination that's because Uber wasn't available. Uber was.

THE COURT: I don't understand the term "Uber wasn't available." What do you mean Uber wasn't --

MS. BROWN: She couldn't have taken an Uber. She was in prison, right?

THE COURT: Oh, I see what you're saying.

MS. BROWN: No one talked about prison. They tried to suggest she was practicing avoidance during the period of time, they knew she was incarcerated, and our expert said she couldn't taken during that time. That wasn't --

MR. SMITH: She was in prison.

MS. BROWN: Nobody is talking. It doesn't say the entire time. It is cited so carefully to the record. And I really implore you to look at those cites before somebody's closing.

MR. SMITH: That's the lawyer game.

MS. BROWN: I am perfectly using the only words that came out of the expert's mouth to no objection to a question they asked. And my slide is perfectly cited to that testimony.

MR. SMITH: That's the lawyer game.

MS. BROWN: And to object in the middle of closing arguments on something cited to the record --

THE COURT: I'm going to tell you to move on. I think we've got enough discussion. Do not show the slide.

MS. BROWN: But, Your Honor, it's the record. They asked --

THE COURT: No, no. I'm not -- I'm not going to -- because the answer to it all was she didn't -- if you're right, that is you're right, because she didn't take an Uber during this period of time. If the reason was she was in prison, fine. But then that's very, very prejudicial.

MS. BROWN: But --

THE COURT: So I don't think you can argue in response.

MR. SMITH: Exactly.

THE COURT: Look, she was so traumatized by this incident that for two years, three years she didn't use an Uber. I mean, I think it's fair.

MS. BROWN: But they did.

MR. SMITH: No, we didn't.

THE COURT: I didn't hear it.

MS. BROWN: That's where this testimony came from.

THE COURT: I'm not arguing the testimony. I'm just telling you don't reference it any more in closing.

MR. SMITH: I won't.

THE COURT: And it's out and the slide is out and we'll move on. Thank you. Here we go.

(End of discussion at sidebar.)

THE COURT: Ms. Brown, thank you very much. You may proceed.

MS. BROWN: Thank you very much. Thank you for your patience, everyone.

When we left off, we were talking about plaintiff's continued use of Uber and Lyft after bringing the lawsuit in this case. That's what the evidence has shown and that's what the exhibits that came into evidence show.

And this is actually a chart that plaintiffs put into evidence, P4979, that shows all of the places that she went to. And it's sort of an odd question and answer because she was asked: Do you use Lyft? And she said, Yeah, all the time but not all the time. But when it's necessary. And when you look at the list of places and the times she was using Lyft, that testimony is not supported. Because there are multiple trips to a hotel at all hours of the night that you should look at on that list and ask yourself: Why was

that necessary?

You're going to see there are trips that took place to this hotel in the middle of the night and all of them with male drivers. And Dr. Valliere told you that if people are really injured in a rideshare, if people do experience a battery, that they would engage in different practices even if they continued to take rideshares. They wouldn't perhaps drive with male drivers she told you. That's not what the evidence shows. Both of these exhibits show the majority of trips with male drivers after filing this lawsuit.

She said, Well, maybe they wouldn't ride late at night. And if you look at the chart that's in evidence, all of the trips to the Woodspring Suites in Raleigh are 4:00 a.m., 12:00 a.m., 5:00 a.m., the middle of the night and the early morning hours. There is no evidence in this record to support what Dr. Valliere told you that even if people continue to take rideshare, they wouldn't continue in the middle of the night and they wouldn't continue with male drivers. The testimony and the evidence shows just the opposite. What the evidence here shows is that plaintiff's allegations were not corroborated or confirmed by other witnesses.

And remember, jurors, it is her burden and her burden alone. She has the burden of bringing you the evidence that makes it in your mind more probably true than

not true that this occurred, and she didn't do that. The evidence does not support that.

You heard from Ms. Mensing herself that she didn't tell anybody about the alleged Uber right on the night it took place, no family, no friends.

You heard, of course, that she never reported to the police that she never reported to Uber, that she never sued Mr. Richardson, but she identified again under oath a number of different witnesses that she said she told about this event at various times. Five of them are people she claimed she told on that very next day, March 26, 2019, and two of them are folks that she claims she told several years later.

But let's see what the evidence showed, because none of these witnesses supported her claims. And that's her burden. Remember, the burden of proof that the judge just read you, she has to prove to you all that it's more probably true than not true. Not that this might have happened. Not that this might have occurred. That she has brought you enough evidence in the form of testimony and documents and reports to convince you yes, the greater weight of the evidence shows that this happened. And she just hasn't come close to meeting her burden of proof in this civil lawsuit.

Let's start with Ms. Ariel Watkins Lankford.

Here's the list that we're going to go through.

This is another document under oath that Ms. Mensing signed. And you can see on the right side this is September of 2025, again this is true and accurate, and she listed all the people I just put on that chart and the days she claims she spoke to them about the incident, and none of this turned out to be true and accurate when the testimony came in during this trial.

And one of the things you heard, in fact, that she wasn't talking to a lot of these people by the time we requested to take their depositions. And so she reached out via text and said, The lawyers want to talk. Can you give me a call first. She reached out to Ms. Lankford. She reached out to Mr. Young, her former best friend and her former boyfriend, trying to talk to them before we asked questions. But the evidence didn't show that these people ever responded to her. Instead, they testified under oath. And let's look at some of the things they said.

Ariel Watkins Lankford was her very, very best friend. They met in elementary school and they were, to use Ms. Lankford's words or Ms. Watkins words, pretty much inseparable. She was her person. Ms. Watkins was her person. We all have people super close to siblings or best friends. Ariel Watkins was that person to Ms. Mensing and that was that person during the relevant time period.

And we heard from Ms. Watkins that they were still

close in March of 2019 when this allegedly happened.

An importantly, Ms. Watkins told you they shared personal details about their lives with each other. And so even if it's true that somebody might be worried about going to the police or might be worried about contacting Uber, if something like this happens, you tell your best friend. This is a safe place to say something that you can say anything. This is the person you can say anything to, your best friend.

And she said that she told Ms. Watkins about it on that very next day. But when we asked Ms. Watkins under oath who like Mr. Richardson has no stake in this case. She's not a defendant. She's not having anything to do with this case. She's just telling the truth like it is under oath. And we said, Did Ms. Mensing tell you in March of 2019 about an incident in an Uber? And she told you no. Her best friend.

She told you that Ms. Mensing has never mentioned any instances in which she suffered an unwanted sexual touching. And, in fact, you heard from Ms. Watkins that when she finally did hear about the allegations that were being made in this lawsuit, she didn't want anything to do with it. You heard from Ms. Watkins she did not support the allegations.

If you're trying it figure out the greater weight of the evidence, Ms. Watkins doesn't go on the plaintiff's

side of that scale because she didn't have any knowledge of it despite the fact that the plaintiff said she told her. And despite the fact that she was her best friend at the time and testified to you that she talked to her every day and shared personal details.

Ms. Mensing identified Mr. Neal Young, her boyfriend at the time, as somebody else she told about this incident when it happened. And we talked to Mr. Young, and he doesn't know a thing about it. Did Ms. Mensing tell you about what happened? I don't remember.

Sitting here today, what is your understanding about what happened? I don't know.

He lived with her at the time. She says he's the person, the first person she told about this when she woke up in the morning, and he has no idea what this is all about.

And I thought I heard counsel say, well, here's a very important part of Mr. Young's testimony. He's talking about a security feed. He's watching -- he saw her watch a security feed. That doesn't make any sense, because the evidence that came to you in this case was that that security feed was live. It wasn't recording. It wasn't there for anybody to go back to. It was live, like a camera at the time it's happening. If it's live, there's nothing to look at the next day. Why in the world would anybody be looking at anything the next day? When you go to look at the

security footage the next day, all you're going to see is live footage of what's happening outside at the moment.

That story doesn't make any sense. And when it comes to the details about what happened, Mr. Young has no idea. Mr. Young did not support Ms. Mensing's allegations in this case.

And then she identified her mom, Ms. Melissa Mensing. And something real strange happened with this testimony, too, because Ms. Mensing herself said that she didn't tell her mom until one to two years after the incident. You can see that down on the bottom of the screen and that was her sworn interrogatory response. But then why in the world would her mom testify that she was told right away? I'm sure it was soon after. Whether it was the same day or a few days later, I don't know.

And that testimony is not credible and doesn't make any sense, because we learned from Ms. Mensing when she was here in court before all of you that she wasn't really talking to her mom at all during this time period. That they had an unfortunately difficult relationship and that they weren't really talking during that time period. She had moved out of her mom's house and was living with Mr. Young.

This testimony doesn't make sense, and Ms. Mensing did not support the claim she's making in this lawsuit either.

We heard and we saw that Ms. Mensing identified Dr. Jenny Smith, her treating psychiatrist, as someone else she told about this incident. And if it really happened, that might make sense a psychiatrist of your own might be somebody you feel comfortable talking to. And we heard from Dr. Smith and you might remember her. She was sort of a soft-spoken doctor and she talked a little bit about the treatment she had of the plaintiff. She seemed like someone you would feel comfortable talking to.

She said she developed a special relationship with Ms. Mensing. She said for some people, some patients she only sees the patients every once or, you know, twice a month to check on medications, but she specifically said that wasn't the case with Ms. Mensing. That she saw Ms. Mensing more frequently than her other patients because she developed a special relationship as her treating provider.

If Ms. Mensing was going to tell anybody, Dr. Smith would be at the top of that list. And there are records in evidence that show the visits that Dr. Smith had with Ms. Mensing.

But even though the plaintiff said under oath that this is one of the people she had told, Dr. Smith testified to you all via video that Ms. Mensing never discussed an Uber incident with her during the time period that she treated her. And we all know in all of the medical records there is

not a single reference to the Uber incident.

Dr. Reminick went through some of those records with you and she said they spanned about 2011 to 2025 and these are some of the different places that Dr. Reminick talked to you about reviewing medical records from different facilities where Ms. Mensing met with different providers, and not one of these providers referenced in their medical records the Uber incident.

And one of the things that's significant about that is that Dr. Reminick told you that these records reflect that Ms. Mensing was talking to her providers about emotional disturbances and things that were emotionally distressing with her, as you would expect. You would expect that somebody would talk to their therapists and psychiatrists and doctors about things that are bothering them. That's the whole point of therapy and treatment and care.

And the good news is the records reflect that Dr. Reminick told you. The records reflect she was engaging with her providers, she was providing information about what was bothering her, but there is not a shred of evidence or documentation that she ever referenced to any one of these providers anything about the Uber incident.

Dr. Smith did not support the claims that she's making in this case. And you got to be thinking the greater weight of the evidence. None of these people supported what

Ms. Mensing said occurred and what she said she told them. That evidence didn't shake out when you heard from those people when it came to you in the case.

And she also identified two individuals here, Mr. Romine and Mr. Lowery, and we don't even know who those people are. She identified to them as people sworn under oath who she had told about this. And you guys know if they would have supported the claims, they would have come in here to testify to you. We don't even know who they are. They certainly didn't testify and bring any evidence to you in this case.

Instead, the only person we heard from live in this case was Mr. David Yankowski. Do you all remember the day that he came in? The totality of his testimony was about 12 minutes, maybe he was here for 15 minutes tops. And there were a lot of things about Mr. Yankowski's testimony that didn't quite add up.

Number one. Mr. Yankowski is the former coworker of her dad. And just think about that for a second. She didn't bring you any therapists, any psychiatrists, any of her best friends, any of the people you would expect to feel comfortable about talking about something like this. All those people said I don't know anything about this. Instead, they bring you the former coworker of her dad, who we also didn't hear from.

And it turned out he didn't really know anything about what was going on. He didn't even know this case had anything to do with Uber or the alleged allegations had anything to do with Uber. And he didn't know anything about what was alleged to have occurred, only that there was some issue, something happened. That's what he told you. She just said he had an issue.

And he talked a lot about sharing a place at lake with the Mensings and knowing Mr. Mensing, Ms. Mensing's father, boating activities, things like that.

But what was real clear from the text that he sent to the plaintiff's lawyer is that he was fishing for money. Mr. Yankowski said to sent this text to the plaintiff's lawyers when we called and asked him, Hey, what do you know about the case? And what it said Uber contacted me, exclamation point, to the lawyers, to the plaintiff's lawyers. I declined and asked nicely not to be contacted again unless I am paid.

Mr. Yankowski demanded payment before he would say what it is that he even knows about what happened here, and you all take that into consideration when you evaluate his credibility.

The judge instructed you on the list of things you should consider and whether somebody has a financial interest is right on that list. He wouldn't talk unless he got paid.

And when Mr. Brown was trying to ask him about that, the testimony was very bizarre. Well, your text says, I decline and ask you not to contact me unless I'm paid. And he says, Well, the concept was I'm not asking for money. I'm doing this out of respect. I'm doing this for the goodness of the world. And Mr. Brown said, Okay, I'm just trying to understand, though, it says that you're not going to do it unless you get paid. Well, nobody's paying me. It went on a couple more times. And none of these explanations make any sense. Who are you, what are you, I don't want to talk to you. Remember Mr. Brown just trying to get an answer? Why would you say you got to be paid? Ultimately, Mr. Yankowski said, I don't know. It just came out.

This doesn't make any sense. The idea that you would confide in your dad's former coworker over your treating psychiatrist or your best friend to whom you are inseparable and talk about every day -- talk to every day? It doesn't make sense.

And Mr. Yankowski's answers were not credible, and he demanded compensation before he would talk to anybody. Mr. Yankowski did not support the lawsuit claims that are being made in this case.

That's it. Those were the people. These were the fact witnesses. Those are the folks who supposedly give you the greater weight of the evidence. They don't even get you

to 50 percent because nobody corroborated the story and nobody knew about the details that are being alleged in this case. And believe it or not, they only brought you one expert witness, Dr. Valliere, and unbelievably she didn't know anything about Ms. Mensing. She didn't talk to her. She didn't evaluate her. She didn't look at the medical records. She didn't even know if she was in the courtroom or not. That's unbelievable. The only person, the only expert. They have the burden of proof. They have to bring you the evidence to convince you it's more probable than not, and the only expert doesn't even know her name.

And then we found out that was intentional. We found out she wrote a book, a book about tips for lawyers. And what she wrote in the book is that in order to avoid an expert being accused of being biased, just don't look at any case specific materials. The best way to protect yourself on cross-examination according to Dr. Valliere is to stay in the dark, and that's what she did. She had no idea about anything about this plaintiff.

And then she had this odd opinion for you all that was essentially like, well, maybe you could be telling the truth or maybe you could not. She listed all sorts of things, like when you report, if you report, if your story is consistent, if you continue to take Uber or if you don't, and she said these things could happen if you're telling the

truth and these things could happen if you're making a false accusation. Maybe, maybe not. Keep using Uber, you might be making a true accusation or you might be making a false accusation.

None of this made any sense and none of it was helpful in trying to get to the bottom of what you all are here to decide: Did this happen? Did they meet their burden of proving to you that it's more likely than not that it did? They haven't come close.

She talked to you about there aren't a lot of false reports. The numbers are talking about making false reports. She's talking about reports to law enforcement. She's admitted to you she's done no evaluation of people who make false reports in the context of a lawsuit for money, which is the only way this alleged incident was reported.

The judge went over with you the instruction on credibility of a witness. I would submit to you all that all of the things Dr. Valliere talked about, memory, the manner in which you're testifying, bias, those are all things that you in your sound and good judgment will consider where you evaluate the evidence that came in in this case.

And Dr. Valliere ultimately admitted that. It is your job, not hers, to determine credibility and to evaluate the evidence that was brought to you.

The final section I want to go through with you all

real quickly before the other side has a chance to get up again.

Plaintiff's memory is not clear. And this is not disputed during the course of the evidence of the trial. And I say this not to shame or embarrass or make a big deal out of a terrible substance abuse addiction. Because we all have people in our lives who have been touched by terrible issues with substance abuse, and we know how awful it is for the person and the families. And we mean no disrespect in defending this case, in proving to you all that they have not met their burden, we mean no disrespect. We tried to do this as quickly as we could and in the most sensitive way.

But Ms. Mensing, she told it to you herself that the substance abuse has had an impact to remember things. It's undisputed it came from the plaintiff herself.

You heard from Dr. Reminick that 100 percent of substance abuse diseases can lead to short-term and long-term memory.

And you heard from Dr. Reminick, the only expert to evaluate the plaintiff. And think about that. In a case where the plaintiffs have the burden of proof, they don't bring you anybody who examined their own client. It is unfathomable to suggest to you all that they have met their burden by the greater weight of the evidence and nobody on that side evaluated the plaintiff. It's unheard of.

And Dr. Reminick, the only one who did do an examination, told you that her memory seems -- memory impairment seems pervasive. When examining her she often says, I don't remember. I found her to be a poor historian of her own history.

There's no evidence of the other side. When you're evaluating greater weight of this evidence, it's the only evidence. They brought you nothing in response to this.

The medical records in evidence show exactly what Dr. Reminick found on her own examination. That Ms. Mensing unfortunately experienced diminished concentration or indecision (cognitive impairment).

And you heard unfortunately that the time period that you all are here to consider was a difficult time period for Ms. Mensing as it relates to her struggles that 2018 to 2019 was really the height of her abuse addiction. And you heard a little bit about how that affected her ability to recall exactly what is the subject of this.

(Video clip played to the Court and jury)

MS. BROWN: You heard, in fact, that Ms. Mensing doesn't know where she was picked up. This lawsuit involves one ride on the early morning hours of March 26, 2019. And it was clear in questioning that the address at which she was picked up was not her friend's address. And she said she doesn't know where she was. That maybe she walked down the

street. She's not sure. She didn't know how long it took to get picked up, and she doesn't know where it was. And she says, Who cares? Why does it matter? But it does matter.

I don't remember that part of the night because it was a really long time ago. Well, that's the night and that's the ride that formed very serious allegations she's made against Mr. Richardson and Uber. It does matter, and she has the burden of proof in this lawsuit and that matters a lot.

You saw this earlier. She doesn't recall. She does not recall what happened in the 24 hours. We spoke about this -- and I won't belabor it because I'm getting to the end here -- but you heard testimony and you saw medical records about how difficult a time period this was with daily heroin, crack cocaine, and alcohol abuse leading right up to the time of the Uber ride

And you heard testimony from Ms. Watkins that in her experience as her very, very best friend at the time this was going on everyday

You saw medical records that at this time the treating physicians determined a severe addiction to opiates, cocaine, and cannabis

now, you heard Mr. Young, and he tried to downplay the addiction at the time he was living with Ms. Mensing. But then we show him and talk to him about a medical record

where he had to take Ms. Mensing to rehab. And Ms. Mensing unfortunately didn't want to participate in that at that time, which is a function of her disease. She was out in the parking lot chugging wine with another girl. And this was the very scary and serious incident where she kind of jumped out of the car as Mr. Young was trying get her treatment

And we bring this up only to show you, one, Mr. Young was not credible in some of the testimony he gave. Where here he says maybe she was drinking on weekends, not that often. Well, he took her to rehab for a very serious problem. And, number two, to just show the extent of her disease. This was a difficult, difficult time.

And, in fact, you heard just a few months before the Uber incident her medical providers terminated their care. And they did that because she needed something much more intensive, and unfortunately the record shows she never got it.

This is important. You saw these two records, and Dr. Reminick explained to you it is not uncommon that people who are struggling with substance abuse are not able to -- not able or not willing to candidly report what they're using.

And here's an example of the record on the left where she reported she had had just a few beers. She reported this on November 1st. And just two weeks later came

back to say I lied and those aren't my words. That's in this medical record. Client reported she lied to the therapist last week and actually did relapse on cocaine and alcohol

And in this lawsuit she said to you on that night she only had one beer. And you have to look at the rest of the records and the evidence as to the state of her addiction at the time that she herself said when she was using she was using everyday, that her best friend said this was unfortunately something that she struggled with everyday. That Dr. Reminick, the only expert to testify to you, said that there are no sober days, unfortunately, for folks in the throes of an addiction like this one

And they didn't bring you anybody to tell you otherwise. We heard that they had Ms. Mensing sit for an evaluation with a therapist, a psychiatrist on their side, an expert that they had her sit down with and they didn't bring that person in here. And you guys know if that expert psychiatrist would have supported these lawsuit claims, they would have put her up on the stand, but they didn't, and you know why.

Dr. Reminick told you that in terms of any clinically significant symptoms, she experienced no threat of death or serious bodily injury, no symptoms over a period of time, and she didn't exhibit this psychiatric condition known as avoidance where you don't do the thing that you alleged

caused you an emotional disturbance. Here we know she continued to use Uber. She continued to use Lyft late at night with male drivers to places that are not necessary to go to.

Dr. Reminick told you there are actually is no diagnoseable condition for a 24-hour period. She's asking you to award money damages for 24 hours, and there is no expert testimony of what that would be for. There is no condition. And no one came in here to tell you what that is. They have the burden of proving that to you, and they did not meet their burden

This is where the evidence landed, and they have not come close to proving to you that it is more probably true than not that this happened. They brought you no expert witness, no expert psychiatrist. The only expert they brought you knows nothing about the plaintiff. The only fact witness they brought you has no details about what happened. And everybody else either denied it happened, no details of when it happened, or reported the wrong time period. That cannot be the greater weight of the evidence.

And so I very respectfully submit to you all the only answer to this question has got to be "No," and then you stop because they have not met their burden. They have not proven to you it is more probable than not that this happened. There's no witnesses. There's no documents.

There's no testimony other than Ms. Mensing's that would support these claims

THE COURT: Counsel, I think you should finish.

MS. BROWN: Yes. Thank you, Your Honor. Just two more minutes and I will be done. Thank you.

And one thing I want to leave you folks with when you get to the back, somebody might say let's -- let's just give her some money because she is struggling right now and Uber's got money, and let's just give her a little something. Who is going to care? And you can't do that because that would be a verdict based on something other than the evidence. And the judge read you your oath as jurors that you will not be influenced by personal likes, dislikes, opinions, prejudices, or sympathy. We all feel so bad for what Ms. Mensing is going through.

And counsel talked about an apology. I am sorry that she is struggling with what she is struggling with, but your verdict cannot be based on that for Ms. Mensing. Your verdict has to be based on the greater weight of the evidence, and they have not brought you that evidence and you have to say "No." And you can't award a small amount of damages on this evidence. You can't even award $1 on this evidence. The answer to that question has got to be "No."

Counsel gets to come back and I hope --

THE COURT: No. I think you have finished. You've

exceeded the allotted time.

MS. BROWN: Thank you, Your Honor.

THE COURT: By eight minutes.

So thank you very much.

MS. BROWN: Thank you, jurors. Thank you very much for your attention and for your service in this case. We appreciate it.

THE COURT: Okay.

Ladies and gentlemen. We're going to take a recess now until 10 after 11:00. Remember the admonition given to you. Don't discuss the case, allow anyone to discuss it with you, form or express any opinion. And then we'll resume with the rebuttal argument.

(The jury exited the courtroom.)

(The proceedings were recessed at 11:13 a.m. and reconvened at 11:20 a.m.)

THE COURT: Please be seated.

Just so you understand the time, the plaintiff started at 9:36 and concluded at 10:22, which is 26 minutes. The defense started at 10:22 and concluded at 10:55 instead of 10:47. So it was about seven extra minutes by virtue of the sidebar. However, I'm not giving the plaintiff any more time. In other words, they have to make their argument in 25 minutes or 24, 25 minutes.

MS. BROWN: Your Honor had indicated they could

only reserve 15 minutes for rebuttal.

THE COURT: No, I didn't say that. If I did say that, that's not what I meant. I meant both sides should have 45 minutes, but they couldn't put the majority of their argument in rebuttal. So I'll cut counsel off at 24 minutes if he goes over.

My suggestion is make it 20 minutes or less. Okay?

MS. BROWN: Um-hum.

(The jury entered the courtroom.)

THE COURT: Please be seated. Let the record reflect all jurors are present. We may now have the concluding argument.

MR. SMITH: Good morning, everybody.

No evidence? No evidence. That's what she said several times, there's no evidence.

And you got the jury instructions. You'll have them back there. One of the things that is evidence is testimony, testimony under oath.

A woman came in here a few days ago and she sat right there and she told you in detail exactly what happened to her. Exactly what happened to her. That's not enough for Uber. In Uber's mind, that's not evidence. That's not enough. They may tell people that's enough outside of here, but it's not enough when you come in here to them. Okay? Fair.

What about all the people that say, Yeah, Brianna told me that? Yeah, I remember that. Oh, I remember sitting here checking the security cameras. Nope, nope, nope. They don't count either. They're all lying. They're all lining. Why? Well, it's her mom, it's her friend, it's her dad's friend. Those are the people we talk to. Those are the people we have in our lives. So anybody in this world comes in and says something bad to them and tell their family and friends about it, well, no, they don't count, they're your friends and family, they're biased. They're trying to help you. Okay?

What's it going to take? When will Uber -- what kind of evidence does Uber need to actually believe a woman? Because we know what happened here. They took his side of the story without even hearing it. Before they even heard, it they said she's not telling the truth. She can't be because they won't accept it. And we know why. Because to accept it means they have to pay somebody something. Anything, something. They don't want to do that. They won't part with a penny. They will drag you and your family through the mud to save a penny.

MS. BROWN: Your Honor, I object to that.

MR. SMITH: That's what she told you.

THE COURT: It's argument. You may proceed.

MR. SMITH: And I -- you have to really step back

and think about there are things happening in this trial and it there are lawyer games. There are lawyer games, okay? They're taking bits and pieces of what people say and they're trying to make you think that's the whole story.

If you noticed during that closing argument did you see a clip of any of the witnesses sentencing we had videos of these people. No. They retyped the testimony and they had a little squiggly or three dots to say oh, it's taken from the transcript.

Let's look at what Neal Young said.

If I could have the ELMO, please.

Neal Young, Ms. Brown was talking about Neal Young in his testimony. And she had up on the screen the question about what did he say? What do you recall? Okay?

Mr. Young said, I recall her searching the video. I recall her searching the video. Right. That's the clip I showed you, that full clip.

And when did that happen? Around March of 2019. Okay.

And then what did -- what did Ms. Brown do in her slide? I don't know if you noticed this, but she cut off the first half of this question that starts at 26:16. That says other than seeing Ms. Mensing searching the video records, and she cut it off and started right here at did.

Oh, you can't see that. I apologize. Started

right here at Did. Did. And she put a little bracket. When you do that and it's not upper case and -- really, lower case, you got to put the little bracket. She did that and she cut off that piece of the testimony so you won't see. The beginning of that testimony was other than searching. Other than seeing Ms. Mensing searching the video cameras, what did she tell you?

That's ridiculous. It's ridiculous that she would do that in front of you and act like I wasn't going to catch it. She hoped we didn't catch it. I did.

And then she had this strange argument that why would Neal remember it? Well, you heard Ms. Mensing. She said there and she said I got in that night. I ran to check the security camera footage to see if he was still outside. To see if she was still out. Remember this Neal's house. Neal's high school. She just moved in recently.

And then in the morning what did she do? She checked it again because Neal was asleep that night. In the morning she checked it Neal's there and he seize her. What did she ask him? Does this record? Does this record? Can I go back in time? Can I find evidence? That's when she tells him no. She doesn't know it's a live feed. That's why she's checking it again. I mean, it's simple.

You heard Ms. Brown -- I was surprised she put up a Google Maps image of the house and she said, Oh, you know,

Dr. Valliere talked about drivers and offenders they want to get away with this. They do it in certain circumstances. And it was a daytime shot of the house, a daytime shot. And she said, Oh, it's a busy highway. This happened at 2:00 in the morning. 2:00 in the morning. She didn't show you the nighttime view of that. 2:00 in the morning. It's not a busy highway there. That's a secluded spot. Oh, there were security cameras? Mr. Richardson knew there was security cameras. It was her boyfriend's house. Mr. Richardson knew that? No. It's a dark car, it's late at night on a highway, but it's not the interstate. It's a highway, straight.

And there was an argument about Mr. Mr. Richardson because he was large and he was in a Nissan Maxima that couldn't have -- no one could sit in the front seat. I don't know if you've ever been in a Nissan Maxima. I have. There is plenty of room for a very large seat room to sit in the driver's seat and another person in the passenger's. Just is. That's why it's called the Maxima.

Then they said they waited three years, she waited three years. Well, she told you why. She's standing up to a powerful company like Uber is not easy. What happens when you do it; they bring your family and friends. They say they're all liars for one reason or another if they all support your story.

And then she said this.

If I can get the ELMO again. I'm sorry.

"I'm here because this is ridiculous that it keeps happening to women. This is crazy that they won't take accountability."

I mean, I think we all know people who have suffered with this kind of thing, the sexual assault people not believing them, it be getting hard to get anybody to listen.

It's been happening again. They've been trained that it's wrong and it's happening again.

And there was this business about the PFS, the plaintiff fact sheet. The plaintiff fact sheet and there's some changes made. Go back and look at it. See some of the things she changed. See that she changed one of member employers was not the USPS but UPS. Hmm, was she lying when somebody at the law firm wrote USPS and then she had to update it to say UPS? No. It was because somebody wrote that it was incorrect. She fixed it.

I'm surprised you saw an expert sit in that stand $3,600 for five minutes and to testify and she had similar mistakes and she had a whole report that she wrote and the documents she considered and thinking of Ms. Mensing there were names of people she never heard of. Okay. Mistake, I get it. I guess it's a mistake. We give you that grace, Dr. Reminick. What grace does Uber give Brianna Mensing?

None. None.

And you heard I think in opening -- and I almost thought she was going to do it in closing, but in opening Ms. Brown played a clip from a recording of the defense medical exam with Dr. Reminick. You never heard that recording ever again.

MS. BROWN: Your Honor, they objected to it. That's unfair.

THE COURT: Counsel, counsel can comment on what the evidence is. Opening statements are not evidence. Opening statements are not evidence and so if a counsel says that something is going to be in evidence, that doesn't make it in evidence. So then it's a question of whether it's admitted if it's not admitted because it's been objected to and I sustained the objection, then it's not in evidence and counsel can comment on it.

MS. BROWN: Yes, Your Honor.

MR. SMITH: Well, yep, it's not in evidence. There's no recording. But we did ask Dr. Reminick about it. I think -- I mean, hopefully you remember we asked her about it. We said that recording, you made that recording right. She said, yeah, because it was a Zoom conversation with her and Ms. Mensing.

And Mr. Boundas asked her. And on that recording she told you about what happened, right? Yeah. She told me

all the details about what happened on that Uber ride. And she was consistent in how she described it. And even telling her on that day about that Uber ride she was upset, she needed toe take a break. That was Dr. Reminick. She admitted that here right in front of you.

And then what did she admit? She admitted that she also said I needed to delete that recording. I needed to delete that recording.

Now, why? Why would the perinatal memory doctor think that she would need to delete a recording of the plaintiff when the key question in the case is has the plaintiff been consistent with what she's saying? Because that's evidence of consistency. I can't have that in the trial. We can't have that. We've got to delete that, but she couldn't delete it. They had to turn it over. We got it. We got to ask questions to Ms. Reminick about it, and the truth is that it showed the plaintiff was consistent. Consistent.

I told you this. Your verdict is going to reverberate. I mean, look the people in this room. There are lots of people -- I mean, the country is interested in this case because it's going to finally show what is a woman's dignity worth. It's going to finally say that.

But there's a message in on the other side too. There is a message on the other side to everybody here in

North Carolina, everybody here in Charlotte, and that message is if you stand up, you're getting it next. You're getting it next. We're going to take you, your family, everybody who supports you, we're going to call them liars too. We're going to put you through the ringer. Not because it's the burden of proof, but because we cannot accept that we're responsible. It's wrong. It's wrong.

Brianna said what happened. People supported her. She counts her testimony counts. The people who saw her in the aftermath of that testimony, count. The people who listened to her story, they count. And the people with who can't remember it, that's -- it happens it. Happens that people can't remember something that didn't happen to them that was told to them a long time ago.

So when you get back in that jury room, I really think, think hard about what a women's dignity is worth, right after she has been grabbed by a man who can't remember if he grabs people.

Ladies and gentlemen, before you begin your deliberations, elect one member of your jury as the foreperson. The foreperson will preside over the deliberations and serve as a spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of all the other jurors if you can do so. Your verdict

must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors and listened to their views. It is important that you attempt to reach an unanimous verdict, but, of course, only if each of you can do so after having made your own conscience decision.

Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and the effect of evidence simply to reach your verdict.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk signed by one or more of the jurors.

No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone, including the Court, how the jury stands whether in terms of a vote

count or otherwise until after you have reached a unanimous verdict or have been discharged.

Do not disclose any vote count in any note to the Court. A verdict form has been prepared for you. After you have reached unanimous verdict and unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign it and date it, and advise the clerk that you are ready to return to the courtroom.

And with that, I am sending you off on your deliberations. Thank you very much. The jury shall retire.

(The jury at 11:28 a.m. exited the courtroom.)

THE COURT: Okay. The jury has retired.

So I think if there is any issue as to any documents in evidence, not in evidence, when Ms. Scott returns you should go over them with her. Make sure that the video presentation or whatever it is. I don't know what it's called anyway. So that's appropriate.

And I don't think I have to say stick around, but stick around and we'll see what happens.

(The Court at 11:29 a.m. stood at ease waiting for a response from the jury.)

(At 2:00 p.m., the jury knocks with a question.)

(The jury entered the courtroom.)

THE COURT: Okay. Let the record reflect that the

parties are present, the jury is not.

The Court has received two notes from the jury. The first one reads as follows.

Please be seated.

Is the monetary amount actually decided upon by jurors? Or is this final number decided by judge or court? Okay.

And the second question is: What is an average for sexual assault for compensation in 24 hours?

All right. So the first is easy. I think both of them are relatively easy to answer. The first one would be as to two questions. One, is the monetary amount actually decided upon by jurors? Answer: Yes.

Question: Or is the final number decided by judge or Court? Answer: No.

The second question is: What is an average for sexual assault for compensation in 24 hours? What I would suggest is that there's no evidence as to the average. Or, I don't know, average -- no evidence for -- no evidence as to the average amount. Average amount of compensation.

Okay. Does anybody have any views on this?

MR. BOUNDAS: Yes.

THE COURT: Go ahead.

MR. BOUNDAS: Our view --

THE COURT: Pardon?

MR. BOUNDAS: Our view would be to tell the jury it is their decision and is in their discretion because even to suggest -- to say that there's no evidence --

THE COURT: There -- okay. Suggest that there could have been.

MR. BOUNDAS: Could have been, right. Exactly.

THE COURT: And there couldn't have been. There couldn't have been.

MR. BOUNDAS: Right.

THE COURT: There couldn't have been because the average -- oh, there is a number for average, but the question is what the average -- what they would want to know is what is the average compensation for an individual who is similarly situated as the plaintiff. So that would be all kinds of -- we've already spent months discussing that.

So I think the fair answer is this matter is up --

MR. WYATT: I think, Your Honor, the language in the instruction is using your common sense. I think I'd refer the jury back to that. There may not be another case, to be honest, referring to 24 hours, so the average may be zero. I think the instruction has the answer.

THE COURT: Please review a particular instruction?

MR. BOUNDAS: Yes, I agree. Just to reiterate the --

THE COURT: Which one is it? I just need to know

what we're talking about here.

MR. WYATT: I don't remember the name of it, but it's --

THE COURT: Well, let's get the number or the name. They're all named. There only were 20 instructions, I think. I just don't have it.

MR. WYATT: It's the main damages instruction.

THE COURT: Pardon?

MR. WYATT: It's the main damages instruction.

MR. BOUNDAS: It's titled "Personal Injury Damages." It's on page 15 of the final instructions.

THE COURT: Okay. So is it all right if I say please review -- again, it's not answering.

MR. BOUNDAS: Your Honor, I would suggest an answer is to use the last line of that instruction, which says you are to determine what is fair compensation by applying logic and common sense to the evidence.

MR. WYATT: I think I agree with that.

THE COURT: Okay. Do you both agree?

MR. WYATT: Twenty-four hours --

THE COURT: You are --

MR. WYATT: Right.

THE COURT: To what?

MR. BOUNDAS: What is fair compensation by applying logic and common sense.

THE COURT: What is fair compensation.

MR. WYATT: I would add for the 24-hour period in there just so you have the complete concept in there.

THE COURT: Fair compensation, yeah.

MR. BOUNDAS: I think that's already in the instruction. No, no. I'm reading it.

THE COURT: Okay. You are to determine what is fair compensation based upon. You read it to me.

MR. BOUNDAS: Yes, I'm reading it to you. By applying logic and common sense to the evidence.

MR. WYATT: And we would add "if any." That's referring to the verdict form.

MR. BOUNDAS: I don't think that's necessary to the question they asked.

Well, I think it is because what they're getting out is how are we figuring out that the right option of damages, and one option is there are no damages. That's part of their task with to decide whether or not.

THE COURT: Let me read this. I want to get a sign-off if it's appropriate. You are to determine if there is fair compensation by applying logic and common sense to the evidence.

MR. WYATT: We agree.

I'm sorry. Can you read it one more time, Your Honor?

THE COURT: You are to determine if there is fair compensation by applying logic and common sense to the evidence.

MR. WYATT: We would suggest "if any."

MR. BOUNDAS: I was just quoting the chart.

THE COURT: I'm not going to say "if any."

MR. BOUNDAS: Okay.

We say if there are no damages, they'd put $1. They would say it there. And if there are damages, it would come in. Right.

THE COURT: So I don't want to short shrift your objection, to the extent you're objecting to it.

MR. WYATT: I made my point, Your Honor. I don't want to elaborate on it. I understand the Court's ruling.

THE COURT: I'm going to send this in. Thank you, everybody.

MR. WYATT: Thank you, Your Honor.

(The Court at 2:13 p.m. waiting for a response from the jury.)

(The jury knocks on the jury room door at 2:25 p.m.)

THE COURT: Be seated.

The Court has received a note from the jury that it has a verdict, and so we will bring in the jury.

And I want to just advise the parties the next MDL

bellwether case is set for September 14th. It's going to be in San Francisco. I think we set it for September 14th, so be aware.

(The jury entered the courtroom.)

THE COURT: Okay. Let the record show all jurors are present.

Ladies and gentlemen of the jury, I received a note from your foreperson that you have arrived at a verdict. Would you hand it to Ms. Scott. She'll come around.

Okay. Would you read the verdict.

THE COURTROOM DEPUTY CLERK: Ladies and gentlemen of the jury, listen to your verdict as it will stand recorded.

United States District Court Northern District of California, San Francisco Division, In Re: Uber Technologies, Inc. sexual assault litigation 3:23-MD-3084.

WHB 823 v. Uber Technologies, Inc., United States District Court, Western District of North Carolina. The case number 25-CV-737, Judge Honorable Charles R. Breyer.

Do you find that Jeffery Richardson committed a battery against plaintiff? Yes.

In what amount, if any, was plaintiff damaged? $5,000.

Dated April 20th, 2026. Juror Foreperson Number 6 signed the verdict.

THE COURT: Okay. Does either side want the jury polled?

MS. BROWN: Yes, Your Honor.

THE COURT: Will you poll the jury.

THE COURTROOM DEPUTY CLERK: Juror Number 1, is the verdict read your verdict?

JUROR NUMBER 1: Yes.juror Number 1.

THE COURTROOM DEPUTY CLERK: Juror Number 2, is the verdict read your verdict?

JUROR NUMBER 2: Yes.

THE COURTROOM DEPUTY CLERK: Juror Number 3, is the verdict read your verdict?

JUROR NUMBER 3: Yes.

THE COURTROOM DEPUTY CLERK: Juror Number 4, is the verdict read your verdict?

JUROR NUMBER 4: Yes.

THE COURTROOM DEPUTY CLERK: Juror Number 5, is the verdict read your verdict?

JUROR NUMBER 5: Yes.

THE COURTROOM DEPUTY CLERK: Juror Number 6, is the verdict read your verdict?

JUROR NUMBER 6: Yes.

THE COURTROOM DEPUTY CLERK: Juror Number 7, is the verdict read your verdict?

JUROR NUMBER 7: Yes.

THE COURTROOM DEPUTY CLERK: Juror Number 8, is the verdict read your verdict?

JUROR NUMBER 8: Yes.

THE COURTROOM DEPUTY CLERK: Juror Number 9, is the verdict read your verdict?

JUROR NUMBER 9: Yes.

THE COURTROOM DEPUTY CLERK: Your Honor, the verdict is unanimous.

THE COURT: You may enter and record the verdict.

Ladies and gentlemen of the jury, I wanted to come down and face you because I want to say thank you. It's never easy to sit on a jury. It's difficult to pass judgment.

And I not only want to say you all have very welcoming to us to come here and try this case. It's more than that. You have really given us your time, your emotional energy, your intellect, you listened attentively, and always idly, and your time. The Court is very grateful and I'm sure the parties are. I have some other remarks I'd like to make to you in the jury room. If you'd retire to the jury room, I'll be back there in a few.

One other thing I want to say. You are now free to talk to anybody or not talk to anybody. They are your First Amendment rights. You have been restored to all.

(The jury exited the courtroom.)

THE COURT: And now, of course, please be seated.

I'd like to thank the parties, counsel on both sides for your courtesy granting the Court and staff every accommodation. It has been a pleasure trying the case here.

What I'm going to do. This is a bellwether case, which means that it was picked out of roughly 3,700 cases to be tried and to determine what does a jury -- as I always like to say "real people" -- think about the case. The second one I've done and I intend to do another one in San Francisco.

So in order for it to accomplish more of what its purpose is, I'm going to see if any of the jurors want to come back and discuss the case. And they'll sit in the jury box. However, I want to clear the courtroom and just have, you know, maybe five lawyers from each side here if they -- if they wish. You don't have to have five, but if you'd like to have five, it may be useful. And they'll come back.

Again, it is my really sincere appreciation. What they say about southern hospitality is true. It's really wonderful.

As I said to one of the judges, I don't think I've been called "sir" this many times since I've been out of the Army 60 years ago. So people are very -- are very polite, very helpful, very thoughtful. And it is a pleasure being in North Carolina. It's a wonderful state. And I just want to

thank you all for making it so accommodating to Ms. Scott, Mr. Cullen. The court reporter is lucky enough to be here. But it has been a real pleasure. So thank you very much.

And I will send the jurors who want to speak back here into the courtroom.

We are adjourned.

(The proceedings concluded at 2:36 p.m.)

* * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 20th day of April 2026.

/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CRC
U.S. Official Court Reporter